1  Lesley E. Weaver (SBN 191305)
   Matthew S. Weiler (SBN 236052)
2  BLEICHMAR FONTI & AULD LLP
   555 12th Street, Suite 1600
3  Oakland, CA 94607
   Tel.: (415) 445-4003
4  Fax: (415) 445-4020
   lweaver@bfalaw.com
5  mweiler@bfalaw.com
6
7  Michael P. Lehmann (SBN 77152)
   Bonny E. Sweeney (SBN 176174)
8  Christopher L. Lebsock (SBN 184546)
   Samantha Stein (SBN 302034)
9  HAUSFELD LLP
   600 Montgomery Street, Suite 3200
10 San Francisco, CA 94111
   Tel.: (415) 633-1908
11 Fax: (415) 358-4980
   mlehmann@hausfeld.com
12 bsweeney@hausfeld.com
   clebsock@hausfeld.com
13 sstein@hausfeld.com
14
15 *Co-Lead Interim Class Counsel*
   [Additional counsel listed on signature page]
16
17                  **UNITED STATES DISTRICT COURT**
18              **NORTHERN DISTRICT OF CALIFORNIA**
19
20 IN RE INDUCTORS ANTITRUST          Case No. 5:18-cv-00198-EJD-NC
   LITIGATION
21                                     **CONSOLIDATED AMENDED CLASS
                                       ACTION COMPLAINT**
22
23                                     **CLASS ACTION**
24                                     JURY TRIAL DEMANDED
25
26
27
28

TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................1

II.    JURISDICTION AND VENUE ...............................................................6

III.   PARTIES ................................................................................................7

       A.    Plaintiffs ....................................................................................7

       B.    The Murata Defendants .............................................................8

       C.    The Panasonic Defendants .........................................................9

       D.    The Sagami Defendants............................................................11

       E.    The Sumida Defendants ...........................................................12

       F.    The Taiyo Yuden Defendants...................................................14

       G.    The TDK Defendants ...............................................................16

       H.    The Tokin Defendants ..............................................................19

       I.    Agents and Co-Conspirators.....................................................20

IV.    AFFECTED COMMERCE ....................................................................21

       A.    The Defendants' Conduct Involved Import Trade or Import Commerce and
             Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S.
             Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and
             Class Members' Antitrust Claims ............................................21

       B.    The Defendants Targeted the United States ..............................24

V.     FACTUAL ALLEGATIONS..................................................................29

       A.    Inductors Generally and Types of Inductors ...........................29

       B.    The Structure of the Inductor Market Is Conducive to Collusion ..................34

             1.    Market Concentration.....................................................34

             2.    Product Commoditization................................................35

             3.    Entry Barriers .................................................................36

             4.    Demand Inelasticity........................................................38

             5.    Declining Demand and Excess Capacity...........................39

| | | | |
|---|---|---|---|
| | C. | The Conduct of Defendants, the Investigation by the DOJ, and the Use of Trade Associations Strongly Support The Assertion That Defendants Colluded | 40 |
| | | 1. | Summary of Defendants' Unlawful Conduct | 40 |
| | | 2. | Conspiratorial Acts Conducted Through JEITA | 43 |
| | | 3. | Subpoenas Issued by DOJ | 52 |
| | | 4. | Involvement of Some Defendants in Other Conspiracies | 53 |
| | | 5. | Use of Trade Associations Other than JEITA to Facilitate and Organize the Conspiracy | 56 |
| | | 6. | Other Interactions | 58 |

VI.   TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT .......................................................................... 59

VII.   CLASS ACTION ALLEGATIONS ........................................................ 62

VIII.   CLAIM FOR RELIEF ........................................................................ 64

IX.   DEMAND FOR JUDGMENT .............................................................. 65

X.   JURY DEMAND ................................................................................. 67

1.      Plaintiffs Arch Electronics, Inc., Cambridge Capital Corporation, Dependable Component Supply Corporation, Lifetime Service Center, Inc., Powerweb, Inc. and Powerweb Energy, Inc. ("Plaintiffs") bring this action on behalf of themselves and on behalf of a class of all similarly situated persons and entities in the United States, its territories, and the District of Columbia (the "Class") for damages and injunctive relief under Sections 15 and 26 of the Clayton Act (15 U.S.C. §§ 15 and 26) for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against Defendants Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Murata Power Solutions, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd; Panasonic Electronic Devices Corporation of America; Sagami Elec Co., Ltd.; Sagami America, Ltd.; Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of America; TDK U.S.A. Corporation; Tokin Corporation; and Tokin America, Inc. (collectively "Defendants").[1] The allegations in this Consolidated Amended Complaint ("CAC") supersede all others in earlier complaints filed in connection with this litigation. Plaintiffs allege as follows, based on information and belief, except as to themselves.

## I.      NATURE OF THE ACTION

2.      This action is based on a scheme by Defendants to fix prices of Inductors (as defined herein) that were purchased by entities or persons in the United States, its territories, or the District of Columbia (including through controlled subsidiaries, agents, affiliates, or joint ventures) during the period from at least January 1, 2003 through December 1, 2016 (the "Class Period").[2]

---

[1] Plaintiffs reserve the right to amend their CAC once the identities of any further alleged conspirators are established.

[2] The Class Period alleged here differs from the potential Conspiracy Period. As explained below, it is possible that the Conspiracy Period ended by September of 2014, but the effects of Defendants' conspiracy lingered on, causing injury and damage to members of the proposed Class for a period thereafter. Plaintiffs' investigation is ongoing, and Plaintiffs have conservatively chosen a Class Period that commences in 2003. Some Plaintiffs purchased millions of dollars of Inductors from Defendants prior to January 1, 2003, and formal

3.      As used herein, the term "Inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer Inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching. Along with resistors (a component having a specific amount of resistance to the flow of an electrical current) and capacitors (a two-terminal electronic component that stores potential energy in the form of an electrical field), Inductors are viewed as part of the category of "passive electronic components." Along with capacitors and resistors, Inductors are one of the most common passive linear elements in electronic circuits and thus are ubiquitous in thousands of products that rely on electronic circuits for power. As explained in more detail below, Inductors are now found in a wide variety of electronic equipment, including: (a) smartphones, laptop and desktop computers, video game consoles, wireless LAN (Local Area Network) boxes, and other types of consumer electronic equipment; (b) televisions; (c) advanced driver assistance systems ("ADAS") used in vehicles; and (d) induction motors that are used in industry to convert electrical energy into mechanical energy.

4.      In 2015, the global market for Inductors was estimated to be worth $2.599 billion. As explained below, the Defendants control over 75% of the global Inductor market, and during the Class Period controlled as high as 80% of the global Inductors market.

5.      As alleged herein, the Defendants formed a cartel to fix and stabilize the prices for Inductors sold or shipped to the United States, its territories and the District of Columbia and world-wide. Defendants acted to stabilize prices of Inductors as a reaction to a series of shocks to the Inductors market that began in the late 1990s resulting from increased competition from Chinese, Korean and Taiwanese manufacturers. The global recession of 2001 exacerbated these effects, as demand for the consumer electronics goods plummeted.

discovery may reveal that prices from 1999 through 2001 were supracompetitive. Plaintiffs reserve the right to amend their CAC with respect to the Class Period following further investigation.

6.      The Defendants' cartel activity arose out of a need to protect profits of these Japan-based companies from the competition created by the entry in December of 1997 of twenty-nine nations (including Japan and the United States) into the Information Technology Agreement ("ITA"), which eliminated tariffs on world trade of various IT products, including Inductors. The situation worsened for Japan-based manufacturers in 2003, when China agreed to enter into the ITA. The need to stabilize prices became especially prominent following the global recession in 2001, when sales of Inductors to North America dropped by 35%.

7.       Despite these dramatic changes, prices for Inductors remained stubbornly high during the Class Period. This is because the Defendants exchanged competitively sensitive information, such as price and anticipated volume of sales, with their competitors for the purpose of reaching agreements to maintain artificially high prices.

8.      The following chart, taken from Federal Reserve Economic Data ("FRED") maintained on a database by the Federal Reserve Bank of St. Louis, shows the effects of the Defendants' conspiracy:



9.      The chart depicts a Price Index for imported Inductors (as well as related types of electronic equipment, such as transformers)[3] using the data from the year 2000 as a baseline. As can be seen, import prices for Inductors started to plummet drastically in January of 1998

---

[3] A transformer is a device that makes use of two coupled Inductors to increase or decrease voltage levels, so Inductors are significant components of transformers.

and reached a nadir by October of 2003, six months after China agreed to enter into the ITA. Thereafter, the import prices of Inductors increased radically, including two major price spikes in July of 2008 and April of 2009, the period of the worldwide recession. Import prices of Inductors climbed steadily, reaching a peak in August of 2014. While prices have since declined slightly, they never returned to their pre-2003 levels, spiking again in August of 2017.

10.      Increased costs of raw materials do not explain the increases in the Import Price Index for Inductors. The following chart depicts how the Raw Material Price Index for passive electronic components stabilized for much of the period between November of 2012 and January of 2016 and declined in the latter portion of that period to the point where it was below its levels in 2012:



11.      Increases in demand do not explain the huge increases in the Import Price Index for Inductors. For example, analysts noted that in March of 2009, the global market for passive electronic components generally had declined by 18% compared to the previous year and that by March of 2010, demand for passive electronic components had declined by an additional 13%. As noted above, contrary to sliding Inductor demand in these years, the Import Price Index for Inductors spiked. In Japan, exports of passive components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009, according to data available from MITI, the Japanese Ministry of International Trade & Industry.

12.      While use of Inductors in smartphones and ADAS increased in the years that followed, the costs of manufacturing these products declined. For example, by 2015, Air Core

1    Inductors (Inductors consisting of a coil wrapped around a ceramic core) occupied

2    approximately 40% of the market and were much easier to manufacture than other types of

3    Inductors. Yet the Import Price Index for Inductors in 2014-15 was at levels that vastly

4    exceeded those of 2009-10.

5         13.    The only plausible explanation for the discrepancy between higher or stabilized

6    Inductor prices during times of decreasing global demand and decreasing manufacturing costs

7    is conspiratorial activity.

8         14.    The same opportunities to conspire that fostered this conspiracy also fostered

9    opportunities for some of the same Defendants to collude in the market for capacitors. The

10   United States Department of Justice ("DOJ") obtained a series of guilty pleas with respect to a

11   conspiracy that extended from as long as September of 1997 through January of 2014.[4] The

12   conduct in question included, *inter alia*: (a) face-to-face meetings at which agreements to fix

13   the prices of capacitors were reached; (b) collusive bidding to customers who asked for pricing

14   on capacitors; (c) exchanges and monitoring of price, sales, bid, supply, demand, shipping and

15   production of capacitors; and (d) acts of fraudulent concealment of the conspiracy. The

16   Honorable District Judge James Donato has rejected some of the fines with respect to corporate

17   plea-takers as being too low.

18        15.    The DOJ's actions with respect to capacitors and its investigation into antitrust

19   violations with respect to resistors, another passive electronics component, have led to the filing

20   of two follow-on class action proceedings centralized before Judge Donato: *In re Capacitors

21   Antitrust Litig.*, No. 14-3264 (N.D. Cal.), and *In re Resistors Antitrust Litig.*, No. 15-3820 (N.D.

22   Cal.) ("*Resistor*s"). Defendant Panasonic Corporation is a defendant in both cases.

23        16.    It has been publicly reported that Panasonic Corporation approached the DOJ

24   and sought leniency with respect to the conspiracy regarding capacitors. Both NEC Tokin (the

25   predecessor of Defendant Tokin Corporation) and Taiyo Yuden Co., Ltd. also acknowledged

26

27   _____

     [4] *See* https://www.justice.gov/opa/pr/seventh-company-agrees-plead-guilty-fixing-prices-

28   electrolytic-capacitors.

1  publicly that they were cooperating with investigators with respect to the capacitors conspiracy.

2  Taiyo Yuden is also a defendant in this case.

3       17.     As was the case in the capacitors and resistors conspiracies, the conspiracy

4  regarding Inductors was carried out, in part, under the auspices of the Japan Electronics &

5  Information Technology Association ("JEITA"), which was formed in 2000. Each of the

6  Japanese Defendants is an active member of JEITA. Through attendance at formal JEITA

7  meetings and other meetings, as well as meetings of other trade associations described below,

8  the Defendants exchanged competitively sensitive information and reached agreements, just as

9  some defendants did in cartels concerning capacitors and resistors.

10      18.     On January 4, 2018, the legal media organization *MLex* first reported that certain

11  Japanese companies received investigative subpoenas from a grand jury empaneled in the

12  Northern District of California relating to an investigation of price-fixing activity in the

13  Inductors market. Globally, the Inductors market was several billion dollars or more in each

14  year of the Class Period. In the United States, hundreds of millions of dollars of Inductors were

15  sold during the Class Period.

16              **II.    JURISDICTION AND VENUE**

17      19.     Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to

18  recover equitable relief for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

19  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this

20  complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

21      20.     Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act

22  (15 U.S.C. §§ 12 and 22) and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly

23  transact business in this District. Additionally, a substantial part of the events giving rise to

24  Plaintiffs' claims occurred in this District. Specifically, some Defendants maintain offices in

25  this District, and all Defendants sell or seek to sell Inductors to electronics companies located

26  in this District.

27

28

21.     This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at purchasers of Inductors and/or products containing Inductors in the United States and in this District.

### III.     PARTIES

#### A. **Plaintiffs**

22.     Each Plaintiff purchased one or more Inductor or products containing Inductors from a Defendant conspirator or an entity owned or controlled by a Defendant conspirator. The purchases identified below were made at various times during the Class Period, beginning no earlier than January 1, 2003, ending no later than December 1, 2016.

23.     Plaintiff Arch Electronics, Inc. ("Arch") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Cheltenham, Pennsylvania. Among other things, Arch sells and installs consumer electronic equipment. During the Class Period, Arch purchased manufactured products containing Inductors directly from one of more of the named Defendants, their predecessor entities, their divisions, subsidiaries or affiliates, or their co-conspirators. These products contained one or more Inductors manufactured by a Defendant. Arch paid more than it would have in the absence of the conspiracy alleged herein.

24.     Plaintiff Cambridge Capital Corporation ("Cambridge") is a New York corporation with a principal place of business in Florida. Cambridge is the successor in interest to Univisions Crimson Holding, Inc. ("UCH"), a company that during the Class Period purchased manufactured products containing Inductors directly from one of more of the named Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators. These products contained one or more Inductors manufactured by a Defendant. Cambridge paid more than it would have in the absence of the conspiracy alleged herein.

25.     Plaintiff Dependable Component Supply Corporation ("Dependable") was incorporated under the laws of Florida. During the Class Period, Dependable purchased Inductors directly from one or more of the Defendants. Dependable paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

26.     Plaintiff Lifetime Service Center, Inc. ("Lifetime") is a corporation with a principal place of business in Williamsville, New York. During the Class Period, Lifetime purchased Inductors directly from one or more of the Defendants. Lifetime paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

27.     Plaintiffs Powerweb, Inc. and Powerweb Energy, Inc. (collectively, "Powerweb") are corporations with their principal places of business located In Philadelphia, Pennsylvania. Powerweb purchased Inductors directly from one or more of the Defendants. Powerweb paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

### B. The Murata Defendants

28.     Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that Murata Manufacturing had $15 million in sales of one type of Inductors (ceramic chip Inductors) in North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers of passive electronic components. Murata Manufacturing annually has revenues in excess of $5 billion from sales of passive electronic components, including Inductors.

29.     In March of 2014, Murata Manufacturing acquired a controlling interest in TOKO, Inc. ("TOKO"), a Japanese company that was a leading Inductor manufacturer that sold hundreds of millions of dollars of Inductors in the United States, its territories and the District of Columbia during the Class Period. According to estimates from one industry expert, TOKO had $47 million of sales of one type of Inductors (ceramic chip Inductors), in North America in 2007 alone. By April of 2015, Murata Manufacturing had assumed all aspects of TOKO's business, including its assets, sales, service, and technical support for the portfolio of TOKO

products, including Inductors. To the extent Murata Manufacturing assumed, in whole or in part, the assets and liabilities of TOKO, Plaintiffs intend to hold Murata Manufacturing liable for any violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by TOKO that occurred during the Class Period.

30.     Defendant Murata Electronics North America, Inc. ("MENA") is a wholly owned subsidiary of Murata Manufacturing. MENA is a Texas corporation with its principal place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors that were purchased throughout the United States, its territories and the District of Columbia during the Class Period.

31.     Murata Power Solutions, Inc. ("Murata Power") is a wholly owned subsidiary of Murata Manufacturing that was created in 2007 when Murata Manufacturing acquired a division of C&D Technologies, a United States company with its headquarters in Pennsylvania. Murata Power has its headquarters at 129 Flanders Road, Westborough MA, 01581. Murata Power sells Inductors to customers located in the United States. Murata Power had $5 million of sales of Inductors in the United States in 2007.

32.     Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth, Georgia.

33.     Defendants Murata Manufacturing, MENA, TOKO, and Murata Power will be referred to collectively herein as "Murata" or the "Murata Defendants."

C. **The Panasonic Defendants**

34.     Defendant Panasonic Corporation ("Panasonic Corporation") is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Panasonic Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors and products containing Inductors in the United States, its territories and the District of Columbia during the Class Period. Panasonic Electronic Devices Co. Ltd. ("PED") was a former Japanese subsidiary of Panasonic Corporation that was a leading manufacturer of

Inductors. It was founded in 1982 and was headquartered in Knoxville, Tennessee. PED had substantial sales of Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that in 2007, PED sold $10 million worth of one type of Inductors (ceramic chip inductors) in North America. In August of 2011, Panasonic Corporation announced that it was dissolving and absorbing PED in April of 2012. Panasonic Corporation is responsible for the acts of its wholly owned and controlled subsidiary PED, and Plaintiffs will seek to hold Panasonic Corporation liable for any violations of Section 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3) by PED that occurred during the Class Period.

35.     Panasonic Corporation of North America ("PCNA") was founded in 1959 and operated in the United States under the name "Matsushita Electric Corporation of America" until 2005. PCNA is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. PCNA was, throughout the Class Period, a wholly owned subsidiary of Panasonic Corporation. On December 22, 2016, PCNA became a subsidiary of Panasonic Holding (Netherlands) B.V. Investment ("Panasonic Holding"), which is wholly owned by Panasonic Corporation. According to Panasonic Corporation's Annual Report for the fiscal year ending March 31, 2017, Panasonic Holding is one of Panasonic Corporation's major consolidated subsidiaries and owns 100 percent of the voting rights in PCNA. Panasonic Consumer Electronics Company ("PCEC") is a division of PCNA, and Panasonic Broadcast and Television Systems Company is a unit of PCNA. During the Class Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled—sold and distributed Inductors to purchasers in the United States, its territories and the District of Columbia. These included Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corporation. Also, during the Class Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to purchasers in the United States, its territories and the District of Columbia products containing Inductors manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates. These included such items as televisions, stereo equipment, Blu-Ray/DVD players, and

1    cameras/camcorders. The Inductors contained in these products are identifiable by part number

2    in the records of Panasonic entities and can be traced either to an entity owned or controlled by

3    Panasonic Corporation or an entity owned or controlled by one of the other Defendants.

4           36.     Defendant Panasonic Industrial Devices Corporation of America ("Panasonic

5    Industrial"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation

6    with its principal place of business located at Two Riverfront Plaza, 7th Floor, Newark, New

7    Jersey 07102. On or about January 12, 2012, PED changed its name to Panasonic Industrial.

8    Panasonic Industrial sold Inductors and products containing Inductors manufactured by

9    Panasonic Corporation or its business units, subsidiaries, agents, or affiliates, which it wholly

10   owned and/or controlled, to purchasers in the United States, its territories and the District of

11   Columbia during the Class Period

12          37.     Defendants Panasonic Corporation, PED, Panasonic Industrial, and PCNA are

13   hereinafter referred to as "Panasonic" or the "Panasonic Defendants."

14          **D.  The Sagami Defendants**

15          38.     Defendant Sagami Elec Co., Ltd. ("Sagami Japan") is a Japanese company that

16   has its principal place of business at 10-30, Ichibashimo-Cho, Tsurumi-ku, Yokohama

17   Kanagawa 230-0024, Japan. Sagami Japan—directly and/or through its predecessors and

18   subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold

19   Inductors in the United States, its territories and the District of Columbia during the Class

20   Period.

21          39.     Defendant Sagami America Ltd. ("Sagami America") is a wholly owned

22   subsidiary of Sagami Japan. Sagami America has its principal place of business at 1854 South

23   Elmhurst Road, Mont Prospect, Illinois 60056. On its website, Sagami Japan lists Sagami

24   America as part of its "Global Network."[5] Sagami Japan manufactured, marketed, and/or sold

25   Inductors in the United States, its territories and the District of Columbia during the Class

26   Period.

27

28   _____
[5] http://www.sagami-elec.co.jp/en/company/network.php.

40.     Defendants Sagami Japan and Sagami America are hereinafter referred to as "Sagami" or the "Sagami Defendants."

**E.  <u>The Sumida Defendants</u>**

41.     Defendant Sumida Corporation ("Sumida Corporation") is a Japanese corporation with its principal place of business at Harumi Island Triton Square Office Tower X 14/F, 1-8-10 Harumi, Chuo-Ku, Tokyo 104-8547, Japan. Sumida Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

42.     Defendant Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103-8589, Japan. Sumida Electric—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, in 2007, Sumida Electric sold $27 million of one type of Inductors (ceramic chip Inductors) in North America, according to industry data. Sumida

//

//

//

//

//

//

//

//

//

//

//

//

Electric is wholly owned by Sumida Corporation, as reflected in the following graphic taken from its website:



43.     Defendant Sumida America Components Inc. ("Sumida America") is a Delaware corporation with its headquarters at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois 60173. It is a wholly owned subsidiary of Sumida Corporation. Sumida America maintains offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose, California 95131. During the Class Period, Sumida America—either directly or through its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled— sold and distributed Inductors manufactured by its business units, subsidiaries, agents, or affiliates or by Sumida Corporation to purchasers in the United States, its territories and the District of Columbia. As seen in the foregoing graphic, Sumida America is wholly owned by Sumida Corporation.

44.     Defendant Sumida Corporation exerts complete control over the activities of both Sumida Electric and Sumida America, as reflected in the following "Management Organization Chart of Sumida Group" from its website:



45.     The webpage containing this graphic explains:

The "Management Organization Chart" is to show the company hierarchy on formal reporting channel, chain of command and authority within Sumida Group in day-to-day operation and also in the decision and policy making process. SUMIDA CORPORATION ("Sumida") is a pure holding company and has been [sic] adopted the Company with Committee System. All three statutory committees (Nomination Committee, Audit Committee and Compensation Committee) are composed of external directors. Executive Officers are responsible for the business execution, and the Board of Directors is specialized in the business supervision in Sumida; thus business execution and supervision function is expressly separated in Sumida. Risk Management Committee is specialized in risk management in Sumida.[6]

46.     Defendants Sumida Corporation, Sumida Electric and Sumida America are hereinafter referred to as "Sumida" or the "Sumida Defendants."

## F.   The Taiyo Yuden Defendants

47.     Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan.

---

[6] https://www.sumida.com/about/index.php?categoryId=5&parentId=9&aboutId=9.

1    Taiyo Yuden Co.—directly and/or through its predecessors and subsidiaries, which it wholly

2    owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States,

3    its territories and the District of Columbia during the Class Period. In its 2017 Annual Report,

4    Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

5         48.    Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois

6    corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of

7    business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During

8    the Class Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries,

9    agents, or affiliates, which it wholly owned and/or controlled—sold and distributed to

10   purchasers in the in the United States, its territories and the District of Columbia Inductors

11   manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo

12   Yuden Co.

13        49.    Defendant Taiyo Yuden Co. exerts control over Taiyo Yuden USA. Corporate

14   policies are set by the parent company and govern the activities of the United States subsidiary,

15   as depicted in the following chart taken from Taiyo Yuden Co.'s website:

16

17

18

19

20

21

22

23

24

25

26   Note: The TM Meeting is an advisory panel for deliberations and decisions on matters concerning personnel, organizations, etc.

27        50.    Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to

28   herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants."

1

### G. The TDK Defendants

2    51.    Defendant TDK Corporation is a Japanese corporation with its principal place

3    of business at 13-1 Nihonbashi 1-chrome, Chuo-ku, Tokyo 103-8272, Japan. TDK

4    Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned

5    and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its

6    territories and the District of Columbia during the Class Period.

7    52.    Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with

8    its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku,

9    Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of

10   the passive components businesses of TDK Corporation and non-party EPCOS AG, a German

11   corporation. TDK-EPC—directly and/or through its predecessors and subsidiaries, which it

12   wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United

13   States, its territories and the District of Columbia during the Class Period. More specifically,

14   TDK-EPC itself develops and manufactures Inductors, which are sold by the TDK Defendants

15   under the TDK and EPCOS brands.[7] TDK-EPC is a wholly owned subsidiary of the TDK

16   Corporation.

17   53.    Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is

18   a wholly owned subsidiary of TDK Corporation with its principal place of business located at

19   525 RXR Plaza, Uniondale, New York 11556. TDK USA describes itself as a "group company

20   of TDK Corporation." During the Class Period, TDK USA—either directly or through its

21   business units, subsidiaries, agents, or affiliates—sold and distributed Inductors manufactured

22   by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation

23   and TDK-EPC to purchasers in the United States purchasers the United States, its territories

24   and the District of Columbia.

25   54.    Defendant TDK Corporation of America ("TDK America") is a wholly owned

26   subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite

27

28   [7] https://www.global.tdk.com/corp/en/news_center/press/aah34500.htm.

300, Lincolnshire, Illinois 60069. Like TDK USA, TDK America describes itself as a "group company of TDK Corporation." TDK America sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the United States, its territories and the District of Columbia

55.    The TDK Defendants were the largest manufacturers of Inductors during the Class Period. For example, in 2007 TDK sold $57 million of one type of Inductors, ceramic chip inductors in North America, more than any other manufacturer according to one industry expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded Inductors, and does so to this day.

56.    TDK Corporation owns and controls both TDK USA and TDK America, as reflected in the following graphic of the "TDK Organization" taken from TDK Corporation's website:

//
//
//
//
//
//
//
//
//
//
//
//
//



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

57.     TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively referred to as "TDK" or the "TDK Defendants."

**H.  The Tokin Defendants**

58.     Defendant Tokin Corporation is a Japanese company with its principal place of business at 8-1, Nishi-Kanda 3-chome, Chiyoda-Ku, Tokyo 101-8362, Japan. Tokin Corporation was established in 1938 as Tohuku Metal Industries Company, which changed its name to "Tokin Corporation" in 1988. In 2002, that entity integrated with the electronic components business of NEC Corporation ("NEC") to become NEC Tokin Corporation ("NEC Tokin"). In February of 2013, Kemet Corporation ("Kemet") acquired an interest in NEC Tokin. By February of 2017, Kemet owned 34% of the shares of NEC Tokin and 51% of the voting rights, while NEC held 66% of the shares and 49% of the voting rights. On February 24, 2017, it was announced that NEC had sold its remaining interest in NEC Tokin to Kemet. Tokin Corporation resumed using the name "Tokin Corporation" on April 10, 2017.

59.     Defendant Tokin Corporation is now a separately incorporated subsidiary of Kemet. It is clear that Tokin now operates as the successor in interest to NEC Tokin. It continues to manufacture and sell Inductors, just as NEC Tokin did. Tokin Corporation also takes full responsibility for past antitrust violations by NEC Tokin. On its current website, Tokin Corporation has posted a letter of apology dated March 29, 2016 by Shigenori Oyama (then Representative Director and President of NEC Tokin and now President of Tokin Corporation) for a cease and desist order issued by the Japan Fair Trade Commission ("JFTC") against it and others for the price-fixing of certain capacitors.[8] In that letter, Mr. Oyama promised that the "entire company will work together to reinforce our compliance regime so that the same event will never happen again in the future. I sincerely apologize for causing such big trouble and concern to our customers, suppliers and all concerned due to the orders at this time."

---

[8] https://www.tokin.com/english/files/Capacitor20160331e.pdf. The JFTC's order can be found here: https://www.jftc.go.jp/en/pressreleases/yearly-2016/March/160329_files/160329_1.pdf.

60.     NEC Tokin also pled guilty to price-fixing of capacitors in United States federal court in January of 2016 and paid a $13.8 million fine.[9]

61.     During the Class Period, Tokin Corporation (then operating as NEC Tokin) sold and distributed Inductors manufactured by it either directly or through its business units, subsidiaries, agents or affiliates, which it wholly owned and/or controlled, to purchasers in the United states, its territories and the District of Columbia.

62.     Defendant Tokin America Inc. ("Tokin America") is a company headquartered in San Jose, California and is a wholly owned subsidiary of Tokin Corporation. Tokin America is the successor to NEC Tokin America Inc. and occupies an office at the same address in San Jose utilized by that predecessor entity. In the United States, its territories and the District of Columbia, Tokin America sells Inductors made by Tokin Corporation. Tokin America is referred to as part of Tokin Corporation's "Overseas Network" and one of its "Overseas Offices and Subsidiaries."[10]

63.     Defendants Tokin Corporation and Tokin America are collectively referred to as "Tokin."

## I.   Agents and Co-Conspirators

64.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

65.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the

---

[9] See ECF No. 9-1 in *United States v. NEC Tokin Corp.*, No. 3:15-cr-00426-JD (N.D. Cal.).
[10] https://www.tokin.com/english/contact/otoi.html#a.

entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed products containing Inductors, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## IV.   AFFECTED COMMERCE

66.     During the Class Period, the Defendants collectively controlled the vast majority of the market for Inductors, both globally and in the United States, as further described below.

67.     The Defendants sold Inductors (or products containing Inductors) directly to customers located in the United States. Substantial quantities of Inductors are shipped from outside the United States into the United States in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

68.     In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

**A. The Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and Class Members' Antitrust Claims**

69.     The Defendants' illegal conduct involved United States import trade or import commerce. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed

1  Inductors to enter the United States market and inflating the prices of Inductors destined for the

2  United States. Such conduct was meant to produce and did in fact produce a substantial effect

3  in the United States in the form of higher prices.

4         70.     According to one leading analyst, the Inductors market in the United States "was

5  an estimated $280 MM in FY 2018 or 10% of global consumption value." This is an increase

6  from $225 million for FY 2016. Demand from private industry (such as smartphone and

7  automobile makers) is fueling this growth.

8         71.     The Defendants recognize the importance of sales of Inductors in the United

9  States in their annual reports and other financial reports. That is why they created and invested

10  in entities like MENA, Murata Power, Murata RF, Taiyo Yuden USA, Sagami America, Tokin

11  America, Sumida America, PCNA, TDK America, and TDK USA. The websites of those

12  entities boast about their respective sales networks in the United States.

13         72.     To give one example, MENA's website states that "[w]e serve as the regional

14  and functional headquarters supporting our customers' engineering and procurement activities

15  throughout the Americas. Along with experienced teams of Technical Sales Managers located

16  in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago,

17  Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized

18  Distributors to service our customers' requirements for sales and technical support, design

19  expertise, logistics and supply chain initiatives."[11]

20         73.     Taiyo Yuden's website similarly lists a headquarters for Taiyo Yuden USA in

21  Chicago and "sales offices" in San Diego, San Jose, Chicago and Boston.[12] Taiyo Yuden USA

22  assisted its corporate parent in marketing and selling Inductors, issuing press releases and

23  disseminating product guides.

24         74.     As a third example, TDK America's website states that "TDK Corporation of

25  America (TCA), a group company of TDK Corporation, was established in 1974 in California

26  as the sales and marketing force for electronic components in North America and Latin

---

27  [11] https://www.murata.com/en-us/about/company/muratalocations/americas/mea.

28  [12] https://www.yuden.co.jp/ut/company/overseas/.

America. TCA has grown into a sales force of fifteen offices in the U.S. and a headquarter office located in Lincolnshire, Illinois. The combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry."[13]

75.     Murata, Sumida, Sagami, Tokin, and Panasonic likewise tout their worldwide sales networks, which include the United States.

76.     The Defendants and others shipped millions of Inductors (and/or products containing Inductors) into the United States during the Class Period. In addition, Inductors that were shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States companies. As a result, a substantial portion of the Defendants' revenues were derived from the United States market. Defendants spent millions of dollars on advertising their products in the United States.

77.     Because of the importance of the United States market to the Defendants and their co-conspirators, Inductors intended for importation into and ultimate consumption in the United States were a focus of the Defendants' illegal conduct. The Defendants knowingly and intentionally sent price-fixed Inductors (and/or products containing price-fixed Inductors) into a stream of commerce that led directly into the United States. This conduct by the Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for Inductors.

78.     Thus, when high-level executives within the Defendants' companies agreed on prices for Inductors, they knew that their price-fixed Inductors would be sold in the United States.

79.     For the reasons set forth above, the Defendants' illegal conduct involved import trade or import commerce into the United States.

80.     The Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce in the form of higher prices for Inductors that Plaintiffs and Members of the Class paid. These prices, tainted by

---

[13] http://www.component.tdk.com/about-us.php.

collusion, directly and immediately impacted Plaintiffs and Members of the Class in the United States. In this respect, the United States effects of the Defendants' illegal conduct gave rise to Plaintiffs' and Class Members' antitrust claims and were the proximate cause of the injury that Plaintiffs and Members of the Class suffered.

81.     A number of facts demonstrate that the Defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable effect on domestic commerce.

**B. The Defendants Targeted the United States**

82.     Because of the relatively small size of Inductors, transportation costs are relatively minor and there is substantial international trade in these electronic components.

83.     During the Class Period, the Defendants manufactured and sold substantial quantities of Inductors shipped from outside the United States, its territories, and the District of Columbia in a continuous and uninterrupted flow of interstate and foreign trade and commerce. In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of the Defendants in connection with the production and sale of Inductors were within the flow of, and affected substantially, interstate and foreign trade and commerce.

84.     During the Class Period, the Defendants also manufactured and sold manufactured products in the United States, its territories, and the District of Columbia that incorporated Inductors made by the Defendants. The Defendants also sold substantial quantities of these products to overseas to direct purchasers for importation to the United States, its territories, and the District of Columbia. The business activities of the Defendants in connection with the production and sale of products containing their Inductors were within the flow of, and affected substantially, interstate and foreign trade and commerce. The paragraphs below detail some specific examples of this.

85.     Murata's connections to the United States, its territories, and the District of Columbia are deep and sustained. "In 1971, General Motors (GM) introduced Murata's ceramic filters to its car radios. This was the result of efforts by Akira Murata, the founder of Murata

1   Manufacturing who traveled to the United States and aggressively pioneered the market.

2   Getting fully involved with the automobile industry was Murata's big dream then. Over 40

3   years ago, we built a plant in the United States and started production locally. Ceramic

4   resonators were introduced to the automobile industry about 25 years ago, and their market

5   continues to enjoy steady sales to this day."[14]

6          86.    On September 3, 2007, Murata announced that it had completed the acquisition

7   of the Power Electronics Division of C&D Technologies ("C&D"), a United States company

8   located in Pennsylvania, for $85 million in cash. After the acquisition, Murata operated C&D's

9   business as "Murata Power Solutions" in the United States and sold Inductors in the United

10  States, its territories, and the District of Columbia that were once offered by C&D.

11         87.    In 2014, Murata received a Preferred Quality Supplier ("PQS") award from Intel

12  Corporation ("Intel") based in part on its sales of Inductors. In a press release, Tsuneo Murata,

13  President of Murata Manufacturing, said "[w]e would like to express our sincere appreciation

14  to Intel for its tremendous support and assistance to achieve this award. We are committed to

15  make every effort to meet and exceed Intel's expectation in 2014."[15] Murata received Intel's

16  PQS award for 2010, 2011, and 2012. In 2014, Intel recognized Murata with a Supplier

17  Continuous Quality Improvement award based in part on its sales of Inductors, "Intel's highest

18  honor for its suppliers."[16]

19         88.    Murata has sales representatives across the United States, including in Silicon

20  Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo (Indiana), and Boston.

21         89.    Panasonic is a household brand and has been conducting business continually in

22  the United States since at least the 1960s. *See, e.g.*, *Zenith Radio Corp. v. Matsushita Elec.*

23  *Indus. Co., Ltd.*, 402 F. Supp. 262, 310 (E.D. Pa. 1975). Panasonic has an English language

24

25

26  _____

27  [14] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline

28  [15] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411

    [16] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411

1  active website that allows potential customers to contact Panasonic's Japanese sales personnel

2  directly about sales inquiries for Inductors.[17]

3          90.     Sagami has had a substantial presence in the United States its territories, and the

4  District of Columbia for over twenty years. It opened Sagami America in 1995, and sells

5  directly to distributors and other customers in the United States. For example, Sagami's

6  Inductors are offered for sale by United States based distributors on their websites.

7          91.     Sumida also targeted markets in the United States, its territories, and the District

8  of Columbia. Sumida's quarterly financial reports report conditions and developments by

9  United States companies such as T-Mobile, and regularly includes reports on business

10  conditions in the United States.

11          92.     Sumida's English language website identifies sales representatives for its

12  products in Alabama, Arizona, California, Florida, Illinois, Indiana, Massachusetts, Michigan,

13  New Jersey, New York, Oregon, Texas, Washington, and Wisconsin.[18]

14          93.     Taiyo Yuden has focused on markets in the United States, its territories, and the

15  District of Columbia, on its own and through its relationships with other United States passive

16  electronic components manufacturers, and has customers in the United States, its territories,

17  and the District of Columbia. In 2005, Taiyo Yuden announced that it would sell Inductors in

18  connection with Kemet, through a "comprehensive sales alliance agreement" "to engage in

19  mutual sales of each other's entire product lines."[19] According to Taiyo Yuden, "Taiyo Yuden

20  and Kemet have built up a cooperative relationship since 1997, when the two companies began

21  regular information exchanges on the product technology side. Now the relationship is to be

22  strengthened even more through a comprehensive sales alliance."[20]

23

24  [17] https://industrial.panasonic.com/cuif/ww/contact-
25  us?field_contact_group=2304&field_contact_lineup=1393.

26  [18] https://www.sumida.com/about/index.php?categoryId=20&parentId=
96&aboutId=99#Southern%20California.

27  [19] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf. This arrangement continued during
the period when Kemet had a financial and ownership stake in NEC Tokin.

28  [20] *Id*.

94.     In April of 2011, Intel gave Taiyo Yuden a PQS award, reflecting Taiyo Yuden's substantial efforts to sell their products, including Inductors, to U.S. companies. Taiyo Yuden President Yoshiro Kanzaki stated "we shall continue to do our utmost to provide quality advanced products and shall approach our work with the aim of becoming Intel's best partner."[21]

95.     The United States has also long been central to TDK's global marketing strategy. TDK has a billboard on Times Square in New York City:



96.     This billboard has been part of TDK's "global advertising strategy" since 2001.[22]

97.     In July of 2013, TDK revamped its English language website to allow customers to search for Inductors and contact sales agents directly for purchases online: "In recent years, the ratio of information acquisition via the Internet has become extremely high for the departments of customers' development, design, purchasing, etc. Also, due to the trend of

---

[21] https://www.yuden.co.jp/ut/news/release/pdf_150.pdf.

[22] https://www.global.tdk.com/corp/en/news_center/press/aah33300.htm. In December of 2011, TDK announced that it had lit up a Christmas tree on Times Square to promote its brand. https://www.global.tdk.com/corp/en/news_center/press/aah37600.htm. TDK lit the Christmas Tree in Times Square again in 2014 and 2015, and promoted is brand in the summer of 2012 by sponsoring a Fourth of July display on Times Square. https://www.global.tdk.com/corp/en/news_center/press/aah40100.htm; https://www.global.tdk.com/corp/en/news_center/press/201412191618.htm (in 2014 TDK advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise").

globalization, there is a need to respond quickly whenever you request from any customer. The inductor site to be announced here inherits the same concept as the monolithic ceramic capacitor site which has been popularly released in January 2013. Please use the new website for searching TDK's inductor which is the No. 1 supplier of inductor by all means."[23] TDK's website currently has an active feature that allows purchase of Inductors through a search feature that links directly to inventory for certain distributors.

98.    Following this development, TDK announced that TDK and EPCOS brand Inductors were available through United States distributors and the EPCOS website it maintained: "TDK Corporation announces that its broad spectrum of sample kits for EPCOS components is now also available directly from Mouser Electronics, a high-service electronic component distributor focused on providing new products to design engineers. Currently, nearly 40 sample kits containing the latest EPCOS protection devices, sensors, chokes, SAW filters, SMT inductors and power inductors are offered on the EPCOS website."[24]

99.    For much of the Class Period, TDK's American Depositary Receipts Shares ("ADRs") were listed on the New York Stock Exchange. In delisting its ADRs in 2009, TDK explained that "[i]n June 1982, TDK listed its [ADRs] on the NYSE primarily to raise funds, bolster corporate creditworthiness and the TDK brand, and broaden its investor base, as it globalized its business operations and rapidly expanded overseas sales. Ever since, the Company has worked to expand its operations in the U.S. and elsewhere around the world."[25] Foreign corporations that issue ADRs must register with the Securities and Exchange Commission and are subject to various federal regulations and reporting rules. These securities allow foreign corporations to profitably enter the United States capital markets.

100.    The Defendants thus engaged in conduct both inside and outside the United States, its territories, and the District of Columbia that caused direct, substantial, and reasonably

---

[23] https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm.

[24] https://en.tdk.eu/tdk-en/373388/company/press-center/press-releases/press-releases/online-service--easy-ordering-of-sample-kits-from-mouser-electronics/166236.

[25] https://www.global.tdk.com/corp/en/news_center/press/aah29200.htm.

1   foreseeable and/or intended anticompetitive effects upon interstate commerce within the United

2   States.

3       101.    The Defendants, directly and through their wholly owned and/or controlled

4   subsidiaries and agents, engaged in a conspiracy to fix or inflate prices of Inductors that

5   restrained trade unreasonably and affected adversely the market for Inductors and manufactured

6   products that incorporated Inductors. The Defendants affected commerce, including import

7   commerce, substantially throughout the United States, thereby proximately causing injury to

8   Plaintiffs and members of the Class.

9                            **V.    FACTUAL ALLEGATIONS**

10      102.    Plaintiffs incorporate by reference the factual allegations made in previous

11  sections.

12          **A. Inductors Generally and Types of Inductors**

13      103.    As noted above, Inductors are passive electronic components that store and

14  regulate energy in a circuit using principles of electromagnetism.

15      104.    Inductors work by creating magnetic fields when current passes through the coils

16  or other inductive material. The magnetic fields created by the passage of current are measured

17  in terms of "force" and "flex." The field force is the amount of "push" that a field exerts over a

18  certain distance, pushing energy through the wire. The field flux is the total quantity, or effect,

19  of the field as energy surrounds the core. Force and flux work off one another. The amount of

20  field flux that will develop in space is proportional to the amount of field force applied, divided

21  by the amount of opposition to flux.

22      105.    The magnetic field also introduces opposition into the circuit, which is a tension

23  that develops within the circuit allowing for storage of energy. Opposition is created by the

24  movement of the magnetic flux as it opposes or resists any changes in the electrical current

25  flowing through it. Energy is stored when the magnetic field flux allows for a certain "inertia"

26  to accumulate in the flow of electrons through the wire (or other inductive material) producing

27  the field.

28

1    106.    An Inductor also acts as a governor, or regulator, of energy in a circuit. When
2    current increases, an inductor absorbs energy and drops voltage. When current decreases, it acts
3    as a source of energy, creating voltage as it releases stored energy.

4    107.    Inductors are classified primarily by inductance, the ability of an Inductor to
5    store energy in the form of a magnetic field. Inductance is measured in the unit of the Henry
6    (µH).

7    108.    Inductors are sold by specifications that relate to inductance, voltage, and size.
8    These measures are standardized. Inductors with the same inductance, core, and size are
9    substantially the same, and fungible with one another.

10    109.    Inductors, capacitors, and resistors perform distinct roles in an electric circuit.
11    Inductors store current using magnetic fields, which also give Inductors the ability to act as
12    resistors. However, unlike resistors, Inductors can also store energy. Inductors block alternating
13    current ("AC") but allow direct current ("DC") to pass through. Capacitors block DC but allow
14    AC to pass through. Unlike capacitors, Inductors can create energy when needed by use of
15    magnetic fields. In short, all three of these components work together to form closed circuits
16    that power the products that contain them. Inductors can perform all of the basic functions of
17    capacitors and resistors, but capacitors and resistors cannot perform all of the functions of an
18    Inductor.

19    110.    An Inductor's role in a simple circuit is depicted below:



111.    Examples of various forms of Inductors are depicted in the following photograph:



112.    As can be seen, Inductors can be as simple as wrapping a metal wire around some form of a core. Wirewound coil Inductors may also be encased, embedded, or molded in plastic cases or in discrete inductor chips. Wirewound coils can have metallic or ceramic cores (or hybrids of both) and may also have air cores.

113.    Multilayered Inductors may also vary in composition and alignment, but they, too, perform the same basic function. Multilayered Inductors are usually encased in plastic. Multilayered Inductors may use ferrite beads, or bead arrays, and may also stack or layer film and various types of coils and electrode materials. The following graphic from TDK's website illustrates some types of chip Inductors:



114.    Inductors are distinguished from one another by the material composing the "core," or the conductor for the magnetic reaction. An inductor's core material can affect its performance, as different metals and materials have different magnetic and inductive properties. A core may be made of ceramic, ferrite, copper, or some other metal. Different cores can

provide equivalent standard levels of inductance, even if each type of material provides different levels of power and performance. The key principle of physics that impacts Inductors' specifications is that inductance is directly proportional to the available surface area contained in the finished inductor. To achieve added surface area, metallic or ceramic materials can be stacked or wound in an Inductor.

115.    At present, the principal type of Inductors are air core Inductors, iron core Inductors, ferrite core Inductors, toroidal core Inductors, and multilayer Inductors. Air core Inductors are the simplest type to make, with a wire wrapped around a ceramic core. These are the cheapest form of Inductors to manufacture. Iron core Inductors are wrapped around an iron core and can be smaller in size than air core Inductors. Ferrite Inductors use ferrite, a metal oxide ceramic based around a mixture of ferric oxide, which has a high degree of magnetic permeability. Toroidal core Inductors are made using a coil wrapped around a toroidal (doughnut-shaped) core. The core is often also made of ferrite. Multilayer Inductors consist of two conductive coil patterns that are arranged in two layers in the upper part of a multilayered body and are electrically connected in consecutive manner. Thin film Inductors are a type of multilayer Inductor typically utilizing a ceramic chip that produces a small form factor. The Defendants each produce a variety of the various categories of Inductors.

116.    The following chart gives the breakdown of types of Inductors sold worldwide:



117.    In automobiles, Inductors are used, for example, in headlight circuitry, transmission systems, electronic control units, fuel systems, navigation systems and ADAS. In consumer applications, they are used in LCD televisions, LED lighting, computer laptops, digital still cameras, smartphones, printers, game consoles, air conditioning systems and home appliances. The following chart from the Paumanok Group Consulting depicts the value, volume and pricing of Inductors by end-use segment:



118.    A 2018 report has indicated that the global market for Inductors was worth $2.599 billion in 2015 and is estimated to reach $3.11 billion in 2023. The North American Inductor market (of which the United States has approximately 71%) was worth $225 million in 2015.[26]

---

[26] Alternatively, a 2017 report has indicated that the global market for Inductors was worth $2.78 billion in 2014 and is estimated to reach $3.75 billion in 2019. The North American Inductor market (of which the United States has approximately 71%) was worth $768 million in 2015 and is estimated to be worth $965 million in 2021.

1

**B.  The Structure of the Inductor Market Is Conducive to Collusion**

2

119.   The Inductors market exhibits five characteristics that are conducive to

3

collusion: (1) the Defendants dominate that market; (2) there are high barriers to entry; (3)

4

Inductors are a commoditized product; (4) Inductors are price inelastic; and (5) there is

5

declining demand and excess capacity. Each of these factors is discussed separately below.

6

**1.      Market Concentration**

7

120.   The Inductors market is highly concentrated. As of 2004, Defendants had over

8

80% of the market in Inductors:

9

10

11

12

13

14

15

16

17



18

121.   In 2007, TDK and Murata alone had over 61% of the market for ceramic chip

19

inductors in North America.

20

//

21

//

22

//

23

//

24

//

25

//

26

//

27

//

28

122.    In 2016, Defendants had two-thirds of the Inductors market:



123.    Acquisitions within the Inductors market, such as Murata Manufacturing's acquisition of TOKO in April of 2015, Murata Manufacturing's acquisition of C&D Technologies' Inductors business, and TDK's successful tender offer for EPCOS AG in October of 2008, have added to this market concentration.

### 2.    Product Commoditization

124.    Inductors are a commoditized product and are found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiation is "minimal."[27]

125.    Inductors are marked using standardized values. The first two digits marking a standardized Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = 10*101µH = 100µH. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means 4.7µH. Precision of an Inductor is also expressed in standard terms, using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

---

[27] There may be Inductors made by one or more of the Defendants that are not "off the shelf," but are instead manufactured to precise specifications by a customer and hence are unique to that customer. They are not within the meaning of the term "Inductors" as used in this CAC.

126.    The International Electrotechnical Commission ("IEC"), an organization that promotes standardization in the electrical fields, has published standards for testing relating to Inductors. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes [another name for Inductors] for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable.

127.    The Defendants understand their products are interchangeable. A webpage maintained by TDK relating to Inductors allows users to enter a non-TDK product code so that, "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar specifications can be searched."[28] Other Defendants' websites offer similar comparison aids.

### 3.    Entry Barriers

128.    Entry barriers into the Inductor market are high. The costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

129.    Barriers to entry also exist because of the resources of the incumbents. The Inductors market is a mature one dominated by established corporations, most of which have global operations. Panasonic and TDK both manufacture a variety of electronic products, as well as other electronic components. Panasonic reported revenues of over $62 billion in its 2017 fiscal year. TDK reported revenues of over $10 billion in 2017. Both are large and diverse multinational corporations that, like all of the Defendants, can benefit from economies of scale. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of which is attributable to sales of electronic components. Sumida is another international giant, who most recently announced sales in

[28] https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/.

excess of $700 million annually. Sumida has Research & Development ("R&D") offices in the United States, China, Japan, Germany, and Canada; sales offices in the United States, China, Japan, Hong Kong, Singapore, Taiwan, Thailand, South Korea, and Germany; and factories in China, Japan, Vietnam, Thailand, Mexico, Germany, Romania, and Slovenia.

130.    The Defendants have established reputations with purchasers of Inductors and sellers of the raw materials needed to manufacture Inductors; have access to significant amounts of capital to fund current operations; have global operations that allow them to specialize function and meet the needs of customers with global businesses; can weather downturns in the economy due to their size and substantial resources; and have integrated supply chains due to their diverse products.

131.    During the Class Period, there were few (if any) new entrants into the market for Inductors. As noted above, during the Class Period, the number of leading Inductors manufacturers fell, which is an indication of a mature market with diminishing demand, circumstances that make the market ripe for collusion.

132.    It is no surprise that new entry practically came to a halt, and the number of participants contracted. New entrants would need to invest hundreds of millions of dollars in building manufacturing facilities, obtaining patents or licenses for technology, and creating a production line; assembling a workforce, including professionals and executives with industry experience; obtaining a supply network; and investing in R&D, marketing, and transportation capabilities necessary to bring a product to market. And even then, it takes years to demonstrate quality control and establish a customer base to see any return on this investment. In short, a prospective competitor in the Inductors market would face a daunting task in establishing and growing a business. It speaks volumes that the United States hardly has a competitive player in this field.

133.    Further barriers to entry exist because manufacture of Inductors requires an expensive supply chain, including the purchase and in-house processing of raw materials such as metals. Inductors can incorporate iron, nickel, zinc, and sometimes barium, cobalt, and strontium.

134.    After raw materials are purchased, they must be processed and chemically treated. Leading Inductor manufacturers have facilities for processing and treating the raw materials. Processing and treating raw materials requires large expenditures of capital for nanotechnology. Nanotechnology, which concerns analysis of materials at the molecular (or very small particle) level, is necessary because of the precision involved in manufacturing small components. Nanotechnology equipment is very expensive.

135.    A core principle of the physics and economics of manufacturing Inductors is that the performance of the component is directly proportional to the size, or surface area, of the Inductor. Accordingly, precision manufacturing and quality control measures are critical.

136.    Manufacture of Inductors involves stacking, winding, and pressing metals and other raw materials, and the technology to imprint and manipulate thin metals and wire. This process requires sophisticated engineering as well as expertise in nanotechnology and process yields.

### 4.    Demand Inelasticity

137.    A 2017 report on the Inductor market has noted that "demand is considerably inelastic." As the report explains:

> In the inductors market, the consumer base is rather fragmented and product differentiation is minimal, thus lowering the overall bargaining power of customers. But fixed costs for suppliers are high thus giving them some power. For a consumer, the switching cost is high and the possibility of backward integration is low since production of inductors involves exclusive expertise and most OEMs find it cheaper to buy it from such suppliers than foray into its manufacturing. The bargaining power of customers is *low*.

(Emphasis in original).

138.    Several characteristics of Inductors cause demand inelasticity. First, the price of Inductors is low compared to the price of many inputs. There is less incentive to switch Inductors suppliers under those circumstances. On a per unit basis, prices of most Inductors range from a few to fifty cents. Products such as computers and cars may have up to sixty or seventy Inductors, but other products have only a couple dozen.

139.    Second, there are no substitutes for Inductors. No other passive electronic component can perform all the functions of an Inductor. Its electromagnetic properties

distinguish it from a capacitor, as does its operation in relation to DC current. Capacitors can only store current; they cannot increase voltage like an Inductor can by use of magnetic fields. Resistors perform some of the "blocking" functions of Inductors, but cannot store or generate voltage. If a circuit in a product calls for an Inductor, no other component will do.

140.    Third, the fact that Original Equipment Manufacturers ("OEMs") and other manufacturers face periodic deadlines for production reduces the chance that Defendants' customers will invest the time and resources to find another supplier.

### 5.    Declining Demand and Excess Capacity

141.    The Inductors market was dealt a series of shocks, starting in the 1990s with the ITA. Inductors faced declining demand following the 2001 recession at the beginning of the Class Period. One industry expert has noted that price erosion was severe in 2001 and 2002 as Inductor manufacturers suffered from excess capacity, and leading Inductor manufacturers contemplated selling their production facilities. Indeed, flagging demand for electronics products characterized much of the early 2000s.

142.    In addition to the effects of the 2001 recession, new technology, such as semiconductor chips and digital circuits, has threatened Inductors. Inductors are not used in digital circuits, which are increasingly used in high-technology products. Inductors are too large to be integrated into semiconductor chips, which are micro-electric circuits that fit onto a silicon wafer.

143.    Many consumer electronics have moved to chip technology. In 2007, a leading analyst predicted that the North American sales volume of Inductors would fall by over a billion units from 2007 to 2014, mostly due to a poor outlook for consumer digital electronics. Compact portable devices that rely on digital chip circuits, such as iPhones, have replaced several different personal electronic devices.

144.    As demand waned, the Defendants faced excess capacity at their Inductors facilities. They have facilities that specialize in the manufacture of few products. Panasonic, for example, has a plant in Tajima, Japan that at one point during the Class Period had 250,000 square feet devoted to manufacturing Inductors. Corporate Defendants that manufacture

1    primarily passive components, such as Taiyo Yuden, Sumida, and Murata, also specialize their

2    manufacturing facilities so that when demand is low, their plants are idle at lower cost.

3         145.    The remarkably resilient prices following the 2008 Great Recession, even as

4    demand waned, illustrate cartel activity at play.

5         146.    When prices remain high or flat in light of declining demand and excess

6    capacity, it becomes clear that collusion is keeping the prices high.

7         **C. The Conduct of Defendants, the Investigation by the DOJ, and the Use of
         Trade Associations Strongly Support The Assertion That Defendants
8         Colluded**

9              **1.    Summary of Defendants' Unlawful Conduct**

10        147.    As noted above, price erosion in the market for Inductors began with trade

11   agreements that eliminated tariffs. In December of 1996, twenty-nine nations agreed to the ITA,

12   which eliminated tariffs and import duties on hundreds of billions of dollars' worth of high

13   technology products, including computers, telecommunication equipment, semiconductors, as

14   well as the passive electronic components (such as Inductors) that were used to manufacture

15   these products.

16        148.    Since its inception, the ITA covered "[e]lectrical transformers, static converters

17   (for example, rectifiers) and inductors." Once tariffs on inductors were lifted, manufacturers

18   that once had no competition from OEMs who purchased from them suddenly had global

19   competition from the signatories to the ITA.

20        149.    Following the adoption of the ITA by Japan and other Asian countries, the

21   Japanese manufacturers began to face competition from manufacturers in Korea and Taiwan,

22   which were signatories.

23        150.    The 2001 recession exerted further downward pressure on prices of Inductors.

24   In Japan, exports of passive electronic components fell from a peak of 781,951 million yen in

25   2000; to 541,797 million yen in 2001; to 531,859 million yen in 2002.

26        151.    In North America, sales of Inductors dropped from 2001 to 2002, and fell every

27   year until 2005. According to an industry analyst, "[t]he inductor business in [North America]

28   follows suit with capacitor and resistor sales in the region with respect to the value of discrete

1   inductor shipments over time. The market experienced a sharp upturn in FY 2001, followed by

2   a sharp drop in new product shipments."

3        152.    As also noted above, China agreed to the ITA in 2003, which resulted in even

4   more competition. Chinese Inductors manufacturers quickly became the greatest threat to

5   Japanese Inductors manufacturers. By 2004, there were 200 Chinese manufacturers of

6   Inductors, and they sold 80% of their products to Japan. China's chip Inductor business alone

7   was expected to grow 20% annually at the time. Knowledge of the impending threat from

8   Chinese manufacturers provided powerful incentive for Defendants to collude to protect their

9   profit margins.

10        153.    Faced with increased requests by purchasers for price reductions and an overall

11   decline in demand for their Inductors, the Defendants had a keen desire to avoid price

12   competition.

13        154.    The Defendants knew that international competitors (especially those in Taiwan

14   and China), despite their inroads, could not successfully compete with Defendants' advantages

15   in capacity, technology, and resources should the Defendants stabilize or inflate prices of

16   Inductors. Taiwanese and Chinese components were often perceived to be of inferior quality

17   and not as reliable as Japanese products.

18        155.    Before and during the Class Period, the Defendants understood that Inductors of

19   similar inductance were interchangeable, and were concerned that purchasers would use that

20   knowledge to cause the Defendants to bid against one another for Inductors.

21        156.    The highly concentrated nature and structure of the Inductors market made it

22   likely that collusion would be possible and profitable. The Defendants comprised over 80% of

23   the market at the beginning of the Class Period, and still had two-thirds of the market in 2016.

24   Purchasers of Inductors could not substitute other electronic components for Inductors.

25   Furthermore, the Defendants knew that although global competition was eroding the price of

26   Inductors, manufacturers (especially of sophisticated and expensive electronics) were unlikely

27   to substitute inferior quality products for the Defendants' Inductors.

28

157.     Direct purchasers, especially OEMs and contract manufacturers, are committed to preset production or delivery deadlines, and the Defendants wagered that they would rather continue to pay flat or increasing prices for Inductors than look for lower prices elsewhere and risk disruption to their business from delays or production shortfalls.

158.     The Defendants agreed to operate as a cartel through both oral and written communications among directors, executives, officers, business unit managers, sales representatives, and employees of the Defendant companies. These communications were organized in part around JEITA meetings and occurred among the Defendants' employees who attended JEITA meetings, as described in further detail below.

159.     The effects of this cartel were felt in the marketplace. As a result of the 2001 recession, prices of some commodity Inductors fell from $0.0452 apiece to $0.0327 from 2000 to 2003. Through their collusion, Defendants ensured that this type of drop, a decrease of 27.6%, would never happen again. It did not.

160.     As reflected in the chart of FRED data shown in the introductory section of this CAC, prices of Inductors stabilized or grew from 2003 onward, despite the forces (such as competing semiconductor chip technology and increased competition from Chinese and Taiwanese competitors) that should have lowered the competitive prices for Defendants' products.

161.     The 2008 recession hit the global economy severely. In Japan, exports of passive components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009. In the United States, monthly factory output fell 27% from July of 2008 to May of 2009, a decrease valued at $133 billion. Yet the prices of Inductors remained remarkably resilient, as explained above.

162.     Collusion is an explanation consistent with the market factors described above and is also consistent with: (1) the subpoenas just issued by DOJ; (2) the involvement of several of the Defendants in conspiracies in other markets, and (3) the involvement of the Defendants in trade associations (particularly JEITA) that facilitated collusion.

1

**2.      Conspiratorial Acts Conducted Through JEITA**

2

163.    Defendants used JEITA meetings as a forum to agree upon pricing for Inductors

3

and exchange confidential business information concerning Inductors from at least 2003

4

through September of 2014.

5

164.    To understand the role that JEITA played in the formation of the conspiracy, it

6

is first necessary to explain how it operates. JEITA conducts an annual conference described as

7

follows: "[a]ll JEITA member companies gather annually for a conference that serves as the

8

industry's premier decision-making forum."[29] Its Board of Directors "discusses and makes

9

decisions concerning important issues related to JEITA's activities, including items raised at the

10

Annual Conference." *Id*.

11

165.    As of July 17, 2017, the Chairman of JEITA's Executive Board is Shusaku

12

Nagae, Chairman of the Board of Panasonic Corporation. A representative of Murata

13

Manufacturing is also one of the Executive Directors of JEITA. JEITA has created five sector-

14

specific boards, one of which is the Passive Components Committee ("PCC"), which

15

encompasses Inductors, capacitors and resistors. The structure of JEITA's Electronic

16

Components Board and its committees is represented in the following chart taken (as translated)

17

from JEITA's Japanese-language website[30]:

18

//

19

//

20

//

21

//

22

//

23

//

24

//

25

//

26

27

[29] http://www.jeita.or.jp/english/about/orga/index.htm.

28

[30] https://home.jeita.or.jp/ecb/aboutus/about_us02.html.



166.    Two of the current Vice-Chairmen of the Electronic Components Board are Tsuneo Murata, President of Murata Manufacturing, and Takehiro Kamigama, President and CEO of TDK-EPC. JEITA maintains "overseas offices" in Washington, D.C. and Brussels, Belgium.

167.    From 1989 until 2003, there existed within JEITA separate Committees on Inductors, capacitors and resistors. In 2003, these separate Committees were merged within the PCC and operated as Subcommittees of the PCC. Meetings of the PCC typically occurred three to four times annually at JEITA's offices in Tokyo, Japan; they occurred typically in May, August, November, and January of each fiscal year. The initial meeting of each fiscal year

1   typically included a General Meeting and a separate social gathering. The January meeting was

2   typically followed by a New Year social gathering. In addition to the formal meetings of the

3   PCC, there were associated events in locations such as the Yokkaichi Tokyu Golf Club, the

4   Katsuragi Golf Club, the Hikone Country Club, the Iwata Grand Hotel, the Nishikanda location

5   of Dinagyan Restaurant, the Kawamuraya store in Nagoya, the Nagahama Royal Hotel, the

6   Hotel Arrowle, the Hibiki Marinouchi store, and the Otamachi Sankei Palace.

7          168.    The PCC selected one Chairperson and two Vice-Chairpersons every two years.

8   The Vice-Chairpersons represented the various Subcommittees. The terms of the Vice-

9   Chairpersons were two years, with a maximum of two consecutive terms. Selections as Vice-

10  Chairpersons was done on a rotation system to allow members of each Subcommittee to so

11  serve. In June of 2004, it was observed that with the existence of Subcommittees on resistors

12  and capacitors, attendance at Inductors Subcommittee meetings was starting to wane, with the

13  result that there was less exchange of company-specific information. It was therefore decided

14  to hold meetings of the Inductors Subcommittee at least four times annually and to encourage

15  more companies to attend, so that a more extensive sharing of confidential detailed corporate

16  information could occur. The meetings again took place typically at JEITA's offices in Tokyo,

17  Japan, or, on occasion, at other venues, such as the Hakata Excel Hotel Tokyu ("Excel Hotel").

18         169.    Participants from the Defendants at meetings of either the PCC or the Inductors

19  Subcommittee or both during the Conspiracy Period included:

20              a.  **Masataka Suzuki (**President of Sumida), **Teruo Hirota** (Sumida

21                  Corporate Service IAO Officer), **Ryuji Teramachi** (Sumida's Eastern

22                  Japan Sales & Marketing Manager), **Hiromatsu Takashima** (Sumida's

23                  Director of Sales for the Asia Region), **Taeko Matsuoka** (part of

24                  Sumida's Marketing Communications Center), and **Fumio Shikano**

25                  (Sumida's CSE Officer and ADM Officer) **for Sumida**;

26              b.  **Kazuya Umezawa** (Managing Executive Officer of Taiyo Yuden),

27                  **Atsushi Ishinari** (Taiyo Yuden's Senior General Manager, Electronic

28

Components Planning Department), **Hisashi Oi** (Taiyo Yuden's General Manager, Ferrite Application Product Managing Department), **Tomonori Endo** (Manager of Taito Yuden's Sales Planning Department), **Satoru Kaneda** (General Manager of Taiyo Yuden's Corporate Headquarters 1, Ferrite Application Division), and **Kenichi Hattori** (Head of Taiyo Yuden's Office of the President) **for Taiyo Yuden**;

c.  **Takashi Oshima**, **Masahiro Ishida** (part of the Inductor Products Team for Panasonic's Circuit Components Group BUPM Marketing 1), **Keiji Chikada** (Global Industry 3 Team Leader for Panasonic's BUPM Marketing 1), and **Hiroshi Itsuki** (Product Strategy Team Leader for Panasonic's Transformer BUPM Marketing Group) **for Panasonic**;

d.  **Jin Kudou** (Marketing Department Deputy Manager for Murata), **Hiromitsu Aoki** (Section Manager of Market External Affairs Division for Murata), **Hideaki Morito** (Senior Manager, EMI Products Planning for Murata), **Tomihiro Fujikawa** (executive in the Product Planning Division of the Planning Department of the EMI Division for Murata**),** **Akimasa Yamakawa** (Section Manager for Murata's Market External Affairs Division**), and **Shigeshi Hatada (**Director of the Component Group of Murata's EMI Planning Department) **for Murata**;

e.  **Shinichi Araya** (Director and Senior Vice-President General Manager of Technology for TDK), **Nobuhiru Ishiguro** (Manager of TDK's Magnetics Business Group Products Strategy Promotion Division), **Hiroyuki Uemura** (Senior Executive Vice-President and Corporate Officer for TDK and President and CEO and TDK-EPC), and **Takuji Suda** (Section Manager of TDK's Magnetics Business Group Product Strategy Presentation Division) **for TDK**;

f.  **Bunchiro Tsuda** (Engineering Group Manager for NEC Tokin's EMC

Devices Group), **Makoto Soto** (General Manager of Sales promotion for NEC Tokin's Functional Devices Division), **Yoshihiko Hori**, a Director at NEC Tokin), **Hidehito Hatakeyama** (Group Manager of the Marketing Division of the Sales Department of NEC Tokin's EMC Group), **Yoshinori Sato** (Group Manager of the Sales Promotion Department of the Sales Promotion Group of NEC Tokin's EMC Group), **Tomohide Date** (a Manager of NEC Tokin who has been indicted by the DOJ for conspiring to fix prices of capacitors),[31] **Hiroshi Ishikawa** (Group Manager of the Sales Promotion Department of NEC Tokin's EMC Group), and **Masaya (Shinya) Watanabe** (Senior Manager of the Sales Promotion Department of NEC Tokin's EMC Group) for **NEC Tokin**; and

g. **Dajiro Tsuruga** (Division Manager of Sagami's Sales and Marketing Division), **Masaki Okada** (manager of Sagami's Corporate Planning and Administration Office), **Koichi Ogiso** (Section Manager of the Head Office Sales Department of Sagami's Sales Support Section), **Mitsuo Igarashi** (Division Manager of Sagami's Sales and Marketing Division). **Masayuki Osashi** (Section Manager of the Marketing Division of Sagami's Sales Development Section), and **Teppei Hashimoto** (division Manager of the Marketing Division of Sagami's Sales Promotion Division) **for Sagami**.

170.    At these Inductors Subcommittee meetings during much of the Conspiracy Period, attendees for the Defendants shared company-specific current and forward-looking

---

[31] *See* ECF No. 15 in *United States v. Isawa*, No. 4:15-cr-00163-JD (N.D. Cal.). Additionally, Akihiko Igasaki and Takayuki Iizuka of Okaya Corporation ("Okaya") attended JEITA meetings related to Inductors on behalf of Okaya. Cartel meeting minutes reflect that Messrs. Iizuka and Igasaki attended cartel meetings with respect to the film capacitor cartel on behalf of Okaya. *See* ECF Nos. 1563-3, 1563-6, *In re Capacitors Antitrust Litig.*, No. 14-3264-JD (N.D. Cal.).

1  information on sales, pieces, shipments, product development, and capacity with respect to

2  Inductors, including Inductors sold or shipped to the United States. The purpose of these

3  information exchanges was to fix prices for Inductors, as well as to establish forecasts to

4  facilitate the implementation of such a fix. Attendees for the Defendants also shared information

5  on how best to deal with the business climate for Inductor sales, again in furtherance of the

6  alleged conspiracy.

7      171.   What follows are just a few specific examples that illustrated what occurred at

8  JEITA Inductor Subcommittee meetings during much of the Conspiracy Period.

9      172.   For instance, on November 12, 2003, representatives from TOKO (Mr. Tanaka),

10  Matsushita Electronic Components (the predecessor to Panasonic Corporation) (Mr. Itsuki),

11  and Sumida (Messrs. Suzuki and Shikano) met to exchange information that included their per

12  unit prices for Inductors for 2003, and projections for prices for 2004. The information

13  exchanged also included detailed company-specific information on quantities sold and sales

14  booked for 2004; the cartel members specifically agreed to include information on total orders

15  as well as overall quantities sold. The information exchanges were performed with each

16  company submitting information directly to other members.

17      173.   On June 24, 2004, a meeting of Inductors manufacturers was held through

18  JEITA attended by representatives from TOKO (Masaharu Tanaka), Panasonic (Mr. Itsuki),

19  Sagami (Mr. Okada), and Sumida (Messrs. Shikano and Suzuki). At this meeting, the

20  participants exchanged detailed information about the order they have received in the first three

21  months of 2004, and provided detailed projections about their orders for the rest of the year.

22  The participants discussed projected business conditions in the United States following the 2004

23  presidential election. At this meeting, it was decided that even more detailed exchanges of

24  information would occur in the future.

25      174.   On July 10, 2007, representatives from Sumida (Messrs. Suzuki and Hirota),

26  NEC Tokin (Messrs. Date and Hatakeyama), Taiyo Yuden (Mr. Hattori), TOKO (a Mr.

27  Oonishi), Sagami (Messrs. Ogisa and Tsuruga), and Murata (Messrs. Kudo and Hibino) met.

28  The cartel members exchanged the results of individual company questionnaires that included

material non-public information such as average sales price, and quantities projected to be sold. The cartel members agreed that each company would submit its own summary of business climate and that it would be discussed at future meetings. The cartel members discussed the results of a joint study concerning raw material costs faced for Inductor manufacturers. The cartel members reviewed average unit price forecasts that were based on information previously exchanged, and agreed to further review and revise a World Production Forecast based on exchanged pricing information.

175.    There are numerous examples of such illegal information exchanges throughout the Class Period. At least 23 meetings of the Inductors Subcommittee took place between July of 2007 and September of 2014, mostly at the Tokyo offices of JEITA. Unlawful information exchanges designed to fix Inductor prices occurred at these meetings. While not every Defendant had a representative at every meeting, each Defendant had one or more representatives at most meetings. Among others, (a) **Murata** sent Messrs. Aoki, Hibino, Inoue, Kita, Kumada, Kudo, Oomura, Ootani, Shimokawa, Yamakawa and Yamazaki; (b) **Panasonic** sent Messrs. Chikada, Ebine, Iishiba, Matsumoto, and Morita; (c) **Sagami** sent Messrs. Ogiso, Tsuruga, Igarashi, and Oohashi; (d) **Sumida** sent Messrs. Hirota, Suzuki, and Takeshima; (e) **Taiyo Yuden** sent Messrs. Hattori, Ishinari, Kanzaki, Murata, and Ooi; (f) **TDK** sent Messrs. Abe, Ishiru, Ishiguro, Mochizoki, Ogasawara, Saito, and Takano; (g) **Tokin** sent Messrs. Date, Hatakayama, Kobayashi, Muramatsu, and Okabe; and (h) **TOKO** sent Messrs. Norose, Oonishi, Oosawa, and Shinoda.

176.    Communications in furtherance of the conspiracy also occurred outside of these formal meetings at social gatherings held in conjunction with the meetings, such as one that occurred in September of 2004 at the Excel Hotel.

177.    As noted above, the PCC often called upon Vice-Chairpersons of the Inductors Subcommittee to give reports on industry trends, market conditions, and the like. Information exchanges in furtherance of the alleged conspiracy also occurred at meetings of the PCC during the Conspiracy Period. The PCC endeavored to deal collectively with issues facing the Inductors industry, such as a period of rising costs for raw materials, and forecasted customer

orders for passive electronic components. The PCC also held roundtables concerning the current business climate and how the Japanese manufacturers (including Defendants) could collectively respond.

178.    Among the attendees for Defendants at PCC meetings were: (a) Messrs. Fujioka, Hatta, Hibino, Ikeda, Inoue, Kudo, Nobumato, Nozaki, Oomura, Shimokawa, Yamazaki, and Yamakawa for **Murata**; (b) Messrs. Chikada, Ebine, Iishiba, Itsuki, Kita, Nitta, Ooshima, and Sugitate of **Panasonic**; (c) Messrs. Ogiso, Okada, and Tsuruga for **Sagami**; (d) Messrs. Hirota, Igarashi, Kawazoe, Suzuki, and Takashima of **Sumida**; (e) Messrs. Hattori, Ishinari, Kanzaki, Murakami, and Murata of **Taiyo Yuden**; (f) Messrs. Abe, Arima, Ikeda, Ishiguro, Ishizu, Kichiji, Morikawa, Ogasawara, Saito, Suda, Sudo, Takano, and Ueno of **TDK**; (g) Messrs. Date, Ishiwaki, Kobayashi, Muramatsu, and Sato for **Tokin**; and (h) Messrs. Aso, Kitano, Norose, Ogino, Ootaki, Oosawa, Tanaka, Takeda, and Yamaguchi for **TOKO**.

179.    Members of the Defendants were also officers in the PCC during the Class Period. In 2003, Yoshiaki Kitano, the President of TOKO, became the Chairperson and a Mr. Nozaki of Murata and Mr. Shikano of Sumida became Vice-Chairpersons. The various subgroups within the Committee sometimes gave reports about their respective exchanges of information, sometimes by product and by division.

180.    All of this conduct, taken as a whole, constituted antitrust violations. Agreements among competitors to fix prices are illegal *per se* under Sections 1 and 3 of the Sherman Act. Information exchanges among competitors can facilitate and serve as evidence of such agreements. As the United States government said in 2014: "certain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination."[32] As the

---

[32] https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf at 1 (footnote omitted).

government went on to explain, "[i]nformation exchanges can be treated as circumstantial evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the *per se* rule as a violation of the antitrust laws."[33]

181.    JEITA came to realize that these activities violated antitrust laws. As explained in the unsealed Consolidated Amended Class Action Complaint for Direct Purchaser Plaintiffs filed on June 24, 2016 in *Resistors*, JEITA's PCC was a "focal point" for collusion and that it was utilized for "facilitating coordination of industry behavior…with the aim of reducing output and stabilizing prices."[34] The defendants in *Resistors* were also accused of providing each other with detailed company-specific competitive information. KOA Corporation ("KOA"), one of those defendants in that case (although not named here), noted generally, "There are many events that are considered normal in Japan but strange from the viewpoints of foreigners. Participating in some of these events can put the company at risk of being deemed taking part in antitrust activities."[35] As also noted in paragraph 101 of the *Resistors* complaint:

> By July 2014, JEITA's leadership also had become aware that its activities violated the antitrust laws. During that month, JEITA distributed a handout to its members (including Panasonic) announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

182. In September of 2014, the PCC presented an explanation of a competition law compliance system that would go into effect the following day.[36] Among the rules that were enacted was the requirement that all information exchanges through JEITA use an independent third party to ensure confidentiality. The guidance explained how to conduct association meetings and exchange competitor information in a way that complied with antitrust and competition laws. Concerns about unlawful information exchanges at social gatherings held in

---

[33] *Id*. at 3.

[34]  ECF No. 140, *Resistors* (June 24, 2016), ¶ 3.

[35] *Id*. ¶10. Koichi Mukaiyama, President of KOA, served as a Chair of the PCC during the Class Period.

[36] It had been publicly announced that the DOJ commenced its criminal antitrust investigation of capacitor manufacturers in April of 2014.

conjunction with JEITA meetings were expressed. On February 5, 2015, the PCC announced for the first time that it would conduct a Competition Law Compliance Seminar on February 15, 2015, at which the law firm Gibson Dunn would make a presentation. PCC members were warned about exchanging confidential corporate information at social gatherings. In September of 2016, consideration was given to creating audio recordings of JEITA meetings. The proposal was not passed because it was perceived as chilling free communication among JEITA members and because it might create antitrust exposure.

### 3.    Subpoenas Issued by DOJ

183.    On January 4, 2018, *MLex* reported:

> Electronics manufacturers have been subpoenaed by US antitrust prosecutors as part of a price-fixing investigation involving the inductor market, MLex has learned.

> Subpoenas were sent out in mid-November, and the San Francisco office at the Department of Justice's antitrust division is overseeing the investigation, it is understood.

> The inductor subpoenas are part of a long-running investigation, which also includes capacitors and resistors. The components are part of electrical circuits that store and regulate the flow of electricity, and are ubiquitous in electronic devices.

184.    The subpoenas were issued by a grand jury empaneled in San Francisco, California. Plaintiffs reasonably believe that Taiyo Yuden, TDK, and Murata received such subpoenas. Panasonic and Sumida have asserted that they have not received such subpoenas, but that does not mean they could not become targets of any investigation regarding Inductors once the materials produced in response to the subpoenas are reviewed by DOJ, especially in light of the information about JEITA meetings described above, of which the DOJ may be unaware. Nor does it mean that Panasonic or Sumida might not have placed a marker with DOJ to obtain leniency, which is still in the process of being perfected.

185.    The subpoenas at issue are, on information and belief, part of a criminal investigation by DOJ. The fact that these companies received subpoenas from a federal grand jury is significant because it indicates that the DOJ is considering a criminal prosecution, as is

reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.[37] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[38] The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division."[39] "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[40] "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[41] The fact of the grand jury investigation, taken together with the economic analysis of the Inductors market contained herein, supports the inference of collusion.

### 4.   Involvement of Some Defendants in Other Conspiracies

186.   Collusion is also the most plausible explanation of what occurred in the Inductors market, given that Defendants Panasonic, Tokin (the successor to NEC Tokin), Taiyo Yuden, and TDK are well-known recidivist antitrust violators.

187.   Panasonic, one of the world's leading manufacturers of Inductors, has pled guilty in numerous price-fixing cases, including electronic products.

188.   On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

---

[37] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[38] *Id*. at III-82.

[39] *Id*.

[40] *Id*. at III-83.

[41] *Id*.

189.     On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere from at least as early as September of 2003 until at least February of 2010.

190.     That same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April of 2007 until about September of 2008.

191.     In 2008, Panasonic created "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these efforts. The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> In fiscal 2012, the company reviewed the efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. The top management strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing departments to confirm whether they encounter suspicious activities or not.[42]

The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive officers in charge of corporate operational functions at the company's headquarters. That group identified the "corporate major risks" for the then just-ended fiscal year 2012 and the then upcoming fiscal year 2013. On both lists was "Cartels." Subsequent corporate sustainability reports for 2013, 2014 and 2015 identified this same "corporate major risk' for the 2013, 2014 and 2015 fiscal years, as well as the 2016 fiscal year.[43]

192.     The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Panasonic's corporate conduct, which has included illegal activity

---

[42] https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf.

[43] *Id.*; http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/2014/sr2014e.pdf.

1    aimed at generating profits at the expense of its customers. It is highly plausible that the same

2    type of conduct occurred in the Inductors market.

3          193.   Faced with an overall decline in demand for their Inductors, and steep price

4    declines after the introduction of the ITA, Panasonic and its colleagues had a keen desire to

5    avoid price competition.

6          194.   As noted above, NEC Tokin, the predecessor of Defendant Tokin, was fined by

7    the JFTC and by a federal district court judge for fixing the prices of certain capacitors and one

8    of its executives (Mr. Date, who participated in meetings of both the Inductors Subcommittee

9    and the PCC meetings) has been indicted for his involvement in that conspiracy.

10         195.   Likewise, Taiyo Yuden has also been accused of, or investigated for,

11   anticompetitive practices by foreign competition authorities. On June 26, 2018, *MLex* reported

12   that the Korean Fair Trade Commission ("KFTC") had completed its investigation into cartel

13   activity in the capacitors market in South Korea. According to *MLex*, Taiyo Yuden was

14   implicated in the KFTC's report, along with Panasonic, NEC-Tokin, and other capacitors

15   manufacturers.

16         196.   In 2009, Taiyo Yuden was fined two million New Taiwan Dollars (NT$) and

17   ordered to cease its illegal licensing practices by the Taiwanese Fair Trade Commission for

18   violating the Taiwanese Fair Trade Act in conspiring with Royal Dutch Philips Electronics,

19   Ltd. and Sony Corporation to abuse their joint monopoly power in the Market for CD-

20   Recordable discs.[44]

21         197.   Similarly, in July of 2016, the JFTC raided the offices of TDK Corporation and

22   NHK Spring Co. ("NHK") on suspicion that they created an unlawful cartel concerning

23   suspensions for hard disk drives ("HDD"). In February of 2018, the JFTC fined suspension

24   makers 1076.16 million yen for agreeing to fix prices. In April of 2018, CADE—Brazil's

25   Administrative Council for Economic Defense—announced that it was investigating a cartel

26   among HDD suspension manufacturers that included TDK and NHK.

27

28   _____
     [44] https://www.ftc.gov.tw/internet/english/doc/docDetail.aspx?uid=786&docid=1720.

198.    The highly concentrated nature and structure of the Inductors market made it likely that collusion would be both possible and profitable. As shown above, Defendants comprised over 75% of the market during much of the Class Period.

5.    **Use of Trade Associations Other than JEITA to Facilitate and Organize the Conspiracy**

199.    Trade associations other than JEITA provided opportunities for the Defendants to meet frequently and exchange information to facilitate collusion. The Defendants are members of a number of trade associations in the United States, Asia and Europe. Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor and police one another's activities in the Inductors market and punish non-compliance. The Defendants' participation in trade associations, as described above, helped facilitate their collusion.

200.    One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia. Several of the Defendants are members of this organization, including MENA, Sumida America, TDK America, and PCNA (through its division Panasonic Industrial Sales Company of America). They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

> ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth and profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.
>
> Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves as a vital nexus for refinement and progress.[45]

201.    For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision-making (Executive summaries, confidence surveys, end market reports, etc.)," the

---

[45] https://www.ecianow.org/about-ecia/what-we-do/.

1   opportunity to "[s]hape opinion and direction by participating on Councils and Committees that

2   design, develop, and publish processes the industry will follow" and "[n]etworking among the

3   industry leaders (…can't have enough professional relationships!)."[46]

4       202.    The data and statistics mentioned by ECIA are significant. For the Inductors

5   market, ECIA prepares quarterly sale reports of Inductors sold in North America, as well as

6   indices of monthly and weekly sales of electronic components.[47] The ECIA also has a Statistics

7   and Industry Data Council, the role of which is defined as follows:

8       The Statistics and Industry Data Council oversees several programs that collect
        and provide unique industry data. These include commodity and market segment
9       level sales trends as well as discrete passive electronic components market
        reports. The primary outputs are the Electronic Component Sales Trends survey
10      (ECST) and the MS Series, a collection of 13 individual reports on capacitors,
        resistors, and inductors that include world statistics.[48]
11

12  The same webpage goes on to list among "2014 accomplishments" that the Statistics and

13  Industry Data Council "[c]ompiled and published more than 100 statistics reports (MS series)

14  on *North American Sales and Booking* for capacitors, resistors and inductors plus monthly

15  reports on world statistics for capacitors and quarterly reports for world statistics for resistors

16  and inductors." Within the council is the "Passive Components Market Services Working

17  Group," of which TDK America, Panasonic Corporation, and MENA are members.

18      203.    By virtue of their membership in such organizations, the Defendants have the

19  opportunity to meet, have improper discussions under the guise of legitimate business contacts,

20  and perform acts necessary for the operation and furtherance of the conspiracy. ECIA, for

21  example, hosts an annual "Executive Conference." The 2014 conference was held in Chicago,

22  Illinois, and the 2015 conference was held in Chicago on October 25-27, 2015. ECIA also hosts

23  an "EDS Summit" that includes electronic component manufacturers "where valuable idea

24

25

26  ---
    [46] https://www.ecianow.org/join-ecia/manufacturer/.

27  [47] https://www.ecianow.org/north-america-sales-booking-reports/.

28  [48] https://www.ecianow.org/about-ecia/councils/statistics-industry-data-council/.

1  exchange can happen through high-level strategic meetings, event functions and informal

2  gatherings."[49] This year's EDS Summit took place on May 15-18, 2018 in Las Vegas, Nevada.

3       204.    Another trade association to which some of the Defendants belong is the

4  European Passive Components Industry Association ("EPCIA"), which is headquartered in

5  Brussels, Belgium. Its members include Murata and Panasonic entities. The Vice President of

6  EPCIA is Reinhard Sperlich of Murata Europe GmBH, which is headquartered in Nürnberg,

7  Germany. EPCIA's goal is "[t]o represent and promote the common interests of the Passive

8  Components Manufacturers active in Europe to ensure an open and transparent market for

9  Passive Components in Europe as part of the global market place"; among its activities are

10  providing members with "general market data," "[f]acilitat[ing] worldwide networking

11  between Passive Component Manufacturers at expert/Management level" and "[r]elat[ing] with

12  similar Industry Associations in other Regions around the world." [50]

13         **6.**     **Other Interactions**

14       205.    Beyond trade associations, Murata, TDK, and Taiyo Yuden have a history of

15  working closely together. For example, in 2005, they jointly prepared and proposed new

16  recommended dimensions for Ultra-Compact Multilayer Chip Ceramic Capacitors.

17       206.    In Taiyo Yuden's 2013 annual report, Eiji Watanuke, its President, stated that

18  "we are transforming our business model to accommodate the formation of alliances with other

19  companies. Looking ahead, we intend to proactively enter these markets characterized as being

20  comparatively less susceptible to price competition."

21       207.    As discussed above, beginning in September of 2005, Taiyo Yuden and Kemet

22  entered into a "comprehensive sales alliance agreement" "to engage in mutual sales of each

23  other's entire product lines."[51]

24

25

26  [49] https://www.ecianow.org/connection-points/eds/.

27  [50] https://www.eusemiconductors.eu/epcia/epcia-home.eu/epcia/epcia-home.

    [51] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf. This arrangement continued during

28  the period when Kemet had a financial and ownership stake in NEC Tokin.

208.   Likewise, the Defendants had opportunities to meet and conspire at industry events such as Semicon Japan, which has an annual trade show and bills itself as the premier exposition for the electronics manufacturing supply chain.

209.   Taken together, all of these characteristics of the industry, including economic characteristics inconsistent with the qualities of a competitive market, combined with collusive activities at JEITA meetings and related meetings, significant opportunities to conspire at other venues, the history of past collusion in related markets for passive electronics or in other electronic component markets by certain of these defendants, and the grand jury investigation, strongly support an inference of collusion.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

210.   Plaintiffs and members of the Class could not have discovered, with reasonable diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it, until the DOJ's investigation was made public in January of 2018.

211.   Defendants actively concealed the existence of the conspiracy from Plaintiffs and members of the Class, and there is nothing in the public domain that would put Plaintiffs or anyone else on notice that the Defendants were conspiring at meetings regarding prices for Inductors sold in the United States. These acts of concealment included collusive conduct carried out under the auspices of what were presented to the public as legitimate trade associations, such as JEITA.

212.   There was no way Plaintiffs could have learned that conspiratorial conduct concerning Inductors was occurring through trade associations such as JEITA, the meetings of which were non-public. Nor were Plaintiffs privy to the conspiratorial acts that occurred at social gatherings of Defendants' executives that occurred in proximity to JEITA meetings, where conspiratorial discussions occurred orally or through other surreptitious means.

213.   Defendants' own public statements concealed the existence of the alleged conspiracy. For example, Murata in its Fiscal Year 2004, 2007 and 2008 Annual Reports repeatedly referred to "competition" as being "fierce." Many of TDK's Annual Reports during

the Class Period also refer to the challenges of "competition." Similarly, in its Annual Reports during the Class Period (such as those from 2009-11), Taiyo Yuden touted its "social responsibility" charter and how it engaged in "fair, open and free competition" and how it was facing "increased" competition. And Panasonic, despite all its public pronouncements that it was educating its executives and departing from its cartel past, has in fact, not done so.

214.    Several of the Defendants have adopted and promulgated a "code of conduct" that is at odds with their participation in the alleged conspiracy.

215.    Thus, Murata said in its 2007 Code of Conduct that "[w]e will conduct fair business by complying with all applicable laws and regulations regarding antitrust and fair competition and trade."[52]

216.    Similarly, TDK's 2005 Code of Conduct states that:

> In general, the purpose of antitrust laws or similar competition laws in many countries is to encourage free competitions or trade and to protect consumer interests. TDK Members must exercise special care to ensure that any business activity with representatives of other companies is not contrary to such antitrust laws or similar anti-competition laws of other countries, where applicable. Each member organization of TDK Group should have its compliance company policy with regard to its respective applicable antitrust laws or similar anti-competition laws, and such policy must be respected or observed by TDK Members of the member organization.[53]

217.    Likewise, Taiyo Yuden's Code of Conduct states that "[a]ny unfair business practice or suspected act of cartel behavior, abuse of dominant bargaining position, tie-in sales or other acts for improper restriction of trade or unfair transaction shall be never committed."[54]

218.    Sumida's "business principles" include the precept that "[w]e respect the manners, customs and laws of local regions in all our business activities."[55]

---

[52] https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/p02.ashx?la=en.

[53] https://www.sec.gov/Archives/edgar/data/203383/000114554907001603/k01416exv11w1.htm.

[54] https://www.yuden.co.jp/cs/company/csr/charter/rule.html.

[55] https://www.sumida.com/info-centre/index.php?categoryId=17#BusinessPrinciples.

219.   And Panasonic's 2008 Code of Conduct states that "[w]e will respect free and fair competition, and abide by all applicable antitrust (competition law) and other laws and regulations."[56]

220.   Kemet, which owns Tokin, has a code of conduct that includes the following:

> Antitrust laws, sometimes also called competition laws, govern the way that companies interact with their competitors, customers, and suppliers in the market place. They are designed to encourage competition by prohibiting unreasonable restraints on trade. KEMET and its directors, officers, and employees are required to comply with the antitrust and unfair competition laws of the many countries in which the company does business. These laws are complex and vary considerably from country to country. They generally concern:
>
> •   Agreements with competitors that harm customers, including price fixing and allocations of customers or contractors,
>
> •   Agreements that unduly limit a customer's ability to sell a product, including establishing the resale price of a product or service or conditioning the sale of products on an agreement to buy other company products and services, and/or
>
> •   Attempts to monopolize, including pricing a product below cost in order to eliminate competition.
>
> KEMET is committed to competing vigorously but fairly for suppliers and customers in all regions and countries where we do business. Violating antitrust laws is a serious matter, and could place both the company and the individual at risk for substantial criminal penalties.

221.   By promulgating these codes of conduct and then not living up to them, the Defendants engaged in fraudulent concealment.

222.   Defendants also began sanitizing the minutes memorializing their meetings at JEITA in order to cover their tracks, changing the entries on its meeting minutes from "information exchange conducive to corporate management" to "information exchange concerning general market conditions," regardless of the actual information exchanged in them.

---

[56] https://www.panasonic.com/global/corporate/management/code-of-conduct/pdf/code-of-conduct/02_coc2008English.pdf.

## VII.   CLASS ACTION ALLEGATIONS

223.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a Class, which is defined as follows:

224.   All persons or entities in the United States, its territories, and the District of Columbia who purchased Inductors (including through controlled subsidiaries, agents, affiliates, or joint ventures) from any of the Defendants identified therein, their subsidiaries, agents, affiliates or joint ventures from January 1, 2003 through December 1, 2016 (the "Class Period"). This Class includes two Subclasses: (a) those who bought Inductors from one of the Defendants and (b) those who bought manufactured products containing Inductors made by one of the Defendants from one or more of the Defendants. Excluded from the Class are the Defendants and their co-conspirators, subsidiaries, agents, and/or affiliates; Defendants' officers, directors, management, employees, subsidiaries, and/or agents; all governmental entities; and the Judges and chambers staff presiding over this case, as well as any members of their immediate families.

225.   The Class definition thus encompasses those who purchased Inductors and/or product(s) containing one or more Inductors from any of the Defendants, even if the Inductors purchased were manufactured, sold, or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

226.   While Plaintiffs do not know the exact number of the members of the Class, they believe there are at least thousands of members.

227.   Plaintiffs also do not know the exact duration of the alleged conspiracy and reserve the right to amend its complaint.

228.   Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

  a.   Whether Defendants engaged in a combination and conspiracy among

themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold customers in the United States, its territories and the District of Columbia;

b.  The identity of the participants of the alleged conspiracy;

c.  The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

d.  Whether the alleged conspiracy violated the Sherman Act;

e.  Whether the conduct of Defendants, as alleged in this CAC, caused injury to the business or property of Plaintiffs and members of the Class;

f.  The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period;

g.  The appropriate injunctive and related equitable relief; and

h.  The appropriate class-wide measure of damages.

229.    The claims of Dependable, Powerweb, and Lifetime are typical of the claims of the members of the Subclass who bought Inductors from any of the Defendants, and the claims of Arch and Capital are typical of the claims of members of the Subclass who bought manufactured products containing Inductors made by one of the Defendants from one or more of the Defendants. The Plaintiffs will fairly and adequately protect the interests of the entire Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Inductors purchased from the Defendants or manufactured products containing Inductors made by one of the Defendants.

230.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

1  231.  The questions of law and fact common to the members of the Class predominate
2  over any questions affecting only individual members, including legal and factual issues
3  relating to liability and damages.

4  232.  Class action treatment is a superior method for the fair and efficient adjudication
5  of the controversy, in that, among other things, such treatment will permit a large number of
6  similarly situated persons to prosecute their common claims in a single forum simultaneously,
7  efficiently and without the unnecessary duplication of evidence, effort and expense that
8  numerous individual actions would engender. The benefits of proceeding through the class
9  mechanism, including providing injured persons or entities with a method for obtaining redress
10 for claims that it might not be practicable to pursue individually, substantially outweigh any
11 difficulties that may arise in management of this class action.

12 233.  The prosecution of separate actions by individual members of the Class would
13 create a risk of inconsistent or varying adjudications, establishing incompatible standards of
14 conduct for Defendants.

**VIII.   CLAIM FOR RELIEF**
**VIOLATIONS OF THE SHERMAN ACT**
**15 U.S.C. §§ 1 and 3**
**(Alleged against all Defendants)**

17 234.  Plaintiffs hereby repeat and incorporate by reference each preceding and
18 succeeding paragraph as though fully set forth herein.

19 235.  Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to
20 artificially restrict competition in the market for Inductors. During the Conspiracy Period, the
21 Defendants met repeatedly to exchange competitively sensitive information, including price
22 and price-related information. These meetings include meetings that were orchestrated by or
23 through JEITA. The effect of these meetings was to raise, fix, set, stabilize, or otherwise
24 artificially manipulate the prices of Inductors beyond the natural interplay of supply and
25 demand.

26
27
28

236.   Defendants formed a cartel, organized in part around JEITA meetings, designed to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

237.   As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for Inductors and manufactured products containing Inductors sold to purchasers in the United States, its territories, and the District of Columbia during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated cartel levels.

238.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

239.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including setting prices of Inductors at supra-competitive prices, and selling these Inductors to Plaintiffs and the members of the Class.

240.   Defendants' anticompetitive and unlawful conduct is illegal per se.

241.   As a result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and the members of the Class have been injured in their businesses and property in that they have paid more for the Inductors that they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

## IX.   DEMAND FOR JUDGMENT

242.   Plaintiffs request that the Court enter judgment on its behalf and on behalf of the Class that:

A.   This action may proceed as a class action, with Plaintiffs serving as Class Representative under Fed. R. Civ. P. 23(c);

B.   Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

| | |
|---|---|
| 1 | C. Plaintiffs and the Class are entitled to recover damages sustained by them, as |
| 2 | provided by the federal antitrust laws under which relief is sought herein, and |
| 3 | that a joint and several judgment in favor of Plaintiffs and the Class be entered |
| 4 | against Defendants in an amount subject to proof at trial, which is to be trebled |
| 5 | in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15; |
| 6 | D. Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest |
| 7 | on the damages awarded them, and that such interest be awarded at the highest |
| 8 | legal rate from and after the date this class action complaint is first served on |
| 9 | Defendants; |
| 10 | E. Plaintiffs and the Class are entitled to equitable relief under 15 U.S.C. § 26 |
| 11 | appropriate to remedy Defendants' restraint of trade, including issuing a |
| 12 | permanent injunction against Defendants and their parents, subsidiaries, |
| 13 | affiliates, successors, transferees, assignees and the respective officers, |
| 14 | directors, partners, agents, and employees thereof and all other persons acting |
| 15 | or claiming to act on their behalf from repeating (or continuing and |
| 16 | maintaining) the conspiracy or agreements alleged herein; |
| 17 | F. Defendants are to be jointly and severally responsible financially for all costs, |
| 18 | including the expenses of a Court-approved notice program; |
| 19 | G. Plaintiffs and the Class recover their reasonable attorneys' fees as provided by |
| 20 | law; and |
| 21 | H. Plaintiffs and the Class receive such other or further relief as may be just and |
| 22 | proper. |
| 23 | // |
| 24 | // |
| 25 | // |
| 26 | // |
| 27 | // |
| 28 | // |

1

## X.   JURY DEMAND

2          243.    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by

3    jury on all matters so triable.

4

5      Dated: July 2, 2018                              Respectfully submitted,

6                                                       /s/ Lesley E. Weaver

7                                                       Lesley E. Weaver (SBN 191305)
                                                        Matthew S. Weiler (SBN 236052)
8                                                       BLEICHMAR FONTI & AULD LLP
                                                        555 12th Street, Suite 1600
9                                                       Oakland, CA 94607
                                                        Tel.: (415) 445-4003
10                                                      Fax: (415) 445-4020
                                                        lweaver@bfalaw.com
11                                                      mweiler@bfalaw.com

12
                                                        *Interim Co-Lead Class Counsel and*
13                                                      *Attorneys for the Direct Purchaser Class*

14
                                                        /s/ Michael P. Lehmann
15
                                                        Michael P. Lehmann (SBN 77152)
16                                                      Bonny E. Sweeney (SBN 176174)
                                                        Christopher Lebsock (SBN 184546)
17                                                      Samantha Stein (SBN 302034)
                                                        HAUSFELD LLP
18                                                      600 Montgomery Street, Suite 3200
                                                        San Francisco, CA 94111
19                                                      Tel.: (415) 633-1908
                                                        Fax: (415) 358-4980
20                                                      mlehmann@hausfeld.com
                                                        bsweeney@hausfeld.com
21                                                      clebsock@hausfeld.com
                                                        sstein@hausfeld.com
22

23
                                                        *Interim Co-Lead Class Counsel and*
24                                                      *Attorneys for the Direct Purchaser Class*

25                                                      Marc H. Edelson (admitted *pro hac vice*)
                                                        EDELSON & ASSOCIATES, LLC
26                                                      3 Terry Drive, Suite 205
                                                        Newtown, PA 18940
27                                                      Tel.: (215) 867-2399
                                                        medelson@edelson-law.com
28

Joshua H. Grabar (admitted *pro hac vice*)
GRABAR LAW OFFICE
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel.: (267) 507-6085
jgrabar@grabarlaw.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
guido@saveri.com
rick@saveri.com
zirpoli@saveri.com

Christopher M. Burke (SBN 214799)
Walter W. Noss (SBN 277580)
Hal Cunningham (SBN 243048)
John Jasnoch (SBN 281605)
SCOTT + SCOTT ATTORNEYS AT LAW
LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-4565

Todd A. Seaver (SBN 271067)
Joseph J. Tabacco, Jr. (SBN 75484)
Matthew D. Pearson (SBN 235339)
Sarah Khorasanee McGrath (SBN 263935)
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
mpearson@bermantabacco.com
smcgrath@bermantabacco.com

Marc Greenspon (*pro hac vice* to be filed)
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300

Fax: (617) 542-1194
mgreenspon@bermantabacco.com

Vincent Briganti (*pro hac vice* to be filed)
Barbara Hart (*pro hac vice* to be filed)
LOWEY DANNENBERG P.C.
White Plains Plaza
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
bhart@lowey.com

Brian Murray (*pro hac vice* to be filed)
Lee Albert (*pro hac vice* to be filed)
GLANCY PRONGAY & MURRAY
230 Park Avenue, Suite 530
New York, NY 10169
Tel.: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

Allan Steyer (SBN 100318)
D. Scott Macrae (SBN 104663)
STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
Tel.: (415) 421-3400
Fax: (415) 421-2234
asteyer@steyerlaw.com
smacrae@bamlawca.com

Arthur N. Bailey (*pro hac vice* to be filed)
R. Anthony Rupp, III (*pro hac vice* to be filed)
Marco Cercone (*pro hac vice* to be filed)
RUPP BASE PFALZGRAF
CUNNINGHAM, LLC
424 Main Street, 1600 Liberty Building
Buffalo, NY 14202
Tel: (716) 854-3400
bailey@ruppbaase.com
rupp@ruppbaase.com
cercone@ruppbaase.com

*Additional Counsel for the Class*