Lesley E. Weaver (Cal. Bar No. 191305)
Matthew S. Weiler (Cal. Bar No. 236052)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
E-mail: lweaver@bfalaw.com
E-mail: mweiler@bfalaw.com

Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
Samantha Stein (Cal. Bar No. 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
E-mail:  mlehmann@hausfeld.com
E-mail:  bsweeney@hausfeld.com
E-mail:  clebsock@hausfeld.com
E-mail:  sstein@hausfeld.com

*Co-Lead Interim Class Counsel*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE INDUCTORS ANTITRUST LITIGATION | Case No. 5:18-cv-00198-EJD-NC **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** Date:      March 7, 2019 Time:     9:00 a.m. Judge:    Edward J. Davila Location:  Courtroom 4 – 5th Floor |

1

## TABLE OF CONTENTS

2

3

**ISSUES TO BE DECIDED**..................................................................................................ix

**I.      INTRODUCTION** ....................................................................................................1

**II.     ARGUMENT** ...........................................................................................................2

    A.    Facts Alleged In The CAC. .................................................................. 2

        1.    Allegations Of The Nature And Structure Of The Inductors Market....3

        2.    Allegations Of Collusive Conduct.........................................................4

        3.    Allegations Of The Criminal Investigation By DOJ. ...........................8

        4.    Other Allegations Of "Plus Factors." ...................................................8

    B.    Standard Of Review On Rule 12(b)(6) Dismissal Motions................... 8

    C.    Plaintiffs Have Alleged A Plausible Conspiracy................................. 10

        1.    Plaintiffs Have Alleged An Economically Plausible Conspiracy. ......10

        2.    Plaintiffs Have Alleged Detailed Facts About Meetings From Which A Conspiracy May Be Inferred. ............................................................17

        3.    The DOJ's Criminal Investigation May Also Be Considered. ............21

        4.    Plaintiffs Have Alleged Adequately Other "Plus Factors.".................22

        5.    Plaintiffs Have Alleged Adequately The Role That Defendants' United States Subsidiaries Played In The Conspiracy. ...................................23

        6.    Defendant Panasonic's Standing Argument Is Without Merit. ...........25

        7.    Defendant Panasonic's FTAIA Argument Is Without Merit. .............28

**III.    CONCLUSION.** ......................................................................................................30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*In re Aftermarket Filters Antitrust Litig.*,
   No. 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................. 22

5

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   175 F. Supp. 3d 44 (S.D.N.Y. 2016) ................................................................................ 13

6

7

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2016).............................................................................. 16

8

9

*Arandell v. Centerpoint Energy Servs., Inc.*,
   900 F.3d 623 (9th Cir. 2018) ............................................................................... 16, 24, 25

10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................... 9, 10, 18, 20

11

12

*In re Automotive Parts Antitrust Litig.*,
   No. 12-cv-501, 2014 WL 4272772 (E.D. Mich. Aug. 29, 2014) .......................... 10, 21, 22

13

14

*B&R Supermarket, Inc. v. Visa, Inc.*,
   No. C 16-01150 WHA, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ..................... 19, 20

15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................*passim*

16

17

*Beltz Travel Serv., Inc., v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) ........................................................................................ 16

18

19

*In re Blood Reagents Antitrust Litig.*,
   756 F. Supp. 2d 623 (E.D. Pa. 2010)................................................................. 10, 21, 22

20

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017).............................................................. 11, 12, 16, 22

21

22

*In re Capacitors Antitrust Litig.*,
   106 F. Supp. 3d 1051 (N.D. Cal. 2015)............................................................ 4, 21, 23, 29

23

24

*In re Capacitors Antitrust Litig.*,
   156 F. Supp. 3d 916, 928 (N.D. Cal. 2015)...................................................................... 24

25

*In re Capacitors Antitrust Litig.*,
   No. 14-cv-03264-JD, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016).......................... 28, 29

26

27

*In re Capacitors Antitrust Litig. (No. III)*,
   No. 17-md-02801-JD, 2018 WL 4558265 (N.D. Cal. Sept. 20, 2018) ................. 28, 29, 30

28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ................................................... 26

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp .2d 1011 (N.D. Cal. 2010) ....................................... *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    911 F. Supp. 857 (N.D. Cal. 2012) ........................................... 26, 28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    MDL No. 1917, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016) ....................... 30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    MDL No. 1917, 2016 WL 7800810 (N.D. Cal. Nov.15, 2016) ......................... 28

*In re Chocolate Confectionary Antitrust Litig.*,
    607 F. Supp. 2d 701 (M.D. Pa. 2009) ................................... 10, 21, 22

*City of Moundridge v. Exxon Mobil Corp.*,
    250 F.R.D. 1 (D.D.C. 2008) ............................................. 9, 22

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ......................................................... 10

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 732 (1984) ...................................................... 24, 25

*Costco Wholesale Corp. v. AU Optronics Corp.*,
    No. C13-1207RAJ, 2014 WL 4674390 (W.D. Wash. Sept. 18, 2014) ..................... 28

*In re Disposable Contact Lens Antitrust*,
    215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................... 11, 20, 22

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) .................................. 12, 14, 16, 22

*In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*,
    Civ. No. 12-711, 2014 WL 3971620 (D.N.J. Aug. 13, 2014) ......................... 22

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ............................................... 10

*In re Electronic Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ....................................... 11

*Esco Corp. v. United States*,
    340 F.2d 1000 (9th Cir. 1965) ............................................. 16

*Federal Trade Comm'n v. Toys "R" Us*,
    221 F.3d 928 (7th Cir. 2000) ............................................. 11

*Federal Trade Commission. v. H.J. Heinz Co.,*
    246 F.3d 708 (D.C. Cir. 2001)................................................................22

*In re Flash Memory Antitrust Litig.,*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009).................................................17, 22, 23

*In re Flat Glass Antitrust Litig. (II),*
    No. 08-mc-180, 2009 WL 331361 (W.D. Pa. 2009) .........................................21

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,*
    795 F. Supp. 2d 847 (E.D. Wis. 2011) ....................................................30

*Gelboim v. Bank of America Corp.,*
    823 F.3d 759 (2d Cir. 2016) ...............................................................11

*In re Generic Prescription Drugs Antitrust Litig.,*
    No. 16-MD-2724, 2018 WL 5003450 (E.D. Pa. Oct. 16, 2018) ..................................21, 22

*In re Graphics Processing Units Antitrust Litig.,*
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)......................................................21

*In re Graphics Processing Units Antitrust Litig.,*
    540 F. Supp. 2d 1085 (N.D. Cal. 2007)......................................................11

*Great Atl. & Pac. Tea Co. v. Federal Trade Comm'n,*
    440 U.S. 69 (1979) ........................................................................17

*GreenCycle Paint, Inc. v. Paintcare, Inc.,*
    250 F. Supp. 3d 448 (N.D. Cal. 2017).......................................................16

*Haley Paint Co. v. E.I. DuPont de Nemours & Co.,*
    804 F. Supp. 2d 419 (D. Md. 2011)..........................................................22

*In re High-Tech Emp. Antitrust Litig.,*
    856 F. Supp. 2d 1103 (N.D. Cal. 2012).........................................10, 16, 19, 20

*Hinds Cty., Miss. v. Wachovia Nat'l Bank, N.A.,*
    700 F. Supp. 2d 378 (S.D.N.Y. 2010) .......................................................21

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) .................................................................25, 26, 27

*Kendall v. Visa, U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008)..........................................................17, 19, 20

*Kendall v. Visa U.S.A., Inc.,*
    No. C 04-4276, 2005 WL 2216941 (N.D. Cal. July 25, 2005) ................................19

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988 (9th Cir. 2018) ..............................................................14

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 923 (N.D. Cal. 2007)..................................................................17

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-md-02420-YGR, 2017 WL 2021361 (N.D. Cal. May 12, 2017)............................30

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 20, 2014)............10, 19, 26, 27

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)..............................26

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000)..........................................................................30

*In re Musical Instruments & Equipment Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015)......................................................11, 17, 19, 20

*In re Nat'l Ass'n of Music Merchants*,
    MDL No. 2121, 2011 WL 3702453 (S.D. Cal. Aug. 22, 2011)..........................................19

*In re New Jersey Tax Sales Certificates Antitrust Litig.*,
    No. 12-1893 (MAS)(TJB), 2014 WL 5512661 (D.N.J. Oct. 31, 2014)............................22

*In re Optical Disk Drive Products Antitrust Litigation*,
    No. 3:10-md-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012)..............................27

*Oxbow Carbon & Minerals LLC v. Union Pac. Ry. Co.*,
    81 F. Supp. 3d 1, 13 (D.D.C. 2015)...................................................................9

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010)......................................................9, 10, 21, 22

*In re Packaged Seafood Prods. Antitrust Litig.*,
    No. 15-MD-2670 JLS (MDD), 2017 WL 35571 (S.D. Cal. Jan. 3, 2017)..................20, 21

*Patel v. Parnes*,
    253 F.R.D. 531 (C.D. Cal. 2008).....................................................................14

*In re Polyurethane Foam Antitrust Litig.*,
    799 F. Supp. 2d 777 (N.D. Ohio 2011)...............................................................9, 10

*In re Polyurethane Foam Antitrust Litig.*,
    No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014)..............................16

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    566 F. Supp. 2d 363 (M.D. Pa. 2008).............................................................10, 22

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011)...............................................................16

*In re Processed Egg Prods. Antitrust Litig.*,
   902 F. Supp. 2d 704 (E.D. Pa. 2012)................................................................. 10

*In re Propranolol Antitrust Litig.*,
   249 F. Supp. 2d 712 (S.D.N.Y. 2017) .................................................... 20, 21, 22

*Ramirez v. United Airlines Inc.*,
   416 F. Supp. 2d 792 (N.D. Cal. 2005)................................................................. 14

*In re Resistors Antitrust Litig.*,
   15-CV-03820-JD, 2017 WL 3895706 (N.D. Cal. Sept. 5, 2017).............................. *passim*

*Royal Printing Co. v. Kimberly-Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980) ......................................................... 25, 26, 27, 28

*In re Southeastern Milk Antitrust Litig.*,
   555 F. Supp. 2d 934 (E.D. Tenn. 2008) ............................................................... 9

*Standard Iron Works v. ArcelorMittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009).......................................................... 10, 22

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ..................................................................... 9, 10

*Starr v. Sony BMG Music Entertainment, Inc.*,
   592 F.3d 314 (2d Cir. 2010) ............................................................................. 21

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) ..................................................................... 12

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008)....................................................... 17, 22, 23

*In re Tableware Antitrust Litig.*,
   363 F. Supp. 2d 1203 (N.D. Cal. 2005)............................................................. 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................ 10

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ........................................................................... 22

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ........................................................................... 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008)............................................................. 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009)......................................................... 9, 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    781 F. Supp. 2d 955 (N.D. Cal. 2011) ................................................................ 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. C 12-3802 SI, 2013 WL 1164897 (N.D. Cal. Mar. 20, 2013) ..................................... 26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2012 WL 5869588 (N.D. Cal. Nov. 19, 2012) ..................................... 27

*In re Transpacific Air Passenger Transp. Antitrust Litig.*,
    No. C07-05634 CRB, 2011 WL 1753738 (N.D. Cal. May 9, 2011) ................................... 16

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
    305 F. Supp. 3d 1134 (D. Or. 2018) ................................................................ 25

*United States v. Container Corp.*,
    393 U.S. 333 (1969) ................................................................................ 17

*United States v. Hsiung*,
    778 F.3d 738 (9th Cir. 2015) ................................................................ 28, 29

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ................................................................................ 17

*Werdebaugh v. Blue Diamond Growers*,
    No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ........................... 14

**Statutes**

Foreign Trade Antitrust Improvements Act ................................................ 28, 29, 30

Sherman Act ................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 8 ................................................................................ 9, 10

Fed. R. Civ. P. 15(a) ................................................................................ 30

Rule 12(b)(6) ................................................................................ 8, 10, 30

1

## ISSUES TO BE DECIDED

2

(1) Whether Plaintiffs' CAC states a plausible claim for relief under *Bell Atlantic Corp.*

3

*v. Twombly*, 550 U.S. 544 (2007).

4

(2) Whether Plaintiffs Arch Electronics and Cambridge Capital Corporation have

5

pleaded facts to demonstrate that they have standing under *Illinois Brick Co. v. Illinois*, 431

6

U.S. 720 (1977).

7

(3) Whether Plaintiffs' CAC states a claim against the U.S. subsidiary Defendants under

8

the Foreign Trade Antitrust Improvements Act (15 U.S.C. §6(a) ("FTAIA").

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Plaintiffs Arch Electronics, Inc. ("Arch"), Cambridge Capital Corporation ("CCC"), Dependable Component Supply Corporation ("Dependable"), Lifetime Service Center, Inc., Powerweb, Inc. and Powerweb Energy, Inc. (collectively "Plaintiffs") hereby oppose the Defendants' combined motion (ECF No. 223) ("DM") to dismiss the Corrected Consolidated Amended Complaint ("CAC") (ECF No. 210).

Plaintiffs' CAC identifies the "who", "what", "where", "when", and "why" of a long-standing scheme to fix prices for Inductors, a passive electronic component that is ubiquitous in consumer electronics products such as smart phones, automobiles, laptop computers, and tablets. CAC ¶¶ 187-209. The CAC alleges that 33 individuals from seven Defendant companies (the "who") participated in fixing prices for Inductors by, *inter alia*, exchanging specific, forward-looking information on prices of Inductors and other competitively-sensitive information (the "what").  The CAC identifies specific meetings in Japan starting in 2003 attended by these individuals that were organized around the Defendant companies' membership in the Japan Electronics & Information Technology Association ("JEITA") ("when" and "where").  The CAC further alleges that this collusion was designed to stabilize or inflate prices of Inductors in the teeth of a series of market shocks that started in December of 1997 with the Information Technology Agreement ("ITA"), which created foreign competition to the Inductors market that had long been dominated by Defendants (the "why"). *Id.* The fact of collusion is confirmed by the prices of Inductors, which defied the economic reality of the last fifteen years by stabilizing and even rising during the Great Recession and falling in 2014 and 2015 during a time of global economic growth once investigations into antitrust violations in the passive electronics industry likely chilled Defendants' anticompetitive activity. *Id*. ¶¶ 8-13.  Viewed as a whole, the collusive scheme is highly plausible.

These facts, which Plaintiffs developed without the assistance of the results of an ongoing investigation by the United States Department of Justice ("DOJ"), and despite a stay on merits discovery in this action (ECF No. 181), are likely the tip of the iceberg. They are also more than enough to withstand the DM, which largely ignores Plaintiffs' allegations, and

establishes a number of factual disputes inappropriate for resolution at the pleading stage. Defendants argue that Plaintiffs have not pled direct evidence of an agreement to fix prices for Inductors. DM at 1-2. Such "smoking gun" evidence of a price-fixing agreement is rare, and is not required at any stage of this type of an antitrust action (certainly not at the pleading stage. Plaintiffs pled facts that on their face demonstrate agreements to exchange competitively-sensitive information, such as prices. Additionally, Plaintiffs have pled detailed facts from which an agreement may be inferred concerning the scope, duration, and nature of the conspiracy. That is all that is required.

The Court should not consider the DM in a vacuum.  In a similar antitrust litigation concerning resistors, another passive electronic component, Judge James Donato said: "[a]t that [JEITA] meeting, the 'participants agreed on a procedure for facilitating coordination of industry behavior in their subsequent meetings,' including the type of information to be exchanged, *e.g.*, 'current sales and changes in production of resistors' and 'your company's estimated forecast and outlook.' … The CAC also specifically alleges that '[s]eeking to salvage their profitability amid a collapse in prices brought on by elimination of tariff barriers and a global recession, defendants at least as early as July 2003 agreed to work together—i.e. conspired—to artificially stabilize and increase resistor prices and preserve their position in global resistor markets.'" *In re Resistors Antitrust Litig.*, 15-CV-03820-JD, 2017 WL 3895706, at *2 (N.D. Cal. Sept. 5, 2017) ("*Resistors*"). Plaintiffs here pled a very similar type of agreement in restraint of trade as that which was found to withstand motions to dismiss in *Resistors*, and Defendants' motion here must be denied.

## II.   ARGUMENT

### A.  Facts Alleged In The CAC.

The CAC alleges violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3) to fix prices of Inductors during the period from January of 2003 to September of 2014. CAC ¶ 2 n.2. Since the effects of a conspiracy do not immediately dissipate upon its termination, the Class Period is longer and extends from January 1, 2003 to December 1, 2016. *Id.* ¶ 224. "This Class includes two Subclasses: (a) those who bought Inductors from one of the Defendants and

1  (b) those who bought manufactured products containing Inductors made by one of the

2  Defendants from one or more of the Defendants." *Id*.

3          **1.**      **Allegations Of The Nature And Structure Of The Inductors Market.**

4       This case involves Inductors, components that store energy in the form of a magnetic

5  field. *Id*. ¶ 3. Inductors are part of the category known as "passive electronic components,"

6  which also includes resistors and capacitors. *Id*. Inductors are generally made by wrapping a

7  wire around some type of a core—usually metallic or ceramic. *Id*. ¶¶ 114-17. Inductors are used

8  widely in various types of electronic equipment, such as televisions, vehicular electronic

9  systems, smartphones, laptop and desktop computers, video game consoles, and induction

10  motors. *Id*. ¶ 3. The types of Inductors at issue here are standardized ones not manufactured to

11  unique specifications by a customer. *Id*. ¶ 124 n.7. The United Nations views them as a

12  commodity, and Defendants' Inductors conform to the specifications of the International

13  Electrotechnical Commission ("IEC") and are largely interchangeable. *Id*. ¶¶ 124-27.

14       The seven families of companies that make Inductors in Japan—Murata, Panasonic,

15  Sagami, Sumida, Taiyo Yuden, TDK, and Tokin—are the Defendants. *Id*. ¶¶ 1, 22-63.

16  Collectively, they accounted for between 84% and 67% of global sales of Inductors during

17  2004-16. *Id*. ¶¶ 4, 120-21, 156. The global market for Inductors has been estimated to be in

18  excess of $2.5 billion and is growing; the North American market has been estimated to be

19  worth between $225 million and $768 million and is also growing. *Id*. ¶ 118.

20       The parents of each of the families of companies are either based in the United States

21  (Kemet Corporation, which now owns Defendant Tokin) or are Japanese companies that have

22  United States subsidiaries that sell Inductors in the United States—as stand alone items or, in

23  the case of Panasonic, also as part of a finished electronic product, such as a Panasonic

24  television. *Id*. ¶¶ 23-24, 30-31, 35-36, 39, 43, 48, 53-54. It is alleged that the Japanese parents

25  closely control the activities and operations of their respective subsidiaries. *Id*. ¶¶ 30-31, 34-36,

26  38, 42-44, 49, 52-54, 56. It is further alleged in great detail that each of the Japanese parents

27  knowingly targets commercial activities generally, and sales of Inductors in particular, to the

28  United States. *Id*. ¶¶ 68-101.

Entry barriers to the Inductors market are high. *Id*. ¶¶ 128-36. The Defendants are globally integrated companies with substantial international reputations. Production costs of Inductors are high and the supply chain is expensive to maintain. Processing of raw materials requires expertise. All of these factors limit entry.

Inductors are also demand inelastic, as market reports have reflected. *Id*. ¶¶ 137-40. During a portion of the claimed Class Period, demand for Inductors actually declined, resulting in excess capacity. *Id*. ¶¶ 11, 140-46, 150-51.

### 2.    Allegations Of Collusive Conduct.

It is alleged that the Defendants formed a cartel and fixed prices for Inductors. This is an economically plausible claim. Indeed, it is similar to the types of claims pled successfully in antitrust class actions involving price-fixing of other passive electronic components, like *Resistors* and *In re Capacitors Antitrust Litig*., 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ("*Capacitors I*"). As noted below, the DOJ has commenced a criminal investigation into the pricing of Inductors. Indeed, as also noted below, the DOJ has found the scheme plausible enough to commence a criminal investigation into the pricing of Inductors. CAC ¶¶ 181-85. While the fact of the investigation buttresses Plaintiffs' claims, the CAC withstands the DM independently of them.

In 1997, 29 nations (including Japan and the United States) entered into the ITA, which eliminated tariffs on world trade of various technological products, including Inductors. CAC ¶¶ 6, 148-49. As a result, according to data from the Federal Reserve Bank of St. Louis ("FRED"), the indexed import price into the United States of Inductors (and products made principally of them, such as transformers) ("Price Index") plummeted. *Id*. ¶ 8. The recession of 2001 only exacerbated this freefall. *Id*. ¶¶ 6, 141-42, 150-51. China joined the ITA in 2003, making matters worse for Japanese manufacturers; the Chinese could now sell Inductors abroad without fear of crippling import tariffs. *See id*. ¶¶ 6, 152.  At about this time, the Price Index, after years of decline, started to rise, gaining particular traction in 2004. The Price Index had a peak during the Great Recession of 2008-09, which was counterintuitive, and rose to even greater heights by late 2014-early 2015. *Id*. ¶ 8. The costs of raw materials for passive electronic

1   components do not justify these increases; they were flat or declining. *Id*. ¶ 10. And

2   development of newer types of Inductors reduced manufacturing costs to a degree. *Id*. ¶ 12. The

3   development of chip technology was predicted in 2007 to adversely affect sales of Inductors,

4   and demand declined during the Great Recession, *Id*. ¶¶ 11, 143. As a result, the Defendants

5   expperienced excess capacity. *Id*. ¶ 144.

6        The Defendants needed to stabilize prices of Inductors in response to the recession and

7   increased competition from China, and they did so by agreeing to form a cartel. The principal

8   means by which they did so was through formal meetings of JEITA, created in 2000, and

9   informal meetings structured around them. *Id*. ¶¶ 17, 158.

10       The CAC is specific on this point. JEITA had a Passive Electronic Components

11  Committee ("PCC") that came to encompass Inductors, resistors, and capacitors. *Id*. ¶ 165. Up

12  to 2003, there were separate committees on the individual types of components, but in 2003,

13  they were merged into the PCC. The PCC met typically three to four times annually at JEITA's

14  offices in Tokyo. In addition to its formal events, social gatherings were convened around them;

15  the CAC identifies ten different venues. *Id*. ¶ 167.

16       In 2004, it was decided to hold Inductors Subcommittee meetings four times annually

17  and to encourage broader attendance, "so that a more extensive sharing of confidential detailed

18  corporate information could occur." *Id*. The meetings again took place at JEITA's Tokyo office

19  or, on occasion, at other venues, such as the Hakata Excel Hotel Tokyu. *Id*. In paragraph 169

20  of the CAC, 40 representatives of the various Defendants are identified by name as attending

21  meetings of the PCC or Inductors Subcommittee or both.

22       The CAC then goes on to state that:

23           At these Inductors Subcommittee meetings during much of the
             Conspiracy Period, attendees for the Defendants shared
24           company-specific current and forward-looking information on
             sales, prices, shipments, product development, and capacity with
25           respect to Inductors, including Inductors sold or shipped to the
             United States. The purpose of these information exchanges was
26           to fix prices for Inductors, as well as to establish forecasts to
             facilitate the implementation of such a fix. Attendees for the
27           Defendants also shared information on how best to deal with the

28

---

business climate for Inductor sales, again in furtherance of the alleged conspiracy.

*Id.* ¶ 170.

Examples of these meetings are given:

> For instance, on November 12, 2003, representatives from TOKO (Mr. Tanaka), Matsushita Electronic Components (the predecessor to Panasonic Corporation) (Mr. Itsuki), and Sumida (Messrs. Suzuki and Shikano) met to exchange information that included their per unit prices for Inductors for 2003, and projections for prices for 2004. The information exchanged also included detailed company-specific information on quantities sold and sales booked for 2004; the cartel members specifically agreed to include information on total orders as well as overall quantities sold. The information exchanges were performed with each company submitting information directly to other members.

> On June 24, 2004, a meeting of Inductors manufacturers was held through JEITA attended by representatives from TOKO (Masaharu Tanaka), Panasonic (Mr. Itsuki), Sagami (Mr. Okada), and Sumida (Messrs. Shikano and Suzuki). At this meeting, the participants exchanged detailed information about the order they have received in the first three months of 2004, and provided detailed projections about their orders for the rest of the year. …. At this meeting, it was decided that even more detailed exchanges of information would occur in the future.

> On July 10, 2007, representatives from Sumida (Messrs. Suzuki and Hirota), NEC Tokin (Messrs. Date and Hatakeyama), Taiyo Yuden (Hattori), TOKO (a Mr. Onishi), Sagami (Messrs. Ogisa and Tsuruga), and Murata (Messrs. Kudo and Hibino) met. The cartel members exchanged the results of individual company questionnaires that included material non-public information such as average sales price, and quantities projected to be sold. The cartel members agreed that each company would submit its own summary of business climate and that it would be discussed at future meetings. The cartel members discussed the results of a joint study concerning raw material costs faced for Inductor manufacturers. The cartel members reviewed average unit price forecasts that were based on information previously exchanged, and agreed to further review and revise a World Production Forecast based on exchanged pricing information.

*Id.* ¶¶ 172-74.

The CAC goes on to allege that:

> There are numerous examples of such illegal information exchanges throughout the Class Period.  At least 23 meetings of the Inductors Subcommittee took place between July of 2007 and September of 2014, mostly at the Tokyo offices of JEITA.

Unlawful information exchanges designed to fix Inductor prices occurred at these meetings. While not every Defendant had a representative at every meeting, each Defendant had one or more representatives at most meetings.  Among others, (a) **Murata** sent Messrs. Aoki, Hibino, Inoue, Kita, Kumada, Kudo, Oomura, Ootani, Shimokawa, Yamakawa and Yamazaki; (b) **Panasonic** sent Messrs. Chikada, Ebine, Iishiba, Matsumoto, and Morita; (c) **Sagami** sent Messrs, Ogiso, Tsuruga, Igarashi, and Oohashi; (d) **Sumida** sent Messrs. Hiroto, Suzuki and Takashima; (e) **Taiyo Yuden** sent Messrs. Hattori, Ishiguro, Ishinari, Kanzaki, Murata, and Ooi; (f) **TDK** sent Messrs. Abe, Ishiru, Machizoki, Ogasawara, Saito, and Takano; (g) **Tokin** sent Messrs. Date, Hatakayama, Kobayashi, Moramatsu and Okabe; and (h) **TOKO** sent Messrs. Norose, Oonishi, Oosawa, and Shinoda.

*Id.* ¶ 175. It is further alleged that "[c]ommunications in furtherance of the conspiracy also occurred outside of these formal meetings at social gatherings held in conjunction with the meetings, such as one that occurred in September of 2004 at the Excel Hotel." *Id.* ¶ 176.

In addition, Plaintiffs alleged in the CAC that the Vice-Chairpersons of the Inductors Subcommittee were called to give reports before the PCC. "Information exchanges in furtherance of the alleged conspiracy also occurred at meetings of the PCC during the Conspiracy Period. The PCC endeavored to deal collectively with issues facing the Inductors industry, such as a period of rising costs for raw materials, and forecasted customer orders for passive electronic components. *Id.* ¶ 177. The PCC also held roundtables "concerning the current business climate and how the Japanese manufacturers (including Defendants) could collectively respond." *Id.* Paragraph 178 of the CAC identifies by name a total of 66 persons employed by Defendants who attended these meetings.

It is also pointed out in detail in the CAC how, in the words of the federal government, information exchanges of this type facilitate collusion and can be treated as evidence of unlawful price-fixing that is a *per se* violation of the Sherman Act. *Id.* ¶ 180.

During much of the relevant period, JEITA had no formal antitrust guidelines. In 2014, after the DOJ announced its investigation of capacitor manufacturers, one was presented to the PCC and, for the first time, a Competition Law Compliance Seminar was held in February of 2015, at which the Gibson Dunn firm (counsel for Panasonic) made a presentation. *Id.* ¶ 182. Even then, issues remained. "In September of 2016 consideration was given to creating audio

1    recordings of JEITA meetings. The proposal was not passed because it was perceived as chilling

2    free communication among JEITA members and because it might create antitrust exposure."

3    *Id*.

4    ### 3.    Allegations Of The Criminal Investigation By DOJ.

5        The CAC also contains allegations that the DOJ has issued criminal subpoenas in

6    connection with its investigation of antitrust violations concerning Inductors. *Id*. ¶¶ 181-85. The

7    issuance of those subpoenas has to be based on reason to believe that there may be evidence

8    that a crime was committed.  *Id*. ¶ 185. The DOJ's investigation remains ongoing.

9    ### 4.    Other Allegations Of "Plus Factors."

10       The CAC also set forth other "plus factors" conducive to collusion. The market structure

11   factors identified above are all claimed to support an inference of collusion. *Id*. ¶ 117. It is

12   alleged that Panasonic, Taiyo Yuden, TDK, and the predecessor of Tokin have been either

13   found guilty of, or are being investigated in connection with, other antitrust conspiracies. *Id*.

14   ¶¶ 186-98. Some of the Defendants' involvements in trade associations other than JEITA—

15   such as the Electronic Components Industry Association ("ECIA") or the European Passive

16   Components Industry Association ("EPCIA")—are presented as plus factors. *Id*. ¶¶ 199-204.

17   Other opportunities for Defendants to interact in settings outside of trade associations or certain

18   contractual relationships are also presented as plus factors. *Id*. ¶¶ 205, 207-09. Also quoted is a

19   statement by Eiji Watanuke, President of Taiyo Yuden, about his desire to form "alliances"

20   with other companies and his being on the lookout for markets "less susceptible to price

21   competition." *Id*. ¶ 206.[1]

22   ### B.  Standard Of Review On Rule 12(b)(6) Dismissal Motions.

23       To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs are only

24   required to plead facts that plausibly suggest the existence of a conspiracy. *Bell Atl. Corp. v.*

25   *Twombly*, 550 U.S. 544 (2007) ("*Twombly*"). The Supreme Court in *Twombly* defined

26

27   ─────────────────────

28   [1] The CAC also contains allegations of fraudulent concealment. These include: (a) misleading statements in certain of the Defendants' public filings (*id*. ¶ 213); (b) the promulgation of corporate codes of conduct that assured customers that Defendants complied with antitrust laws (*id*. ¶¶ 214-21; and (c) as noted in the *Resistors* complaint, the sanitizing of certain JEITA minutes (*id*. ¶ 222).

plausibility as pleading "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." 550 U.S. at 556. Indeed, it said that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* The CAC here sets forth "well-pleaded factual allegations" and the court "should assume their veracity." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("*Iqbal*").

This conclusion is reinforced by the Supreme Court's opinion in *Iqbal,* which confirmed several accepted pleading precepts previously articulated in *Twombly*. *First*, the Supreme Court reemphasized that Fed. R. Civ. P. 8 does not require detailed factual allegations. *Id.* at 677-78 (quoting *Twombly*, 550 U.S. at 555). *Second*, "[u]nder *Twombly*'s construction of Rule 8," a plaintiff merely has to "nudge[] [its] claims... 'across the line from conceivable to plausible.'" 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). *Third*, the Supreme Court reiterated that it was not imposing a probability requirement at the pleading stage. 556 U.S. at 678 ("[t]he plausibility standard is not akin to a 'probability requirement...'"). *See also Twombly*, 550 U.S. at 556 ("[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage."). Moreover, by explaining that the *Twombly* standard applies to all civil actions, the Supreme Court acknowledged that the standard is not heightened for antitrust actions. *Iqbal*, 556 U.S. at 685.[2]

In *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), the Ninth Circuit synthesized the teachings of *Twombly* and *Iqbal* to arrive at a two-part formulation: (1) to be given a presumption of truth on a motion to dismiss, a complaint may not merely recite a cause of action, "but must contain sufficient factual allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) the factual allegations

---

[2] *See, e.g.*, *Oxbow Carbon & Minerals LLC v. Union Pac. Ry. Co.*, 81 F. Supp. 3d 1, 13 (D.D.C. 2015); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 794 (N.D. Ohio 2011) ("*Foam*"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005 (E.D. Mich. 2010) ("*Packaged Ice*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) ("*LCD*"); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("*Southeastern Milk*"); *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 3 (D.D.C. 2008).

taken as true "must plausibly suggest an entitlement to relief." *Id*. at 1216. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible. The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable." *Id*. at 1216-17 (emphasis in original). Defendants' own cited case (DM at 8) has reaffirmed these principles. *Eclectic Properties East, LLC v. Marcus & Millichap Co*., 751 F.3d 990, 996 (9th Cir. 2014).

Neither *Twombly* nor *Iqbal* requires that plaintiffs plead a complaint as if actual observers of the conspiracy, present in every room where the Defendants met to fix prices or restrict output. Rather, a plaintiff advancing a Section 1 claim need only allege parallel conduct plus a measure of additional facts that support a "plausible" inference of concerted activity. And, of course, allegations in a price-fixing case are to be considered as a whole, not on a piecemeal basis. *Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962).[3] The CAC alleges more than enough to satisfy Fed. R. Civ. P. 8 and puts Defendants on fair notice of the claims against them.

### C.  Plaintiffs Have Alleged A Plausible Conspiracy.

####         1.      Plaintiffs Have Alleged An Economically Plausible Conspiracy.

As explained above, Plaintiffs have alleged an economically plausible conspiracy. Up to 2003, import prices for Inductors were falling, caused in part by the adoption of the ITA and

---

[3] *See, e.g., In re Processed Egg Prods. Antitrust Litig*., 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012); *In re High-Tech Emp. Antitrust Litig*., 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) ("*High-Tech*"); *Foam*, 799 F. Supp. 2d at 782; *In re Blood Reagents Antitrust Litig*., 756 F. Supp. 2d 623, 630-31 (E.D. Pa. 2010) ("*Blood Reagents*"); *In re Cathode Ray Tube (CRT) Antitrust Litig*., 738 F. Supp .2d 1011, 1019 (N.D. Cal. 2010) ("*CRT I*"); *Packaged Ice*, 723 F. Supp. 2d at 1006; *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("*ArcelorMittal*"); *In re Chocolate Confectionary Antitrust Litig*., 607 F. Supp. 2d 701, 705 (M.D. Pa. 2009) ("*Chocolate*"); *In re Pressure Sensitive Labelstock Antitrust Litig*., 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) ("*Labelstock*"); *In re Lithium Ion Batteries Antitrust Litig*., No. 13-MD-2420 YGR, 2014 WL 309192, at *11 (N.D. Cal. Jan. 20, 2014) ("*LIB I*"); *In re Automotive Parts Antitrust Litig*., No. 12-cv-501, 2014 WL 4272772, at *8 (E.D. Mich. Aug. 29, 2014) ("*Auto Parts*"). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007).

by the 2001 recession. The situation only worsened in 2003, when China signed the ITA. Incredibly, however, in 2003, the indexed import prices for Inductors started to climb, continued to do so through the Great Recession of 2008-09, and rose even higher by 2014. The costs of raw material or customer demand do not explain why this should be the case. The Supreme Court in *Twombly* stated that "when allegations of parallel conduct are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557. The Ninth Circuit in *In re Musical Instruments & Equipment Antitrust Litigation* recognized this point as well. 798 F.3d 1186, 1194 (9th Cir. 2015). The Court in *Twombly* gave as an example of such context the situation where "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." 550 U.S. at 556 n.4.[4] The CAC presents just such a factual situation.

The Defendants make several arguments against the economic plausibility of the allegations in the CAC. DM at 8-13. They argue that: (a) Plaintiffs rely on an averaged Price Index that makes no attempt to track the individual prices charged by each Defendant in order to show parallelism; (b) the Price Index tracks products other than Inductors and makes no effort to disaggregate prices for the "off the shelf" Inductors that are the subject of the class

---

[4] For examples of this principle in application, *see, e.g.*, *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 766, 775 (2d Cir. 2016) (noting that allegations that the value of the London Interbank Offered Rate moved in tandem with the Federal Reserve Eurodollar Deposit Rate until 2007, when there was divergence, supported the plausibility of the claimed conspiracy); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 798, 807 (N.D. Ill. 2017) ("*Broiler Chickens*") (court credited allegations that the broiler chicken industry as a whole slowed production to a historically unprecedented rate during the relevant period, with at least some alleged conspirators using the historically unprecedented method of slaughtering or exporting breeder flocks); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1296 (M.D. Fla. 2016) ("*Contact Lens*") (contact lens manufacturers' decisions to adopt an unprecedented "Unilateral Pricing Policy" in the duration of a little over a year supported collusion claim); *In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 696 (S.D.N.Y. 2012) (publishers separately signing agency agreements with Apple Inc., something that was unprecedented); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1093-94 (N.D. Cal. 2007) (rival manufacturers suddenly changed the way they introduced new products to the market). *See also Federal Trade Comm'n v. Toys "R" Us*, 221 F.3d 928, 935 (7th Cir. 2000) (agreement to limit sales to the warehouse stores was "an abrupt shift from the past", supporting determination of collusion).

claims; (c) the Price Index demonstrates no collusion because the same data source depicts identical results for all commodities generally and for a broad range of manufactured goods; (d) the cost data on which Plaintiffs rely does not cover the entire Conspiracy Period; and (e) the Defendants as a whole actually lost market share during the Conspiracy Period and some of them gained market share at the expense of others (*id*. at 11-12). None of these arguments pass muster.

**Use Of Averaged Prices**. On the first argument, Defendants have steadfastly refused to provide individual transactional data, even though the first request for such data was made on May 25, 2018, well before the filing of the CAC. *See* Appendix to ECF No. 201. Defendants cannot be allowed to seek dismissal of the CAC on the basis of failure to plead more granular statistical data that they have wrongfully withheld.

In any event, courts have deemed the use of averaged data in a complaint sufficient for pleading purposes. *See, e.g.*, *Broiler Chickens*, 290 F. Supp. 3d at 797 (court considered Department of Agriculture composite and monthly average price movements and Urner Barry average prices in comparison to Georgia Dock average prices); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 63-64 (D.D.C. 2016) ("*Domestic Airlines*") (court considered chart of average quarterly growth rate in airfares on certain routes and United States Producer Price Index of airfares in denying motion to dismiss). Indeed, even at the class certification phase of a case, "use of averaged and aggregated data is not fatal to [plaintiffs'] econometric models." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009). Moreover, for much of the first part of the conspiracy, TDK, Taiyo Yuden, Murata, Panasonic, and Sumida had 84% of the global Inductors market. CAC ¶ 120. Thus, the indexed price movements for Inductors during the first part of the Conspiracy Period largely represents *their conduct*.

This is true of both the price increases, as well as the sudden drop in prices at the end of 2014 (a period of economic growth) that occurred when news of the cartel investigations into capacitors became public. "It had been publicly announced that the DOJ commenced its criminal antitrust investigation of capacitor manufacturers in April of 2014." CAC ¶ 182 n.36.

1    Thus, Defendants could reasonably conclude that other passive electronic component segments

2    would soon also be under antitrust scrutiny. Parallel conduct by which defendants cease to

3    engage in anticompetitive pricing is itself unlawful concerted activity. *Alaska Elec. Pension*

4    *Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (sustaining an antitrust

5    claim based in part on an allegation that defendants "simultaneously ceased engaging in parallel

6    conduct" when they learned of government investigations.)

7        **Plaintiffs' Reliance On The Price Index**. As to the second point, the Price Index cited

8    in the CAC tracks prices for Inductors, transformers and rectifiers. As noted in the CAC, a

9    transformer consists of two coupled Inductors used to regulate voltage. *Id*. ¶ 9 n.3. Thus, the

10   bulk of the products tracked in the Price Index *are* Inductors or products largely made up of

11   Inductors. As for the alleged failure to focus on prices for only "off the shelf" Inductors, the

12   Price Index can be inferred to do exactly that. The CAC excludes from the definition of

13   "Inductors" only those specifically made in response to precise specifications "unique" to a

14   particular customer. *Id*. ¶ 124 n.27. It can readily be inferred from the CAC that such products

15   form a very small percentage of all Inductor sales. This inference is supported by the allegations

16   that: (a) the United Nations Commodity Statistics database lists Inductors as a commodity;

17   (b) most Inductors are standardized, and the IEC has issued standards for testing Inductors that

18   are incorporated in Defendants' product references for Inductors; and (c) Defendants such as

19   TDK publish databases that allow their respective Inductors to be compared to the similar

20   models sold by their competitors. *Id*. ¶¶ 124-27. It stands to reason that the figure cited in the

21   CAC of as much as $768 million annually in United States sales of Inductors consists

22   overwhelmingly of these commoditized products, not "unique" items created for a single

23   customer.

24        **Defendants' Improper Reliance On Other FRED Charts**. With respect to

25   Defendants' third point, they are failing to consider that this is a motion to dismiss, not a motion

26   for summary judgment. In the CAC, Plaintiffs used a single chart provided by FRED. In

27   response, Defendants improperly seek to have the Court take judicial notice of their annotated

28   versions of this chart, as well as *other FRED charts not cited in the CAC* that encompass "All

1   Commodities" or "Miscellaneous Manufactured Articles" or "Consumer Goods Excluding

2   Automobiles." DM at 16 & n.5; ECF Nos. 224-1 to 22-3. This is improper, and these materials

3   should be disregarded in deciding the motion. "'[U]nderlying arguments made by the parties,

4   disputed facts, and conclusions of fact' contained in the record are not the subject of judicial

5   notice." *Ramirez v. United Airlines Inc.*, 416 F. Supp. 2d 792, 795 (N.D. Cal. 2005) (quoting

6   *Cactus Corner, L.L.C. v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075, 1099 (E.D. Cal. 2004)).

7         The Ninth Circuit has recently said that "the unscrupulous use of extrinsic documents

8   to resolve competing theories against the complaint risks premature dismissals of plausible

9   claims that may turn out to be valid after discovery." *Khoja v. Orexigen Therapeutics, Inc.*, 899

10  F.3d 988, 998 (9th Cir. 2018). *See Domestic Airlines*, 221 F. Supp. 3d at 70-72 (declining to

11  take judicial notice of uncited portions of documents relied upon in complaint); *Patel v. Parnes*,

12  253 F.R.D. 531, 546 (C.D. Cal. 2008) (judicial notice of "truth of the content" and any

13  inferences drawn from them are inappropriate); *Werdebaugh v. Blue Diamond Growers*, No.

14  12-CV-02724-LHK, 2014 WL 7148923, at *4 (N.D. Cal. Dec. 15, 2014) (rejecting judicial

15  notice of article discussing pricing due to "disputes [concerning] the basis of the conclusions

16  and 'facts' contained in these articles").

17        In any event, the indices for other product groups attached as Exhibit 2 to the

18  Defendants' declaration do *not* show the "very same patterns of ups and downs" for which

19  Defendants now argue. DM at 6. The chart in paragraph 8 of the CAC shows the Price Index

20  reaching 108.4 in August of 1997, a few months before the ITA took effect. Thereafter, it

21  declined to 95.2 at about the time China joined the ITA. Soon thereafter, the Price Index climbed

22  remarkably, going past 110 in 2008-09—in the teeth of the Great Recession. And, contrary to

23  Defendants' argument (DM at 15), its upward climb did not stop there, but went to 117.6 by

24  August of 2014. The indices for "Consumer Goods" and "Miscellaneous Manufactured

25  Articles" proffered by Defendants do not exhibit such steep declines or increases. The index for

26  "All Commodities" shows a peak being reached in 2008, but it immediately reversed itself into

27  a freefall and never exceeded that level again. All of this is distinct from the Price Index

28  discussed in the CAC. Moreover, Defendants' charts depict different industries and different

1   measures for index numbers (several of their charts depict consumer (end use) numbers). And

2   most importantly, the Price Index in the CAC has to be viewed holistically with all the other

3   facts alleged.

4   **Plaintiffs' Use Of Public Cost Data**. With respect to cost data, Plaintiffs offered a chart

5   demonstrating that the raw material price index for passive electronic components was largely

6   stable during 2012-14 and began declining in 2015. CAC ¶ 10. Defendants criticize the absence

7   of data before 2012, but Plaintiffs used the best information publicly available to them. If

8   Defendants wanted more accuracy, they should have produced the cost data requested back in

9   May of 2018; they ought not to be allowed to benefit from their own improper intransigence.

10   At any rate, there is no basis to infer from the CAC that costs were not also largely stable in the

11   period preceding 2012.

12   **Defendants' Market Shares**. As for the argument that the claimed conspiracy is

13   implausible because of Defendants' own market share movement, some degree of market share

14   erosion was to be expected since when China joined the ITA in 2003, thereby allowing Chinese

15   Inductors manufacturers to sell their product more freely.[5] But even in 2016, TDK, Murata,

16   Taiyo Yuden, Panasonic, and Sumida jointly held 67% of the global Inductors market and two

17   other defendants named here—Tokin and Sagami—are part of the undifferentiated "other"

18   category. *Id*. ¶ 121. The decline in the collective market share of Defendants is hardly as steep

19   as they portray, and their participation in the conspiracy still remained highly profitable,

20   especially given the rising dollar value of recent global sales, as reflected in North American

21   sales. *Id*. ¶¶ 70, 118 & n.26. In addition, part of Murata's growth in market share came from its

22   acquisition of Toko in 2014 and not from its taking market share away from other Defendants.

23   *Id*. ¶ 121. But for that acquisition, Toko would have been named as a separate Defendant.

24

25

26   [5] Indeed, it has been pointed out that "[c]ircumstantial evidence of…collusion might be a
     decline in the market shares of the leading firms in a market, for their agreeing among
27   themselves to charge a high fixed price might have caused fringe firms and new entrants to
     increase output and thus take sales from the leading firms." *In re Text Messaging Antitrust
28   Litig.*, 782 F.3d 867, 876 (7th Cir. 2015).

Moreover, loss of market share does not mean a cartel comes to an end. For example, the European Commission's 2001 decision in the case involving the European Citric Acid Cartel (Case No. COMP/E-1/36 604) noted that from 1991 to 1994, cartel members' global collective market share fell from 70% to 52%, yet cartel members were still meeting regularly to advance the goals of the conspiracy, up until dawn raids by antitrust regulators in June of 1995. *Id.* ¶¶ 118-28.[6] Similarly, in *Broiler Chickens*, the court refused to dismiss conspiracy claims, even though, among the 17 defendant broiler chicken producers, Tyson Foods' market share rose significantly between 2008-15, while that of Pilgrim's Pride fell significantly, and the market shares of others were relatively stable. 290 F. Supp. 3d at 780.

Defendants try to portray Inductors pricing as the product of the normal economic forces of supply and demand. They fail in doing so. The market facts alleged in the CAC present a "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors"; when coupled with other allegations in the CAC—such as collusive activity at JEITA and the issuance of subpoenas by DOJ—the allegations of collusion here are plausible. Even if increasing demand after 2012 may have been a factor in increased prices for Inductors, "participants in…vibrant industries may not collude to generate more pronounced increases in prices than market forces would otherwise produce." *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *31 (N.D. Ohio Nov. 17, 2014). *See Resistors*, 2017 WL 3895706, at *2.[7]

---

[6]The opinion is available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32002D0742&from=EN.

[7] Some Defendants argue that a conspiracy that includes them is implausible because they have a small share of the Inductors market or did not participate in all of the acts complained of. *See* MD at 12, 18 n.6. However, as the Ninth Circuit said in *Beltz Travel Serv., Inc., v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980), "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability." It added that "each conspirator may be performing different tasks to bring about the desired result." *Id.* at 1367. *Accord Arandell v. Centerpoint Energy Servs., Inc*., 900 F.3d 623, 634 (9th Cir. 2018) ("*Arandell*"); *Esco Corp. v. United States*, 340 F.2d 1000, 1006 (9th Cir. 1965). While these cases involve summary judgments or review of jury verdicts, the same principle has been applied in evaluating motions to dismiss. *See, e.g.*, *GreenCycle Paint, Inc. v. Paintcare, Inc.*, 250 F. Supp. 3d 448, 458 (N.D. Cal. 2017); *Domestic Airline*, 221 F. Supp. 3d at 73; *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207 (N.D. Cal. 2016); *High-Tech*, 856 F. Supp. 2d at 1118; *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 732

## 2. Plaintiffs Have Alleged Detailed Facts About Meetings From Which A Conspiracy May Be Inferred.

Defendants contend that Plaintiffs only plead information exchanges, not an agreement to fix Inductor prices. MD at 18. They further contend that Plaintiffs have alleged only three meetings at JEITA in which information was exchanged. *Id*. This mischaracterizes the CAC. As noted above, Plaintiffs have alleged in paragraph 170 of the CAC that confidential current and forward-looking price, capacity and other data were shared for the express purpose of fixing the prices of Inductors. Three examples are given, but dozens of meetings are referred to. Participants from each Defendant are identified by name and include people already indicted by the DOJ for price-fixing of other products (CAC ¶ 169f & n.31). Thus, the type of basic information required by Ninth Circuit caselaw is contained in the CAC; the Defendants do not have to speculate about what Plaintiffs are alleging.

Defendants basically contend that exchanges of information among competitors do not rise to the level of antitrust violations. However, allegations of the exchange of price data and other information among competitors with either an unlawful purpose or an anticompetitive effect support denial of a motion to dismiss. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("*SRAM*"). *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1143 (N.D. Cal. 2009).[8] *See Great Atl. & Pac. Tea Co. v. Federal Trade Comm'n*, 440 U.S. 69, 80 (1979) (noting the dangers inherent in exchange of pricing information); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 457 (1978) ("the most likely consequence of any such agreement to exchange price information would be the stabilization of industry prices"); *United States v. Container Corp.*, 393 U.S. 333, 337 (1969) ("[t]he inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition.").

---

(E.D. Pa. 2011); *In re Transpacific Air Passenger Transp. Antitrust Litig.*, No. C07-05634 CRB, 2011 WL 1753738, at *21 n.22 (N.D. Cal. May 9, 2011).

[8] The court in *Flash Memory* distinguished its prior decision in *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 923 (N.D. Cal. 2007) (on which Defendants rely (DM at 11)) by noting that in that prior case, the complaint only alleged parallel conduct. 643 F. Supp. 2d at 1146-47.

---

As the United States government delegation stated to the Organization for Economic Cooperation & Development's Competition Committee in a 2010 report cited in the CAC, "certain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination."[9] CAC ¶ 181 & n.32.

In the report, it is noted at page 4 that actual evidence of competitive harm, such as industry-wide price movements resulting from the exchange are a strong factor in finding illegality. *Id*. at 4. Other identified factors that may be considered included: (a) "[t]he nature and quantity of the information (extensive exchange of information regarding pricing, output, major costs, marketing strategies and new product development is more likely to have anticompetitive implications)"; (b) "[h]ow recent the shared data is (sharing of past data is generally deemed less problematic than sharing current data)"; (c) "[t]he parties' intent in sharing the information (an anticompetitive intent, such as an intent to stabilize prices, is problematic; (d) "[t]he industry structure (in concentrated industries, an exchange among few firms could be more likely to harm competition); (e) [h]ow the exchange is structured and controlled (a direct exchange is more likely to be anticompetitive than an exchange through an intermediary); and (f) "[t]he frequency of exchanges (the more frequent the exchange, the more problematic it may be)." *Id*.

Here, the CAC alleges not only an anticompetitive effect, but also frequent in-person exchanges of current and forward-looking data on price, capacity, marketing strategies and other confidential matters undertaken by the leading competitors in a highly concentrated industry for the purpose of stabilizing or raising prices. These allegations more than satisfy

---

[9] https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf, cited in CAC ¶ 33. The presentation was principally authored by DOJ and is part of a list of such submissions on its website. https://www.justice.gov/atr/us-oecd-submissions-competition-policy.

*Twombly* and *Iqbal*. Moreover, Plaintiffs' allegations are consistent with what was pled in *Resistors*. There, the court noted, in upholding the complaint "the Court has no difficulty finding that DPPs have plausibly alleged a price-fixing conspiracy," based on participation in JEITA meetings, including the same type of exchanges of forward-looking competitively sensitive information exchanged here. 2017 WL 3895706, at *2. In light of the foregoing authority, Defendants' argument that information exchanges among competitors are not actionable under the Sherman Act is simply wrong.

Defendants rely heavily on two Ninth Circuit decisions in support of their motion: *Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ("*Kendall*"), and *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ("*MI*"). DM at 7-10, 12-14, 17-18. Neither is apposite; both are distinguishable.

In *Kendall*, the plaintiff alleged that two bank consortiums conspired with each other to set the fees charged to merchants for credit card sales. After the plaintiffs had an opportunity to take depositions of personnel from Visa and Mastercard (518 F.3d at 1046), the district court dismissed the first amended complaint without leave to amend and the Ninth Circuit affirmed. It noted that the plaintiffs "do not allege any facts to support their theory that the Banks conspired or agreed with each other or with the Consortiums to restrain trade." *Id.* at 1048. It observed that "[e]ven after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.*; *See Kendall v. Visa U.S.A., Inc.*, No. C 04-4276, 2005 WL 2216941, at *2 n.1 (N.D. Cal. July 25, 2005). On its face, *Kendall* could not be more dissimilar. Here, as discussed above, no merits depositions have occurred, a criminal government investigation is pending, and the CAC is replete with discussions of specific meetings among identified representatives of Defendants at which they shared present and future price and capacity information.[10]

---

[10] Subsequent cases have distinguished *Kendall* on similar grounds. *See, e.g.*, *High-Tech*, 856 F. Supp. 2d at 1116-17; *CRT I*, 738 F. Supp. 2d at 1018; *B&R Supermarket, Inc. v. Visa, Inc*., No. C 16-01150 WHA, 2016 WL 5725010, at *5 (N.D. Cal. Sept. 30, 2016) ("*B&R*"); *LIB I*, 2014 WL 309192, at *11.

1    *MI* was also a case where the court granted limited merits discovery after dismissing the

2    initial consolidated complaint. *In re Nat'l Ass'n of Music Merchants*, MDL No. 2121, 2011 WL

3    3702453, at *8-9 (S.D. Cal. Aug. 22, 2011). Despite this opportunity, the plaintiffs still could

4    not frame a sufficient complaint and the district court dismissed their case with prejudice; the

5    Ninth Circuit affirmed in a two-to-one decision. *MI* was markedly different from this case in

6    that it involved an alleged "hub and spoke" conspiracy having both horizontal and vertical

7    aspects. It was claimed that Guitar Center, Inc. ("GC"), the largest retailer of musical

8    instruments in the United States, worked with five leading guitar manufacturers and the national

9    Association of Music Merchants ("NAMM") to impose minimum advertised retail price

10   policies ("MAP"). 798 F.3d at 1190-91. To the extent there was parallel conduct among the

11   manufacturers, the Ninth Circuit said that it could be plausibly viewed as individual action by

12   manufacturers in response to similar pressure from GC, including public advocacy by GC at

13   NAMM meetings. *Id.* at 1196. There were no allegations that any manufacturer defendants ever

14   met and discussed, let alone agreed to use of, MAP. Thus, the facts of *MI* are very different

15   from those alleged in the CAC, and, once again, the amended complaint in *MI* was preceded by

16   merits discovery not available here.[11]

17       By contrast, Plaintiffs here identify the participants, subject matter, time period,

18   location, and objective of the consiracy with specificity, more than satisfying *Twombly*, *Iqbal*,

19   *Kendall* and *MI*. As in *B&R*, the Defendants here, through their executives, "got in a room" and

20   agreed to uniform conduct. 2016 WL 5725010, at *5. The CAC is more akin to the complaints

21   in *CRT I*, where, unlike the situation in *Kendall*, "the complaints allege a governmental

22   investigation, hundreds of meetings between 1995 and 2007, and detailed allegations

23   concerning the structure and typical pattern of those meetings." 738 F. Supp. 2d at 1018. *See*

24   _____

25   [11] Subsequent court decisions have distinguished *MI* on the basis of its unique factual background and the absence of factual evidentiary allegations of a conspiracy in the amended complaint. *See, e.g., In re Propranolol Antitrust Litig.*, 249 F. Supp. 2d 712, 720 (S.D.N.Y.

26   2017) ("*Propranolol*"); *Contact Lens*, 215 F. Supp. 2d at 1297; *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2017 WL 35571, at *11 n.9 (S.D. Cal. Jan. 3,

27   2017) ("*PSPs*"). The court in *PSPs* warned of the danger of "mov[ing] beyond *Musical Instruments* and effectively transform[ing] *Twombly*'s standard from one of plausibility to one

28   of probability." *Id.*

1    *also High-Tech*, 856 F. Supp. 2d at 1116 ("[u]nlike the plaintiffs' complaint in *Kendall*,

2    Plaintiffs' CAC details the actors, effect, victims, location, and timing of the six bilateral

3    agreements between Defendants").

### 3.    The DOJ's Criminal Investigation May Also Be Considered.

5    Defendants argue that the existence of the DOJ's criminal investigation into antitrust

6    violations concerning the pricing of Inductors should not be considered in deciding their motion

7    to dismiss. MD at 21-22. While the existence of such an investigation is not dispositive,

8    allegations regarding the investigation., can be considered, along with all other allegations, in

9    determining whether a complaint can survive a motion to dismiss.[12]

10   Plaintiffs recognize that Judge Donato in *Capacitors I* and Judge Alsup in *In re*

11   *Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) gave little

12   weight to pending governmental investigations in deciding a motion to dismiss. But their

13   opinions should not preclude consideration of this factor by this Court. As said in the *PSP* case,

14   decided in 2017: "it would be improper to draw a conclusion that a pending government

15   investigation on its own supplies sufficient factual material to survive a 12(b)(6) motion to

16   dismiss. However, it is perfectly permissible to take as true the fact that a government

17   investigation has been instituted, and that therefore at least several individuals within the

18   governmental chain of command thought certain facts warranted further inquiry into a potential

19   criminal conspiracy." 2017 WL 35571, at *8.

20   Moreover, here, the DOJ has made a confidential submission to the Court on this topic.

21   *See* ECF No. 159 at 4. As Judge Cousins said in his order permitting non-merits discovery,

22   "[n]or is the complaint clearly frivolous or simply a 'fishing expedition,' given the United

23   States' intervention in this case." ECF No. 205 at 2.

---

[12] *See, e.g., Starr v. Sony BMG Music Entertainment, Inc.*, 592 F.3d 314, 325 (2d Cir. 2010); *Propranolol*, 249 F. Supp. 3d at 723; *Blood Reagents*, 756 F. Supp. 2d at 632; *Packaged Ice*, 723 F. Supp. 2d at 1009; *Hinds Cty., Miss. v. Wachovia Nat'l Bank, N.A.*, 700 F. Supp. 2d 378, 394-95 (S.D.N.Y. 2010); *Chocolate*, 602 F. Supp. 2d at 553-54, 576-77; *In re Generic Prescription Drugs Antitrust Litig.*, No. 16-MD-2724, 2018 WL 5003450, at *29-30 (E.D. Pa. Oct. 16, 2018) ("*GD*"); *Auto Parts*, 2014 WL 4272772, at *8; *In re Flat Glass Antitrust Litig. (II)*, No. 08-mc-180, 2009 WL 331361 at *2 (W.D. Pa. 2009). *Cf. In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005).

1            **4.**      **Plaintiffs Have Alleged Adequately Other "Plus Factors."**

2       **Allegations Of Concentration And Barriers To Entry.** As noted above, the CAC

3 contains numerous allegations about the concentrated nature of the Inductors market and the

4 barriers to entry. Defendants' contention that these allegations in the CAC do not support an

5 inference of collusion should be rejected. Many courts have held that structural evidence of this

6 type supports the plausibility of a claimed conspiracy.[13] The district court in *Flash Memory*

7 made this point by citing the following language from *Federal Trade Commission. v. H.J. Heinz*

8 *Co*., 246 F.3d 708, 724 (D.C. Cir. 2001): "[s]ignificant market concentration makes it easier for

9 firms in the market to collude, expressly or tacitly, and thereby force price above, or farther

10 above the competitive level." 643 F. Supp. 2d at 1147.

11       **Opportunities To Conspire Other Than At JEITA**. The CAC also contains

12 allegations about certain Defendants' participation in trade associations other than JEITA (such

13 as ECIA or EPCIA) and participation in industry events that provide additional opportunities

14 to conspire. Defendants denigrate the significance of this evidence, but it can be properly taken

15 into account by the Court.  As explained in *SRAM*, allegations that the defendants participated

16 together in trade organizations "demonstrate[] how and when Defendants had opportunities to

17 exchange information or make agreements." 580 F. Supp. 2d at 903. The CAC must be read as

18 a whole, and these allegations, when considered in the context of all of the other allegations can

19 be considered in determining its sufficiency.[14]

20     ————————————

21 [13] *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("*Text Messaging*"); *Propranolol*, 249 F. Supp. 3d at 723; *Domestic Airlines*, 221 F. Supp. 3d at 61; *Haley Paint Co. v. E.I. DuPont de Nemours & Co*., 804 F. Supp. 2d 419, 426 (D. Md. 2011)

22 ("*Haley*"); *Blood Reagents*, 756 F. Supp. 2d at 631-32; *Packaged Ice*, 723 F. Supp. 2d 1014; *ArcelorMittal*, 639 F. Supp. 2d at 883; *Chocolate*, 602 F. Supp. 2d at 576-77); *SRAM*, 580 F.

23 Supp. 2d at 903; *Labelstock*, 556 F. Supp. 2d at 370-71; *City of Moundridge v. Exxon Mobil Co*., 250 F.R.D. 1, 5 (D.D.C. 2008); *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser*

24 *Antitrust Litig.*, Civ. No. 12-711, 2014 WL 3971620, at *7 (D.N.J. Aug. 13, 2014) ("*DIPF*"); *Auto Parts*, 2014 WL 4272772, at *9; *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883,

25 2009 WL 3754041 at *3 (N.D. Ill. Nov. 5, 2009).

26 [14] *See, e.g.*, *Text Messaging*, 630 F.3d at 628; *Broiler Chickens*, 790 F.Supp.3d at 799-800; *Contact Lens*, 215 F.Supp.3d at 1297; *Haley*, 804 F.Supp.2d at 426; *Blood Reagents*, 756 F.

27 Supp. 2d at 632; *Packaged Ice*, 723 F. Supp. 2d at 1017; *Flash Memory*, 643 F. Supp. 2d at 1148; *ArcelorMittal*, 639 F. Supp. 2d at 894-95, 897; *GD*, 2018 WL 5003450, at *28; *In re New*

28 *Jersey Tax Sales Certificates Antitrust Litig.*, No. 12-1893 (MAS)(TJB), 2014 WL 5512661, at *7 (D.N.J. Oct. 31, 2014); *DIPF*, 2014 WL 3971620, at *7.

**Prior Antitrust Violations By Defendants.** Finally, the antitrust violations or investigations of Defendants with respect to other products that are alleged in the CAC can also be fairly considered on a motion to dismiss. *E.g.*, *Blood Reagents*, 756 F. Supp. 2d at 629; *In re Flash Memory*, 643 F. Supp. 2d at 1149; *SRAM*, 580 F. Supp. 2d at 903. As noted in *Flash Memory*, "evidence concerning a prior conspiracy may be relevant and admissible to show the development and background of a current conspiracy." This factor is significant here, because at least one alleged co-conspirator (Tomohide Date of NEC Tokin) is being criminally prosecuted for his role in the capacitors conspiracy.

**5.      Plaintiffs Have Alleged Adequately The Role That Defendants' United States Subsidiaries Played In The Conspiracy.**

Defendants argue that the CAC fails to allege adequately the role of their respective United States subsidiaries in the claimed conspiracy, noting that the latter did not participate in the events claimed to have occurred in Japan. DM at 25-26. They rely principally on *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008).

However, the paragraph 65 of the CAC, which states that when it refers to a corporate family, it is meant that where an entity or individual from that family participated in conspiratorial acts, this was done on behalf of the entire family of companies:

> The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed products containing Inductors, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings.

In a subsequent opinion in the *TFT-LCD* case (which Defendants avoid mentioning) very similar language was deemed sufficient to allege involvement by United States subsidiaries in the conspiracies claimed therein. *LCD*, 599 F. Supp. 2d at 1184-85. Judge Conti reached a similar conclusion in the *CRT* litigation. *CRT I*, 738 F. Supp. 2d at 1019.

1  Defendants also cite Judge Donato's opinions in *Capacitors I* and *Resistors* in support

2 of their position. DM at 26. However, they conspicuously fail to note that the plaintiffs in

3 *Capacitors* added allegations regarding participation by defendant families, and, on a renewed

4 motion to dismiss, Judge Donato held that the added language sufficed for dismissal purposes

5 to state a claim against subsidiaries. *In re Capacitors Antitrust Litig.*, 156 F. Supp. 3d 916, 928

6 (N.D. Cal. 2015) ("*Capacitors II*"). Similarly, in *Resistors*, while Judge Donato did dismiss

7 claims against certain subsidiaries with leave to amend, he observed that the complaint before

8 him did not have the detail alleged in *Capacitors II* (and present here) concerning the

9 subsidiaries' role in distributing price-fixed products. 2017 WL 3895706, at *4.

10  Moreover, here, during the relevant period, all of the United States subsidiaries are

11 alleged to be wholly owned and controlled by the Japanese parents. CAC ¶¶ 28, 30-31, 34-36,

12 38-39, 41-44, 48-49, 50-53, 56, 58, 62. This fact is significant, as reflected in the Ninth Circuit's

13 recent decision in *Arandell*. There, it was alleged that Reliant Energy, Inc. ("Reliant") colluded

14 with other natural gas suppliers to manipulate the prices of natural gas sold in Wisconsin

15 through Centerpoint Energy Services, Inc. ("CES"), Reliant's wholly-owned subsidiary. The

16 plaintiffs contended that CES, Reliant, and a successor entity to Reliant conspired with other

17 natural gas conglomerates to fix the retail prices of natural gas sold in Wisconsin. The district

18 court granted summary judgment for CES, finding that there was no basis to conclude that CES

19 knowingly participated in the conspiracy of which Reliant was accused. The Ninth Circuit

20 reversed. It held that under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 732

21 (1984), the Reliant entities and CES acted as a single enterprise with a complete unity of interest

22 so that they had one corporate consciousness. 900 F.3d at 629-30. The Ninth Circuit said that a

23 wholly-owned subsidiary that engages in coordinated activity in furtherance of the

24 anticompetitive scheme of its parent or commonly owned affiliates is deemed as a matter of

25 law to engage in such activity with the purposes of the single "economic unit" of which it is a

26 part. *Id*. at 630-31. This is true "whether or not the parent keeps a tight rein over the subsidiary"

27 and "with or without an additional finding of knowledge" by the subsidiary. *Id*. at 631-32

28 (internal quotations omitted). The Ninth Circuit said that CES played a "crucial" role in the

conspiracy: "[u]ntil CES sold the gas to consumers, the rigged and inflated prices were not passed on to buyers outside of the Reliant economic unit and there was no gain to the Reliant enterprise." *Id*. at 635 (emphasis in original). That was enough to create a triable issue of whether CES was tied to the conspiracy; the fact that it might not have participated in (or even known of) all acts in furtherance of the conspiracy did not dictate a contrary result. *Id*. at 634-35.[15] Here, as in *Arandell*, the CAC alleges enough to indicate that Defendants' United States subsidiaries ought to be treated, along with their respective parents, as one entity

### 6.    Defendant Panasonic's Standing Argument Is Without Merit.

Defendant Panasonic advances a separate argument against Plaintiffs Arch and CCC relating to their purchases of Panasonic finished products containing Inductors. It asserts that their damage claims under the Sherman and Clayton Acts are barred for lack of standing pursuant to the indirect purchaser rule announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*"). DM at 23-24. This argument should be rejected.

To begin with, after *Arandell*, Plaintiffs should be viewed as direct purchasers from the *single "economic unit"* that consists of the Panasonic parent entity and its wholly-owned subsidiaries. *See* 900 F.3d at 630-31.

Even if the principle identified in the *Arandell* decision is not applied here, Plaintiffs would still have standing to sue for federal antitrust treble damage claims. The issue to be considered is: who is the most adequate enforcer of such claims? Is it one or more of Panasonic's United States subsidiaries that sell price-fixed Inductors (including Panasonic Inductors) or products containing them in the United States? The answer to that question is no. In the lengthy history of electronics antitrust class actions in this district, *no* Panasonic subsidiary has *ever* sued either (a) the Japanese parent for participation in a conspiracy or (b) alleged co-conspirators of the Japanese parent. This is hardly surprising, as reflected in the Ninth Circuit's decision in *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th

---

[15] *Arandell* was decided in the context of summary judgment, not on a motion to dismiss but the rule of law that it announced should apply equally to the present motion. *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1145-46 (D. Or. 2018) (prior to *Arandell*, district court applied *Copperweld* offensively in partially denying motion to dismiss).

Cir. 1980) ("*Royal Printing*"). That case involved a price-fixing conspiracy among manufacturers of paper. The manufacturers did not sell directly to customers like the plaintiffs; instead their wholesaling divisions made such sales. Each wholesaling division sold not only the paper made by its parent entity, but also the paper made by the alleged co-conspirators. *Id.* at 324. Summary judgment for the defense was granted pursuant to *Illinois Brick*. The Ninth Circuit reversed, ruling that a cartel member's subsidiaries are unlikely to sue their parent for price-fixing:

> There is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator. Even if the pricing decisions of such a subsidiary or division are necessarily determined by market forces, its litigation decisions will usually be subject to parental control. The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy.
>
> We recognize that there is, in fact, some small chance that such a subsidiary or division might wish to sue its parent's co-conspirators. The parent might be under government pressure or discover that the conspiracy is not sufficiently profitable; and if a subsidiary has outside shareholders, a derivative suit might be a possibility. In such an event, multiple liability might lurk.
>
> But because as a practical matter the chance of a direct-purchaser suit is so small, the correspondingly small risk of multiple recovery does not disturb us. This is especially so when our only alternative is to effectively immunize the transactions here from private antitrust liability, thus thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick.*

*Id.* at 326 (footnotes omitted).

District courts in this circuit have said that wholly owned subsidiaries or divisions are "paradigmatic examples" of situations that satisfy *Royal Printing*. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *25 (N.D. Cal. Oct. 2, 2014); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 12-3802 SI, 2013 WL 1164897, at *2 (N.D. Cal. Mar. 20, 2013). That is what the CAC alleges as to Panasonic and its United States subsidiaries during the Class Period. CAC ¶¶ 34-35.

1    Thus, courts that have applied the *Royal Printing* doctrine have said that plaintiffs

2    alleged to be "direct" are in fact "indirect," but are a species of indirect purchaser that *owns the*

3    *federal treble damage claim. See, e.g., CRT II*, 911 F. Supp. 2d at 862 n.1; *LIB I*, 2014 WL

4    309192, at *6. Indeed, in *CRT*, a class that included such purchasers was certified as a "direct

5    purchaser" class. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 610 n.7 (N.D.

6    Cal. 2015). As Judge Seeborg said in *In re Optical Disk Drive Products Antitrust Litigation*,

7    No. 3:10-md-2143 RS, 2012 WL 1366718, at *5 (N.D. Cal. Apr. 19, 2012), the issue is "one of

8    nomenclature rather than substance"; "[i]ndeed, by stating that certain claims could not go

9    forward because they involved purchases that were 'truly indirect,' the [Ninth Circuit's]

10   decision implies that it would not be entirely wrong to characterize claims permitted under its

11   reasoning as equivalent to those involving 'direct' purchases."

12   Panasonic ignores *Royal Printing*. To the extent it assumes that the Ninth Circuit's

13   analysis cannot apply to price-fixed components used in a finished product. However, that

14   argument has been expressly rejected by Judge Illston in *In re TFT-LCD (Flat Panel) Antitrust*

15   *Litig.*, No. M 07-1827 SI, 2012 WL 5869588, at *3 & n. 5 (N.D. Cal. Nov. 19, 2012) and Judge

16   Gonzalez Rogers in *LIB I*, 2014 WL 309192, at *8.

17   A prime concern raised in *Illinois Brick*—about whether the alleged overcharge with

18   respect to a component is passed on in the sale price of the finished product—is simply

19   irrelevant under *Royal Printing*. As part of its reasoning in that case, the Ninth Circuit

20   explained:

21          Allowing Royal Printing to sue for the full overcharge, on the
            other hand, creates the possibility that Royal Printing might
22          recover an amount, trebled, that exceeds its actual damages
            (because market forces probably forced the middlemen to absorb
23          part of the overcharge); to that extent this alternative affords
            Royal Printing an opportunity for a windfall gain. But this is no
24          more than was approved in *Hanover Shoe*, where the plaintiff
            was allowed to recover its "full" damages even though it had
25          "mitigated" its damages by passing part of the excessive costs on
            to its customers. *Hanover Shoe* teaches that in such situations
26          there is nothing wrong with the plaintiff winning a windfall gain,
            so long as the antitrust laws are vindicated and the defendant does
27          not suffer multiple liability, with its potential for windfall loss

28

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS          18-cv-00198-EJD-NC

1

> (i.e., the defendant would be forced to pay out a greater amount, trebled, than its antitrust violation grossed for it).

2

3

> Because there is a sufficiently small risk of multiple liability here, and because without a pass-on theory the case would not involve *Illinois Brick* - style complexities, we hold that Royal Printing may sue the appellees for the entire overcharge.

4

5

621 F.2d at 327 (footnotes omitted).[16]

6

For all of the foregoing reasons, Panasonic's argument that Plaintiffs Arch and CCC

7

lack standing must fail.

8

### 7.      Defendant Panasonic's FTAIA Argument Is Without Merit.

9

Panasonic also argues that Plaintiffs' damage claims are barred in whole or in part by

10

the Foreign Trade Antitrust Improvements Act (15 U.S.C. §6(a) ("FTAIA"). DM at 24-25. This

11

contention should be rejected.

12

The CAC identifies Plaintiffs as entities located in the United States, CAC ¶¶ 23-27.

13

They bought Inductors (or products containing Inductors) imported into the United States. The

14

complaint focuses on United States import prices. *Id*. ¶ 8. The United States is a huge market

15

for makers of Inductors and products containing them. *Id*. ¶ 118. The import commerce

16

associated with sale of Inductors and products containing them to customers in the United States

17

is recounted at length in the CAC. *Id*. ¶¶ 69-79. The alleged conspiracy was targeted at the

18

United States and had a direct, substantial and foreseeable impact on domestic commerce. *Id*.

19

¶¶ 81-101. The conspiratorial discussions included exchanges of information relating to sales,

20

prices, shipments, capacity, and product development of Inductors sold or shipped to the United

21

States. *Id*. ¶ 170. This encompasses Inductors incorporated into finished products. Given all of

22

these allegations taken as a whole, the CAC cannot be dismissed in whole or in part because of

23

the FTAIA.

24

The caselaw supports this conclusion. The Ninth Circuit has made it clear the limitations

25

imposed by the FTAIA on the Sherman Act are not jurisdictional but go to the merits of a claim.

26

27

[16] *Accord, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig*., 911 F. Supp. 857, 872 (N.D. Cal. 2012) ("*CRT II*"); *In re Cathode Ray Tube (CRT) Antitrust Litig*., MDL No. 1917, 2016 WL 7800810, at *5 (N.D. Cal. Nov.15, 2016); *Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13-1207RAJ, 2014 WL 4674390, at *1 (W.D. Wash. Sept. 18, 2014).

28

1   *United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015) ("*Hsiung*"); *In re Capacitors*

2   *Antitrust Litig.*, No. 14-cv-03264-JD, 2016 WL 5724960, at *3 (N.D. Cal. Sept. 30, 2016)

3   ("*Capacitors III*").[17] Two guiding principles govern interpretation of the FTAIA. *First*, import

4   trade or commerce is excluded from the scope of the FTAIA and is subject to the Sherman Act.

5   *Hsiung*, 778 F.3d at 751; *Capacitors III,* 2016 WL 5724960, at *3. In *Hsiung*, the Ninth Circuit

6   said that "not much imagination is required to say that this phrase means precisely what it says."

7   778 F.3d at 754-55. It found that "transactions between the foreign defendant producers of TFT-

8   LCDs and purchasers located in the United States" were import trade because the defendants

9   had "sold" TFT-LCD panels to customers in the United States." *Id*. at 756. *See Capacitors III*,

10  2016 WL 5724960, at *3. *Second*, non-import commerce with foreign nations is within the

11  scope of the FTAIA and is excluded from the Sherman Act unless two conditions are met: "(1)

12  the conduct must have had a 'direct, substantial and reasonably foreseeable effect' on U.S.

13  domestic commerce, and (2) such U.S. domestic effect must 'give[ ] rise to' a Sherman Act

14  claim." *Id*.

15          The Ninth Circuit in *Hsiung* said that the commerce associated with TFT-LCD panels

16  sold abroad that were incorporated in finished consumer products ultimately sold in the United

17  States "was both substantial and had a reasonably foreseeable impact on the United States, and

18  the court went on to find that the impact was also sufficiently 'direct,' thereby satisfying the

19  first prong of the domestic effects exception." *Capacitors III*, 2016 WL 5724960, at *6 (citing

20  *Hsiung*, 778 F.3d at 758-59). The Ninth Circuit did not reach the question of whether the second

21  part of the "domestic effects" exception was satisfied, because it found that there was abundant

22  evidence of import commerce. 778 F.3d at 760.

23          Panasonic cites *Capacitors III* for the proposition that it is unlikely that capacitors

24  installed in finished products can satisfy either the "import commerce" or "domestic effects"

25  tests and therefore the same point can be made as to Inductors. DM at 25. Very recently,

26  however, Judge Donato issued an opinion in Phase II of summary judgment proceedings in

27

28  _____
    [17] *Capacitors III* was not decided on a motion to dismiss. It was instead decided on "Phase I"
    of summary judgment motions, after evidence had been taken. 2016 WL 5724960, at *1.

*Capacitors* that goes unmentioned in Defendants' brief. That ruling involved, *inter alia*, capacitors sold to foreign "sister companies" of Flextronics, Inc. The companies installed them abroad into finished products that were then sold into the United States. The court held that on a summary judgment record, there were jury issues as to whether these foreign purchases and shipments satisfied the "import commerce" exclusion from, and/or the "domestic effects" exception to, the FTAIA. *In re Capacitors Antitrust Litig. (No. III)*, No. 17-md-02801-JD, 2018 WL 4558265, at *5 (N.D. Cal. Sept. 20, 2018). *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 5725008, at *3-5 (N.D. Cal. Sept. 30, 2016) (denying summary judgment on both the "import commerce" exclusion and the "domestic effects" exception).

Here, summary judgment motions are a long way off; this is a Rule 12(b)(6) motion. It would be wholly inappropriate to grant any dismissal on either the "import commerce" exclusion from, or the "domestic effects" exception to, the FTAIA.[18]

### III.   CONCLUSION.

For all of the foregoing reasons, the motion to dismiss should be denied. Should the Court be inclined to grant it in whole or in part, Plaintiffs should be given leave to amend the CAC. Under Fed. R. Civ. P. 15(a), leave to amend "shall be freely granted when justice so requires." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*).

Dated: December 19, 2018

Respectfully submitted,
By: /s/ Michael P. Lehmann
Michael P. Lehmann (SBN 77152)
Bonny E. Sweeney (SBN 176174)
Christopher Lebsock (SBN   184546)
Samantha Stein (SBN 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

---

[18] For examples of denials of motions to dismiss on one or both of these issues, *see, e.g.*, *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 795 F. Supp. 2d 847, 850-51 (E.D. Wis. 2011); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 963 (N.D. Cal. 2011); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420-YGR, 2017 WL 2021361, at *4-5 (N.D. Cal. May 12, 2017).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fax: (415) 358-4980
mlehmann@hausfeld.com
bsweeney@hausfeld.com
clebsock@hausfeld.com
sstein@hausfeld.com

*Interim Co-Lead Class Counsel and Attorneys for the Direct Purchaser Class*

By: /s/ Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Matthew S. Weiler (SBN 236052)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
mweiler@bfalaw.com

*Interim Co-Lead Class Counsel for the Direct Purchaser Class*

Marc H. Edelson (admitted *pro hac vice*)
EDELSON & ASSOCIATES, LLC
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel.: (215) 867-2399
medelson@edelson-law.com
Joshua H. Grabar (admitted *pro hac vice*)
GRABAR LAW OFFICE
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel.: (267) 507-6085
jgrabar@grabarlaw.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel: (415) 217-6810
guido@saveri.com
rick@saveri.com
zirpoli@saveri.com

Christopher M. Burke (SBN 214799)

Walter W. Noss (SBN. 277580)
Hal Cunningham (SBN. 243048)
John Jasnoch (SBN 281605)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Phone: (619) 233-4565
Fax: (619) 233-4565


Todd A. Seaver
Joseph J. Tabacco, Jr.
Matthew D. Pearson
Sarah Khorasanee McGrath
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
mpearson@bermantabacco.com
smcgrath@bermantabacco.com

Marc Greenspon (*pro hac vice* to be filed)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile:  (617) 542-1194
mgreenspon@bermantabacco.com

Vincent Briganti (*pro hac vice* to be filed)
Barbara Hart (*pro hac vice* to be filed)
LOWEY DANNENBERG P.C.
White Plains Plaza
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile:  (914) 997-0035
vbriganti@lowey.com
bhart@lowey.com

Brian Murray (*pro hac vice* to be filed)
Lee Albert (*pro hac vice* to be filed)
GLANCY PRONGAY & MURRAY
230 Park Avenue, Suite 530
New York, NY 10169
Telephone: (212) 682-5340

1

2

Facsimile:  (212) 884-0988
Email: bmurray@glancylaw.com
lalbert@glancylaw.com

3

4

5

6

7

8

Allan Steyer (SBN 100318)
D. Scott Macrae (SBN 104663)
STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA  94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234
Email: asteyer@steyerlaw.com
Email: smacrae@bamlawca.com

9

10

11

12

13

14

15

Arthur N. Bailey (*pro hac vice* to be filed)
R. Anthony Rupp, III (*pro hac vice* to be filed)
Marco Cercone (*pro hac vice* to be filed)
RUPP BASE PFALZGRAF
CUNNINGHAM, LLC
424 Main Street, 1600 Liberty Building
Buffalo, New York 14202
Tel: (716) 854-3400
Email: bailey@ruppbaase.com
Email: rupp@ruppbaase.com
Email: cercone@ruppbaase.com

16

*Additional Counsel for the Class*

17

18

19

20

21

22

23

24

25

26

27

28