1   Lesley E. Weaver (SBN 191305)
    Matthew S. Weiler (SBN 236052)
2   BLEICHMAR FONTI & AULD LLP
3   555 12th Street, Suite 1600
    Oakland, CA 94607
4   Tel.: (415) 445-4003
    Fax: (415) 445-4020
5   lweaver@bfalaw.com
    mweiler@bfalaw.com
6

7   Michael P. Lehmann (SBN 77152)
    Bonny E. Sweeney (SBN 176174)
8   Christopher L. Lebsock (SBN 184546)
    Samantha Stein (SBN 302034)
9   HAUSFELD LLP
    600 Montgomery Street, Suite 3200
10  San Francisco, CA 94111
    Tel.: (415) 633-1908
11  Fax: (415) 358-4980
    mlehmann@hausfeld.com
12  bsweeney@hausfeld.com
    clebsock@hausfeld.com
13  sstein@hausfeld.com
14

15  *Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*
    [Additional counsel listed on signature page]

16              **UNITED STATES DISTRICT COURT**

17            **NORTHERN DISTRICT OF CALIFORNIA**

18

| | |
|---|---|
| 19 IN RE INDUCTORS ANTITRUST LITIGATION | Case No. 5:18-cv-00198-EJD-NC |
| 20 | **[PROPOSED] DIRECT PURCHASER PLAINTIFFS' SECOND** |
| 21 THIS DOCUMENT RELATES TO: | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| THE DIRECT PURCHASER PLAINTIFFS' 22 ACTION | |
| 23 | <u>**CLASS ACTION**</u> |
| 24 | JURY TRIAL DEMANDED |
| 25 | <u>PUBLIC REDACTED VERSION OF</u> |
| 26 | <u>DOCUMENT SOUGHT TO BE</u> <u>SUBMITTED UNDER SEAL</u> |

27

28

TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE .......................................................................... 8

III.    PARTIES .............................................................................................................. 8

        A.      Plaintiffs .................................................................................................. 8

        B.      The Murata Defendants ........................................................................... 9

        C.      The Panasonic Defendants ...................................................................... 11

        D.      The Sagami Defendants ........................................................................... 13

        E.      The Sumida Defendants ........................................................................... 13

        F.      The Taiyo Yuden Defendants .................................................................. 16

        G.      The TDK Defendants ............................................................................... 17

        H.      The Tokin Defendants ............................................................................. 21

        I.      Agents and Co-Conspirators .................................................................... 22

IV.     AFFECTED COMMERCE ................................................................................. 23

        A.      The Defendants' Conduct Involved Import Trade or Import Commerce and
                Had Direct, Substantial and Reasonably Foreseeable Effects on United States
                Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and
                Class Members' Antitrust Claims ............................................................ 23

        B.      The Defendants Targeted the United States ............................................ 26

V.      FACTUAL ALLEGATIONS ............................................................................... 31

        A.      Inductors Generally and Types of Inductors .......................................... 31

        B.      The Structure of the Inductor Market Is Conducive to Collusion ........... 37

                1.      Market Concentration .................................................................. 37

                2.      Product Commoditization ............................................................ 38

                3.      Entry Barriers .............................................................................. 39

                4.      Demand Inelasticity ..................................................................... 41

                5.      Declining Demand and Excess Capacity ..................................... 42

C.    The Conduct of Defendants, the Investigation by the DOJ, and the Use of Trade Associations Strongly Support The Assertion That Defendants Colluded ...................................................................................... 43

1.    Summary of Defendants' Unlawful Conduct ..................................... 43

2.    Conspiratorial Acts Conducted Through JEITA ................................ 46

3.    Examples of Conspiratorial Acts in The United States ...................... 59

4.    Subpoenas Issued by DOJ And Presence Of A Leniency Applicant. . 66

5.    Use of Trade Associations Other than JEITA to Facilitate and Organize the Conspiracy .................................................................. 68

6.    Other Interactions ........................................................................... 71

7.    Some Defendants' Involvement in Other Conspiracies in Electronic Product Markets Further Support an Inference of Conspiratorial Conduct Based on Similar Facts Pled Here .......................................... 72

VI.   TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT ......................................................................................... 74

VII.  CLASS ACTION ALLEGATIONS ............................................................. 77

VIII. CLAIM FOR RELIEF ................................................................................. 79

IX.   DEMAND FOR JUDGMENT ..................................................................... 81

X.    JURY DEMAND ......................................................................................... 82

1.      Plaintiffs Arch Electronics, Inc., Cambridge Capital Corporation, Dependable Component Supply Corporation, Lifetime Service Center, Inc., Powerweb, Inc. and Powerweb Energy, Inc. (collectively, "Plaintiffs") bring this action on behalf of themselves and on behalf of a class of all similarly situated persons and entities in the United States, its territories, and the District of Columbia (the "Class") for damages and injunctive relief under Sections 15 and 26 of the Clayton Act (15 U.S.C. §§ 15 and 26) for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against Defendants Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Murata Power Solutions, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd; Panasonic Industrial Devices Corporation of America; Sagami Elec Co., Ltd.; Sagami America, Ltd.; Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of North America; TDK U.S.A. Corporation; TOKO Inc. (now known as Saitama Murata Manufacturing Co., Ltd.); Tokin Corporation; and Tokin America, Inc. (collectively "Defendants").[1] The allegations in this Second Consolidated Amended Complaint ("2CAC") supersede all others in earlier complaints filed in connection with this litigation. Plaintiffs allege as follows, based on information and belief, except as to themselves.

## I.    NATURE OF THE ACTION

2.      This action is based on a scheme by Defendants to fix prices of Inductors (as described herein) that were purchased by entities or persons in the United States, its territories, or the District of Columbia (including through controlled subsidiaries, agents, affiliates, or joint ventures) during the period from at least January 1, 2003 through December 31, 2017 (the "Class Period").[2]

---

[1] Plaintiffs reserve the right to amend their complaint further once the identities of any further alleged conspirators are established.

[2] The Class Period alleged here differs from the period during which the Defendants actively conspired (the "Conspiracy Period"). As explained below, it is possible that the Conspiracy Period ended in 2016, but the effects of Defendants' conspiracy lingered on, causing injury and damage to members of the proposed Class for a period thereafter. Plaintiffs' investigation

3.      As used herein, the term "inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; common mode filters; "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer Inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching. Along with resistors (a component having a specific amount of resistance to the flow of an electrical current) and capacitors (a two-terminal electronic component that stores potential energy in the form of an electrical field), Inductors are viewed as part of the category of "passive electronic components." Along with capacitors and resistors, inductors are one of the most common passive linear elements in electronic circuits and thus are ubiquitous in thousands of products that rely on electronic circuits for power. As explained in more detail below, Inductors are now found in a wide variety of electronic equipment, including: (a) smartphones, laptop and desktop computers, video game consoles, wireless LAN (Local Area Network) boxes, and other types of consumer electronic equipment; (b) televisions; (c) advanced driver assistance systems ("ADAS") used in vehicles; and (d) induction motors that are used in industry to convert electrical energy into mechanical energy.

4.      The term "Inductors" as used herein refers to any inductors (as described above and further below) manufactured by each of the Defendants, unless the context indicates otherwise. When the term "inductors" with no initial capitalization is used herein, it refers to inductors generally, including inductors made by Defendants and by others, unless the context indicates otherwise.

---

is ongoing, and Plaintiffs have conservatively chosen a Class Period that commences in 2003. Some Plaintiffs purchased millions of dollars of Inductors from Defendants prior to January 1, 2003 during which time at least some conspiratorial activity may have occurred. Formal discovery may reveal that prices from 1999 through 2003 were supracompetitive. Plaintiffs reserve the right to further amend their 2CAC with respect to the Class Period following further investigation.

1       5.      In 2015, the global market for inductors generally was estimated to be worth

2   $2.599 billion. As explained below, the Defendants control roughly 75% of the global inductors

3   market, and during the Class Period controlled as high as 80% of the global inductors market.

4       6.      As alleged herein, the Defendants formed a cartel to fix and stabilize the prices

5   for Inductors sold or shipped to the United States, its territories and the District of Columbia

6   and world-wide. Defendants acted to stabilize prices of Inductors as a reaction to a series of

7   shocks to the inductors market that began in the late 1990s resulting from increased competition

8   from Chinese, Korean and Taiwanese manufacturers. The global recession of 2001 exacerbated

9   these effects, as demand for the consumer electronics goods plummeted.

10      7.      The Defendants' cartel activity arose out of a need to protect profits of these

11  Japan-based companies from the competition created by the entry in December of 1997 of

12  twenty-nine nations (including Japan and the United States) into the Information Technology

13  Agreement ("ITA"), which eliminated tariffs on world trade of various IT products, including

14  inductors. The situation worsened for Japan-based manufacturers in 2003, when China agreed

15  to enter into the ITA. The need to stabilize prices became especially prominent following the

16  global recession in 2001, when sales of inductors to North America dropped by 35%.

17      8.      Despite these dramatic changes, prices for Inductors remained stubbornly high

18  during the Class Period. This is because the Defendants expressly conspired to fix prices and

19  allocate markets for Inductors by exchanging competitively sensitive information with their

20  competitors, such as price and anticipated volume of sales, for the purpose of reaching

21  agreements to maintain artificially high prices.

22      9.      The following chart, taken from Federal Reserve Economic Data ("FRED")

23  maintained on a database by the Federal Reserve Bank of St. Louis, shows the effects of the

24  Defendants' conspiracy:

25

26

27

28



10.    The chart depicts a Price Index for imported inductors ("Import Price Index") (as well as related types of electronic equipment, such as transformers)[3] using the data from the year 2000 as a baseline. As can be seen, the index of import prices for inductors started to plummet drastically in January of 1998 and reached a nadir by October of 2003, six months after China agreed to enter into the ITA. Thereafter, the Import Price Index increased radically, including two major price spikes in July of 2008 and April of 2009, the period of the worldwide recession. of the Import Price Index climbed steadily, reaching a peak in August of 2014. While the Import Price Index has since declined slightly, it never returned to its pre-2003 levels, spiking again in August of 2017. The Import Price Index during this period largely reflected index prices for Defendants' Inductors that were imported into the United States, given their collective dominant position.

---

[3] A transformer is a device that makes use of two coupled inductors to increase or decrease voltage levels, so Inductors are significant components of transformers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11.     Increased costs of raw materials do not explain the increases in the Import Price Index. The following chart depicts how the Raw Material Price Index for passive electronic components stabilized for much of the period between November of 2012 and January of 2016 and declined in the latter portion of that period to the point where it was below its levels in 2012:



12.     Increases in demand do not explain the huge increases in the Import Price Index. For example, analysts noted that in March of 2009, the global market for passive electronic components generally had declined by 18% compared to the previous year and that by March of 2010, demand for passive electronic components had declined by an additional 13%. As noted above, contrary to sliding Inductor demand in these years, the Import Price Index spiked. In Japan, exports of passive components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009, according to data available from MITI, the Japanese Ministry of International Trade & Industry.

13.     While use of inductors in smartphones and ADAS increased in the years that followed, the costs of manufacturing these products declined. For example, by 2015, Air Core inductors (inductors consisting of a coil wrapped around a ceramic core) occupied approximately 40% of the market and were much easier to manufacture than other types of Inductors. Yet the Import Price Index in 2014-15 was at levels that vastly exceeded those of 2009-10.

14.     The only plausible explanation for the discrepancy between higher or stabilized indexed Inductor import prices during times of decreasing global demand and decreasing manufacturing costs is conspiratorial activity.

15.     That is exactly what happened here. On January 4, 2018, the legal media organization *MLex* first reported that certain Japanese companies received investigative subpoenas from a grand jury empaneled in the Northern District of California relating to an investigation by the United States Department of Justice ("DOJ") of price-fixing activity with respect to Inductors. The DOJ has confirmed the existence of that investigation to this Court and has sought and received repeated limited stays of discovery in these civil actions so that its investigation may continue.

16.     On May 20, 2019, *MLex* identified Defendant TDK Corporation as a leniency applicant with the DOJ. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As explained below, that fact is significant because in order to seek leniency, TDK had to admit to a criminal violation of the antitrust laws. █████████████████████████████████████ Once a conspiracy is established, liability for acts done in furtherance of it is broad. As the United States Court of Appeals for the Ninth Circuit has stated in *Beltz Travel Service, Inc., v. International Air Transportation Association*, 620 F.2d 1360, 1366-67 (9th Cir. 1980): "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability…. each conspirator may be performing different tasks to bring about the desired result."

17.     The situation that fostered this conspiracy also fostered participation by some of the same Defendants to collude in the market for capacitors. The DOJ obtained a series of guilty pleas with respect to a capacitors conspiracy that extended from as long as September of 1997

through January of 2014.[4] The conspiracy included some, but not all of the Defendants in this action. The conduct in question included, *inter alia*: (a) face-to-face meetings at which agreements to fix the prices of capacitors were reached; (b) collusive bidding to customers who asked for pricing on capacitors; (c) exchanges and monitoring of price, sales, bid, supply, demand, shipping and production of capacitors; and (d) acts of fraudulent concealment of the conspiracy. The Honorable District Judge James Donato has rejected some of the fines with respect to corporate plea-takers as being too low.

18.    The DOJ's actions with respect to capacitors and its investigation into antitrust violations with respect to resistors, another passive electronics component, have led to the filing of two follow-on class action proceedings centralized before Judge Donato: *In re Capacitors Antitrust Litig*., No. 14-3264 (N.D. Cal.), and *In re Resistors Antitrust Litig*., No. 15-3820 (N.D. Cal.) ("*Resistors*"). Defendant Panasonic Corporation is a defendant in both cases.

19.    It has been publicly reported that Panasonic Corporation approached the DOJ and sought leniency with respect to the conspiracy regarding capacitors. Both NEC Tokin (the predecessor of Defendant Tokin Corporation) and Taiyo Yuden Co., Ltd. also acknowledged publicly that they were cooperating with investigators with respect to the capacitors conspiracy. Taiyo Yuden Co., Ltd. is also a defendant in the capacitors case.

20.    As was the case in the capacitors and resistors conspiracies, the conspiracy regarding Inductors was carried out, in part, under the auspices of the Japan Electronics & Information Technology Association ("JEITA"), which was formed in 2000. Each of the Japanese Defendants is an active member of JEITA. Through attendance at formal JEITA meetings and other meetings, as well as meetings of other trade associations described below, the Defendants exchanged competitively sensitive information and reached agreements, just as some defendants did in cartels concerning capacitors and resistors.

//

//

---

[4] *See* https://www.justice.gov/opa/pr/seventh-company-agrees-plead-guilty-fixing-prices-electrolytic-capacitors.

## II.     JURISDICTION AND VENUE

21.     Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable relief for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

22.     Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 12 and 22) and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly transact business in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Specifically, some Defendants maintain offices in this District, and all Defendants sell or seek to sell Inductors to electronics companies located in this District.

23.     This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at purchasers of Inductors and/or products containing Inductors in the United States and in this District.

## III.     PARTIES

### A. Plaintiffs

24.     Each Plaintiff purchased one or more Inductors or products containing Inductors from a Defendant conspirator or an entity owned or controlled by a Defendant conspirator. The purchases identified below were made at various times during the Class Period, beginning no earlier than January 1, 2003, ending no later than December 31, 2017.

25.     Plaintiff Arch Electronics, Inc. ("Arch") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Cheltenham, Pennsylvania. Among other things, Arch sells and installs consumer electronic equipment. During the Class Period, Arch purchased manufactured products containing Inductors directly from one of more of the named Defendants, their predecessor entities, their divisions, subsidiaries or affiliates, or their co-conspirators. These products contained one or more Inductors manufactured by a Defendant. Arch paid more than it would have in the absence of the conspiracy alleged herein.

26.     Plaintiff Cambridge Capital Corporation ("Cambridge") is a New York corporation with a principal place of business in Florida. Cambridge is the successor in interest to Univisions Crimson Holding, Inc. ("UCH"), a company that during the Class Period purchased manufactured products containing Inductors directly from one of more of the named Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators. These products contained one or more Inductors manufactured by a Defendant. Cambridge paid more than it would have in the absence of the conspiracy alleged herein.

27.     Plaintiff Dependable Component Supply Corporation ("Dependable") was incorporated under the laws of Florida. During the Class Period, Dependable purchased Inductors directly from one or more of the Defendants. Dependable paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

28.     Plaintiff Lifetime Service Center, Inc. ("Lifetime") is a corporation with a principal place of business in Williamsville, New York. During the Class Period, Lifetime purchased Inductors directly from one of the Defendants. Lifetime paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

29.     Plaintiffs Powerweb, Inc. and Powerweb Energy, Inc. (collectively, "Powerweb") are corporations with their principal places of business located in Philadelphia, Pennsylvania. Powerweb purchased Inductors directly from one or more of the Defendants. Powerweb paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

**B.  The Murata Defendants**

30.     Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that Murata Manufacturing had $15 million in sales of one type of Inductors (ceramic chip Inductors) in

1  North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers

2  of passive electronic components. Murata Manufacturing annually has revenues in excess of $5

3  billion from sales of passive electronic components, including Inductors.

4        31.    In March of 2014, Murata Manufacturing acquired a controlling interest in

5  Defendant TOKO, Inc. ("TOKO"), a Japanese company that was a leading Inductor

6  manufacturer that sold hundreds of millions of dollars of Inductors in the United States, its

7  territories and the District of Columbia during the Class Period. According to estimates from

8  one industry expert, TOKO had $47 million of sales of one type of Inductors (ceramic chip

9  Inductors), in North America in 2007 alone. By April of 2015, Murata Manufacturing had

10  assumed all aspects of TOKO's business, including its assets, sales, service, and technical

11  support for the portfolio of TOKO products, including Inductors. To the extent Murata

12  Manufacturing assumed, in whole or in part, the assets and liabilities of TOKO, Plaintiffs intend

13  to hold Murata Manufacturing liable for any violations of Sections 1 and 3 of the Sherman Act

14  (15 U.S.C. §§ 1, 3) by TOKO that occurred during the Class Period. Plaintiffs also separately

15  name TOKO as a Defendant.

16        32.    Defendant Murata Electronics North America, Inc. ("MENA") is a wholly

17  owned subsidiary of Murata Manufacturing. MENA is a Texas corporation with its principal

18  place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA—

19  directly and/or through its subsidiaries, which it wholly owned and/or controlled—

20  manufactured, marketed, and/or sold Inductors that were purchased throughout the United

21  States, its territories and the District of Columbia during the Class Period.

22        33.    Murata Power Solutions, Inc. ("Murata Power") is a wholly owned subsidiary

23  of Murata Manufacturing that was created in 2007 when Murata Manufacturing acquired a

24  division of C&D Technologies, a United States company with its headquarters in Pennsylvania.

25  Murata Power has its headquarters at 129 Flanders Road, Westborough MA, 01581. Murata

26  Power sells Inductors to customers located in the United States. Murata Power had $5 million

27  of sales of Inductors in the United States in 2007.

28

34.     Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth, Georgia.

35.     Defendant TOKO (now known as Saitama Murata Manufacturing Co., Ltd. ("Saitama Murata")) was once an independent company that had substantial market share in sales of Inductors. TOKO's headquarters are at 18, Gomigaya, Tsurugashima-shi, Saitama, 350-2281, Japan. As is alleged in greater detail below, TOKO—both before and after its acquisition by Murata Manufacturing—attended meetings of competitors and participated in anticompetitive activity with Defendants. The current TOKO entity is a subsidiary of Murata Manufacturing. TOKO continues to manufacture and perform research and development for Inductors under the direction of Murata Manufacturing. In 2019, TOKO was renamed Saitama Murata.

36.     Defendants Murata Manufacturing, MENA, Murata Power, and TOKO (now known as Saitama Murata) will be referred to collectively herein as "Murata" or the "Murata Defendants."

C. **The Panasonic Defendants**

37.     Defendant Panasonic Corporation ("Panasonic Corporation") is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Panasonic Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors and products containing Inductors in the United States, its territories and the District of Columbia during the Class Period. Panasonic Electronic Devices Co. Ltd. ("PED") was a former Japanese subsidiary of Panasonic Corporation that was a leading manufacturer of Inductors. It was founded in 1982 and was headquartered in Knoxville, Tennessee. PED had substantial sales of Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that in 2007, PED sold $10 million worth of one type of Inductors (ceramic chip Inductors) in North America. In August of 2011, Panasonic Corporation announced that it was dissolving and absorbing PED in April of 2012. Panasonic Corporation is responsible for the acts of its wholly owned and controlled subsidiary

1    PED, and Plaintiffs will seek to hold Panasonic Corporation liable for any violations of Section

2    1 and 3 of the Sherman Act (15 U.S.C. §§1, 3) by PED that occurred during the Class Period.

3           38.     Panasonic Corporation of North America ("PCNA") was founded in 1959 and

4    operated in the United States under the name "Matsushita Electric Corporation of America"

5    until 2005. PCNA is a Delaware corporation with its principal place of business located at Two

6    Riverfront Plaza, Newark, New Jersey 07102. PCNA was, throughout the Class Period, a

7    wholly owned subsidiary of Panasonic Corporation. On December 22, 2016, PCNA became a

8    subsidiary of Panasonic Holding (Netherlands) B.V. Investment ("Panasonic Holding"), which

9    is wholly owned by Panasonic Corporation. According to Panasonic Corporation's Annual

10   Report for the fiscal year ending March 31, 2017, Panasonic Holding is one of Panasonic

11   Corporation's major consolidated subsidiaries and owns 100 percent of the voting rights in

12   PCNA. Panasonic Consumer Electronics Company ("PCEC") is a division of PCNA, and

13   Panasonic Broadcast and Television Systems Company is a unit of PCNA. During the Class

14   Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates,

15   which it wholly owned and/or controlled—sold and distributed Inductors to purchasers in the

16   United States, its territories and the District of Columbia. These included Inductors

17   manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent,

18   Panasonic Corporation. Also, during the Class Period, PCNA—either directly or through its

19   business units, subsidiaries, agents, or affiliates—sold and distributed to purchasers in the

20   United States, its territories and the District of Columbia products containing Inductors

21   manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates.

22   These included such items as televisions, stereo equipment, Blu-Ray/DVD players, and

23   cameras/camcorders. The Inductors contained in these products are identifiable by part number

24   in the records of Panasonic entities and can be traced either to an entity owned or controlled by

25   Panasonic Corporation or an entity owned or controlled by one of the other Defendants.

26          39.     Defendant Panasonic Industrial Devices Corporation of America ("Panasonic

27   Industrial"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation

28   with its principal place of business located at Two Riverfront Plaza, 7th Floor, Newark, New

Jersey 07102. On or about January 12, 2012, PED changed its name to Panasonic Industrial. Panasonic Industrial sold Inductors and products containing Inductors manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled, to purchasers in the United States, its territories and the District of Columbia during the Class Period

40.     Defendants Panasonic Corporation, PED, Panasonic Industrial, and PCNA are hereinafter referred to as "Panasonic" or the "Panasonic Defendants."

**D.  The Sagami Defendants**

41.     Defendant Sagami Elec Co., Ltd. ("Sagami Japan") is a Japanese company that has its principal place of business at 10-30, Ichibashimo-Cho, Tsurumi-ku, Yokohama Kanagawa 230-0024, Japan. Sagami Japan—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

42.     Defendant Sagami America Ltd. ("Sagami America") is a wholly owned subsidiary of Sagami Japan. Sagami America has its principal place of business at 1854 South Elmhurst Road, Mont Prospect, Illinois 60056. On its website, Sagami Japan lists Sagami America as part of its "Global Network."[5] Sagami Japan manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

43.     Defendants Sagami Japan and Sagami America are hereinafter referred to as "Sagami" or the "Sagami Defendants."

**E.  The Sumida Defendants**

44.     Defendant Sumida Corporation ("Sumida Corporation") is a Japanese corporation with its principal place of business at Harumi Island Triton Square Office Tower X 14/F, 1-8-10 Harumi, Chuo-Ku, Tokyo 104-8547, Japan. Sumida Corporation—directly and/or

---

[5] http://www.sagami-elec.co.jp/en/company/network.php.

through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. Defendant Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103-8589, Japan. Sumida Electric—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, in 2007, Sumida Electric sold $27 million of one type of Inductors (ceramic chip Inductors) in North America, according to industry data. Sumida Electric is wholly owned by Sumida Corporation, as reflected in the following graphic taken from its website:



45.     Defendant Sumida America Components Inc. ("Sumida America") is a Delaware corporation with its headquarters at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois 60173. It is a wholly owned subsidiary of Sumida Corporation. Sumida

1   America maintains offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose,

2   California 95131. During the Class Period, Sumida America—either directly or through its

3   business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled—

4   sold and distributed Inductors manufactured by its business units, subsidiaries, agents, or

5   affiliates or by Sumida Corporation to purchasers in the United States, its territories and the

6   District of Columbia. As seen in the foregoing graphic, Sumida America is wholly owned by

7   Sumida Corporation.

8       46.     Defendant Sumida Corporation exerts complete control over the activities of

9   both Sumida Electric and Sumida America, as reflected in the following "Management

10   Organization Chart of Sumida Group" from its website:



25       47.     The webpage containing this graphic explains:

26   The "Management Organization Chart" is to show the company hierarchy on
formal reporting channel, chain of command and authority within Sumida Group

27   in day-to-day operation and also in the decision and policy making process.
SUMIDA CORPORATION ("Sumida") is a pure holding company and has been

28

[*sic*] adopted the Company with Committee System. All three statutory committees (Nomination Committee, Audit Committee and Compensation Committee) are composed of external directors. Executive Officers are responsible for the business execution, and the Board of Directors is specialized in the business supervision in Sumida; thus business execution and supervision function is expressly separated in Sumida. Risk Management Committee is specialized in risk management in Sumida.[6]

48.     Defendants Sumida Corporation, Sumida Electric and Sumida America are hereinafter referred to as "Sumida" or the "Sumida Defendants."

### F.  The Taiyo Yuden Defendants

49.     Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. Taiyo Yuden Co.—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. In its 2017 Annual Report, Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

50.     Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Class Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled—sold and distributed to purchasers in the in the United States, its territories and the District of Columbia Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo Yuden Co.

---

[6] https://www.sumida.com/about/index.php?categoryId=5&parentId=9&aboutId=9.

51.     Defendant Taiyo Yuden Co. exerts control over Taiyo Yuden USA. Corporate policies are set by the parent company and govern the activities of the United States subsidiary, as depicted in the following chart taken from Taiyo Yuden Co.'s website:



52.     Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants."

### G. The TDK Defendants

53.     Defendant TDK Corporation is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chrome, Chuo-ku, Tokyo 103-8272, Japan. TDK Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

54.     Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK-EPC—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United

1  States, its territories and the District of Columbia during the Class Period. More specifically,

2  TDK-EPC itself develops and manufactures Inductors, which are sold by the TDK Defendants

3  under the TDK and EPCOS brands.[7] TDK-EPC is a wholly owned subsidiary of the TDK

4  Corporation.

5        55.      Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is

6  a wholly owned subsidiary of TDK Corporation with its principal place of business located at

7  525 RXR Plaza, Uniondale, New York 11556. TDK USA describes itself as a "group company

8  of TDK Corporation." During the Class Period, TDK USA—either directly or through its

9  business units, subsidiaries, agents, or affiliates—sold and distributed Inductors manufactured

10  by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation

11  and TDK-EPC to purchasers in the United States purchasers the United States, its territories

12  and the District of Columbia.

13        56.      Defendant TDK Corporation of America ("TDK America") is a wholly owned

14  subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite

15  300, Lincolnshire, Illinois 60069. Like TDK USA, TDK America describes itself as a "group

16  company of TDK Corporation." TDK America sold and distributed Inductors manufactured by

17  business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to

18  purchasers in the Inductors manufactured by business units, subsidiaries, agents, or affiliates of

19  its corporate parent, TDK Corporation, to purchasers in the United States, its territories and the

20  District of Columbia

21        57.      The TDK Defendants were the largest manufacturers of Inductors during the

22  Class Period. For example, in 2007 TDK sold $57 million of one type of Inductors, ceramic

23  chip Inductors in North America, more than any other manufacturer according to one industry

24  expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded

25  Inductors, and does so to this day.

26

27

28  [7] https://www.global.tdk.com/corp/en/news_center/press/aah34500.htm.

1     58.     TDK Corporation owns and controls both TDK USA and TDK America, as

2  reflected in the following graphic of the "TDK Organization" taken from TDK Corporation's

3  website:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



59.     TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively referred to as "TDK" or the "TDK Defendants."

1

### H. The Tokin Defendants

2        60.      Defendant Tokin Corporation is a Japanese company with its principal place of

3   business at 8-1, Nishi-Kanda 3-chome, Chiyoda-Ku, Tokyo 101-8362, Japan. Tokin

4   Corporation was established in 1938 as Tohuku Metal Industries Company, which changed its

5   name to "Tokin Corporation" in 1988. In 2002, that entity integrated with the electronic

6   components business of NEC Corporation ("NEC") to become NEC Tokin Corporation ("NEC

7   Tokin"). In February of 2013, Kemet Corporation ("Kemet") acquired an interest in NEC

8   Tokin. By February of 2017, Kemet owned 34% of the shares of NEC Tokin and 51% of the

9   voting rights, while NEC held 66% of the shares and 49% of the voting rights. On February 24,

10  2017, it was announced that NEC had sold its remaining interest in NEC Tokin to Kemet. Tokin

11  Corporation resumed using the name "Tokin Corporation" on April 10, 2017.

12       61.      Defendant Tokin Corporation is now a separately incorporated subsidiary of

13  Kemet. It is clear that Tokin now operates as the successor in interest to NEC Tokin. It continues

14  to manufacture and sell Inductors, just as NEC Tokin did. Tokin Corporation also takes full

15  responsibility for past antitrust violations by NEC Tokin. On its current website, Tokin

16  Corporation has posted a letter of apology dated March 29, 2016 by Shigenori Oyama (then

17  Representative Director and President of NEC Tokin and now President of Tokin Corporation)

18  for a cease and desist order issued by the Japan Fair Trade Commission ("JFTC") against it and

19  others for the price-fixing of certain capacitors.[8] In that letter, Mr. Oyama promised that the

20  "entire company will work together to reinforce our compliance regime so that the same event

21  will never happen again in the future. I sincerely apologize for causing such big trouble and

22  concern to our customers, suppliers and all concerned due to the orders at this time."

23       62.      NEC Tokin also pled guilty to price-fixing of capacitors in United States federal

24  court in January of 2016 and paid a $13.8 million fine.[9]

25

_____

26  [8] https://www.tokin.com/english/files/Capacitor20160331e.pdf. The JFTC's order can be
    found here: https://www.jftc.go.jp/en/pressreleases/yearly-
27  2016/March/160329_files/160329_1.pdf.

28  [9] See ECF No. 9-1 in United States v. NEC Tokin Corp., No. 3:15-cr-00426-JD (N.D. Cal.).

63.     During the Class Period, Tokin Corporation (then operating as NEC Tokin) sold and distributed Inductors manufactured by it either directly or through its business units, subsidiaries, agents or affiliates, which it wholly owned and/or controlled, to purchasers in the United states, its territories and the District of Columbia.

64.     Defendant Tokin America Inc. ("Tokin America") is a company headquartered in San Jose, California and is a wholly owned subsidiary of Tokin Corporation. Tokin America is the successor to NEC Tokin America Inc. and occupies an office at the same address in San Jose utilized by that predecessor entity. In the United States, its territories and the District of Columbia, Tokin America sells Inductors made by Tokin Corporation. Tokin America is referred to as part of Tokin Corporation's "Overseas Network" and one of its "Overseas Offices and Subsidiaries."[10]

65.     Defendants Tokin Corporation and Tokin America are collectively referred to as "Tokin."

### I.     Agents and Co-Conspirators

66.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

67.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within

---

[10] https://www.tokin.com/english/contact/otoi.html#a.

corporate families distributed products containing Inductors, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## IV.    AFFECTED COMMERCE

68.    During the Class Period, the Defendants collectively controlled the vast majority of the market for inductors, both globally and in the United States, as further described below.

69.    The Defendants sold Inductors (or products containing Inductors) directly to customers located in the United States. Substantial quantities of Inductors are shipped from outside the United States into the United States in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

70.    In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

**A. The Defendants' Conduct Involved Import Trade or Import Commerce and Had Direct, Substantial and Reasonably Foreseeable Effects on United States Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and Class Members' Antitrust Claims**

71.    The Defendants' illegal conduct involved United States import trade or import commerce. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed Inductors to enter the United States market and inflating the prices of Inductors destined for the

1    United States. Such conduct was meant to produce and did in fact produce a substantial effect

2    in the United States in the form of higher prices.

3         72.    According to one leading analyst, the inductors market in the United States "was

4    an estimated $280 MM in FY 2018 or 10% of global consumption value." This is an increase

5    from $225 million for FY 2016. Demand from private industry (such as smartphone and

6    automobile makers) is fueling this growth.

7         73.    The Defendants recognize the importance of sales of Inductors in the United

8    States in their annual reports and other financial reports. That is why they created and invested

9    in entities like MENA, Murata Power, Murata RF, Taiyo Yuden USA, Sagami America, Tokin

10   America, Sumida America, PCNA, TDK America, and TDK USA. The websites of those

11   entities boast about their respective sales networks in the United States.

12        74.    To give one example, MENA's website states that "[w]e serve as the regional

13   and functional headquarters supporting our customers' engineering and procurement activities

14   throughout the Americas. Along with experienced teams of Technical Sales Managers located

15   in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago,

16   Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized

17   Distributors to service our customers' requirements for sales and technical support, design

18   expertise, logistics and supply chain initiatives."[11]

19        75.    Taiyo Yuden's website similarly lists a headquarters for Taiyo Yuden USA in

20   Chicago and "sales offices" in San Diego, San Jose, Chicago and Boston.[12] Taiyo Yuden USA

21   assisted its corporate parent in marketing and selling Inductors, issuing press releases and

22   disseminating product guides.

23        76.    As a third example, TDK America's website states that "TDK Corporation of

24   America (TCA), a group company of TDK Corporation, was established in 1974 in California

25   as the sales and marketing force for electronic components in North America and Latin

26   America. TCA has grown into a sales force of fifteen offices in the U.S. and a headquarter

27   [11] https://www.murata.com/en-us/about/company/muratalocations/americas/mea.

28   [12] https://www.yuden.co.jp/ut/company/overseas/.

1   office located in Lincolnshire, Illinois. The combined efforts of sales, marketing and technical

2   personnel have built the TDK name as a respected leader in the industry."[13]

3        77.    Murata, Sumida, Sagami, Tokin, and Panasonic likewise tout their worldwide

4   sales networks, which include the United States.

5        78.    The Defendants shipped millions of Inductors (and/or products containing

6   Inductors) into the United States during the Class Period. In addition, Inductors that were

7   shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States

8   companies. As a result, a substantial portion of the Defendants' revenues were derived from the

9   United States market. Defendants spent millions of dollars on advertising their products in the

10  United States.

11       79.    Because of the importance of the United States market to the Defendants and

12  their co-conspirators, Inductors intended for importation into and ultimate consumption in the

13  United States were a focus of the Defendants' illegal conduct. The Defendants knowingly and

14  intentionally sent price-fixed Inductors (and/or products containing price-fixed Inductors) into

15  a stream of commerce that led directly into the United States. This conduct by the Defendants

16  was meant to produce and did in fact produce a substantial effect in the United States in the

17  form of artificially-inflated prices for Inductors.

18       80.    Thus, when high-level executives within the Defendants' companies agreed on

19  prices for Inductors, they knew that their price-fixed Inductors would be sold in the United

20  States.

21       81.    For the reasons set forth above, the Defendants' illegal conduct involved import

22  trade or import commerce into the United States.

23       82.    The Defendants' illegal conduct had direct, substantial, and reasonably

24  foreseeable effects on United States domestic and import trade or commerce in the form of

25  higher prices for Inductors that Plaintiffs and Members of the Class paid. These prices, tainted

26  by collusion, directly and immediately impacted Plaintiffs and Members of the Class in the

27

28  ―――――――――――――――
    [13] http://www.component.tdk.com/about-us.php.

1   United States. In this respect, the United States effects of the Defendants' illegal conduct gave

2   rise to Plaintiffs' and Class Members' antitrust claims and were the proximate cause of the

3   injury that Plaintiffs and Members of the Class suffered.

4         83.   As described in further detail, Defendants' price-fixing conspiracy involved

5   unlawful conduct within the United States that had a direct, substantial and reasonably

6   foreseeable effect on domestic commerce.

7            **B.  The Defendants Targeted the United States**

8         84.   Because of the relatively small size of Inductors, transportation costs are

9   relatively minor and there is substantial international trade in these electronic components.

10         85.   During the Class Period, the Defendants manufactured and sold substantial

11   quantities of Inductors shipped from outside the United States, its territories, and the District of

12   Columbia in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

13   In addition, substantial quantities of equipment and supplies necessary to the production and

14   distribution of Inductors, as well as payments for Inductors and related products sold by the

15   Defendants, traveled in interstate and foreign trade and commerce. The business activities of

16   the Defendants in connection with the production and sale of Inductors were within the flow

17   of, and affected substantially, interstate and foreign trade and commerce.

18         86.   During the Class Period, the Defendants also manufactured and sold

19   manufactured products in the United States, its territories, and the District of Columbia that

20   incorporated Inductors made by the Defendants. The Defendants also sold substantial quantities

21   of these products overseas to direct purchasers for importation to the United States, its

22   territories, and the District of Columbia. The business activities of the Defendants in connection

23   with the production and sale of products containing their Inductors were within the flow of, and

24   affected substantially, interstate and foreign trade and commerce. The paragraphs below detail

25   some specific examples of this.

26         87.   Murata's connections to the United States, its territories, and the District of

27   Columbia are deep and sustained. "In 1971, General Motors (GM) introduced Murata's ceramic

28   filters to its car radios. This was the result of efforts by Akira Murata, the founder of Murata

Manufacturing who traveled to the United States and aggressively pioneered the market. Getting fully involved with the automobile industry was Murata's big dream then. Over 40 years ago, we built a plant in the United States and started production locally. Ceramic resonators were introduced to the automobile industry about 25 years ago, and their market continues to enjoy steady sales to this day."[14]

88.     On September 3, 2007, Murata announced that it had completed the acquisition of the Power Electronics Division of C&D Technologies ("C&D"), a United States company located in Pennsylvania, for $85 million in cash. After the acquisition, Murata operated C&D's business as "Murata Power Solutions" in the United States and sold Inductors in the United States, its territories, and the District of Columbia that were once offered by C&D.

89.     In 2014, Murata received a Preferred Quality Supplier ("PQS") award from Intel Corporation ("Intel") based in part on its sales of Inductors. In a press release, Tsuneo Murata, President of Murata Manufacturing, said "[w]e would like to express our sincere appreciation to Intel for its tremendous support and assistance to achieve this award. We are committed to make every effort to meet and exceed Intel's expectation in 2014."[15] Murata received Intel's PQS award for 2010, 2011, and 2012. In 2014, Intel recognized Murata with a Supplier Continuous Quality Improvement award based in part on its sales of Inductors, "Intel's highest honor for its suppliers."[16]



92.     Murata has sales representatives across the United States, including in Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo (Indiana), and Boston.

---

[14] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline
[15] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411
[16] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411

93.     Panasonic is a household brand and has been conducting business continually in the United States since at least the 1960s. *See, e.g., Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F. Supp. 262, 310 (E.D. Pa. 1975). Panasonic has an English language active website that allows potential customers to contact Panasonic's Japanese sales personnel directly about sales inquiries for Inductors.[17]

94.     Sagami has had a substantial presence in the United States its territories, and the District of Columbia for over twenty years. It opened Sagami America in 1995, and sells directly to distributors and other customers in the United States. For example, Sagami's Inductors are offered for sale by United States-based distributors on their websites.

95.     Sumida also targeted markets in the United States, its territories, and the District of Columbia. Sumida's quarterly financial reports report conditions and developments by United States companies such as T-Mobile, and regularly includes reports on business conditions in the United States.

96.     Sumida's English language website identifies sales representatives for its products in Alabama, Arizona, California, Florida, Illinois, Indiana, Massachusetts, Michigan, New Jersey, New York, Oregon, Texas, Washington, and Wisconsin.[18]

97.     Taiyo Yuden has focused on markets in the United States, its territories, and the District of Columbia, on its own and through its relationships with other United States passive electronic components manufacturers, and has customers in the United States, its territories, and the District of Columbia. In 2005, Taiyo Yuden announced that it would sell Inductors in connection with Kemet, through a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire product lines."[19] According to Taiyo Yuden, "Taiyo Yuden and Kemet have built up a cooperative relationship since 1997, when the two companies began

---

[17] https://industrial.panasonic.com/cuif/ww/contact-us?field_contact_group=2304&field_contact_lineup=1393.

[18] https://www.sumida.com/about/index.php?categoryId=20&parentId=96&aboutId=99#Southern%20California.

[19] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf. This arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.

regular information exchanges on the product technology side. Now the relationship is to be strengthened even more through a comprehensive sales alliance."[20]

98.    In April of 2011, Intel gave Taiyo Yuden a PQS award, reflecting Taiyo Yuden's substantial efforts to sell their products, including Inductors, to U.S. companies. Taiyo Yuden President Yoshiro Kanzaki stated "we shall continue to do our utmost to provide quality advanced products and shall approach our work with the aim of becoming Intel's best partner."[21]

101.    The United States has also long been central to TDK's global marketing strategy. TDK has a billboard on Times Square in New York City:



102.    This billboard has been part of TDK's "global advertising strategy" since 2001.[22]

---

[20] Id.

[21] https://www.yuden.co.jp/ut/news/release/pdf_150.pdf.

[22] https://www.global.tdk.com/corp/en/news_center/press/aah33300.htm. In December of 2011, TDK announced that it had lit up a Christmas tree on Times Square to promote its brand. https://www.global.tdk.com/corp/en/news_center/press/aah37600.htm. TDK lit the Christmas Tree in Times Square again in 2014 and 2015, and promoted is brand in the summer of 2012 by sponsoring a Fourth of July display on Times Square.

103.    In July of 2013, TDK revamped its English language website to allow customers to search for Inductors and contact sales agents directly for purchases online: "In recent years, the ratio of information acquisition via the Internet has become extremely high for the departments of customers' development, design, purchasing, etc. Also, due to the trend of globalization, there is a need to respond quickly whenever you request from any customer. The inductor site to be announced here inherits the same concept as the monolithic ceramic capacitor site which has been popularly released in January 2013. Please use the new website for searching TDK's inductor which is the No. 1 supplier of inductor by all means."[23] TDK's website currently has an active feature that allows purchase of Inductors through a search feature that links directly to inventory for certain distributors.

104.    Following this development, TDK announced that TDK and EPCOS brand Inductors were available through United States distributors and the EPCOS website it maintained: "TDK Corporation announces that its broad spectrum of sample kits for EPCOS components is now also available directly from Mouser Electronics, a high-service electronic component distributor focused on providing new products to design engineers. Currently, nearly 40 sample kits containing the latest EPCOS protection devices, sensors, chokes, SAW filters, SMT inductors and power inductors are offered on the EPCOS website."[24]

105.    For much of the Class Period, TDK's American Depositary Receipts Shares ("ADRs") were listed on the New York Stock Exchange. In delisting its ADRs in 2009, TDK explained that "[i]n June 1982, TDK listed its [ADRs] on the NYSE primarily to raise funds, bolster corporate creditworthiness and the TDK brand, and broaden its investor base, as it globalized its business operations and rapidly expanded overseas sales. Ever since, the

---

https://www.global.tdk.com/corp/en/news_center/press/aah40100.htm; https://www.global.tdk.com/corp/en/news_center/press/201412191618.htm (in 2014 TDK advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise").

[23] https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm.

[24] https://en.tdk.eu/tdk-en/373388/company/press-center/press-releases/press-releases/online-service--easy-ordering-of-sample-kits-from-mouser-electronics/166236.

1    Company has worked to expand its operations in the U.S. and elsewhere around the world."[25]

2    Foreign corporations that issue ADRs must register with the Securities and Exchange

3    Commission and are subject to various federal regulations and reporting rules. These securities

4    allow foreign corporations to profitably enter the United States capital markets.

5    

6    

7    

8        108.    The Defendants thus engaged in conduct both inside and outside the United

9    States, its territories, and the District of Columbia that caused direct, substantial, and reasonably

10   foreseeable and/or intended anticompetitive effects upon interstate commerce within the United

11   States.

12       109.    The Defendants, directly and through their wholly owned and/or controlled

13   subsidiaries and agents, engaged in a conspiracy to fix or inflate prices of Inductors that

14   restrained trade unreasonably and affected adversely the market for Inductors and manufactured

15   products that incorporated Inductors. The Defendants affected commerce, including import

16   commerce, substantially throughout the United States, thereby proximately causing injury to

17   Plaintiffs and members of the Class.

18                         **V.    FACTUAL ALLEGATIONS**

19       110.    Plaintiffs incorporate by reference the factual allegations made in previous

20   sections.

21        **A. Inductors Generally and Types of Inductors**

22       111.    As noted above, inductors, including Defendants' Inductors,   are passive

23   electronic components that store and regulate energy in a circuit using principles of

24   electromagnetism.

25       112.    Inductors work by creating magnetic fields when current passes through the coils

26   or other inductive material. The magnetic fields created by the passage of current are measured

27

28   _____
     [25] https://www.global.tdk.com/corp/en/news_center/press/aah29200.htm.

in terms of "force" and "flex." The field force is the amount of "push" that a field exerts over a certain distance, pushing energy through the wire. The field flux is the total quantity, or effect, of the field as energy surrounds the core. Force and flux work off one another. The amount of field flux that will develop in space is proportional to the amount of field force applied, divided by the amount of opposition to flux.

113.    The magnetic field also introduces opposition into the circuit, which is a tension that develops within the circuit allowing for storage of energy. Opposition is created by the movement of the magnetic flux as it opposes or resists any changes in the electrical current flowing through it. Energy is stored when the magnetic field flux allows for a certain "inertia" to accumulate in the flow of electrons through the wire (or other inductive material) producing the field.

114.    An inductor also acts as a governor, or regulator, of energy in a circuit. When current increases, an inductor absorbs energy and drops voltage. When current decreases, it acts as a source of energy, creating voltage as it releases stored energy.

115.    Inductors are classified primarily by inductance, the ability of an Inductor to store energy in the form of a magnetic field. Inductance is measured in the unit of the Henry ($\mu$H).

116.    Inductors are sold by specifications that relate to inductance, voltage, and size. These measures are standardized. Inductors with the same inductance, core, and size are substantially the same, and fungible with one another.

117.    Inductors, capacitors, and resistors perform distinct roles in an electric circuit. Inductors store current using magnetic fields, which also give inductors the ability to act as resistors. However, unlike resistors, Inductors can also store energy. Inductors block alternating current ("AC") but allow direct current ("DC") to pass through. Capacitors block DC but allow AC to pass through. Unlike capacitors, inductors can create energy when needed by use of magnetic fields. In short, all three of these components work together to form closed circuits that power the products that contain them. Inductors can perform all of the basic functions of

1    capacitors and resistors, but capacitors and resistors cannot perform all of the functions of an

2    Inductor.

3          118.     An Inductor's role in a simple circuit is depicted below:



4

5

6

7

8

9

10

11

12

13

14

15

16          119.     Examples of various forms of inductors are depicted above.

17          120.     As can be seen, inductors can be as simple as wrapping a metal wire around

18    some form of a core. Wirewound coil inductors may also be encased, embedded, or molded in

19    plastic cases or in discrete inductor chips. Wirewound coils can have metallic or ceramic cores

20    (or hybrids of both) and may also have air cores.

21          121.     Multilayered inductors may also vary in composition and alignment, but they,

22    too, perform the same basic function. Multilayered inductors are usually encased in plastic.

23    Multilayered inductors may use ferrite beads, or bead arrays, and may also stack or layer film

24    and various types of coils and electrode materials. The following graphic from TDK's website

25

26

27

28

illustrates some types of chip inductors:



122.    Inductors are distinguished from one another by the material composing the "core," or the conductor for the magnetic reaction. An inductor's core material can affect its performance, as different metals and materials have different magnetic and inductive properties. A core may be made of ceramic, ferrite, copper, or some other metal. Different cores can provide equivalent standard levels of inductance, even if each type of material provides different levels of power and performance. The key principle of physics that impacts inductors' specifications is that inductance is directly proportional to the available surface area contained in the finished inductor. To achieve added surface area, metallic or ceramic materials can be stacked or wound in an Inductor.

123.    At present, the principal type of inductors are air core inductors, iron core Inductors, ferrite core inductors, toroidal core inductors, and multilayer inductors. Air core inductors are the simplest type to make, with a wire wrapped around a ceramic core. These are the cheapest form of Inductors to manufacture. Iron core inductors are wrapped around an iron core and can be smaller in size than air core inductors. Ferrite inductors use ferrite (including ferrite in bead form), a metal oxide ceramic based around a mixture of ferric oxide, which has a high degree of magnetic permeability. Toroidal core inductors are made using a coil wrapped around a toroidal (doughnut-shaped) core. The core is often also made of ferrite. Multilayer inductors consist of two conductive coil patterns that are arranged in two layers in the upper part of a multilayered body and are electrically connected in consecutive manner. Thin film

inductors are a type of multilayer inductor typically utilizing a ceramic chip that produces a small form factor. The Defendants each produce a variety of the various categories of inductors.

124.    The following chart gives the breakdown of types of inductors sold worldwide:



125.    In automobiles, inductors are used, for example, in headlight circuitry, transmission systems, electronic control units, fuel systems, navigation systems and ADAS. In consumer applications, they are used in LCD televisions, LED lighting, computer laptops, digital still cameras, smartphones, printers, game consoles, air conditioning systems and home appliances. The following chart from the Paumanok Group Consulting depicts the value, volume and pricing of inductors by end-use segment:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    126.    A 2018 report has indicated that the global market for inductors was worth

19 $2.599 billion in 2015 and is estimated to reach $3.11 billion in 2023. The North American

20 inductor market (of which the United States has approximately 71%) was worth $225 million

21 in 2015.[26]

22
23
24
25

26 [26] Alternatively, a 2017 report has indicated that the global market for inductors was worth
$2.78 billion in 2014 and is estimated to reach $3.75 billion in 2019. The North American
27 Inductor market (of which the United States has approximately 71%) was worth $768 million
in 2015 and is estimated to be worth $965 million in 2021.
28

127.     Defendants provide product catalogs that include data sheets for some of their Inductors products. These data sheets in product catalogs are available on Defendants' websites while that line of Inductors is being manufactured and sold.[27]

**B. The Structure of the Inductor Market Is Conducive to Collusion**

128.     The inductors market exhibits five characteristics that are conducive to collusion: (1) the Defendants dominate that market; (2) there are high barriers to entry; (3) Inductors are commoditized products; (4) inductors are price inelastic; and (5) there is declining demand and excess capacity. Each of these factors is discussed separately below.

**1.     Market Concentration**

129.     The inductors market is highly concentrated. As of 2004, Defendants had over 80% of the market in inductors:



130.     In 2007, TDK and Murata alone had over 61% of the market for ceramic chip inductors in North America.

---

[27] For example, an earlier version of TDK's website allowed data sheets for product lines A-Z to be accessed through a webpage entitled "Search Product Catalog by Category."

131.    In 2016, Defendants TDK, Murata, Taiyo Yuden, Panasonic, and Sumida had two-thirds of the inductors market:



132.    It should be noted that the foregoing chart does not fully capture Defendants' collective market power to the extent that certain Defendants—Sagami and Tokin—fall within the "Other" category. Indeed, Plaintiffs estimate that in 2016, Sagami and Tokin had about 3% each of the global market share for a total collective share of at least 73%. Acquisitions within the inductors market, such as Murata Manufacturing's acquisition of TOKO in April of 2015, Murata Manufacturing's acquisition of C&D Technologies' inductors business, and TDK's successful tender offer for EPCOS AG in October of 2008, have contributed to this market concentration.

### 2.    Product Commoditization

133.    Inductors are treated as a commoditized product and are found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiation is "minimal."[28]

---

[28]  To be clear, the 2CAC defines "Inductors" to include all such components manufactured by Defendants, regardless of whether some of them are commoditized or not.

134.    Inductors are identified by a series of letters and numbers using standardized values. The first two digits marking an Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = 10*101μH = 100μH. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means 4.7μH. Precision of an Inductor is also expressed using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

135.    The International Electrotechnical Commission ("IEC"), an organization that promotes standardization in the electrical fields, has published standards for testing relating to this component. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable.

136.    The Defendants understand their products are interchangeable. A webpage maintained by TDK relating to its and other Defendants' Inductors allows users to enter a non-TDK product code so that "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar specifications can be searched."[29] Other Defendants' websites offer similar comparison aids.

### 3.    Entry Barriers

137.    Entry barriers into the inductor market are high. The costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

138.    Barriers to entry also exist because of the resources of the incumbents. The inductors market is a mature one dominated by established corporations, most of which have global operations. Panasonic and TDK both manufacture a variety of electronic products, as

---

[29] https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/.

well as other electronic components. Panasonic reported revenues of over $62 billion in its 2017 fiscal year. TDK reported revenues of over $10 billion in 2017. Both are large and diverse multinational corporations that, like all of the Defendants, can benefit from economies of scale. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of which is attributable to sales of electronic components. Sumida is another international giant, who most recently announced sales in excess of $700 million annually. Sumida has Research & Development ("R&D") offices in the United States, China, Japan, Germany, and Canada; sales offices in the United States, China, Japan, Hong Kong, Singapore, Taiwan, Thailand, South Korea, and Germany; and factories in China, Japan, Vietnam, Thailand, Mexico, Germany, Romania, and Slovenia.

139.    The Defendants have established reputations with purchasers of inductors and sellers of the raw materials needed to manufacture Inductors; have access to significant amounts of capital to fund current operations; have global operations that allow them to specialize function and meet the needs of customers with global businesses; can weather downturns in the economy due to their size and substantial resources; and have integrated supply chains due to their diverse products.

140.    During the Class Period, there were few significant new entrants into the market for inductors and much consolidation of that market. As noted above, during the Class Period, the number of leading inductors manufacturers fell, which is an indication of a mature market with diminishing demand, circumstances that make the market ripe for collusion.

141.    It is no surprise that new entry practically came to a halt, and the number of participants contracted. New entrants would need to invest hundreds of millions of dollars in building manufacturing facilities, obtaining patents or licenses for technology, and creating a production line; assembling a workforce, including professionals and executives with industry experience; obtaining a supply network; and investing in R&D, marketing, and transportation capabilities necessary to bring a product to market. And even then, it takes years to demonstrate quality control and establish a customer base to see any return on this investment. In short, a

1  prospective competitor in the Inductors market would face a daunting task in establishing and

2  growing a business. It speaks volumes that the United States hardly has a competitive player in

3  this field.

4        142.    Further barriers to entry exist because manufacture of inductors requires an

5  expensive supply chain, including the purchase and in-house processing of raw materials such

6  as metals. Inductors can incorporate iron, nickel, zinc, and sometimes barium, cobalt, and

7  strontium.

8        143.    After raw materials are purchased, they must be processed and chemically

9  treated. Leading inductor manufacturers have facilities for processing and treating the raw

10  materials. Processing and treating raw materials requires large expenditures of capital for

11  nanotechnology. Nanotechnology, which concerns analysis of materials at the molecular (or

12  very small particle) level, is necessary because of the precision involved in manufacturing small

13  components. Nanotechnology equipment is very expensive.

14        144.    A core principle of the physics and economics of manufacturing inductors is that

15  the performance of the component is directly proportional to the size, or surface area, of the

16  Inductor. Accordingly, precision manufacturing and quality control measures are critical.

17        145.    Manufacture of Inductors involves stacking, winding, and pressing metals and

18  other raw materials, and the technology to imprint and manipulate thin metals and wire. This

19  process requires sophisticated engineering as well as expertise in nanotechnology and process

20  yields.

21              **4.       Demand Inelasticity**

22        146.    A 2017 report on the inductor market has noted that "demand is considerably

23  inelastic." As the report explains:

24        In the inductors market, the consumer base is rather fragmented and product
           differentiation is minimal, thus lowering the overall bargaining power of
25         customers. But fixed costs for suppliers are high thus giving them some power.
           For a consumer, the switching cost is high and the possibility of backward
26         integration is low since production of inductors involves exclusive expertise and
           most OEMs find it cheaper to buy it from such suppliers than foray into its
27         manufacturing. The bargaining power of customers is *low*.

28

(Emphasis in original).

147.   Several characteristics of inductors cause demand inelasticity. *First*, the price of inductors is low compared to the price of many inputs. There is less incentive to switch inductors suppliers under those circumstances. On a per unit basis, prices of most inductors range from a few to fifty cents. Products such as computers and cars may have up to sixty or seventy inductors, but other products have only a couple dozen.

148.   *Second*, there are no substitutes for Inductors. No other passive electronic component can perform all the functions of an inductor. Its electromagnetic properties distinguish it from a capacitor, as does its operation in relation to DC current. Capacitors can only store current; they cannot increase voltage like an Inductor can by use of magnetic fields. Resistors perform some of the "blocking" functions of Inductors, but cannot store or generate voltage. If a circuit in a product calls for an Inductor, no other component will do.

149.   *Third*, the fact that Original Equipment Manufacturers ("OEMs") and other manufacturers face periodic deadlines for production reduces the chance that Defendants' customers will invest the time and resources to find another supplier.

### 5.   Declining Demand and Excess Capacity

150.   The inductors market was dealt a series of shocks, starting in the 1990s with the ITA. Inductors faced declining demand following the 2001 recession at the beginning of the Class Period. One industry expert has noted that price erosion was severe in 2001 and 2002 as inductor manufacturers suffered from excess capacity, and leading inductor manufacturers contemplated selling their production facilities. Indeed, flagging demand for electronics products characterized much of the early 2000s.

151.   In addition to the effects of the 2001 recession, new technology, such as semiconductor chips and digital circuits, has threatened Inductors. Inductors are not used in digital circuits, which are increasingly used in high-technology products. Inductors are too large to be integrated into semiconductor chips, which are micro-electric circuits that fit onto a silicon wafer.

152.    Many consumer electronics have moved to chip technology. In 2007, a leading analyst predicted that the North American sales volume of inductors would fall by over a billion units from 2007 to 2014, mostly due to a poor outlook for consumer digital electronics. Compact portable devices that rely on digital chip circuits, such as iPhones, have replaced several different personal electronic devices.

153.    As demand waned, the Defendants faced excess capacity at their Inductors facilities. They have facilities that specialize in the manufacture of few products. Panasonic, for example, has a plant in Tajima, Japan that at one point during the Class Period had 250,000 square feet devoted to manufacturing Inductors. Corporate Defendants that manufacture primarily passive components, such as Taiyo Yuden, Sumida, and Murata, also specialize their manufacturing facilities so that when demand is low, their plants are idle at lower cost.

154.    The remarkably resilient prices following the 2008 Great Recession, even as demand waned, illustrate cartel activity at play.

155.    When prices remain high or flat in light of declining demand and excess capacity, it becomes clear that collusion is keeping the prices high.

**C. The Conduct of Defendants, the Investigation by the DOJ, and the Use of Trade Associations Strongly Support The Assertion That Defendants Colluded**

**1.    Summary of Defendants' Unlawful Conduct**

156.     As noted above, price erosion in the market for inductors began with trade agreements that eliminated tariffs. In December of 1996, twenty-nine nations agreed to the ITA, which eliminated tariffs and import duties on hundreds of billions of dollars' worth of high technology products, including computers, telecommunication equipment, semiconductors, as well as the passive electronic components (such as Inductors) that were used to manufacture these products.

157.    Since its inception, the ITA covered "[e]lectrical transformers, static converters (for example, rectifiers) and inductors." Once tariffs on inductors were lifted, manufacturers that once had no competition from OEMs who purchased from them suddenly had global competition from the signatories to the ITA.

158.   Following the adoption of the ITA by Japan and other Asian countries, the Japanese manufacturers began to face competition from manufacturers in Korea and Taiwan, which were signatories to the ITA.

159.   The 2001 recession exerted further downward pressure on prices of inductors. In Japan, exports of passive electronic components fell from a peak of 781,951 million yen in 2000; to 541,797 million yen in 2001; to 531,859 million yen in 2002.

160.   In North America, sales of inductors dropped from 2001 to 2002, and fell every year until 2005. According to an industry analyst, "[t]he inductor business in [North America] follows suit with capacitor and resistor sales in the region with respect to the value of discrete inductor shipments over time. The market experienced a sharp upturn in FY 2001, followed by a sharp drop in new product shipments."

161.    As also noted above, China agreed to the ITA in 2003, which resulted in even more competition overseas. Chinese inductors manufacturers quickly became a threat to Japanese inductors manufacturers. Knowledge of the impending threat from Chinese manufacturers provided powerful incentive for Defendants to collude to protect their profit margins.

162.   Faced with increased requests by purchasers for price reductions and an overall decline in demand for their Inductors, the Defendants had a keen desire to avoid price competition.

163.   The Defendants knew that international competitors (especially those in Taiwan and China), despite their inroads, could not successfully compete with Defendants' advantages in capacity, technology, and resources should the Defendants stabilize or inflate prices of Inductors. Taiwanese and Chinese components were often perceived to be of inferior quality and not as reliable as Japanese products.

164.   Before and during the Class Period, the Defendants understood that inductors of similar inductance were interchangeable and were concerned that purchasers would use that knowledge to cause the Defendants to bid against one another for business from purchasers of inductors.

165.    The highly concentrated nature and structure of the inductors market made it likely that collusion would be possible and profitable. The Defendants comprised over 80% of the market at the beginning of the Class Period, and still had nearly 75% of the market in 2016. Purchasers of Inductors could not substitute other electronic components for Inductors. Furthermore, the Defendants knew that although global competition was eroding the price of Inductors, manufacturers (especially of sophisticated and expensive electronics) were unlikely to substitute inferior quality products for the Defendants' Inductors.

166.    Direct purchasers, especially OEMs and contract manufacturers, are committed to preset production or delivery deadlines, and the Defendants wagered that they would rather continue to pay flat or increasing prices for Inductors than look for lower prices elsewhere and risk disruption to their business from delays or production shortfalls.

167.    The Defendants agreed to operate as a cartel through both oral and written communications among directors, executives, officers, business unit managers, sales representatives, and employees of the Defendant companies. These communications were organized in part around JEITA meetings and occurred among the Defendants' employees who attended JEITA meetings, as described in further detail below.

168.    The cartel alleged herein was also implemented through conspiratorial acts engaged in within the United States, as well as in Japan. This conduct involved ███ █████████████████████████████████████████████████████████████ as described in further detail below.

169.    The effects of this cartel were felt in the marketplace. As a result of the 2001 recession, prices of some inductors fell from $0.0452 apiece to $0.0327 from 2000 to 2003. Through their collusion, Defendants ensured that this type of drop, a decrease of 27.6%, would never happen again. It did not.

170.    As reflected in the chart of FRED data shown in the introductory section of this 2CAC, prices of inductors stabilized or grew from 2003 onward, despite the forces (such as competing semiconductor chip technology and increased competition from Chinese and

1   Taiwanese competitors) that should have lowered the competitive prices for Defendants'
2   products.

3        171.    The 2008 recession hit the global economy severely. In Japan, exports of passive
4   components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009. In the
5   United States, monthly factory output fell 27% from July of 2008 to May of 2009, a decrease
6   valued at $133 billion. Yet the prices of inductors remained remarkably resilient, as explained
7   above.

8        172.    Collusion here is admitted by TDK, as described further below. Collusion is also
9   an explanation consistent with the market factors described above and: (1) the subpoenas issued
10  by DOJ; (2) the involvement of several of the Defendants in conspiracies in other markets, and
11  (3) the involvement of the Defendants in trade associations (particularly JEITA) that facilitated
12  collusion.

13       **2.**       **Conspiratorial Acts Conducted Through JEITA**

14       173.    Defendants used JEITA meetings as a forum to agree upon pricing for Inductors
15  and exchange confidential business information concerning Inductors from at least 2003
16  through September of 2014. As described further below, personnel from each Defendant's sales
17  group who attended JEITA meetings reported to the heads of these sales groups, who in turn
18  were responsible for setting prices of Inductors.

19       174.    To understand the role that JEITA played in the formation of the conspiracy, it
20  is first necessary to explain how it operates. JEITA conducts an annual conference described as
21  follows: "[a]ll JEITA member companies gather annually for a conference that serves as the
22  industry's premier decision-making forum."[30] Its Board of Directors "discusses and makes
23  decisions concerning important issues related to JEITA's activities, including items raised at the
24  Annual Conference." *Id.*

25       175.    As of July 17, 2017, the Chairman of JEITA's Executive Board is Shusaku
26  Nagae, Chairman of the Board of Panasonic Corporation. A representative of Murata

27

28    [30] http://www.jeita.or.jp/english/about/orga/index.htm.

Manufacturing is also one of the Executive Directors of JEITA. JEITA has created five sector-specific boards, one of which is the Passive Components Committee ("PCC"), which encompasses Inductors, capacitors and resistors. The structure of JEITA's Electronic Components Board and its committees is represented in the following chart taken (as translated) from JEITA's Japanese-language website[31]:

---

[31] https://home.jeita.or.jp/ecb/aboutus/about_us02.html.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  //
26  //
27  //
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

176.    Two of the current Vice-Chairmen of the Electronic Components Board are Tsuneo Murata, President of Murata Manufacturing, and Takehiro Kamigama, President and CEO of TDK-EPC. JEITA maintains "overseas offices" in Washington, D.C. and Brussels, Belgium.[32]

177.    From 1989 until 2003, there existed within JEITA separate Committees on Inductors, capacitors and resistors. In 2003, these separate Committees were merged within the PCC and operated as Subcommittees of the PCC. Meetings of the PCC typically occurred three to four times annually at JEITA's offices in Tokyo, Japan; they occurred typically in May, August, November, and January of each fiscal year. The initial meeting of each fiscal year typically included a General Meeting and a separate social gathering. The January meeting was typically followed by a New Year social gathering. In addition to the formal meetings of the PCC, there were associated events in locations such as the Yokkaichi Tokyu Golf Club, the Katsuragi Golf Club, the Hikone Country Club, the Iwata Grand Hotel, the Nishikanda location of Dinagyan Restaurant, the Kawamuraya store in Nagoya, the Nagahama Royal Hotel, the Hotel Arrowle, the Hibiki Marinouchi store, and the Otamachi Sankei Palace.

178.    The PCC selected one Chairperson and two Vice-Chairpersons every two years. The Vice-Chairpersons represented the various Subcommittees. The terms of the Vice-Chairpersons were two years, with a maximum of two consecutive terms. Selections as Vice-Chairpersons was done on a rotation system to allow members of each Subcommittee to so serve. In June of 2004, it was observed that with the existence of Subcommittees on resistors and capacitors, attendance at what JEITA referred to as "Inductors Subcommittee" ("IC") meetings was starting to wane, with the result that there was less exchange of company-specific information. It was therefore decided to hold meetings of the IC at least four times annually and to encourage more companies to attend, so that a more extensive sharing of confidential detailed corporate information could occur. The meetings again took place typically at JEITA's offices

---

[32] For the Court's convenience, Plaintiffs attach as an Appendix the names and known positions of personnel who attended meetings with competitors during the Class Period.

in Tokyo, Japan, or, on occasion, at other venues, such as the Hakata Excel Hotel Tokyu ("Excel Hotel").

179.    Participants from the Defendants at meetings of either the PCC or the IC or both during the Conspiracy Period included:

a.  **Masataka Suzuki** (President of Sumida), **Teruo Hirota** (Sumida Corporate Service IAO Officer), **Ryuji Teramachi** (Sumida's Eastern Japan Sales & Marketing Manager), **Hiromatsu Takashima** (Sumida's Director of Sales for the Asia Region), **Takeo Matsuoka** (part of Sumida's Marketing Communications Center), and **Fumio Shikano** (Sumida's CSE Officer and ADM Officer) **for Sumida**;

b.  **Kazuya Umezawa** (Managing Executive Officer of Taiyo Yuden), **Atsushi Ishinari** (Taiyo Yuden's Senior General Manager, Electronic Components Planning Department), **Hisashi Oi** (Taiyo Yuden's General Manager, Ferrite Application Product Managing Department), **Tomonori Endo** (Manager of Taiyo Yuden's Sales Planning Department), **Satoru Kaneda** (General Manager of Taiyo Yuden's Corporate Headquarters 1, Ferrite Application Division), and **Kenichi Hattori** (Head of Taiyo Yuden's Office of the President) **for Taiyo Yuden**;

c.  **Takashi Oshima**, **Masahiro Ishida** (part of the Inductor Products Team for Panasonic's Circuit Components Group BUPM Marketing 1), **Keiji Chikada** (Global Industry 3 Team Leader for Panasonic's BUPM Marketing 1), and **Hiroshi Itsuki** (Product Strategy Team Leader for Panasonic's Transformer BUPM Marketing Group) **for Panasonic**;

d.  **Jin Kudo** (Marketing Department Deputy Manager for Murata), **Hiromitsu Aoki** (Section Manager of Market External Affairs Division for Murata), **Hideaki Morito** (Senior Manager, EMI Products Planning for Murata), **Tomohiro Fujioka** (executive in the Product Planning

Division of the Planning Department of the EMI Division for Murata**),** **Akimasa Yamakawa** (Section Manager for Murata's Market External Affairs Division**),** and **Shigeshi Hatada (**Director of the Component Group of Murata's EMI Planning Department) **for Murata**;

e.   **Shinichi Araya** (Director and Senior Vice-President General Manager of Technology for TDK**), Nobuhiku Ishiguro** (Manager of TDK's Magnetics Business Group Products Strategy Promotion Division), **Hiroyuki Uemura** (Senior Executive Vice-President and Corporate Officer for TDK and President and CEO and TDK-EPC), and **Takuji Suda** (Section Manager of TDK's Magnetics Business Group Product Strategy Presentation Division) **for TDK**;

f.   **Bunchiro Tsuda** (Engineering Group Manager for NEC Tokin's EMC Devices Group), **Makoto Soto** (General Manager of Sales Promotion for NEC Tokin's Functional Devices Division), **Yoshihiko Hori**, a Director at NEC Tokin), **Hidehito Hatakeyama** (Group Manager of the Marketing Division of the Sales Department of NEC Tokin's EMC Group), **Yoshinori Sato** (Group Manager of the Sales Promotion Department of the Sales Promotion Group of NEC Tokin's EMC Group), **Tomohide Date** (a Manager of NEC Tokin who has been indicted by the DOJ for conspiring to fix prices of capacitors),[33] **Hiroshi Ishikawa** (Group Manager of the Sales Promotion Department of NEC Tokin's EMC Group), and **Masaya (Shinya) Watanabe** (Senior Manager of the Sales Promotion Department of NEC Tokin's EMC Group) for **NEC**

---

[33] *See* ECF No. 15 in *United States v. Isawa*, No. 4:15-cr-00163-JD (N.D. Cal.). Additionally, Akihiko Igasaki and Takayuki Iizuka of Okaya Corporation ("Okaya") attended JEITA meetings related to Inductors on behalf of Okaya. Cartel meeting minutes reflect that Messrs. Iizuka and Igasaki attended cartel meetings with respect to the film capacitor cartel on behalf of Okaya. *See* ECF Nos. 1563-3, 1563-6, *In re Capacitors Antitrust Litig.*, No. 14-3264-JD (N.D. Cal.).

**Tokin**; and

g. **Daijiro Tsuruga** (Division Manager of Sagami's Sales and Marketing Division), **Masaki Okada** (Manager of Sagami's Corporate Planning and Administration Office), **Koichi Ogiso** (Section Manager of the Head Office Sales Department of Sagami's Sales Support Section), **Mitsuo Igarashi** (Division Manager of Sagami's Sales and Marketing Division). **Masayuki Osashi** (Section Manager of the Marketing Division of Sagami's Sales Development Section), and **Teppei Hashimoto** (Division Manager of the Marketing Division of Sagami's Sales Promotion Division) for **Sagami**.

180.    At these IC meetings during much of the Conspiracy Period, attendees for the Defendants shared company-specific current and forward-looking information on sales, prices, shipments, product development, and capacity with respect to Inductors, including Inductors sold or shipped to the United States. The purpose of these information exchanges was to fix prices for Inductors, as well as to establish forecasts to facilitate the implementation of such a fix. Attendees for the Defendants also shared information on how best to deal with the business climate for Inductor sales, again in furtherance of the alleged conspiracy.

181.    What follows are just a few specific examples that illustrate what occurred at JEITA Inductor Subcommittee meetings during much of the Conspiracy Period.

182.    For instance, on November 12, 2003, representatives from TOKO (Masaharu Tanaka), Matsushita Electronic Components (the predecessor to Panasonic Corporation) (Hiro Yuki Itsuki), and Sumida (Messrs. Suzuki and Shikano) met to exchange information that included their per unit prices for Inductors for 2003, and projections for prices for 2004. The information exchanged also included detailed company-specific information on quantities sold and sales booked for 2004; the cartel members specifically agreed to include information on total orders as well as overall quantities sold. The information exchanges were performed with each company submitting information directly to other members. Those were then compiled

1  into extended spreadsheets for use by IC members. The Defendants used this information to

2  agree upon prices for Inductors, including those sold in the United States.

3      183.   On June 24, 2004, a meeting of Inductors manufacturers was held through

4  JEITA attended by representatives from TOKO (Mr. Tanaka), Panasonic (Mr. Itsuki), Sagami

5  (Mr. Okada), and Sumida (Messrs. Shikano and Suzuki). At this meeting, the participants

6  exchanged detailed information about the order they have received in the first three months of

7  2004, and provided detailed projections about their orders for the rest of the year. The

8  participants discussed projected business conditions in the United States following the 2004

9  presidential election. At this meeting, it was decided that even more detailed exchanges of

10  information would occur in the future. Those were then compiled into extended spreadsheets

11  for use by IC members.

12      184.   On July 10, 2007, representatives from Sumida (Messrs. Suzuki and Hirota),

13  NEC Tokin (Messrs. Date and Hatakeyama), Taiyo Yuden (Mr. Hattori), TOKO (a Mr.

14  Oonishi), Sagami (Messrs. Ogiso and Tsuruga), and Murata (Messrs. Kudo and Hibino) met.

15  The cartel members exchanged the results of individual company questionnaires that included

16  material non-public information such as average sales price, and quantities projected to be sold.

17  The cartel members agreed that each company would submit its own summary of business

18  climate and that it would be discussed at future meetings. The cartel members discussed the

19  results of a joint study concerning raw material costs faced for Inductor manufacturers. The

20  cartel members reviewed average unit price forecasts that were based on information previously

21  exchanged and agreed to further review and revise a World Production Forecast based on

22  exchanged pricing information.

23      185.   JEITA members exchanged detailed individual company information at JEITA

24  meetings on prices for Inductors used in various applications. JEITA created spreadsheets that

25  included detailed pricing information for various applications of Inductors based on face to face

26  exchanges of information. These were circulated to JEITA members for the purpose of

27  discussing them at JEITA meetings attended by all Defendants.

28

186.    Throughout the remainder of the Class Period, Defendants continued to exchange company-specific information by discussing individual results of surveys administered by JEITA to its members at Inductors Subcommittee meetings. For example, JEITA members reviewed individual survey results at a meeting on October 21, 2009, and formulated company-specific figures for demand with information exchanged at the meeting.

187.    As another example, from at least January of 2009 through the beginning of 2016, Defendants exchanged material non-public information related to "consumption factors" ("CF"). CF data included forward-looking sales information from Inductors manufacturers, in order to estimate global demand. CF data collection was discussed at IC meetings.

188.    There are numerous examples of such illegal information exchanges throughout the Class Period. At least 23 meetings of the Inductors Subcommittee took place between July of 2007 and September of 2014, mostly at the Tokyo offices of JEITA. Unlawful information exchanges designed to fix Inductor prices occurred at these meetings. While not every Defendant had a representative at every meeting, each Defendant had one or more representatives at most meetings. Among others, (a) **Murata** sent Messrs. Aoki, Hibino, Inoue, Kita, Kumada, Kudo, Oomura, Ootani, Shimokawa, Yamakawa and Yamazaki; (b) **Panasonic** sent Messrs. Chikada, Ebine, Iishiba, Matsumoto, and Morita; (c) **Sagami** sent Messrs. Ogiso, Tsuruga, Igarashi, and Oohashi; (d) **Sumida** sent Messrs. Hirota, Suzuki, and Takeshima; (e) **Taiyo Yuden** sent Messrs. Hattori, Ishinari, Kanzaki, Murata, and Ooi; (f) **TDK** sent Messrs. Abe, Ishiru, Ishiguro, Mochizuki, Ogasawara, Saito, and Takano; (g) **Tokin** sent Messrs. Date, Hatakayama, Kobayashi, Muramatsu, and Okabe; and (h) **TOKO** sent Messrs. Norose, Oonishi, Oosawa, and Shinoda.

189.    Communications in furtherance of the conspiracy also occurred outside of these formal meetings at social gatherings held in conjunction with the meetings, such as one that occurred in September of 2004 at the Excel Hotel.

190.    As noted above, the PCC often called upon Vice-Chairpersons of the IC to give reports on industry trends, market conditions, and the like. Information exchanges in furtherance of the alleged conspiracy also occurred at meetings of the PCC during the

Conspiracy Period. The PCC endeavored to deal collectively with issues facing the Inductors industry, such as a period of rising costs for raw materials, and forecasted customer orders for passive electronic components. The PCC also held roundtables concerning the current business climate and how the Japanese manufacturers (including Defendants) could collectively respond.

191.    For example, at a   May 2007 PCC meeting TOKO, Sagami, and Murata presented information that included current sales of Inductors, the status of current pricing for Inductors to the PCC, and forecasts on Inductors for the period from August of 2007 to March of 2008. Among the topics included were  "cost-down" requests, which were requests by customers for price decreases. Sumida, Panasonic, Tokin, and Taiyo Yuden gave similar presentations at the November 2007 PCC meeting. These types of presentations were routine.

192.    Likewise, in 2006 and 2007, Panasonic and Sumida were responsible for providing global Inductor demand forecasting data to JEITA members for discussion at JEITA meetings. Panasonic and Sumida provided forecasting information for Inductors and based theirs forecasts on data that included data obtained from JEITA members containing detailed information regarding unit pricing, numbers of Inductors used per product, volume, and amount of sales for various Inductors.

193.    Among the attendees for Defendants at PCC meetings were: (a) Messrs. Fujioka, Hatta, Hibino, Ikeda, Inoue, Kudo, Nobumoto, Nozaki, Oomura, Shimokawa, Yamazaki, and Yamakawa for **Murata**; (b) Messrs. Chikada, Ebine, Iishiba, Itsuki, Kita, Nitta, Oshima, and Sugitate of **Panasonic**; (c) Messrs. Ogiso, Okada, and Tsuruga for **Sagami**; (d) Messrs. Hirota, Igarashi, Kawazoe, Suzuki, and Takashima of **Sumida**; (e) Messrs. Hattori, Ishinari, Kanzaki, Murakami, and Murata of **Taiyo Yuden**; (f) Messrs. Abe, Arima, Ikeda, Ishiguro, Ishiru, Kichiji, Morikawa, Ogasawara, Saito, Suda, Sudo, Takano, and Ueno of **TDK**; (g) Messrs. Date, Ishiwaki, Kobayashi, Muramatsu, and Sato for **Tokin**; and (h) Messrs. Aso, Kitano, Norose, Ogino, Ootaki, Oosawa, Tanaka, Takeda, and Yamaguchi for **TOKO**.

194.    Members of the Defendants were also officers in the PCC during the Class Period. In 2003, Yoshiaki Kitano, the President of TOKO, became the Chairperson and a Mr. Nozaki of Murata and Mr. Shikano of Sumida became Vice-Chairpersons. The various

1  subgroups within the Committee sometimes gave reports about their respective exchanges of

2  information, sometimes by product and by division.

3       195.   All of this conduct, taken as a whole, constituted antitrust violations.

4  Agreements among competitors to fix prices are illegal *per se* under Sections 1 and 3 of the

5  Sherman Act. Information exchanges among competitors can facilitate and serve as evidence

6  of such agreements. As the United States government delegation stated to the Organization for

7  Economic Cooperation & Development's Competition Committee in a 2010 report that "certain

8  information exchanges among competitors may violate Section 1 of the Sherman Act, which

9  prohibits a 'contract, combination… or conspiracy' that unreasonably restrains trade."[34] The

10 United States government noted that "[i]n addition to serving as evidence of an unlawful

11 agreement, information exchanges likely to affect prices may, under certain circumstances, be

12 illegal in and of themselves."[35] Even if the information exchange is not itself an unlawful

13 agreement, it can be powerful evidence of an agreement to fix prices because "[t]he antitrust

14 concern is that information exchanges may facilitate anticompetitive harm by advancing

15 competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens

16 competition. Thus, for example, exchanges on price may lead to illegal price coordination." [36]

17 The United States delegation noted that  actual evidence of competitive harm, such as industry-

18 wide price movements resulting from the exchange are a strong factor in finding illegality.[37]

19 Other identified factors that may be considered included: (a) "[t]he nature and quantity of the

20 information (extensive exchange of information regarding pricing, output, major costs,

21 marketing strategies and new product development is more likely to have anticompetitive

22 implications)"; (b) "[h]ow recent the shared data is (sharing of past data is generally deemed

---

[34] https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf, at p. 2. The presentation was principally authored by the United States Department of Justice ("DOJ") and is part of a list of such submissions on its website. https://www.justice.gov/atr/us-oecd-submissions-competition-policy.

[35] *Id.* at 3.

[36] *Id*. at 2.

[37] *Id*. at 4.

less problematic than sharing current data)"; (c) "[t]he parties' intent in sharing the information (an anticompetitive intent, such as an intent to stabilize prices, is problematic); (d) "[t]he industry structure (in concentrated industries, an exchange among few firms could be more likely to harm competition); and (e) "[t]he frequency of exchanges (the more frequent the exchange, the more problematic it may be)."[38]

196.    JEITA has acknowledged that these activities violated antitrust laws. As explained in the unsealed Consolidated Amended Class Action Complaint for Direct Purchaser Plaintiffs filed on June 24, 2016 in *Resistors*, JEITA's PCC was a "focal point" for collusion and that it was utilized for "facilitating coordination of industry behavior…with the aim of reducing output and stabilizing prices."[39] The defendants in *Resistors* were also accused of providing each other with detailed company-specific competitive information. KOA

---

[38] *Id*. The DOJ and the Federal Trade Commission ("FTC") had made a similar point in their "Antitrust Guidelines for Collaborations Among Competitors" at 15 (2000) ("DOJ-FTC Guidelines") (available at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf). The competitive concern [with information sharing] depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.").

These activities are not shielded from antitrust liability through the fact that they occurred in part under the auspices of a trade association. As the FTC has said: "forming a trade association does not shield joint activities from antitrust scrutiny: Dealings among competitors that violate the law would still violate the law even if they were done through a trade association. For instance, it is illegal to use a trade association to control or suggest prices of members. It is illegal to use information-sharing programs, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, as a disguised means of fixing prices. One area for concern is exchanging price or other sensitive business data among competitors, whether within a trade or professional association or other industry group. Any data exchange or statistical reporting that includes current prices, or information that identifies data from individual competitors, can raise antitrust concerns if it encourages more uniform prices than otherwise would exist." https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade.

[39]  ECF No. 140, *Resistors* (June 24, 2016), ¶ 3.

Corporation ("KOA"), one of those defendants in that case (although not named here), noted generally, "There are many events that are considered normal in Japan but strange from the viewpoints of foreigners. Participating in some of these events can put the company at risk of being deemed taking part in antitrust activities."[40] As also noted in paragraph 101 of the *Resistors* complaint:

> By July 2014, JEITA's leadership also had become aware that its activities violated the antitrust laws. During that month, JEITA distributed a handout to its members (including Panasonic) announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

197.    Indeed,  JEITA in 2014 informed members through a memorandum that there had been cases where JEITA was required to submit its committee meeting minutes and handouts to the competition law enforcement authorities pursuant to requests.

198.    In September of 2014, the PCC presented an explanation of a competition law compliance system that would go into effect the following day.[41] Among the rules that were enacted was the requirement that all information exchanges through JEITA use an independent third party to ensure confidentiality. The guidance explained how to conduct association meetings and exchange competitor information in a way that complied with antitrust and competition laws. Concerns about unlawful information exchanges at social gatherings held in conjunction with JEITA meetings were expressed. On February 5, 2015, the PCC announced for the first time that it would conduct a Competition Law Compliance Seminar on February 15, 2015, at which the law firm Gibson Dunn would make a presentation. PCC members were warned about exchanging confidential corporate information at social gatherings.

199.    Even after all of this, however, antitrust concerns with respect to how JEITA conducted itself remained. For example, in a JEITA IC meeting in January of 2016, JEITA

---

[40] *Id*. ¶10. Koichi Mukaiyama, President of KOA, served as a Chair of the PCC during the Class Period.

[41] It had been publicly announced that the DOJ commenced its criminal antitrust investigation of capacitor manufacturers in April of 2014.

members discussed the concerns raised by a German attorney regarding the method for collecting CF data among JEITA members, including that the companies themselves were collecting this information. Thereafter, JEITA decided not to allow (as it had been doing) CF data to be communicated in that fashion. Because CF data included forward-looking non-public information on demand, the exchange of CF data was another way that Defendants were able to fix or inflate prices of Inductors.

200.    Similarly, in September of 2016, consideration was given to creating audio recordings of JEITA meetings. The proposal was not passed because it was perceived as chilling free communication among JEITA members and because it might create antitrust exposure.

### 3.    Examples of Conspiratorial Acts in The United States

201.    Conspiratorial acts to fix the price of Inductors occurred in the United States as well as Japan.













1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



4.      **Subpoenas Issued by DOJ And Presence Of A Leniency Applicant.**

232.    On January 4, 2018, *MLex* reported:

Electronics manufacturers have been subpoenaed by US antitrust prosecutors as part of a price-fixing investigation involving the inductor market, MLex has learned.

Subpoenas were sent out in mid-November, and the San Francisco office at the Department of Justice's antitrust division is overseeing the investigation, it is understood.

The inductor subpoenas are part of a long-running investigation, which also includes capacitors and resistors. The components are part of electrical circuits that store and regulate the flow of electricity, and are ubiquitous in electronic devices.

233.    The subpoenas were issued by a grand jury empaneled in San Francisco, California. Taiyo Yuden, TDK, and Murata received such subpoenas. Panasonic and Sumida have asserted that they have not received such subpoenas, but that does not mean they could not become targets of any investigation regarding Inductors once the materials produced in response to the subpoenas are reviewed by DOJ, especially in light of the information about JEITA meetings described above, of which the DOJ may have been unaware. Nor does it mean

1   that Panasonic or Sumida might not have placed a marker with DOJ to obtain leniency, which

2   is still in the process of being perfected.

3       234.    The subpoenas at issue are part of an acknowledged criminal investigation by

4   DOJ. The fact that these companies received subpoenas from a federal grand jury is significant

5   because it indicates that the DOJ is considering a criminal prosecution, as is reflected in Chapter

6   3 of the 2014 edition of the DOJ's Antitrust Division Manual.[42] Section F.1 of that chapter notes

7   that "staff should consider carefully the likelihood that, if a grand jury investigation developed

8   evidence confirming the alleged anticompetitive conduct, the Division would proceed with a

9   criminal prosecution."[43] The staff request needs to be approved by the relevant field chief and

10  is then sent to the Antitrust Criminal Enforcement Division."[44] "The DAAG [Deputy Assistant

11  Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal

12  Enforcement will make a recommendation to the Assistant Attorney General. If approved by

13  the Assistant Attorney General, letters of authority are issued for all attorneys who will

14  participate in the grand jury investigation."[45] "The investigation should be conducted by a grand

15  jury in a judicial district where venue lies for the offense, such as a district from or to which

16  price-fixed sales were made or where conspiratorial communications occurred."[46]

17      235.    As noted above, *MLex* on May 20, 2019, also revealed that TDK is an applicant

18  for leniency from the DOJ with respect to the latter's investigation of Inductors. The

19  significance of a company seeking Type B leniency cannot be understated. According to the

20  DOJ's "Frequently Asked Questions" about the Antitrust Division's Leniency Program (as

21  updated on January 26, 2017), an applicant for Type B leniency must admit to participating in

22  a *criminal violation* of the antitrust laws[47]:

23  ---

[42] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

24

[43] *Id*. at III-82.

25

[44] *Id*.

26

[45] *Id*. at III-83.

27

[46] *Id*.

28

[47] https://www.justice.gov/atr/page/file/926521/download.

*5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.[48]

236.   As indicated on the same DOJ webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

## 5.   Use of Trade Associations Other than JEITA to Facilitate and Organize the Conspiracy

237.   Trade associations other than JEITA provided opportunities for the Defendants to meet frequently and exchange information to facilitate collusion. The Defendants are members of a number of trade associations in the United States, Asia and Europe. Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor and police one another's activities in the inductors market and punish non-compliance. The Defendants' participation in trade associations, as described above, helped facilitate their collusion.

238.   One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia. Several of the Defendants are members of this organization, including MENA, Sumida America, TDK America, and PCNA (through its division Panasonic Industrial Sales Company of America). They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth

---

[48] https://www.justice.gov/atr/page/file/926521/download.

and profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.

Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves as a vital nexus for refinement and progress.[49]

239.    For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision-making (Executive summaries, confidence surveys, end market reports, etc.)," the opportunity to "[s]hape opinion and direction by participating on Councils and Committees that design, develop, and publish processes the industry will follow" and "[n]etworking among the industry leaders (…can't have enough professional relationships!)."[50]

240.    The data and statistics mentioned by ECIA are significant. For the inductors market, ECIA prepares quarterly sale reports of inductors sold in North America, as well as indices of monthly and weekly sales of electronic components.[51] The ECIA also has a Statistics and Industry Data Council, the role of which is defined as follows:

The Statistics and Industry Data Council oversees several programs that collect and provide unique industry data. These include commodity and market segment level sales trends as well as discrete passive electronic components market reports. The primary outputs are the Electronic Component Sales Trends survey (ECST) and the MS Series, a collection of 13 individual reports on capacitors, resistors, and inductors that include world statistics.[52]

The same webpage goes on to list among "2014 accomplishments" that the Statistics and Industry Data Council "[c]ompiled and published more than 100 statistics reports (MS series) on *North American Sales and Booking* for capacitors, resistors and inductors plus monthly reports on world statistics for capacitors and quarterly reports for world statistics for resistors

---

[49] https://www.ecianow.org/about-ecia/what-we-do/.

[50] https://www.ecianow.org/join-ecia/manufacturer/.

[51] https://www.ecianow.org/north-america-sales-booking-reports/.

[52] https://www.ecianow.org/about-ecia/councils/statistics-industry-data-council/.

1    and inductors." Within the council is the "Passive Components Market Services Working

2    Group," of which TDK America, Panasonic Corporation, and MENA are members.

3         241.    The ECIA, like the European inductors trade association described below, hosts

4    periodically World Capacitor/Resistor/Inductor Trade Statistics meetings, which are held

5    biannually. Many Defendants named here, as well as defendants sued in the Capacitors and

6    Resistors class actions, attend these meetings. As stated on ECIA's website with respect to the

7    April 2012 meeting held in Washington DC, "'[t]hese World Meetings demonstrate a unique

8    cooperation among major companies in the international electronic components community,'

9    says Jim Bruorton, KEMET Electronics and WCTS Chairman, The Americas. 'The meetings

10   offer a one of a kind opportunity for the three regions to discuss common goals and issues in

11   the industry. This special session provides a baseline for many of these discussions.'"[53]

12        242.    By virtue of their membership in such organizations, the Defendants have the

13   opportunity to meet, have improper discussions under the guise of legitimate business contacts,

14   and perform acts necessary for the operation and furtherance of the conspiracy. ECIA, for

15   example, hosts an annual "Executive Conference." The 2014 conference was held in Chicago,

16   Illinois, and the 2015 conference was held in Chicago on October 25-27, 2015. ECIA also hosts

17   an "EDS Summit" that includes electronic component manufacturers "where valuable idea

18   exchange can happen through high-level strategic meetings, event functions and informal

19   gatherings."[54] This year's EDS Summit took place on May 15-18, 2018 in Las Vegas, Nevada.

20        243.    Another trade association to which some of the Defendants belong is the

21   European Passive Components Industry Association ("EPCIA"), which is headquartered in

22   Brussels, Belgium. Its members include Murata and Panasonic entities. The Vice-President of

23   EPCIA is Reinhard Sperlich of Murata Europe GmBH, which is headquartered in Nürnberg,

24   Germany. EPCIA's goal is "[t]o represent and promote the common interests of the Passive

25   Components Manufacturers active in Europe to ensure an open and transparent market for

26

27   ─────────────────
     [53] https://www.ebnonline.com/document.asp?doc_id=239406.

28   [54] https://www.ecianow.org/connection-points/eds/.

Passive Components in Europe as part of the global market place"; among its activities are providing members with "general market data," "[f]acilitat[ing] worldwide networking between Passive Component Manufacturers at expert/Management level" and "[r]elat[ing] with similar Industry Associations in other Regions around the world."[55]

### 6.   Other Interactions

244.   Beyond trade associations, Murata, TDK, and Taiyo Yuden have a history of working closely together. For example, in 2005, they jointly prepared and proposed new recommended dimensions for Ultra-Compact Multilayer Chip Ceramic Capacitors.

245.   In Taiyo Yuden's 2013 annual report, Eiji Watanuke, its President, stated that "we are transforming our business model to accommodate the formation of alliances with other companies. Looking ahead, we intend to proactively enter these markets characterized as being comparatively less susceptible to price competition."

246.   As discussed above, beginning in September of 2005, Taiyo Yuden and Kemet entered into a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire product lines."[56]

247.   Likewise, the Defendants had opportunities to meet and conspire at industry events such as Semicon Japan, which has an annual trade show and bills itself as the premier exposition for the electronics manufacturing supply chain.

248.   Taken together, all of these characteristics of the industry including economic characteristics inconsistent with the qualities of a competitive market; collusive activities at JEITA meetings and related meetings, significant opportunities to conspire at other venues, the history of past collusion in related markets for passive electronics or in other electronic component markets by certain of these defendants, and the grand jury investigation, strongly support an inference of collusion.

---

[55] https://www.eusemiconductors.eu/epcia/epcia-home.eu/epcia/epcia-home.

[56] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf. This arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.

**7.     Some Defendants' Involvement in Other Conspiracies in Electronic Product Markets Further Support an Inference of Conspiratorial Conduct Based on Similar Facts Pled Here**

249.    Collusion is also the most plausible explanation of what occurred in the inductors market. Defendants Panasonic, Tokin (the successor to NEC Tokin), Taiyo Yuden, and TDK are well-known recidivist antitrust violators. Panasonic, one of the world's leading manufacturers of inductors generally, has pled guilty in numerous price-fixing cases, including electronic products.

250.    On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

251.    On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere from at least as early as September of 2003 until at least February of 2010.

252.    That same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April of 2007 until about September of 2008.

253.    In 2008, Panasonic created "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these efforts. The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> In fiscal 2012, the company reviewed the efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. The top management strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing departments to confirm whether they encounter suspicious activities or not.[57]

---

[57] https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf.

254.    The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive officers in charge of corporate operational functions at the company's headquarters. That group identified the "corporate major risks" for the then just-ended fiscal year 2012 and the then upcoming fiscal year 2013. On both lists was "Cartels." Subsequent corporate sustainability reports for 2013, 2014 and 2015 identified this same "corporate major risk' for the 2013, 2014 and 2015 fiscal years, as well as the 2016 fiscal year.[58]

255.    The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Panasonic's corporate conduct, which has included illegal activity aimed at generating profits at the expense of its customers. It is highly plausible that the same type of conduct occurred in the Inductors market.

256.    Faced with an overall decline in demand for their Inductors, and steep price declines after the introduction of the ITA, Panasonic and its colleagues had a keen desire to avoid price competition.

257.    As noted above, NEC Tokin, the predecessor of Defendant Tokin, was fined by the JFTC and by a federal district court judge for fixing the prices of certain capacitors and one of its executives (Mr. Date, who participated in meetings of both the IC and the PCC meetings) has been indicted for his involvement in that conspiracy.

258.    Likewise, Taiyo Yuden has also been accused of, or investigated for, anticompetitive practices by foreign competition authorities. On June 26, 2018, *MLex* reported that the Korean Fair Trade Commission ("KFTC") had completed its investigation into cartel activity in the capacitors market in South Korea. According to *MLex*, Taiyo Yuden was implicated in the KFTC's report, along with Panasonic, NEC-Tokin, and other capacitors manufacturers.

259.    In 2009, Taiyo Yuden was fined two million New Taiwan Dollars (NT$) and ordered to cease its illegal licensing practices by the Taiwanese Fair Trade Commission for

---

[58] *Id.*; http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/2014/sr2014e.pdf.

1  violating the Taiwanese Fair Trade Act in conspiring with Royal Dutch Philips Electronics,

2  Ltd. and Sony Corporation to abuse their joint monopoly power in the Market for CD-

3  Recordable discs.[59]

4  260.  Similarly, in July of 2016, the JFTC raided the offices of TDK Corporation and

5  NHK Spring Co. ("NHK") on suspicion that they created an unlawful cartel concerning

6  suspensions for hard disk drives ("HDD"). In February of 2018, the JFTC fined suspension

7  makers 1076.16 million yen for agreeing to fix prices. In April of 2018, CADE—Brazil's

8  Administrative Council for Economic Defense—announced that it was investigating a cartel

9  among HDD suspension manufacturers that included TDK and NHK.

10  261.  The highly concentrated nature and structure of the inductors market made it

11  likely that collusion would be both possible and profitable. As shown above, Defendants

12  comprised over 75% of the market during much of the Class Period.

13  **VI.  TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE
      INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT
14      CONCEALMENT**

15  262.  Plaintiffs and members of the Class could not have discovered, with reasonable

16  diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it,

17  until the DOJ's investigation was made public in January of 2018.

18  263.  Defendants actively concealed the existence of the conspiracy from Plaintiffs

19  and members of the Class, and there is nothing in the public domain that would put Plaintiffs

20  or anyone else on notice that the Defendants were conspiring at meetings regarding prices for

21  Inductors sold in the United States. These acts of concealment included collusive conduct

22  carried out under the auspices of what were presented to the public as legitimate trade

23  associations, such as JEITA.

24  264.  There was no way Plaintiffs could have learned that conspiratorial conduct

25  concerning Inductors was occurring through trade associations such as JEITA, the meetings of

26  which were non-public. Nor were Plaintiffs privy to the conspiratorial acts that occurred at

27  social gatherings of Defendants' executives that occurred in proximity to JEITA meetings,

28  _____

[59] https://www.ftc.gov.tw/internet/english/doc/docDetail.aspx?uid=786&docid=1720.

1   where conspiratorial discussions occurred orally or through other surreptitious means.

2   ███████████████████████████████████████████████████

3   ███████████████████████████

4          265.    Defendants' own public statements concealed the existence of the alleged

5   conspiracy. For example, Murata in its Fiscal Year 2004, 2007 and 2008 Annual Reports

6   repeatedly referred to "competition" as being "fierce." Many of TDK's Annual Reports during

7   the Class Period also refer to the challenges of "competition." Similarly, in its Annual Reports

8   during the Class Period (such as those from 2009-11), Taiyo Yuden touted its "social

9   responsibility" charter and how it engaged in "fair, open and free competition" and how it was

10  facing "increased" competition. And Panasonic, despite all its public pronouncements that it

11  was educating its executives and departing from its cartel past, has in fact, not done so.

12         266.    Several of the Defendants have adopted and promulgated a "code of conduct"

13  that is at odds with their participation in the alleged conspiracy.

14         267.    Thus, Murata said in its 2007 Code of Conduct that "[w]e will conduct fair

15  business by complying with all applicable laws and regulations regarding antitrust and fair

16  competition and trade."[60]

17         268.    Similarly, TDK's 2005 Code of Conduct states that:

18         In general, the purpose of antitrust laws or similar competition laws in many
           countries is to encourage free competitions or trade and to protect consumer
19         interests. TDK Members must exercise special care to ensure that any business
           activity with representatives of other companies is not contrary to such antitrust
20         laws or similar anti-competition laws of other countries, where applicable. Each
           member organization of TDK Group should have its compliance company
21         policy with regard to its respective applicable antitrust laws or similar anti-
           competition laws, and such policy must be respected or observed by TDK
22         Members of the member organization.[61]
23

24

25
_____

26  [60] https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/
    p02.ashx?la=en.

27  [61] https://www.sec.gov/Archives/edgar/data/203383/000114554907001603/
28  k01416exv11w1.htm.

269.  Likewise, Taiyo Yuden's Code of Conduct states that "[a]ny unfair business practice or suspected act of cartel behavior, abuse of dominant bargaining position, tie-in sales or other acts for improper restriction of trade or unfair transaction shall be never committed."[62]

270.  Sumida's "business principles" include the precept that "[w]e respect the manners, customs and laws of local regions in all our business activities."[63]

271.  And Panasonic's 2008 Code of Conduct states that "[w]e will respect free and fair competition, and abide by all applicable antitrust (competition law) and other laws and regulations."[64]

272.  Kemet, which owns Tokin, has a code of conduct that includes the following:

> Antitrust laws, sometimes also called competition laws, govern the way that companies interact with their competitors, customers, and suppliers in the market place. They are designed to encourage competition by prohibiting unreasonable restraints on trade. KEMET and its directors, officers, and employees are required to comply with the antitrust and unfair competition laws of the many countries in which the company does business. These laws are complex and vary considerably from country to country. They generally concern:
>
> •  Agreements with competitors that harm customers, including price fixing and allocations of customers or contractors,
>
> •  Agreements that unduly limit a customer's ability to sell a product, including establishing the resale price of a product or service or conditioning the sale of products on an agreement to buy other company products and services, and/or
>
> •  Attempts to monopolize, including pricing a product below cost in order to eliminate competition.
>
> KEMET is committed to competing vigorously but fairly for suppliers and customers in all regions and countries where we do business. Violating antitrust laws is a serious matter, and could place both the company and the individual at risk for substantial criminal penalties.

---

[62] https://www.yuden.co.jp/cs/company/csr/charter/rule.html.

[63] https://www.sumida.com/info-centre/index.php?categoryId=17#BusinessPrinciples.

[64] https://www.panasonic.com/global/corporate/management/code-of-conduct/pdf/code-of-conduct/02_coc2008English.pdf.

273.    By promulgating these codes of conduct and then not living up to them, the Defendants engaged in fraudulent concealment.

274.    As reported in the *Resistors* complaint described above, Defendants also began sanitizing the minutes memorializing their meetings at JEITA in order to cover their tracks, changing the entries on its meeting minutes from "information exchange conducive to corporate management" to "information exchange concerning general market conditions," regardless of the actual information exchanged in them.

275.    ███████████████████████████████████████████████████
████████████████████████████████

## VII.    CLASS ACTION ALLEGATIONS

276.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a Class, which is defined as follows:

277.    All persons or entities in the United States, its territories, and the District of Columbia who purchased Inductors (including through controlled subsidiaries, agents, affiliates, or joint ventures) from any of the Defendants identified therein, their subsidiaries, agents, affiliates or joint ventures from January 1, 2003 through December 31, 2017 (the "Class Period"). This Class includes two Subclasses: (a) those who bought Inductors from one of the Defendants and (b) those who bought manufactured products containing Inductors made by one of the Defendants from one or more of the Defendants. Excluded from the Class are the Defendants and their co-conspirators, subsidiaries, agents, and/or affiliates; Defendants' officers, directors, management, employees, subsidiaries, and/or agents; all governmental entities; and the Judges and chambers staff presiding over this case, as well as any members of their immediate families.

278.    The Class definition thus encompasses those who purchased Inductors and/or product(s) containing one or more Inductors from any of the Defendants, even if the Inductors purchased were manufactured, sold, or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

279.     While Plaintiffs do not know the exact number of the members of the Class, they believe there are at least thousands of members.

280.     Plaintiffs also do not know the exact duration of the alleged conspiracy and reserve the right to amend its complaint.

281.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

      a.   Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold to customers in the United States, its territories and the District of Columbia;

      b.   The identity of the participants of the alleged conspiracy;

      c.   The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

      d.   Whether the alleged conspiracy violated the Sherman Act;

      e.   Whether the conduct of Defendants, as alleged in this 2CAC, caused injury to the business or property of Plaintiffs and members of the Class;

      f.   The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period;

      g.   The appropriate injunctive and related equitable relief; and

      h.   The appropriate class-wide measure of damages.

282.     The claims of Dependable, Powerweb, and Lifetime are typical of the claims of the members of the Subclass who bought Inductors from any of the Defendants, and the claims of Arch and Cambridge are typical of the claims of members of the Subclass who bought manufactured products containing Inductors made by one of the Defendants from one or more of the Defendants. The Plaintiffs will fairly and adequately protect the interests of the entire Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful

1    conduct in that they paid artificially inflated prices for Inductors purchased from the Defendants

2    or manufactured products containing Inductors made by one of the Defendants.

3    283.    Plaintiffs' claims arise out of the same common course of conduct giving rise to

4    the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not

5    antagonistic to, those of the other members of the Class. Plaintiffs are represented by counsel

6    who are competent and experienced in the prosecution of antitrust, unfair competition, and class

7    action litigation.

8    284.    The questions of law and fact common to the members of the Class predominate

9    over any questions affecting only individual members, including legal and factual issues

10   relating to liability and damages.

11   285.    Class action treatment is a superior method for the fair and efficient adjudication

12   of the controversy, in that, among other things, such treatment will permit a large number of

13   similarly situated persons to prosecute their common claims in a single forum simultaneously,

14   efficiently and without the unnecessary duplication of evidence, effort and expense that

15   numerous individual actions would engender. The benefits of proceeding through the class

16   mechanism, including providing injured persons or entities with a method for obtaining redress

17   for claims that it might not be practicable to pursue individually, substantially outweigh any

18   difficulties that may arise in management of this class action.

19   286.    The prosecution of separate actions by individual members of the Class would

20   create a risk of inconsistent or varying adjudications, establishing incompatible standards of

21   conduct for Defendants.

**VIII.    CLAIM FOR RELIEF**
**VIOLATIONS OF THE SHERMAN ACT**
**15 U.S.C. §§ 1 and 3**
**(Alleged against all Defendants)**

22
23

24   287.    Plaintiffs hereby repeat and incorporate by reference each preceding and

25   succeeding paragraph as though fully set forth herein.

26   288.    Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to

27   artificially restrict competition in the market for inductors. During the Conspiracy Period, the

28

1   Defendants met repeatedly to exchange competitively sensitive information, including price
2   and price-related information. These meetings include meetings that were orchestrated by or
3   through JEITA. The effect of these meetings was to raise, fix, set, stabilize, or otherwise
4   artificially manipulate the prices of Inductors beyond the natural interplay of supply and
5   demand.

6       289.   Defendants formed a cartel, organized in part around JEITA meetings, designed
7   to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond
8   the natural interplay of supply and demand.

9       290.   As described above, Defendants implemented this conspiracy in the United
10  States as well.

11      291.   As a result of Defendants' and their co-conspirators' unlawful conduct and acts
12  taken in furtherance of their conspiracy, prices for Inductors and manufactured products
13  containing Inductors sold to purchasers in the United States, its territories, and the District of
14  Columbia during the Class Period were raised, fixed, maintained, or stabilized at artificially
15  inflated cartel levels.

16      292.   The combination or conspiracy among Defendants consisted of a continuing
17  agreement, understanding and concerted action among Defendants and their co-conspirators.

18      293.   For purposes of formulating and effectuating their combination or conspiracy,
19  Defendants and their co-conspirators did those things they combined or conspired to do,
20  including setting prices of Inductors at supra-competitive prices, and selling these Inductors to
21  Plaintiffs and the members of the Class.

22      294.   Defendants' anticompetitive and unlawful conduct is illegal *per se*.

23      295.   As a result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and
24  the members of the Class have been injured in their businesses and property in that they have
25  paid more for the Inductors that they purchased during the Class Period than they otherwise
26  would have paid but for Defendants' conduct.

27

28

---

## IX.   DEMAND FOR JUDGMENT

296.   Plaintiffs request that the Court enter judgment on its behalf and on behalf of the Class that:

    A.   This action may proceed as a class action, with Plaintiffs serving as Class Representative under Fed. R. Civ. P. 23(c);

    B.   Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

    C.   Plaintiffs and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

    D.   Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

    E.   Plaintiffs and the Class are entitled to equitable relief under 15 U.S.C. § 26 appropriate to remedy Defendants' restraint of trade, including issuing a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from repeating (or continuing and maintaining) the conspiracy or agreements alleged herein;

    F.   Defendants are to be jointly and severally responsible financially for all costs, including the expenses of a Court-approved notice program;

    G.   Plaintiffs and the Class recover their reasonable attorneys' fees as provided by law; and

1    H.  Plaintiffs and the Class receive such other or further relief as may be just and

2         proper.

3                        **X.    JURY DEMAND**

4         297.    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by

5    jury on all matters so triable.

6

7    Dated: July 24, 2019                    Respectfully submitted,

8                                            /s/ *Lesley E. Weaver*

9                                            Lesley E. Weaver (SBN 191305)
                                             Matthew S. Weiler (SBN 236052)
10                                           BLEICHMAR FONTI & AULD LLP
                                             555 12th Street, Suite 1600
11                                           Oakland, CA 94607
                                             Tel.: (415) 445-4003
12                                           Fax: (415) 445-4020
                                             lweaver@bfalaw.com
13                                           mweiler@bfalaw.com

14

15                                           /s/ *Michael P. Lehmann*

16                                           Michael P. Lehmann (SBN 77152)
                                             Bonny E. Sweeney (SBN 176174)
17                                           Christopher Lebsock (SBN 184546)
                                             Samantha Stein (SBN 302034)
18                                           HAUSFELD LLP
                                             600 Montgomery Street, Suite 3200
19                                           San Francisco, CA 94111
                                             Tel.: (415) 633-1908
20                                           Fax: (415) 358-4980
                                             mlehmann@hausfeld.com
21                                           bsweeney@hausfeld.com
22                                           clebsock@hausfeld.com
                                             sstein@hausfeld.com
23

24                                           *Interim Co-Lead Counsel for the Proposed*
25                                           *Direct Purchaser Class*

26

27                                           Marc H. Edelson (admitted *pro hac vice*)
                                             EDELSON & ASSOCIATES, LLC
28                                           3 Terry Drive, Suite 205

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Newtown, PA 18940
Tel.: (215) 867-2399
medelson@edelson-law.com

Joshua H. Grabar (admitted *pro hac vice*)
GRABAR LAW OFFICE
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel.: (267) 507-6085
jgrabar@grabarlaw.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
guido@saveri.com
rick@saveri.com
zirpoli@saveri.com

Christopher M. Burke (SBN 214799)
Walter W. Noss (SBN 277580)
Hal Cunningham (SBN 243048)
John Jasnoch (SBN 281605)
SCOTT + SCOTT ATTORNEYS AT LAW
LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-4565

Todd A. Seaver (SBN 271067)
Joseph J. Tabacco, Jr. (SBN 75484)
Matthew D. Pearson (SBN 235339)
Sarah Khorasanee McGrath (SBN 263935)
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
mpearson@bermantabacco.com
smcgrath@bermantabacco.com

Marc Greenspon
BERMAN TABACCO

1

2

3

One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194
mgreenspon@bermantabacco.com

4

5

6

7

8

9

Vincent Briganti
Barbara Hart
LOWEY DANNENBERG P.C.
White Plains Plaza
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
bhart@lowey.com

10

11

12

13

14

15

Brian Murray
Lee Albert
GLANCY PRONGAY & MURRAY
230 Park Avenue, Suite 530
New York, NY 10169
Tel.: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

16

17

18

19

20

21

Allan Steyer (SBN 100318)
D. Scott Macrae (SBN 104663)
STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
Tel.: (415) 421-3400
Fax: (415) 421-2234
asteyer@steyerlaw.com
smacrae@bamlawca.com

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Arthur N. Bailey
R. Anthony Rupp, III
Marco Cercone
RUPP BASE PFALZGRAF
CUNNINGHAM, LLC
424 Main Street, 1600 Liberty Building
Buffalo, NY 14202
Tel: (716) 854-3400
bailey@ruppbaase.com
rupp@ruppbaase.com
cercone@ruppbaase.com

*Additional Counsel for the Proposed Direct Purchaser Class*

Pursuant to Civil L. R. 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories above.

Date: July 24, 2019

*/s/ Matthew S. Weiler*
Matthew S. Weiler