1  Lesley E. Weaver (SBN 191305)
   Anne K. Davis (SBN 267909)
2  BLEICHMAR FONTI & AULD LLP
3  555 12th Street, Suite 1600
   Oakland, CA 94607
4  Tel.: (415) 445-4003
   Fax: (415) 445-4020
5  lweaver@bfalaw.com
   adavis@bfalaw.com
6

7  Michael P. Lehmann (SBN 77152)
   Bonny E. Sweeney (SBN 176174)
8  Christopher L. Lebsock (SBN 184546)
   Samantha J. Stein (SBN 302034)
9  HAUSFELD LLP
   600 Montgomery Street, Suite 3200
10 San Francisco, CA 94111
   Tel.: (415) 633-1908
11 Fax: (415) 358-4980
12 mlehmann@hausfeld.com
   bsweeney@hausfeld.com
13 clebsock@hausfeld.com
   sstein@hausfeld.com
14

15 *Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*
   [Additional counsel listed on signature page]
16
                **UNITED STATES DISTRICT COURT**
17
                **NORTHERN DISTRICT OF CALIFORNIA**
18

19 IN RE INDUCTORS ANTITRUST          | Case No. 5:18-cv-00198-EJD-NC
   LITIGATION
20                                    | **DIRECT PURCHASER PLAINTIFFS'**
21 THIS DOCUMENT RELATES TO:          | **SECOND CONSOLIDATED AMENDED**
                                      | **CLASS ACTION COMPLAINT**
   THE DIRECT PURCHASER PLAINTIFFS'
22 ACTION                             | **CLASS ACTION**
23                                    | JURY TRIAL DEMANDED
24                                    | REDACTED VERSION OF DOCUMENT
25                                    | SOUGHT TO BE SUBMITTED UNDER
                                      | SEAL
26

27

28

---

1

# TABLE OF CONTENTS

2  I.     NATURE OF THE ACTION ..................................................................... 1

3  II.    JURISDICTION AND VENUE .................................................................. 7

4  III.   PARTIES ............................................................................................... 8

5         A.    Plaintiffs ....................................................................................... 8

6         B.    The Murata Defendants ................................................................. 9

7         C.    The Panasonic Defendants ........................................................... 11

8         D.    The Sagami Defendants ................................................................ 12

9         E.    The Sumida Defendants ................................................................ 13

10        F.    The Taiyo Yuden Defendants ....................................................... 16

11        G.    The TDK Defendants .................................................................... 17

12        H.    The Tokin Defendants .................................................................. 20

13        I.    Agents and Co-Conspirators ......................................................... 21

14 IV.    AFFECTED COMMERCE ..................................................................... 22

15        A.    The Defendants' Conduct Involved Import Trade or Import Commerce and

16              Had Direct, Substantial and Reasonably Foreseeable Effects on United States

17              Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and

18              Class Members' Antitrust Claims ................................................. 22

19        B.    The Defendants Targeted the United States ................................... 25

20 V.     FACTUAL ALLEGATIONS ................................................................... 31

21        A.    Inductors Generally and Types of Inductors ................................. 31

22        B.    The Structure of the Inductor Market ........................................... 36

23              1.    Market Concentration ......................................................... 37

24              2.    Product Commoditization And Lack of Substitutability .......... 38

25              3.    Entry Barriers ..................................................................... 39

26              4.    Demand Inelasticity ............................................................ 43

27        C.    Direct Evidence OF Defendants' Unlawful Conduct ..................... 44

28

1.   The Presence Of A Leniency Applicant. ............................................... 44

2.   Examples of Conspiratorial Acts With Respect To Various Customers In The United states. .......................................................... 46

a.   Unlawfulness of Such Conspiratorial Acts.............................. 46

■   █████████████████████████████████████

█████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

■   █████████████████████████████████████

k.   Summary.................................................................... 62

3.   Unlawful Conduct Through JEITA. ....................................................... 62

a.   Background and Structure of JEITA. ..................................... 62

b.   JEITA Facilitated Unlawful Agreements And Information Exchanges ................................................................. 73

c.   JEITA's Recognition Of Its Unlawful Practices. .................... 84

D.   Circumstantial Evidence Of Defendants' Unlawful Conduct ........................ 87

1.   Structural Characteristics of the Industry. ............................................. 87

2.   Defendants' Pricing With Respect To Inductors. ................................. 88

3.   Use of Trade Associations Other Than JEITA to Facilitate and Organize the Conspiracy ................................................................. 90

4.   Other Interactions ............................................................................. 93

1

5.      Some Defendants' Involvement in Other Conspiracies in Electronic

Product Markets Further Support an Inference of Conspiratorial

Conduct Based on Similar Facts Pled Here.........................................94

VI.     TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-

DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT

CONCEALMENT ........................................................................................97

VII.    CLASS ACTION ALLEGATIONS ........................................................100

VIII.   CLAIM FOR RELIEF ........................................................................102

IX.     DEMAND FOR JUDGMENT ...............................................................103

X.      JURY DEMAND...................................................................................105

1.      Plaintiffs Arch Electronics, Inc., Cambridge Capital Corporation, Dependable Component Supply Corporation, Lifetime Service Center, Inc., Powerweb, Inc. and Powerweb Energy, Inc. (collectively, "Plaintiffs") bring this action on behalf of themselves and on behalf of a class of all similarly situated persons and entities in the United States, its territories, and the District of Columbia (the "Class") for damages and injunctive relief pursuant to Sections 15 and 26 of the Clayton Act (15 U.S.C. §§ 15 and 26) for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against Defendants Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Murata Power Solutions, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd; Panasonic Industrial Devices Corporation of America; Sagami Elec Co., Ltd.; Sagami America, Ltd.; Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of North America; TDK U.S.A. Corporation; TOKO Inc. (now known as Saitama Murata Manufacturing Co., Ltd.); Tokin Corporation; and Tokin America, Inc. (collectively "Defendants").[1] The allegations in this Second Consolidated Amended Complaint ("2CAC") supersede all others in earlier complaints filed in connection with this litigation. Plaintiffs allege as follows, based on information and belief, except as to themselves.

## I.    NATURE OF THE ACTION

2.      This action is based on a scheme by Defendants to fix prices of Inductors that were purchased by entities or persons in the United States, its territories, or the District of Columbia (including through controlled subsidiaries, agents, affiliates, or joint ventures) during the period from January 1, 2003 through December 31, 2017 (the "Class Period").[2]

---

[1] Plaintiffs reserve the right to amend their complaint once the identities of any other alleged conspirators are established.

[2] The Class Period alleged here differs from the period during which the Defendants actively conspired (the "Conspiracy Period"). As explained below, it is possible that the Conspiracy Period ended sometime in 2016, but the effects of Defendants' conspiracy lingered on, causing injury and damage to members of the proposed Class for a period thereafter. Plaintiffs' investigation is ongoing, and Plaintiffs have conservatively chosen a Class Period that commences in 2003. Some Plaintiffs purchased millions of dollars of Inductors from

3.      As used in this 2CAC, the non-capitalized term "inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; common mode filters ("CMFs"); "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching. Along with resistors (a component having a specific amount of resistance to the flow of an electrical current) and capacitors (a two-terminal electronic component that stores potential energy in the form of an electrical field), inductors are viewed as part of the category of "passive electronic components." Along with capacitors and resistors, inductors are one of the most common passive linear elements in electronic circuits and thus are ubiquitous in thousands of products that rely on electronic circuits for power. As explained in more detail below, inductors are now found in a wide variety of electronic equipment, including: (a) smartphones, laptop and desktop computers, video game consoles, wireless LAN (Local Area Network) boxes, and other types of consumer electronic equipment; (b) televisions; (c) advanced driver assistance systems ("ADAS") used in vehicles; and (d) induction motors that are used in industry to convert electrical energy into mechanical energy.

4.      The capitalized term "Inductors" as used herein refers to any inductors (as described above and further below) manufactured by each of the Defendants, unless the context indicates otherwise. When the term "inductors" with no initial capitalization is used herein, it refers to inductors generally, including inductors made by Defendants and by others, unless the context indicates otherwise.

5.      Since the filing of the initial Consolidated Amended Complaint ("CAC"), Plaintiffs have continued their investigation and are now able to allege multiple specific acts in furtherance of a conspiracy among the Defendants to fix the prices of Inductors that affected United States commerce.

---

Defendants prior to January 1, 2003 during which time at least some conspiratorial activity may have occurred. Plaintiffs reserve the right to further amend their 2CAC with respect to the Class Period following further investigation.

1        6.   *First*, Defendant TDK Corporation has admitted that it is the United States

2   Department of Justice ("DOJ") leniency applicant and has confessed to participating in a

3   conspiracy to fix the prices of Inductors. Consequently, this is no longer a case where Plaintiffs

4   are relying upon inferences drawn from the mere pendency of a criminal investigation. In order

5   to qualify as a leniency applicant, TDK Corporation had to admit to committing a felony

6   violation of the antitrust laws and provide sufficient evidence to establish that a conspiracy

7   existed. Thus, criminal violations of the Sherman Act have occurred and been admitted; guilty

8   pleas will eventually follow. The fact of this admission alone is *direct evidence* of a conspiracy.

9   As a result, an analysis of "plus factors" is unnecessary to sustain this 2CAC, although plus

10  factors are certainly also pled.

11       7.   *Second*, in January of 2019, TDK Corporation provided information to the

12  Plaintiffs about its conspiratorial activities in connection with ███████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ███████████████████████████████████████

26       8.   ███████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████,

1

2

3

4

5

6

7       9.

8

9

10

11

12       ████████████ All of this activity is *direct*, not circumstantial, evidence

13   of Sherman Act violations.

14       10.   *Third*, Plaintiffs have supplemented the factual allegations relating to

15   Defendants' activities at JEITA (the "Japan Electronics & Information Technology

16   Association"). JEITA enabled participants in the passive electronics industry—including

17   manufacturers of Inductors, capacitors and resistors—to meet and collude on prices of all three

18   of these components. Thus, JEITA did not merely provide an opportunity to collude;

19   Defendants used JEITA to commit specific acts in furtherance of the conspiracy to inflate the

20   price of Inductors, to monitor each other's pricing, and to enforce the unlawful agreement.

21       11.   With respect to Inductors, there was a special JEITA committee known as the

22   Inductors Subcommittee ("IC") where representatives of the Defendants (seven in total for the

23   Murata entities, eight for the predecessor to the Tokin entities, six for the Panasonic entities,

24   six for the Sagami entities, seven for the Sumida entities, eight for the Taiyo Yuden entities,

25   four for the TDK entities, and 14 for the TOKO entities) unlawfully exchanged company-

26   specific data on such matters as current quarterly and monthly sales results on a year-over-year

27   basis; current business conditions based on the status of orders; market trends, including where

28   each company's business was strong; information relating to pricing; product trends and

developments; overseas production status; future outlook and business forecasts; the status of and anticipated, transactional and delivery issues, and requests from customers. Many of the participants are identified by name herein.

12.     Further unlawful information exchanges and price-fixing agreements occurred at meetings of JEITA's Passive Components Committee ("PCC"), meetings of which were attended by a total of 107 personnel from various Defendants. To be clear, personnel employed by every single Defendant family in this action participated in these meetings and participated in illegal information exchanges of confidential information for the purpose of fixing the price of Inductors. The 2CAC presents *direct evidence* of this participation by all of them.

13.     ████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████ and a lawyer for the European Passive Components Industry Association ("EPCIA") in 2016. Thus, the 2CAC identifies, with great specificity, the who, what, when, where and how of this conspiracy, including which employees or officers of each Defendant participated in illegal information sharing. This is *direct evidence* of anticompetitive conduct.

14.     The reasons for this conspiracy are not novel. The Defendants entered into the conspiracy in an attempt to protect their profits from erosion due to new entrants into the market

following the signing of the Information Technology Agreement ("ITA") of December of 1997, which eliminated tariffs on certain IT products, including inductors. Although those new entrants ultimately did not succeed in taking away Defendants' market share, the need to stabilize prices and mitigate price declines became especially acute following the global recession in 2001, when sales of inductors to North America dropped by 35%.

15.     Defendants' production of transactional data in the action is incomplete and is currently at a standstill following the Court's order with respect to the CAC. However, the data already obtained reflects that ████████████████████████████████████████. The direct evidence of a conspiracy supports the plausible conclusion that Defendants' conspiracy permitted the Defendants "to slow, negate and even reverse the market-driven decline in price for their products, and to fix prices at supra-competitive levels." *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1062 (N.D. Cal. 2015).

16.     The conditions that fostered this conspiracy also fostered collusion by some of the same Defendants in the market for capacitors. This is relevant here because the markets for passive components are related and, indeed, collusion in the capacitors market and the Inductors market occurred at some of the very same JEITA meetings, as alleged with specificity below.

17.     The DOJ obtained a series of guilty pleas with respect to a capacitors conspiracy that extended from as long as November of 2001 through January of 2014.[3] The conspiracy included some, but not all, of the Defendants in this action. As is true with the Inductors conspiracy, the collusive conduct relating to capacitors included, *inter alia*: (a) face-to-face meetings at which agreements to fix the prices of capacitors were reached; (b) collusive bidding to customers who asked for pricing on capacitors; (c) exchanges and monitoring of price, sales, bid, supply, demand, shipping and production of capacitors; and (d) acts of fraudulent concealment. The DOJ's criminal investigations into the capacitors and resistors markets have

---

[3]     *See*     https://www.justice.gov/opa/pr/seventh-company-agrees-plead-guilty-fixing-prices-electrolytic-capacitors;                    https://www.justice.gov/opa/pr/leading-electrolytic-capacitor-manufacturer-ordered-pay-60-million-criminal-fine-price-fixing

led to the filing of two follow-on class action proceedings centralized before Judge Donato: *In re Capacitors Antitrust Litig.*, No. 14-3264 (N.D. Cal.) ("*Capacitors*"), and *In re Resistors Antitrust Litig.*, No. 15-3820 (N.D. Cal.) ("*Resistors*"). Defendant Panasonic Corporation is a defendant in both cases, and NEC-Tokin (the predecessor of Tokin Corporation) and Epcos/TDK were sued in *Capacitors*, with the former paying a $13.8 million fine.[4] The activities in furtherance of the capacitor and resistor conspiracies were conducted at the same forums (meetings of JEITA's PCC and attendant social gatherings) and involved some of the same people as the conspiracy concerning Inductors.

18.    The substantive discussion in this 2CAC first lays out the parties, their involvement in United States commerce, and the characteristics of the inductors industry. Then, Plaintiffs will present in detail the categories of direct evidence described above. After that, they will present the additional categories of circumstantial evidence supportive of their claims, which is additive but unnecessary given the direct evidence set forth herein. Finally, the 2CAC includes allegations concerning fraudulent concealment, class certification, and the cause of action.

## II.    JURISDICTION AND VENUE

19.    Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable relief for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

20.    Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 12 and 22) and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly transact business in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Specifically, some Defendants maintain offices in this District, and all Defendants sell or seek to sell Inductors to electronics companies located in this District.

---

[4]    https://www.justice.gov/opa/pr/nec-tokin-corporation-plead-guilty-and-pay-138-million-fixing-price-electrolytic-capacitors

21.     This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at purchasers of Inductors and/or products containing Inductors in the United States and in this District.

### III.     PARTIES

#### A. Plaintiffs

22.     Each Plaintiff purchased one or more Inductors or products containing Inductors from a Defendant conspirator or an entity owned or controlled by a Defendant conspirator. The purchases identified below were made at various times during the Class Period, beginning no earlier than January 1, 2003, ending no later than December 31, 2017.

23.     Plaintiff Arch Electronics, Inc. ("Arch") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Cheltenham, Pennsylvania. Among other things, Arch sells and installs consumer electronic equipment. During the Class Period, Arch purchased manufactured products containing Inductors directly from one of more of the named Defendants, their predecessor entities, their divisions, subsidiaries or affiliates, or their co-conspirators. These products contained one or more Inductors manufactured by a Defendant. Arch paid more than it would have in the absence of the conspiracy alleged herein.

24.     Plaintiff Cambridge Capital Corporation ("Cambridge") is a New York corporation with a principal place of business in Florida. Cambridge is the successor in interest to Univisions Crimson Holding, Inc., a company that during the Class Period purchased manufactured products containing Inductors directly from one of more of the named Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators. These products contained one or more Inductors manufactured by a Defendant. Cambridge paid more than it would have in the absence of the conspiracy alleged herein.

25.     Plaintiff Dependable Component Supply Corporation ("Dependable") was incorporated under the laws of Florida. During the Class Period, Dependable purchased Inductors directly from one or more of the Defendants. Dependable paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

26.     Plaintiff Lifetime Service Center, Inc. ("Lifetime") is a corporation with a principal place of business in Williamsville, New York. During the Class Period, Lifetime purchased Inductors directly from one of the Defendants. Lifetime paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

27.     Plaintiffs Powerweb, Inc. and Powerweb Energy, Inc. (collectively, "Powerweb") are corporations with their principal places of business located in Philadelphia, Pennsylvania. Powerweb purchased Inductors directly from one or more of the Defendants. Powerweb paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein.

### B.  The Murata Defendants

28.     Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that Murata Manufacturing had $15 million in sales of one type of Inductors (ceramic chip Inductors) in North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers of passive electronic components. Murata Manufacturing annually has revenues in excess of $5 billion from sales of passive electronic components, including Inductors.

29.     In March of 2014, Murata Manufacturing acquired a controlling interest in Defendant TOKO, Inc. ("TOKO"), a Japanese company that was a leading Inductor manufacturer that sold hundreds of millions of dollars of Inductors in the United States, its territories and the District of Columbia during the Class Period. According to estimates from one industry expert, TOKO had $47 million of sales of one type of Inductors (ceramic chip Inductors), in North America in 2007 alone. By April of 2015, Murata Manufacturing had assumed all aspects of TOKO's business, including its assets, sales, service, and technical support for the portfolio of TOKO products, including Inductors. To the extent Murata

1   Manufacturing assumed, in whole or in part, the assets and liabilities of TOKO, Plaintiffs intend

2   to hold Murata Manufacturing liable for any violations of Sections 1 and 3 of the Sherman Act

3   (15 U.S.C. §§ 1, 3) by TOKO that occurred during the Class Period. Plaintiffs also separately

4   name TOKO as a Defendant.

5          30.     Defendant Murata Electronics North America, Inc. ("MENA") is a wholly

6   owned subsidiary of Murata Manufacturing. MENA is a Texas corporation with its principal

7   place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA—

8   directly and/or through its subsidiaries, which it wholly owned and/or controlled—

9   manufactured, marketed, and/or sold Inductors that were purchased throughout the United

10  States, its territories and the District of Columbia during the Class Period.

11         31.     Murata Power Solutions, Inc. ("Murata Power") is a wholly owned subsidiary

12  of Murata Manufacturing that was created in 2007 when Murata Manufacturing acquired a

13  division of C&D Technologies, a United States company with its headquarters in Pennsylvania.

14  Murata Power has its headquarters at 129 Flanders Road, Westborough, Massachusetts 01581.

15  Murata Power sells Inductors to customers located in the United States. Murata Power had $5

16  million of sales of Inductors in the United States in 2007.

17         32.     Murata Manufacturing also operates Murata Americas RF Product Department

18  ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth, Georgia.

19         33.     Defendant TOKO (now known as Saitama Murata Manufacturing Co., Ltd.

20  ("Saitama Murata")) was once an independent company that had substantial market share in

21  sales of Inductors. TOKO's headquarters are at 18, Gomigaya, Tsurugashima-shi, Saitama,

22  350-2281, Japan. As is alleged in greater detail below, TOKO—both before and after its

23  acquisition by Murata Manufacturing—attended meetings of competitors and participated in

24  anticompetitive activity with Defendants. The current TOKO entity is a subsidiary of Murata

25  Manufacturing. TOKO continues to manufacture and perform research and development for

26  Inductors under the direction of Murata Manufacturing. In 2019, TOKO was renamed Saitama

27  Murata.

28

1    34.    Defendants Murata Manufacturing, MENA, Murata Power, and TOKO (now

2  known as Saitama Murata) will be referred to collectively herein as "Murata" or the "Murata

3  Defendants", unless otherwise noted.

4        C.  **The Panasonic Defendants**

5    35.    Defendant Panasonic Corporation ("Panasonic Corporation") is a Japanese

6  corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi,

7  Osaka 571-8501, Japan. Panasonic Corporation—directly and/or through its predecessors and

8  subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold

9  Inductors and products containing Inductors in the United States, its territories and the District

10 of Columbia during the Class Period. Panasonic Electronic Devices Co. Ltd. ("PED") was a

11 former Japanese subsidiary of Panasonic Corporation that was a leading manufacturer of

12 Inductors. It was founded in 1982 and was headquartered in Knoxville, Tennessee. PED had

13 substantial sales of Inductors in the United States, its territories and the District of Columbia

14 during the Class Period. For example, industry data shows that in 2007, PED sold $10 million

15 worth of one type of Inductor (ceramic chip Inductors) in North America. In August of 2011,

16 Panasonic Corporation announced that it was dissolving and absorbing PED in April of 2012.

17 Panasonic Corporation is responsible for the acts of its wholly owned and controlled subsidiary

18 PED, and Plaintiffs will seek to hold Panasonic Corporation liable for any violations of Section

19 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3) by PED that occurred during the Class Period.

20    36.    Panasonic Corporation of North America ("PCNA") was founded in 1959 and

21 operated in the United States under the name "Matsushita Electric Corporation of America"

22 until 2005. PCNA is a Delaware corporation with its principal place of business located at Two

23 Riverfront Plaza, Newark, New Jersey 07102. PCNA was, throughout the Class Period, a

24 wholly owned subsidiary of Panasonic Corporation. On December 22, 2016, PCNA became a

25 subsidiary of Panasonic Holding (Netherlands) B.V. Investment ("Panasonic Holding"), which

26 is wholly owned by Panasonic Corporation. According to Panasonic Corporation's Annual

27 Report for the fiscal year ending March 31, 2017, Panasonic Holding is one of Panasonic

28 Corporation's major consolidated subsidiaries and owns 100 percent of the voting rights in

PCNA. Panasonic Consumer Electronics Company ("PCEC") is a division of PCNA, and Panasonic Broadcast and Television Systems Company is a unit of PCNA. During the Class Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled—sold and distributed Inductors to purchasers in the United States, its territories and the District of Columbia. These included Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corporation. Also, during the Class Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to purchasers in the United States, its territories and the District of Columbia products containing Inductors manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates. These included such items as televisions, stereo equipment, Blu-Ray/DVD players, and cameras/camcorders. The Inductors contained in these products are identifiable by part number in the records of Panasonic entities and can be traced either to an entity owned or controlled by Panasonic Corporation or an entity owned or controlled by one of the other Defendants.

37.     Defendant Panasonic Industrial Devices Corporation of America ("Panasonic Industrial"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, 7th Floor, Newark, New Jersey 07102. On or about January 12, 2012, PED changed its name to Panasonic Industrial. Panasonic Industrial sold Inductors and products containing Inductors manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled, to purchasers in the United States, its territories and the District of Columbia during the Class Period

38.     Defendants Panasonic Corporation, PED, Panasonic Industrial, and PCNA are hereinafter referred to as "Panasonic" or the "Panasonic Defendants", unless otherwise noted.

**D.  The Sagami Defendants**

39.     Defendant Sagami Elec Co., Ltd. ("Sagami Japan") is a Japanese company that has its principal place of business at 10-30, Ichibashimo-Cho, Tsurumi-ku, Yokohama Kanagawa 230-0024, Japan. Sagami Japan—directly and/or through its predecessors and

subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

40.    Defendant Sagami America Ltd. ("Sagami America") is a wholly owned subsidiary of Sagami Japan. Sagami America has its principal place of business at 1854 South Elmhurst Road, Mont Prospect, Illinois 60056. On its website, Sagami Japan lists Sagami America as part of its "Global Network."[5] Sagami Japan manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

41.    Defendants Sagami Japan and Sagami America are hereinafter referred to as "Sagami" or the "Sagami Defendants" unless otherwise noted.

### E.   The Sumida Defendants

42.    Defendant Sumida Corporation ("Sumida Corporation") is a Japanese corporation with its principal place of business at Harumi Island Triton Square Office Tower X 14/F, 1-8-10 Harumi, Chuo-Ku, Tokyo 104-8547, Japan. Sumida Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. Defendant Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103-8589, Japan. Sumida Electric—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, in 2007, Sumida Electric sold $27 million of one type of Inductors (ceramic chip Inductors) in North America, according to industry data. Sumida Electric is wholly owned by Sumida Corporation, as reflected in the following graphic taken from its website:

---

[5] http://www.sagami-elec.co.jp/en/company/network.php

43.     Defendant Sumida America Components Inc. ("Sumida America") is a Delaware corporation with its headquarters at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois 60173. It is a wholly owned subsidiary of Sumida Corporation. Sumida America maintains offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose, California 95131. During the Class Period, Sumida America—either directly or through its business units, subsidiaries, agents, or affiliates, which it wholly owned and/or controlled— sold and distributed Inductors manufactured by its business units, subsidiaries, agents, or affiliates or by Sumida Corporation to purchasers in the United States, its territories and the District of Columbia. As seen in the foregoing graphic, Sumida America is wholly owned by Sumida Corporation.

44.     Defendant Sumida Corporation exerts complete control over the activities of both Sumida Electric and Sumida America, as reflected in the following "Management Organization Chart of Sumida Group" from its website:

45.     The webpage containing this graphic explains:

The "Management Organization Chart" is to show the company hierarchy on formal reporting channel, chain of command and authority within Sumida Group in day-to-day operation and also in the decision and policy making process. SUMIDA CORPORATION ("Sumida") is a pure holding company and has been [*sic*] adopted the Company with Committee System. All three statutory committees (Nomination Committee, Audit Committee and Compensation Committee) are composed of external directors. Executive Officers are responsible for the business execution, and the Board of Directors is specialized in the business supervision in Sumida; thus business execution and supervision function is expressly separated in Sumida. Risk Management Committee is specialized in risk management in Sumida.[6]

46.     Defendants Sumida Corporation, Sumida Electric and Sumida America are hereinafter referred to as "Sumida" or the "Sumida Defendants" unless otherwise noted.

---

[6] https://www.sumida.com/about/index.php?categoryId=5&parentId=9&aboutId=9

1

**F.   The Taiyo Yuden Defendants**

2   47.   Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation

3   with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan.

4   Taiyo Yuden Co.—directly and/or through its predecessors and subsidiaries, which it wholly

5   owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States,

6   its territories and the District of Columbia during the Class Period. In its 2017 Annual Report,

7   Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

8   48.   Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois

9   corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of

10   business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During

11   the Class Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries,

12   agents, or affiliates, which it wholly owned and/or controlled—sold and distributed to

13   purchasers in the in the United States, its territories and the District of Columbia Inductors

14   manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo

15   Yuden Co.

16   49.   Defendant Taiyo Yuden Co. exerts control over Taiyo Yuden USA. Corporate

17   policies are set by the parent company and govern the activities of the United States subsidiary,

18   as depicted in the following chart taken from Taiyo Yuden Co.'s website:



50.     Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants" unless otherwise noted.

### G. The TDK Defendants

51.     Defendant TDK Corporation is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chome, Chuo-ku, Tokyo 103-8272, Japan. TDK Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

52.     Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK-EPC—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. More specifically, TDK-EPC itself develops and manufactures Inductors, which are sold by the TDK Defendants under the TDK and EPCOS brands.[7] TDK-EPC is a wholly owned subsidiary of the TDK Corporation.

53.     Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at 525 RXR Plaza, Uniondale, New York 11556. TDK USA describes itself as a "group company of TDK Corporation." During the Class Period, TDK USA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation and TDK-EPC to purchasers in the United States purchasers the United States, its territories and the District of Columbia.

---

[7] https://www.global.tdk.com/corp/en/news_center/press/aah34500.htm

54.     Defendant TDK Corporation of America ("TDK America") is a wholly owned subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite 300, Lincolnshire, Illinois 60069. Like TDK USA, TDK America describes itself as a "group company of TDK Corporation." TDK America sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the United States, its territories and the District of Columbia. TDK America has a marketing and sales office located in San Jose, California, that serves North American and Latin American customers.

55.     The TDK Defendants were the largest manufacturers of Inductors during the Class Period. For example, in 2007 TDK sold $57 million of one type of Inductor (ceramic chip Inductors) in North America, more than any other manufacturer according to one industry expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded Inductors and does so to this day.

56.     TDK Corporation owns and controls both TDK USA and TDK America, as reflected in the following graphic of the "TDK Organization" taken from TDK Corporation's website:



57.    TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively referred to as "TDK" or the "TDK Defendants" unless otherwise noted.

1

**H.  The Tokin Defendants**

2    58.    Defendant Tokin Corporation is a Japanese company with its principal place of

3    business at 8-1, Nishi-Kanda 3-chome, Chiyoda-Ku, Tokyo 101-8362, Japan. Tokin

4    Corporation was established in 1938 as Tohoku Metal Industries Company, which changed its

5    name to "Tokin Corporation" in 1988. In 2002, that entity integrated with the electronic

6    components business of NEC Corporation ("NEC") to become NEC Tokin Corporation ("NEC

7    Tokin"). In February of 2013, Kemet Corporation ("Kemet") acquired an interest in NEC

8    Tokin. By February of 2017, Kemet owned 34% of the shares of NEC Tokin and 51% of the

9    voting rights, while NEC held 66% of the shares and 49% of the voting rights. On February 24,

10   2017, it was announced that NEC had sold its remaining interest in NEC Tokin to Kemet. Tokin

11   Corporation resumed using the name "Tokin Corporation" on April 10, 2017.

12   59.    Defendant Tokin Corporation is now a separately incorporated subsidiary of

13   Kemet. Tokin Corporation now operates as the successor in interest to NEC Tokin. It continues

14   to manufacture and sell Inductors, just as NEC Tokin did. Tokin Corporation also takes full

15   responsibility for past antitrust violations by NEC Tokin. On its current website, Tokin

16   Corporation has posted a letter of apology dated March 29, 2016 by Shigenori Oyama

17   ("Oyama") (then Representative Director and President of NEC Tokin and now President of

18   Tokin Corporation) for a cease and desist order issued by the Japan Fair Trade Commission

19   ("JFTC") against it and others for the price-fixing of certain capacitors.[8] In that letter, Oyama

20   promised that the "entire company will work together to reinforce our compliance regime so

21   that the same event will never happen again in the future. I sincerely apologize for causing such

22   big trouble and concern to our customers, suppliers and all concerned due to the orders at this

23   time."

24   60.    As noted above, NEC Tokin also pled guilty to price-fixing of capacitors in

25   United States federal court in January of 2016 and paid a $13.8 million fine.[9]

26   _____

27   [8] https://www.tokin.com/english/files/Capacitor20160331e.pdf. The JFTC's order can be found here: https://www.jftc.go.jp/en/pressreleases/yearly-2016/March/160329_files/160329_1.pdf

28   [9] *See* ECF No. 9-1 in *United States v. NEC Tokin Corp.*, No. 3:15-cr-00426-JD (N.D. Cal.).

61.     During the Class Period, Tokin Corporation (then operating as NEC Tokin) sold and distributed Inductors manufactured by it either directly or through its business units, subsidiaries, agents or affiliates, which it wholly owned and/or controlled, to purchasers in the United states, its territories and the District of Columbia.

62.     Defendant Tokin America Inc. ("Tokin America") is a company headquartered in San Jose, California and is a wholly owned subsidiary of Tokin Corporation. Tokin America is the successor to NEC Tokin America Inc. and occupies an office at the same address in San Jose utilized by that predecessor entity. In the United States, its territories and the District of Columbia, Tokin America sells Inductors made by Tokin Corporation. Tokin America is referred to as part of Tokin Corporation's "Overseas Network" and one of its "Overseas Offices and Subsidiaries."[10]

63.     Defendants Tokin Corporation and Tokin America are collectively referred to as "Tokin" unless otherwise noted.

## I.     Agents and Co-Conspirators

64.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

65.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within

[10] https://www.tokin.com/english/contact/otoi.html#a

corporate families distributed products containing Inductors, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## IV.   AFFECTED COMMERCE

66.    During the Class Period, the Defendants collectively controlled the vast majority of the market for inductors, both globally and in the United States, as further described below.

67.    The Defendants sold Inductors (or products containing Inductors) directly to customers located in the United States. Substantial quantities of Inductors are shipped from outside the United States into the United States in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

68.    In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

### A. The Defendants' Conduct Involved Import Trade or Import Commerce and Had Direct, Substantial and Reasonably Foreseeable Effects on United States Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and Class Members' Antitrust Claims

69.    The Defendants' illegal conduct involved United States import trade or import commerce. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed Inductors to enter the United States market and inflating the prices of Inductors destined for the

1  United States. Such conduct was meant to produce and did in fact produce a substantial effect

2  in the United States in the form of higher prices.

3      70.    According to one leading analyst, the inductors market in the United States "was

4  an estimated $280 MM in FY 2018 or 10% of global consumption value." This is an increase

5  from $225 million for FY 2016. Demand from private industry (such as smartphone and

6  automobile makers) is fueling this growth.

7      71.    The Defendants recognize the importance of sales of Inductors in the United

8  States in their annual reports and other financial reports. That is why they created and invested

9  in entities like MENA, Murata Power, Murata RF, Taiyo Yuden USA, Sagami America, Tokin

10 America, Sumida America, PCNA, TDK America, and TDK USA. The websites of those

11 entities boast about their respective sales networks in the United States.

12     72.    To give one example, MENA's website states that "[w]e serve as the regional

13 and functional headquarters supporting our customers' engineering and procurement activities

14 throughout the Americas. Along with experienced teams of Technical Sales Managers located

15 in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago,

16 Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized

17 Distributors to service our customers' requirements for sales and technical support, design

18 expertise, logistics and supply chain initiatives."[11]

19     73.    Taiyo Yuden's website similarly lists a headquarters for Taiyo Yuden USA in

20 Chicago and "sales offices" in San Diego, San Jose, Chicago and Boston.[12] Taiyo Yuden USA

21 assisted its corporate parent in marketing and selling Inductors, issuing press releases and

22 disseminating product guides.

23     74.    As a third example, TDK America's website states that "TDK Corporation of

24 America (TCA), a group company of TDK Corporation, was established in 1974 in California

25 as the sales and marketing force for electronic components in North America and Latin

26

27 [11] https://www.murata.com/en-us/about/company/muratalocations/americas/mea

28 [12] https://www.yuden.co.jp/ut/company/overseas/

America."[13] "TCA has grown into a sales force of nine offices in the U.S. with headquarters located in Lincolnshire, Illinois. The combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry."[14]

75.     Murata, Sumida, Sagami, Tokin, and Panasonic likewise tout their worldwide sales networks, which include the United States.

76.     The Defendants shipped millions of Inductors (and/or products containing Inductors) into the United States during the Class Period. In addition, Inductors that were shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States companies. As a result, a substantial portion of the Defendants' revenues were derived from the United States market. Defendants spent millions of dollars on advertising their products in the United States.

77.     Because of the importance of the United States market to the Defendants and their co-conspirators, Inductors intended for importation into and ultimate consumption in the United States were a focus of the Defendants' illegal conduct. The Defendants knowingly and intentionally sent price-fixed Inductors (and/or products containing price-fixed Inductors) into a stream of commerce that led directly into the United States. Defendants' conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for Inductors.

78.     Thus, when high-level executives within the Defendants' companies agreed on prices for Inductors, they knew that their price-fixed Inductors would be sold in the United States. This included negotiating prices for Inductors for large manufacturers like Apple or other major customers identified previously would set the floor for market pricing for similar Inductors sold through other channels in the United States.

---

[13]          https://www.tdk-electronics.tdk.com/en/1767762/company/press-center/press-releases/press-release-usa/distribution-award--tdk-honors-avnet-for-highest-sales-growth/1767750
[14]    https://www.linkedin.com/jobs/view/technical-account-representative-at-tdk-corporation-of-america-1308754304/

79.     For the reasons set forth above, the Defendants' illegal conduct involved import trade or import commerce into the United States.

80.     The Defendants' illegal conduct had direct, substantial, and reasonably foreseeable effects on United States domestic and import trade or commerce in the form of higher prices for Inductors that Plaintiffs and Members of the Class paid. These prices, tainted by collusion, directly and immediately impacted Plaintiffs and Members of the Class in the United States. In this respect, the United States effects of the Defendants' illegal conduct gives rise to Plaintiffs' and Class Members' antitrust claims and are the proximate cause of the injury that Plaintiffs and Members of the Class suffered.

81.     As described in further detail herein, Defendants' price-fixing conspiracy involved unlawful conduct within the United States that had a direct, substantial and reasonably foreseeable effect on domestic commerce.

**B.  The Defendants Targeted the United States**

82.     Because of the relatively small size of Inductors, transportation costs are relatively minor and there is substantial international trade in these electronic components.

83.     During the Class Period, the Defendants manufactured and sold substantial quantities of Inductors shipped from outside the United States, its territories, and the District of Columbia in a continuous and uninterrupted flow of interstate and foreign trade and commerce. In addition, substantial quantities of equipment and supplies necessary for the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. Defendants' business activities in connection with the production and sale of Inductors were within the flow of, and affected substantially, interstate and foreign trade and commerce.

84.     During the Class Period, the Defendants also manufactured and sold manufactured products in the United States, its territories, and the District of Columbia that incorporated Inductors made by the Defendants. The Defendants also sold substantial quantities of these products overseas to direct purchasers for importation to the United States, its territories, and the District of Columbia. The business activities of the Defendants in connection

1    with the production and sale of products containing their Inductors were within the flow of, and

2    affected substantially, interstate and foreign trade and commerce. The paragraphs below detail

3    some specific examples of this.

4          85.     Murata's connections to the United States, its territories, and the District of

5    Columbia are deep and sustained. "In 1971, General Motors (GM) introduced Murata's ceramic

6    filters to its car radios. This was the result of efforts by Akira Murata, the founder of Murata

7    Manufacturing who traveled to the United States and aggressively pioneered the market.

8    Getting fully involved with the automobile industry was Murata's big dream then. Over 40

9    years ago, we built a plant in the United States and started production locally. Ceramic

10   resonators were introduced to the automobile industry about 25 years ago, and their market

11   continues to enjoy steady sales to this day."[15]

12         86.     On September 3, 2007, Murata announced that it had completed the acquisition

13   of the Power Electronics Division of C&D Technologies ("C&D"), a United States company

14   located in Pennsylvania, for $85 million in cash. After the acquisition, Murata operated C&D's

15   business as "Murata Power Solutions" in the United States and sold Inductors in the United

16   States, its territories, and the District of Columbia that were once offered by C&D.

17         87.     In 2014, Murata received a Preferred Quality Supplier ("PQS") award from Intel

18   Corporation ("Intel") based in part on its sales of Inductors. In a press release, Tsuneo Murata,

19   President of Murata Manufacturing, said "[w]e would like to express our sincere appreciation

20   to Intel for its tremendous support and assistance to achieve this award. We are committed to

21   make every effort to meet and exceed Intel's expectation in 2014."[16] Murata received Intel's

22   PQS award for 2010, 2011, and 2012. In 2014, Intel recognized Murata with a Supplier

23   Continuous Quality Improvement award based in part on its sales of Inductors, "Intel's highest

24   honor for its suppliers."[17]

25

26   [15] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline

27   [16] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411

28   [17] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411

1 ████ ████████████████████████████████████████

2 ████████████████████████

3 ████ ████████████████████████████████████████

4 ████████████████████████

90.     Murata has sales representatives across the United States, including in Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo (Indiana), and Boston.

91.     Panasonic is a household brand and has been conducting business continually in the United States since at least the 1960s. *See, e.g.*, *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F. Supp. 262, 310 (E.D. Pa. 1975). Panasonic has an English language active website that allows potential customers to contact Panasonic's Japanese sales personnel directly about sales inquiries for Inductors.[18]

████ ██████████████████████████████████████████.

93.     Sagami has had a substantial presence in the United States its territories, and the District of Columbia for over twenty years. It opened Sagami America in 1995 and sells directly to distributors and other customers in the United States. For example, Sagami's Inductors are offered for sale by United States-based distributors on their websites. Sagami has qualified as a vendor to Apple.

94.     Sumida also targeted markets in the United States, its territories, and the District of Columbia. Sumida's quarterly financial reports report conditions and developments by United States companies such as T-Mobile, and regularly includes reports on business conditions in the United States.

95.     Sumida's English language website identifies sales representatives for its products in Alabama, Arizona, California, Florida, Illinois, Indiana, Massachusetts, Michigan, New Jersey, New York, Oregon, Texas, Washington, and Wisconsin.[19]

---

[18]                               https://industrial.panasonic.com/cuif/ww/contact-us?field_contact_group=2304&field_contact_lineup=1393

[19]                               https://www.sumida.com/about/index.php?categoryId=20&parentId=96&aboutId=99#Southern%20California

96.     Sumida has qualified as a vendor to Apple.

97.     Taiyo Yuden has focused on markets in the United States, its territories, and the District of Columbia, on its own and through its relationships with other United States passive electronic components manufacturers, and has customers in the United States, its territories, and the District of Columbia. In 2005, Taiyo Yuden announced that it would sell Inductors in connection with Kemet, through a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire product lines."[20] According to Taiyo Yuden, "Taiyo Yuden and Kemet have built up a cooperative relationship since 1997, when the two companies began regular information exchanges on the product technology side. Now the relationship is to be strengthened even more through a comprehensive sales alliance."[21]

98.     In April of 2011, Intel gave Taiyo Yuden a PQS award, reflecting Taiyo Yuden's substantial efforts to sell their products, including Inductors, to U.S. companies. Taiyo Yuden President Yoshiro Kanzaki stated, "we shall continue to do our utmost to provide quality advanced products and shall approach our work with the aim of becoming Intel's best partner."[22]

---

[20] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf. This arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.

[21] *Id.*

[22] https://www.yuden.co.jp/ut/news/release/pdf_150.pdf

1      101.    The United States has also long been central to TDK's global marketing strategy.

2   TDK has a billboard on Times Square in New York City:



12     102.    This billboard has been part of TDK's "global advertising strategy" since

13   2001.[23]

14     103.    In July of 2013, TDK revamped its English language website to allow customers

15   to search for Inductors and contact sales agents directly for purchases online: "In recent years,

16   the ratio of information acquisition via the Internet has become extremely high for the

17   departments of customers' development, design, purchasing, etc. Also, due to the trend of

18   globalization, there is a need to respond quickly whenever you request from any customer. The

19   inductor site to be announced here inherits the same concept as the monolithic ceramic capacitor

20   site which has been popularly released in January 2013. Please use the new website for

---

[23] https://www.tdk.com/corp/en/news_center/press/aah33300.htm. In December of 2011, TDK announced that it had lit up a Christmas tree on Times Square to promote its brand. https://www.global.tdk.com/corp/en/news_center/press/aah37600.htm. TDK lit the Christmas Tree in Times Square again in 2014 and 2015 and promoted its brand in the summer of 2012 by sponsoring a Fourth of July display on Times Square. *See* https://www.global.tdk.com/corp/en/news_center/press/aah40100.htm; https://www.global.tdk.com/corp/en/news_center/press/201412191618.htm (in 2014 TDK advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise").

1    searching TDK's inductor which is the No. 1 supplier of inductor by all means."[24] TDK's

2    website currently has an active feature that allows purchase of Inductors through a search

3    feature that links directly to inventory for certain distributors.

4         104.    Following this development, TDK announced that TDK and EPCOS brand

5    Inductors were available through United States distributors and the EPCOS website it

6    maintained: "TDK Corporation announces that its broad spectrum of sample kits for EPCOS

7    components is now also available directly from Mouser Electronics, a high-service electronic

8    component distributor focused on providing new products to design engineers. Currently,

9    nearly 40 sample kits containing the latest EPCOS protection devices, sensors, chokes, SAW

10   filters, SMT inductors and power inductors are offered on the EPCOS website."[25]

11        105.    For much of the Class Period, TDK's American Depositary Receipts Shares

12   ("ADRs") were listed on the New York Stock Exchange. In delisting its ADRs in 2009, TDK

13   explained that "[i]n June 1982, TDK listed its [ADRs] on the NYSE primarily to raise funds,

14   bolster corporate creditworthiness and the TDK brand, and broaden its investor base, as it

15   globalized its business operations and rapidly expanded overseas sales. Ever since, the

16   Company has worked to expand its operations in the U.S. and elsewhere around the world."[26]

17   Foreign corporations that issue ADRs must register with the Securities and Exchange

18   Commission and are subject to various federal regulations and reporting rules. These securities

19   allow foreign corporations to profitably enter the United States capital markets.

20   ███  ████████████████████████████████████████████████████████

21   ███  ████████████████████████████████████████████████████████

22   ████████████████████████████

23        108.    Tokin has also qualified as a vendor to Apple.

24

---

25   [24]  https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm.Thie webpage used to
26   exist and was quoted in the CAC. TDK has now apparently deleted it.

27   [25]      https://www.marketscreener.com/EPCOS-AG-ADR-424434/news/EPCOS-AG-ADR-
     Online-Service-Easy-ordering-of-sample-kits-from-Mouser-Electronics-16581394/

28   [26] https://www.global.tdk.com/corp/en/news_center/press/aah29200.htm

109.    The Defendants thus engaged in conduct both inside and outside the United States, its territories, and the District of Columbia that caused direct, substantial, and reasonably foreseeable and/or intended anticompetitive effects upon interstate commerce within the United States.

110.    The Defendants, directly and through their wholly owned and/or controlled subsidiaries and agents, engaged in a conspiracy to fix or inflate prices of Inductors that restrained trade unreasonably and affected adversely the market for Inductors and manufactured products that incorporated Inductors. The Defendants affected commerce, including import commerce, substantially throughout the United States, thereby proximately causing injury to Plaintiffs and members of the Class.

## V.    FACTUAL ALLEGATIONS

111.    Plaintiffs incorporate by reference the factual allegations made in previous sections.

### A.   Inductors Generally and Types of Inductors

112.    As noted above, inductors, including Defendants' Inductors, are passive electronic components that store and regulate energy in a circuit using principles of electromagnetism.

113.    Inductors work by creating magnetic fields when current passes through the coils or other inductive material. The magnetic fields created by the passage of current are measured in terms of "force" and "flex." The field force is the amount of "push" that a field exerts over a certain distance, pushing energy through the wire. The field flux is the total quantity, or effect, of the field as energy surrounds the core. Force and flux work off one another. The amount of field flux that will develop in space is proportional to the amount of field force applied, divided by the amount of opposition to flux.

114.    The magnetic field also introduces opposition into the circuit, which is a tension that develops within the circuit allowing for storage of energy. Opposition is created by the movement of the magnetic flux as it opposes or resists any changes in the electrical current flowing through it. Energy is stored when the magnetic field flux allows for a certain "inertia"

1  to accumulate in the flow of electrons through the wire (or other inductive material) producing

2  the field.

3      115.    An inductor also acts as a governor, or regulator, of energy in a circuit. When

4  current increases, an inductor absorbs energy and drops voltage. When current decreases, it acts

5  as a source of energy, creating voltage as it releases stored energy.

6      116.    Inductors are classified primarily by inductance, the ability of an inductor to

7  store energy in the form of a magnetic field. Inductance is measured in the unit of the Henry

8  (μH).

9      117.    Inductors are sold by specifications that relate to inductance, voltage, and size.

10  These measures are standardized. Inductors with the same inductance, core, and size are

11  substantially the same, and fungible with one another.

12      118.    Inductors, capacitors, and resistors perform distinct roles in an electric circuit.

13  Inductors store current using magnetic fields, which also give inductors the ability to act as

14  resistors. However, unlike resistors, inductors can also store energy. Inductors block alternating

15  current ("AC") but allow direct current ("DC") to pass through. Capacitors block DC but allow

16  AC to pass through. Unlike capacitors, inductors can create energy when needed by use of

17  magnetic fields. In short, all three of these components work together to form closed circuits

18  that power the products that contain them. Inductors can perform all of the basic functions of

19  capacitors and resistors, but capacitors and resistors cannot perform all of the functions of an

20  inductor.

21      119.    An inductor's role in a simple circuit is depicted below:



1

120.    Examples of various forms of inductors are depicted below.



121.    As can be seen, inductors can be as simple as wrapping a metal wire around some form of a core. Wirewound coil inductors may also be encased, embedded, or molded in plastic cases or in discrete inductor chips. Wirewound coils can have metallic or ceramic cores (or hybrids of both) and may also have air cores.

122.    Multilayered inductors may also vary in composition and alignment, but they, too, perform the same basic function. Multilayered inductors are usually encased in plastic. Multilayered inductors may use ferrite beads, or bead arrays, and may also stack or layer film and various types of coils and electrode materials. The graphic below from TDK's website illustrates some types of chip inductors.



123.    Inductors are distinguished from one another by the material composing the "core," or the conductor for the magnetic reaction. An inductor's core material can affect its performance, as different metals and materials have different magnetic and inductive properties. A core may be made of ceramic, ferrite, copper, or some other metal. Different cores can provide equivalent standard levels of inductance, even if each type of material provides

1   different levels of power and performance. The key principle of physics that impacts inductors'

2   specifications is that inductance is directly proportional to the available surface area contained

3   in the finished inductor. To achieve added surface area, metallic or ceramic materials can be

4   stacked or wound in an Inductor.

5          124.   At present, the principal type of inductors are air core inductors, iron core

6   Inductors, ferrite core inductors, toroidal core inductors, and multilayer inductors. Air core

7   inductors are the simplest type to make, with a wire wrapped around a ceramic core. These are

8   the cheapest form of inductors to manufacture. Iron core inductors are wrapped around an iron

9   core and can be smaller in size than air core inductors. Ferrite inductors use ferrite (including

10   ferrite in bead form), a metal oxide ceramic based around a mixture of ferric oxide, which has

11   a high degree of magnetic permeability. Toroidal core inductors are made using a coil wrapped

12   around a toroidal (doughnut-shaped) core. The core is often also made of ferrite. Multilayer

13   inductors consist of two conductive coil patterns that are arranged in two layers in the upper

14   part of a multilayered body and are electrically connected in consecutive manner. Thin film

15   inductors are a type of multilayer inductor typically utilizing a ceramic chip that produces a

16   small form factor. The Defendants each produce a variety of the various categories of inductors.

17          125.   The following chart gives the breakdown of types of inductors sold worldwide:



27          126.   As can be seen, a plurality of inductors now being produced are air core

28   inductors.

127.    In automobiles, inductors are used, for example, in headlight circuitry, transmission systems, electronic control units, fuel systems, navigation systems and ADAS. In consumer applications, they are used in LCD televisions, LED lighting, computer laptops, digital still cameras, smartphones, printers, game consoles, air conditioning systems and home appliances.

128.    The following chart from the Paumanok Group Consulting depicts the value, volume and pricing of inductors by end-use segment:



129.    A 2018 report has indicated that the global market for inductors was worth $2.599 billion in 2015 and is estimated to reach $3.11 billion in 2023. The North American

1  inductor market (of which the United States has approximately 71%) was worth $225 million

2  in 2015.[27]

3      130.    Defendants provide product catalogs that include data sheets for some of their

4  Inductors products. These data sheets in product catalogs are available on Defendants' websites

5  while that line of Inductors is being manufactured and sold.[28]

6          **B.  The Structure of the Inductor Market**

7      131.    The inductors market exhibits four salient characteristics: (1) the Defendants

8  dominate that market and most of the competitors are at the "fringe"; (2) there are high barriers

9  to entry that prevent significant new entrants from appearing and competing effectively with

10  Defendants; (3) inductors are standardized, commoditized products; and (4) inductors are price

11  inelastic. Each of these factors is discussed separately below.

12

13

14

15

16

17

18

19

20

21

22

23

---

24  [27] Alternatively, a 2017 report has indicated that the global market for inductors was worth
$2.78 billion in 2014 and is estimated to reach $3.75 billion in 2019. The North American
25  Inductor market (of which the United States has approximately 71%) was worth $768 million
in 2015 and is estimated to be worth $965 million in 2021.
26
[28] For example, an earlier version of TDK's website allowed data sheets for product lines A-Z
27  to be accessed through a webpage entitled "Search Product Catalog by Category."

28

1

### 1.      Market Concentration

2      132.    The inductors market is highly concentrated. As of 2004, Defendants

3 collectively had over 80% of the market in inductors:



133.    As this chart reflects, while there may other sellers, they are at the "fringe" level

and cannot challenge the dominance of the Defendants. In 2007, TDK and Murata alone had

over 61% of the market for ceramic chip inductors in North America.

134.    The situation had not changed drastically nearly a decade later. In 2016,

Defendants TDK, Murata, Taiyo Yuden, Panasonic, and Sumida had two-thirds of the inductors

market:



135.    The foregoing chart also does not fully capture Defendants' collective market power to the extent that certain Defendants—Sagami and Tokin—fall within the "Other" category. Indeed, Plaintiffs estimate that in 2016, Sagami and Tokin had about 3% each of the global market share for a total collective share of at least 73%. Acquisitions within the inductors market, such as Murata Manufacturing's acquisition of TOKO in April of 2015, Murata Manufacturing's acquisition of C&D Technologies' inductors business, and TDK's successful tender offer for EPCOS AG in October of 2008, have contributed to this market concentration.

## 2.    Product Commoditization And Lack of Substitutability

136.    Inductors have no close substitutes. As noted above, they perform different functions from other passive electronic components.

137.    Inductors are also treated as a commoditized product and are found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiation is "minimal."[29]

138.    Inductors are identified by a series of letters and numbers using standardized values. The first two digits marking an Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = 10*10$^1$µH = 100µH. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means 4.7µH. Precision of an Inductor is also expressed using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

139.    The International Electrotechnical Commission ("IEC"), an organization that promotes standardization in the electrical fields, has published standards for testing relating to this component. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable within the various categories described above.

---

[29] To be clear, the 2CAC defines "Inductors" to include all such components manufactured by Defendants, regardless of whether some of them are commoditized or not.

140.    Defendants understand their products are interchangeable. For example, TDK maintains a webpage that allows users to enter a non-TDK inductor product code so that "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar specifications can be searched."[30]

### 3.    Entry Barriers

141.    Entry barriers into the inductor market are high. The costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

142.    Barriers to entry also exist because of the resources of the incumbents. The inductors market is a mature one dominated by established corporations, most of which have global operations. Panasonic and TDK both manufacture a variety of electronic products, as well as other electronic components. Panasonic reported revenues of over $62 billion in its 2017 fiscal year. TDK reported revenues of over $10 billion in 2017. Both are large and diverse multinational corporations that, like all of the Defendants, can benefit from economies of scale. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of which is attributable to sales of electronic components. Sumida is another international giant, who most recently announced sales in excess of $700 million annually. Sumida has Research & Development ("R&D") offices in the United States, China, Japan, Germany, and Canada; sales offices in the United States, China, Japan, Hong Kong, Singapore, Taiwan, Thailand, South Korea, and Germany; and factories in China, Japan, Vietnam, Thailand, Mexico, Germany, Romania, and Slovenia.

143.    The Defendants have established reputations with purchasers of inductors and sellers of the raw materials needed to manufacture inductors; have access to significant amounts

---

[30] https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/

of capital to fund current operations; have global operations that allow them to specialize function and meet the needs of customers with global businesses; can weather downturns in the economy due to their size and substantial resources; and have integrated supply chains due to their diverse products.

144.    During the Class Period, there were few significant new entrants into the market for inductors and much consolidation of that market. As noted above, during the Class Period, the number of leading inductors manufacturers fell, which is an indication of a mature market with diminishing demand, circumstances that make the market ripe for collusion.

145.    As a result of the China's adoption of the ITA in 2003, there was new entry in the form of a number of small Chinese manufacturers of inductors, but that new entry did not play a significant role with respect to inductors sold in, or shipped to, the United States. Chinese manufacturers of inductors primarily served Asian markets, particularly China. The following chart depicts that point.



146.    Chinese manufacturers did not make significant inroads into the United States market because their inductor products were perceived as being of lesser quality than those of the Japanese Defendants. For example, to the best of Plaintiffs' knowledge, no Chinese manufacturer of inductors was qualified by Apple to sell inductors to it during the Class Period. In a 2018 article discussing Chinese and Japanese manufacturers of passive electronic

components, it was pointed out that the Japanese manufacturers are known for the consistency and quality control of their mass-produced passive component products; Wu Yeqing, the General Manager and electronic engineer of Beijing Technology, Ltd., conceded in the article that domestic Chinese enterprises are "relatively weak in terms of technology, materials and quality control."[31]

147.    Commentators recognize the inferior nature of inductors made by Chinese manufacturers. A contributor to one online electronics forum has explained:

> Some chinese inductors are junk.  They bla[]tantly lie about specs, particularly about saturation current.  But then again, this is the kind of thing you should be on the lookout for with cheap chinese parts.
>
> There is an even more insidious problem with many low spec / no spec / fake spec power inductors. Power inductors are often based on powdered iron cores held together by a binder. All binders are not created equ[]al and the losses in a given core depend not only on circuit parameters but on dark implementation magic learned by competent inductor makers over aeons.
>
> The binder degrades with temperature and time and the degradation affects the losses, leading to a feedback process which in many cases will run away very rapidly or exponentially past some critical level. In fact, it always does this, but the time scales of a properly design ed and specified part are so much larger than the design lifetime that you don't see it. Low cost john[n]y come lately cores of any origin, Chinese or otherwise, are liable to have higher losses or less capable binders or both. This means that an inductor designed to use a core well but not to over stress it will often have early catastr[o]phic failure if an inferior core material is used.[32]

148.    Another commentator put it more succinctly: "stock Chinese inductors are rather crummy (low quality)."[33]

---

[31]https://www.jqknews.com/news/17693-China_consumes_trillions_of_capacitors_and_resistors_every_year_and_high-end_products_come_from_Japan.html.

[32] http://ecomorder.com/techref/postbot.asp?by=thread&id=%5BEE%5D+New+ideas+for+power+factor+corrected+supplies&w=body&tgt=post&at=20080826152343a

[33]  http://www.dadaelectronics.eu/ForumRetrieve.aspx?ForumID=317&TopicID=487554. *See also*  https://forums.anandtech.com/threads/best-gaming-mouse-20-60.2532960/page-2  (in a blog concerning the best computer mouse to use, one participant noted an audible whine emanating from his model and stated "those cheap Chinese inductors/designs will probably do that.").

149.    Indeed, the market share charts from 2004 and 2016 depicted above demonstrate that no Chinese manufacturer of inductors displaced the Japanese defendants who had the leading market shares.

150.    It is no surprise that new entry was limited, and the number of significant participants contracted. New entrants would need to invest hundreds of millions of dollars in building manufacturing facilities, obtaining patents or licenses for technology, and creating a production line; assembling a workforce, including professionals and executives with industry experience; obtaining a supply network; and investing in R&D, marketing, and transportation capabilities necessary to bring a product to market. And even then, it takes years to demonstrate quality control and establish a customer base to see any return on this investment. In short, a prospective competitor in the inductors market would face a daunting task in establishing and growing a business. It speaks volumes that the United States hardly has a competitive player in this field.

151.    Further barriers to entry exist because manufacture of inductors requires an expensive supply chain, including the purchase and in-house processing of raw materials such as metals. Inductors can incorporate iron, nickel, zinc, and sometimes barium, cobalt, and strontium.

152.    After raw materials are purchased, they must be processed and chemically treated. Leading inductor manufacturers have facilities for processing and treating the raw materials. The processing and treating of raw materials requires large expenditures of capital for nanotechnology. Nanotechnology, which concerns analysis of materials at the molecular (or very small particle) level, is necessary because of the precision involved in manufacturing small components. Nanotechnology equipment is very expensive.

153.    A core principle of the physics and economics of manufacturing inductors is that the performance of the component is directly proportional to the size, or surface area, of the Inductor. Accordingly, precision manufacturing and quality control measures are critical.

154.    Manufacture of inductors involves stacking, winding, and pressing metals and other raw materials, and the technology to imprint and manipulate thin metals and wire. This

1   process requires sophisticated engineering as well as expertise in nanotechnology and process

2   yields.

3                           **4.      Demand Inelasticity**

4       155.    A 2017 report on the inductor market has noted that "demand is considerably

5   inelastic", meaning that as the price of inductors increases, demand does not decrease. As the

6   report explains:

7           In the inductors market, the consumer base is rather fragmented and product
            differentiation is minimal, thus lowering the overall bargaining power of
8           customers. But fixed costs for suppliers are high thus giving them some power.
            For a consumer, the switching cost is high and the possibility of backward
9           integration is low since production of inductors involves exclusive expertise and
            most OEMs find it cheaper to buy it from such suppliers than foray into its
10          manufacturing. The bargaining power of customers is *low*.

11

12  (Emphasis in original).

13      156.    Several characteristics of inductors cause demand inelasticity. *First*, there are no

14  substitutes for inductors. No other passive electronic component can perform all the functions

15  of an inductor. Its electromagnetic properties distinguish it from a capacitor, as does its

16  operation in relation to DC current. Capacitors can only store current; they cannot increase

17  voltage like an Inductor can by use of magnetic fields. Resistors perform some of the "blocking"

18  functions of inductors, but cannot store or generate voltage. If a circuit in a product calls for an

19  Inductor, no other component will do.

20      157.    *Second*, generally the price of inductors is relatively low, with prices of most

21  inductors ranging from a few to fifty cents. Products such as computers and cars may have up

22  to sixty or seventy inductors, but other products have only a couple dozen. Thus, if prices for

23  inductors rise, such an increase is usually still not significant enough for there to be any drop

24  in demand.

25      158.    *Third*, the fact that Defendants' customers, including Original Equipment

26  Manufacturers ("OEMs") and other manufacturers that use inductors in their products, face

27  periodic deadlines for production reduces the chance that Defendants' customers will invest the

28  time and resources to find another supplier.

### C.  Direct Evidence OF Defendants' Unlawful Conduct

159.     As explained above, the direct evidence of Defendants' unlawful conduct falls into three categories: (1) TDK's application for leniency from the DOJ and the consequences that flow from that; (2) the acts of information sharing and/or price-fixing by TDK, Taiyo Yuden, Murata, TOKO and Tokin in the United States and Japan with respect to certain large United States customers; and (3) the acts of all Defendants at various JEITA meetings. The facts relating to each of these categories are pled separately below, but these allegations must be viewed holistically.

### 1.     The Presence Of A Leniency Applicant.

160.     On January 4, 2018, *MLex* reported:

> Electronics manufacturers have been subpoenaed by US antitrust prosecutors as part of a price-fixing investigation involving the inductor market, *MLex* has learned.

> Subpoenas were sent out in mid-November, and the San Francisco office at the Department of Justice's antitrust division is overseeing the investigation, it is understood.

> The inductor subpoenas are part of a long-running investigation, which also includes capacitors and resistors. The components are part of electrical circuits that store and regulate the flow of electricity, and are ubiquitous in electronic devices.

161.     The subpoenas were issued by a grand jury empaneled in San Francisco, California. Taiyo Yuden, TDK, and Murata received such subpoenas. Panasonic and Sumida have represented that they have not received such subpoenas, but that does not mean they could not become targets of any investigation regarding Inductors once the materials produced in response to the subpoenas are reviewed by DOJ, especially in light of the information about JEITA meetings described below, of which the DOJ may have been unaware.

162.     The subpoenas at issue are part of an acknowledged criminal investigation by DOJ. The fact that these companies received subpoenas from a federal grand jury is significant because it indicates that the DOJ is considering a criminal prosecution, as is reflected in Chapter

3 of the 2014 edition of the DOJ's Antitrust Division Manual.[34] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[35] The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division."[36] "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[37] "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[38]

163.     On May 20, 2019, the publication *MLex* also revealed that TDK is an applicant for leniency from the DOJ with respect to the latter's investigation of Inductors. TDK had previously confirmed this fact to Plaintiffs in January of 2019.

164.     The significance of a company seeking Type B leniency cannot be understated. According to the DOJ's "Frequently Asked Questions" about the Antitrust Division's Leniency Program (as updated on January 26, 2017), an applicant for Type B leniency must admit to participating in a *criminal violation* of the antitrust laws[39]:

> 5. *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging,

---

[34] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

[35] *Id*. at III-82.

[36] *Id*.

[37] *Id*. at III-83.

[38] *Id*.

[39] https://www.justice.gov/atr/page/file/926521/download

capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.[40]

165.    As indicated on the same DOJ webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

166.    Thus, there can be no doubt that the Court is confronted not with some investigation that may lead nowhere, but instead faces an investigation that has resulted in undisputed admissions of criminal violations of the Sherman Act.

### 2.    Examples of Conspiratorial Acts With Respect To Various Customers In The United states.

### a.    Unlawfulness of Such Conspiratorial Acts.

167.    TDK has admitted to participating in numerous criminal acts in both the United States and Japan relating to violations of the Sherman Act involving the price-fixing of Inductors sold in the United States. The acts described below that occurred in the United States involved, *inter alia*, explicit agreements to fix the prices of Inductors sold to United States companies. The acts in Japan involved some of the same conduct. Thus, as noted above, this 2CAC pleads *direct evidence, not merely circumstantial evidence*, of multiple instances of conduct that violates the antitrust laws.

168.    Some of the acts described below also involve sharing of confidential information among horizontal competitors for the purpose of implementing a price-fixing agreement.

169.    Agreements among competitors to fix prices are illegal *per se* under Sections 1 and 3 of the Sherman Act. Information exchanges among competitors can also be Sherman Act violations or, alternatively, can facilitate and serve as evidence of price-fixing agreements. The United States government delegation stated to the Organization for Economic Cooperation & Development's Competition Committee in a 2010 report that "certain information exchanges

---

[40] https://www.justice.gov/atr/page/file/926521/download

among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade."[41] The United States government noted that "[i]n addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."[42] Even if the information exchange is not itself an unlawful agreement, it can be powerful evidence of an agreement to fix prices because "[t]he antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination."[43]

170.     The United States delegation noted that actual evidence of competitive harm, such as industry-wide price movements resulting from the exchange are a strong factor in finding illegality.[44] Other identified factors that may be considered included: (a) "[t]he nature and quantity of the information (extensive exchange of information regarding pricing, output, major costs, marketing strategies and new product development is more likely to have anticompetitive implications)"; (b) "[h]ow recent the shared data is (sharing of past data is generally deemed less problematic than sharing current data)"; (c) "[t]he parties' intent in sharing the information (an anticompetitive intent, such as an intent to stabilize prices, is problematic)"; (d) "[t]he industry structure (in concentrated industries, an exchange among few firms could be more likely to harm competition)"; and (e) "[t]he frequency of exchanges (the more frequent the exchange, the more problematic it may be)."[45]

---

[41]  https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf, at p.2. The presentation was principally authored by the DOJ and is part of a list of such submissions on its website. *See* https://www.justice.gov/atr/us-oecd-submissions-competition-policy.

[42] https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf, at p.3.

[43] *Id*. at 2.

[44] *Id*. at 4.

[45] *Id*.

1    171.    The DOJ and the Federal Trade Commission ("FTC") made a similar point in

2  their "Antitrust Guidelines for Collaborations Among Competitors" at 15 (2000) ("DOJ-FTC

3  Guidelines").[46] There, the agencies stated:

> The competitive concern [with information sharing] depends on the nature of
> the information shared. Other things being equal, the sharing of information
> relating to price, output, costs, or strategic planning is more likely to raise
> competitive concern than the sharing of information relating to less
> competitively sensitive variables. Similarly, other things being equal, the
> sharing of information on current operating and future business plans is more
> likely to raise concerns than the sharing of historical information. Finally, other
> things being equal, the sharing of individual company data is more likely to raise
> concern than the sharing of aggregated data that does not permit recipients to
> identify individual firm data.

10    172.    With these points in mind for context, the relevant facts revealed so far by the

11  leniency applicant are as follows.

---

[46]    https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

---

1  ████████████████████████████████████████████████████████████

2  ██████████████████████████████████████

3       ███   ███████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████

14      ███   ████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████. An MFC is

18 an agreement that outlines an obligation for a supplier to provide favored customers with pricing

19 that is no higher than the best prices offered by the supplier to other clients. This is generally

20 referred to as "on no less favorable terms." ████████████████████████

21 ████████████████████████████████████████████████████████████

22 ██████████████████████

23      ███   ████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ██████████████████████████████

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



[47] "An LC filter combines inductors (L) and capacitors (C) to form low-pass, high-pass, multiplexer, band-pass, or band-reject filtering in radio frequency (RF) and many other applications. Passive electronic LC filters block, or reduce, noise (EMI) from circuits and systems, and separate, or condition, desired signals." https://www.coilcraft.com/edu/LC_Filter.cfm.

1

2

3

4

5

6

7

8

9

10      This had the effect of setting the floor for prices of similar types of Inductors.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ████████████████████████████████████████████████████████

2  █████████████████████████████████

3              **k.      Summary.**

4         234.    The purpose of these meetings at all times was to keep prices of Inductors higher

5  than they would otherwise have been, as well as to limit competitive participation in RFQs. The

6  net effect of these actions, taken over nearly a decade, was to inflate the price of Inductors

7  overall.

8         235.    Plaintiffs are aware of no specific act taken by any Defendant to withdraw from

9  this conspiracy, other than TDK's cooperation with the government. TDK itself has not

10 indicated that it is no longer participating in collusive activity or that it took steps to make a

11 "noisy withdrawal" from these collusive acts. TDK has been largely unresponsive to Plaintiffs'

12 requests for information following its initial proffer, including failing to provide information

13 that it offered to produce in the proffer itself, and failing to respond substantively to multiple

14 requests for additional information.

15        236.    The collusive activity identified above should be viewed in the context of the

16 extensive exchanges of confidential information which took place at JEITA meetings, described

17 below.

18              **3.      Unlawful Conduct Through JEITA.**

19              **a.      Background and Structure of JEITA.**

20        237.    In addition to the foregoing acts admitted to by TDK, Defendants violated the

21 antitrust laws through their activities at JEITA. The information exchanges Defendants engaged

22 in at these meetings involved confidential pricing and product information that competitors are

23 prohibited from sharing by the United States antitrust laws. Defendants knew that these

24 exchanges were illegal, and expressly noted that they would have to find different alternatives

25 for sharing the information once there was an investigation into their actions at JEITA.

26        238.    Thus, Plaintiffs are *not* merely alleging that JEITA provided an opportunity for

27 Defendants to collude. This 2CAC identifies specific meetings in which each Defendant

28

participated and exchanged confidential business pricing information for the purpose of inflating the prices of Inductors.

239.    JEITA is a trade organization for Japanese electronics manufacturers. It was formed in 2000 from two earlier organizations: (1) the Electronic Industries Association of Japan and (2) Japan Electronic Industries Development Association.[49] Defendants used JEITA meetings as a forum to agree upon pricing for Inductors and exchange confidential business information concerning Inductors from at least 2003 through the beginning of 2016. As described further below, personnel from each Defendant's sales group who attended JEITA meetings reported to the heads of these sales groups, who in turn were responsible for setting prices of Inductors. Notably, the admitted conspiracies involving capacitors and resistors were also furthered through JEITA meetings.

240.    **Objectives of JEITA**. The purported objective of JEITA is "to promote the healthy manufacturing, international trade and consumption of electronics products and components in order to contribute to the overall development of the electronics and information technology (IT) industries, and thereby further Japan's economic development and cultural prosperity."[50] However, another key objective of JEITA, which is illegal under United States antitrust laws, was the exchange of detailed competitor information among its members. This JEITA website from 2003 explicitly stated that one of the goals of its Electronic Components Board was to "[e]nhance information exchanges for each business field . . ."[51]

241.    **JEITA Annual Conferences And Board Structure**. JEITA conducts an annual conference described on its website as follows: "[a]ll JEITA member companies gather annually for a conference that serves as the industry's premier decision-making forum."[52] Its Board of Directors "discusses and makes decisions concerning important issues related to

---

[49] https://www.jeita.or.jp/english/press/2000/1101/.

[50] https://www.jeita.or.jp/english/about/what/index.htm.

[51] https://web.archive.org/web/20031206200959/http://home.jeita.or.jp/ecb/aboutus/about_us01.html. The test above is a translation from the Japanese language.

[52] http://www.jeita.or.jp/english/about/orga/index.htm.

JEITA's activities, including items raised at the Annual Conference."[53] JEITA created an Electronics Component Board ("ECB") to organize its activities. The following chart, a translation of one taken from JEITA's website, illustrates the organization of the ECB.[54]

---

[53] *Id.*

[54] https://home.jeita.or.jp/ecb/aboutus/about_us02.html

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Electronic Components Board

Organization

- Electronic Components Board
  - Electronic Components Executive Committee

- Electronic Components Steering Committee
  - Subcommittee on Personnel Labor Management
  - Subcommittee on Risk Management
- Electronic Components Statistic & Perspective Committee
- Electronic Components Engineering Committee
  - Subcommittee on Electronic Components Technology Roadmap
  - Subcommittee on Electronic Components Safety
  - Subcommittee on Electronic Components Technology Environment
- Electronic Components Standardization Committee
  - Subcommittee on Passive Components
  - Subcommittee on Connectors & Switches
  - Subcommittee on Soft Magnetic Materials

- Passive Components Committee
- Functional Components Committee
- Mechanical Components Committee
- Power Supplies Components Committee
- Electronic Materials Committee

242.    Two of the current Vice-Chairmen of the Electronic Components Board are Tsuneo Murata, President of Murata Manufacturing, and Takehiro Kamigama, President and CEO of TDK-EPC. JEITA maintains "overseas offices" in Washington, D.C. and Brussels, Belgium.

243.    **Organization of the PCC**. JEITA created five sector-specific boards, one of which is the aforementioned PCC, which encompasses inductors, capacitors and resistors.[55]

244.    Meetings of the PCC typically occurred three to four times annually at JEITA's offices in Tokyo, Japan; they occurred typically in May, August, November, and January of each fiscal year. The initial meeting of each fiscal year typically included a General Meeting and a separate social gathering. The January meeting was typically followed by a New Year social gathering.  In addition to the formal meetings of the PCC, there were associated "social" events in locations such as the Yokkaichi Tokyu Golf Club, the Katsuragi Golf Club, the Hikone Country Club, the Iwata Grand Hotel, the Nishikanda location of Dinagyan Restaurant, the Kawamuraya store in Nagoya, the Nagahama Royal Hotel, the Hotel Arrowle, the Hibiki Marunouchi store, and the Otemachi Sankei Plaza.

245.    The PCC selected one Chairperson and two Vice-Chairpersons every two years from each of the Condensers, Resistors and Inductors Subcommittees.  The terms were two years, with a maximum of two consecutive terms and was done on a rotation system to allow members of each Subcommittee to serve. For example, if a member from the IC served as Chair of the PCC, the two Vice-Chairs would be selected from Condensers and Resistors Committees for the rotational period. The list of PCC Chairpersons during the relevant period is as follows:

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Kitano, Toshiaki** 北野良明 President (TOKO) | X | X | X | X | | | | | | | | | | |

---

[55] https://home.jeita.or.jp/ecb/aboutus/about_us02.html

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mukaiyama, Koichi 向山 孝一 Chairman (KOA) | | | | | X | X | | | | | | | | |
| Okabe, Masakazu 岡部 政和 President (NEC-Tokin) | | | | | | | X | X | | | | | | |
| **Kanzaki, Yoshiro** 岡部 政和 Chairman (Taiyo Yuden) | | | | | | | | | X | X | | | | |
| Sawamura, Satoshi 澤村 諭 President and CEO (ROHM) | | | | | | | | | | | X | X | X | |
| Fujiwara, Tadanobu 藤原 忠信 President/Rep. Dir. (ROHM) | | | | | | | | | | | X | X | X | |
| **Ishiguro Nobuhiko** 石黒 信彦 GM, Magnetics Bus. Grp., Product Strategy Promotion Div. (TDK-EPC) | | | | | | | | | | | | | X | X |
| Nakanishi, Shofuda 仲西 正札 GM, Condensers Bus. Grp. 1, Sales Planning & Marketing Div. (Murata) | | | | | | | | | | | | | X | X |
| Kawabata, Kaoru 川端 薫 GM, Sales Strategy Dep., Sales Operations Unit (HDK) | | | | | | | | | | | | | X | X |
| Yawata, Shigeyuki 八幡 滋行 Chairman, Chief Executive Officer and Representative | | | | | | | | | | | | | | X |

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive Officer (Sumida) | | | | | | | | | | | | | | |

**Bold** font denotes chairpersons from the IC.

246. **Organization and Meetings of the IC**. Until 2003, there existed within JEITA's ECB separate Committees on inductors, capacitors and resistors. In 2003, these separate Committees were merged within the PCC and operated as Subcommittees. The IC began operating in June of 2004.

247. IC meetings began in June 2004 after PCC attendees specializing in inductors observed that while the PCC included robust discussions of capacitors and resistors, attendance from members representing inductors was starting to wane, with the result that there was less exchange of company-specific information. Thus, to promote more extensive information exchanges of confidential detailed corporate information, it was decided to hold separate meetings specifically focused on Inductors at least four times annually and to encourage more companies to attend. Overall, 23 meetings of the IC took place between July of 2007 and September of 2014. At least 67 Inductors-related meetings (including IC meetings) occurred during the Class Period.

248. IC meetings typically occurred prior to PCC regular meetings on the same day. Attendees would first conduct information exchanges at IC meetings and then present results at the greater PCC meeting held later in the day. The PCC meetings also could include presentations on resistors and capacitors, thus demonstrating the interrelatedness of JEITA discussions on all three types of passive electronic components.

249. As mentioned above, Vice-Chairs were selected on a rotational basis from each Subcommittee and acted as its representative at the PCC. Six Vice-Chairs represented the IC during the Class Period, as follows:

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Shikano, Fumio** 鹿野 文雄 ADM Officer; CSE Officer (Sumida) | X | X | X | X | | | | | | | | | | |

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Suzuki, Masataka** 鈴木 政孝 President; Chairman of Sumida Power Tech. Co. Ltd (Sumida) | | | | X | X | X | X | | | | | | | |
| **Norose, Masahiro** 野呂瀬正浩 GM, Sales Head Office, Marketing Div. (TOKO) | | | | | | | X | X | X | X | X | | | |
| **Fujii, Koichi** 藤井 浩一 [title unknown] (TOKO) | | | | | | | | | X | | | | | |
| **Ohtaki, Eriko** 大滝恵理子 Executive Director, CSR Operations (TOKO) | | | | | | | | | | X | X | | | |
| **Oi, Hisashi*** 大井 久 Senior GM in Charge of Greater China Area; GM, Ferrite Application Product Div. (Taiyo Yuden) | | | | | | | | | | | X | X | X | |
| **Hattori, Kenichi** 服部 健一 GM, Sales Head Office, Sales Strategy and Planning (Taiyo Yuden) | | | | | | | | | | | X | X | X | |
| **Ishiguro, Nobuhiko** GM, Magnetics Bus. Grp., Product Strategy Promotion Div. (TDK-EPC) | | | | | | | | | | | | | X | X |

\* Hisashi Oi met with TDK's Nelson and Honma in the United States around February of 2009 (discussed above).

250.    At least 60 members from Defendant companies attended IC-related meetings during the class period.  Their names, affiliated companies and years attended are listed in the chart below:

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MURATA | | | | | | | | | | | | | | |
| Aoki, Hiromitsu 青木 啓充 | | | | | X | X | X | X | X | | | | | |
| Fujioka, Tomohiro 藤岡 朋宏 | | | | | | | | | X | X | X | | | |
| Hatada, Shigeshi 畑田 繁 | | | | | | | | | | | | | | X |
| Hibino 日比野 | | | | | X | X | | | | | | | | |
| Kudo, Jin 工藤 仁 | X | X | X | X | X | X | | | | | | | | |
| Morito, Hideaki 森戸 秀明 | | | | | | | | | | | | | X | X |
| Yamakawa, Akimasa 山川 明昌 | | | | | | | | | X | X | X | X | X | X |
| TOKIN/NEC TOKIN | | | | | | | | | | | | | | |
| Date, Tomohide 伊達 知秀 | | X | X | X | X | X | X | X | X | X | X | X | | |
| Hatakeyama, Hideto 畠山 秀人 | | | | | X | X | | | | | | | | |
| Hori, Yoshihiko 堀 義彦 | | | | X | X | | | | | | | | | |
| Ichikawa, Hiroshi 市川 浩 | | | | | | | | | | | | X | X | X |
| Sato, Makoto 佐藤 真 | | | X | X | | | | | | | | | | |
| Sato, Yoshinori 佐藤 芳則 | | | | | | | X | X | X | X | X | X | | |
| Tsuda, Bunshiro 津田 文史郎 (attendance unknown) | | | | | | | | | | | | | | |
| Watanabe, Shinya 渡辺 真也 | | | | | | | | | | | | X | X | |
| Panasonic | | | | | | | | | | | | | | |
| Chikada, Keiji 近田 惠次 | | | | | X | X | | | | | | | | |
| Hourai Yoshinori 蓬莱 義則 | | | | | | | | | | X | | | | |

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Iishiba, Masahiro** 飯柴 正弘 | | | | | | | X | X | | X | X | X | X | |
| **Itsuki, Hiroyuki** 伊槻 博之 | X | X | X | X | X | | | | | | | | | |
| **Muraoka** 村岡 | | | | X | | | | | | | | | | |
| **Ohshima, Takashi** 大島 隆司 | | | X | X | | | | | | | | | | |
| Sagami ||||||||||||||| 
| **Hashimoto, Teppei** 橋本 哲平 | | | | | | | | | | | | X | X | X |
| **Igarashi, Mitsuo** 五十嵐三津雄 | | | | | | | | | X | X | X | | | |
| **Ogiso, Koichi "Kevin"** 小木曽 功一 | | | | X | X | X | X | X | X | X | | | | |
| **Ohashi, Masayuki** 大橋 正幸 | | | | | | | | | | X | X | X | X | X |
| **Okada, Masaaki** 岡田 正昭 | X | X | X | X | | | | | | | | | | |
| **Tsuruga, Daijiro** 敦賀 大二郎 | X | X | X | X | X | X | X | X | | | | | | |
| Sumida ||||||||||||||| 
| **Hirota, Teruo** 廣田 光雄 | | | X | X | X | X | X | | | | | | | |
| **Igarashi** 五十嵐 | | | | | | | | | | | X | | | |
| **Matsuoka, Takeo** 松岡 妙子 (attendance unknown) | | | | | | | | | | | | | | |
| **Shikano, Fumio** 鹿野 文雄 | X | X | X | X | | | | | | | | | | |
| **Suzuki, Masataka "Tony"** 鈴木 政孝 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **Takeshima, Hiromatsu "Walter"** 竹島 廣松 | | | | | | | | | X | X | X | X | X | |
| **Teramachi, Ryuji** 寺町 龍治 | | | | | | | | | | | | | X | X |

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Taiyo Yuden | | | | | | | | | | | | | | |
| Endo, Tomonori 遠藤 智徳 | | | | | | | X | | | | | | | X |
| Hattori, Kenichi 服部 健一 | X | X | X | X | X | X | X | X | X | X | X | X | X | |
| Ishinari, Atsushi 石成 敦 | | | | | | | X | X | X | X | X | | | |
| Kaneda, Satoru 金田 悟 | | | | | X | X | X | | | | | | | |
| Kanzaki, Yoshiro 神崎 芳郎 | | | | | | | | | X | X | X | | | |
| Oi, Hisashi 大井 久 | | | | | | | | | | | X | X | X | |
| Tobe, Takeshi 戸邉 武史 (attendance unknown) | | | | | | | | | | | | | | |
| Umezawa, Kazuya 梅沢 一也 | | | X | | | | | | | | | | | |
| TDK | | | | | | | | | | | | | | |
| Araya, Shinichi 荒谷 真一 (attendance unknown) | | | | | | | | | | | | | | |
| Ishiguro, Nobuhiko 石黒 信彦 | | | | | | X | X | X | X | X | X | X | X | X |
| Suda, Takuji 須田 拓司 | | X | | | X | | | | | | | | | |
| Uemura, Hiroyuki 植村 博之 (attendance unknown) | | | | | | | | | | | | | | |
| TOKO | | | | | | | | | | | | | | |
| Aso, Ikuhiro 麻生 育弘 | | | | | | | X | X | X | X | | | | |
| Fujii, Koichi 藤井 浩一 | | | | | | | | | X | X | | | | |
| Ishida, Kazuyuki 石田 一行 (attendance unknown) | | | | | | | | | | | | | | |
| Itou, Koji 伊藤 浩二 | | | | | | | | | | | | X | X | X |

| Last, First | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Kitano, Yoshiaki** 北野 良明 | X | X | X | X | X | | | | | | | | | |
| **Norose, Masahiro** 野呂瀬 正浩 | | | | | | | X | X | X | | | | | |
| **Ogino, Yuji** 荻野 裕司 | | | X | X | X | | | | | | | | | |
| **Ohnishi, Katsuaki** 大西 克明 | | | | | X | X | X | | | | | | | |
| **Osawa, Keisuke** 大澤 慶祐 | | | | | | | | | | X | X | | | |
| **Ohtaki, Eriko** 大滝 恵理子 | | | | | | | | | | X | X | X | | |
| **Shimakage, Shinkichi** 島影 新吉 (attendance unknown) | | | | | | | | | | | | | | |
| **Shinoda, Tatsushi** 篠田 達史 | | X | X | X | X | X | X | | | | | | | |
| **Takeda, Mamoru** 竹田 守 | | | | | X | X | | | | | | | | |
| **Tanaka, Shoji** 田中 正治 | X | X | X | | | | | | | | | | | |

251.    At least one of these individuals, Tomohide Date of NEC Tokin, has been prosecuted criminally in connection with the conspiracy involving capacitors.[56]

> **b.    JEITA Facilitated Unlawful Agreements And Information Exchanges**

252.    **2003 Meetings Preceding Creation of the IC**. As noted above, the IC was not a distinct entity until mid-2004. Prior to that, confidential, company-specific information was shared and discussed at PCC meetings (discussed separately below), which could also involve discussion of data concerning capacitors and/or resistors; thus, the conspiracies and collusive acts involving each of these passive electronic components were interrelated.

---

[56] *See* ECF No. 15 in *United States v. Isawa*, No. 4:15-cr-00163-JD (N.D. Cal.). Additionally, Akihiko Igasaki and Takayuki Iizuka of Okaya Corporation ("Okaya") attended JEITA meetings related to Inductors on behalf of Okaya. Cartel meeting minutes reflect that Iizuka and Igasaki attended cartel meetings with respect to the film capacitor cartel on behalf of Okaya. *See* ECF Nos. 1563-3, 1563-6, *In re Capacitors Antitrust Litig.*, No. 14-3264-JD (N.D. Cal.).

253.     On occasion prior to July of 2004, there were meetings (called "Coil Working Group" ("CWG") meetings) that related specifically to Inductors. In connection with all of these types of meetings, JEITA personnel would send questionnaires to representatives of individual participants seeking confidential company-specific data. The responses would be compiled by JEITA personnel and then disseminated for use at a formal IC, CWG, or PCC meeting, where representatives would discuss the information, and sometimes collectively rework it. Sometimes, the data would be disseminated with reference to "Company A," "Company B", and so on. The companies lurking behind these references were known to participants of Defendants at these meetings and the specifics of each such company's data were discussed (and sometimes commented on) at such meetings. Thus, despite the use of ostensibly anonymous monikers such as "Company A" or "Company B," it was easy for the Defendants to identify which competitors' data was reflected in the charts circulated at the meetings.

254.     An example of one compilation prepared for distribution and discussion at these meetings is the following chart:

256.    For example, on November of 2003, a CWG meeting was scheduled. ███

257.    At that point in time, all three types of passive electronic components were the subject of consideration by a single committee in which representatives of TOKO (Tanaka), Sagami (Okada), Sumida (Suzuki and Shikano), and Matsushita Electronic Components ("MEC") (the predecessor to Panasonic Corporation) (Itsuki) participated. This demonstrates the interrelatedness of the conspiracies involving capacitors, resistors and Inductors.

258.    **IC Meetings**. At the July 2004 PCC meeting, JEITA announced a new system of subcommittee information exchanges. Gatherings were to be held separately from the PCC meeting as the JEITA leadership determined product-specific information exchanges were not effectively taking place. Pursuant to the new system, attendees would participate in their respective subcommittee meetings exchanging detailed information prior to PCC meetings. The topics discussed would then be presented at the PCC meetings held later in the day according to predetermined presentation groupings.

259.    Pursuant to these policies, IC members exchanged company-specific data on such matters as current quarterly and monthly sales results on a year-over-year basis; current business conditions based on the status of orders; market trends, including where each

company's business was strong; product trends and developments; overseas production status; future outlook and business forecasts; the status of transactional and delivery issues, and requests from customers.

260.    Consequently, at these IC meetings during much of the Conspiracy Period, attendees for the Defendants shared company-specific current and forward-looking information on sales, prices, shipments, product development, and capacity with respect to Inductors, including Inductors sold or shipped to the United States. The purpose of these information exchanges was to fix prices for Inductors, as well as to establish forecasts to facilitate the implementation of such a fix. Attendees for the Defendants also shared information on how best to deal with the business climate for Inductor sales, again in furtherance of the alleged conspiracy. The specificity of these exchanges enabled Defendants to predict pricing levels of their competitors and to act in accordance to inflate Inductors pricing. It also enabled the Defendants to monitor whether any actor was pricing competitively for the purposes of enforcing the agreement to inflate prices.

261.    What follows are just a few specific examples that illustrate what occurred at IC meetings during much of the Conspiracy Period.

262.    On June 24, 2004, a meeting of Inductors manufacturers was held through JEITA attended by representatives from TOKO (Tanaka), Panasonic (Itsuki), Sagami (Okada), and Sumida (Shikano and Suzuki). At this meeting, the participants exchanged detailed information about the orders that they received in the first three months of 2004, and provided detailed projections about their orders for the rest of the year. The participants discussed projected business conditions in the United States following the 2004 presidential election. At this meeting, it was decided that even more detailed exchanges of information would occur in the future.

263.    On July 10, 2007, an IC meeting occurred that was originally scheduled to occur on July 4. Representatives from Sumida (Suzuki and Hirota), NEC Tokin (Date and Hatakeyama), Taiyo Yuden (Hattori), TOKO (Ohnishi), Sagami (Ogiso and Tsuruga), and Murata (Kudo and Hibino) met. ███████████████████████

1

2

3

4

5

6

7       264.    On August 28, 2007, an IC meeting was held at which Itsuki and Ohshima of

8    Panasonic, Tsuruga of Sagami, Shikano and Suzuki of Sumida, and Ogino of TOKO were

9    present.

10

11

12

13       265.    Throughout the remainder of the Class Period, Defendants continued to

14    exchange company-specific information by discussing individual results of surveys

15    administered by JEITA to its members at IC meetings. For example, JEITA members reviewed

16    individual survey results at a meeting on October 21, 2009, and formulated company-specific

17    figures for demand with information exchanged at the meeting.

18       266.    As another example, from at least January of 2009 through the beginning of

19    2016, Defendants attending IC meetings exchanged material non-public information related to

20    "consumption factors" ("CF"). CF data included forward-looking sales information from

21    Inductors manufacturers, in order to estimate global demand. CF data collection was regularly

22    discussed at IC meetings. IC members discussed CF on at least 12 separate occasions prior to

23    2016. These are discussed in greater detail below.

24       267.    In sum, there are numerous examples of illegal information exchanges

25    throughout the Class Period. At least 38 meetings of the IC (or its predecessor, the CWG) took

26    place from 2003 to 2016, mostly at the Tokyo offices of JEITA. Unlawful information

27    exchanges designed to fix Inductor prices occurred at these meetings. While not every

28

1    Defendant had a representative at every meeting, each Defendant had one or more

2    representatives at most meetings.[57]

3    268.   **PCC Meetings**. As noted above, the PCC often called upon Vice-Chairpersons

4    of the IC to give reports on industry trends, market conditions, and the like. The PCC

5    endeavored to deal collectively with issues facing the Inductors industry, such as a period of

6    rising costs for raw materials, and forecasted customer orders for passive electronic

7    components. The PCC also held roundtables concerning the current business climate and how

8    the Japanese manufacturers (including Defendants) could collectively respond.

9    269.   Among the attendees for Defendants at PCC meetings were: (a) Aoki, Fujioka,

10   Hatada, Hatta, Hibino, Ikeda, Ikuta, Inoue, Kita, Kudo, Kumada, Matsumoto, Morito,

11   Nakajima, Nakanishi, Nobumoto, Nomura, Nozaki, Ohmura, Ohtani, Shimokawa, Yamakawa,

12   and Yamazaki for **Murata**; (b) Chikada, Ebine, Hourai, Hashimoto, Iishiba, Itsuki, Kita,

13   Kamioka, Kawamoto, Kojima, Kuwata, Matsumoto, Muraoka, Morita, Nitta, Ohshima,

14   Sugitate, Takahashi, Takeuchi, and Yamamoto of **Panasonic**; (c) Hashimoto, Igarashi, Ogiso,

15   Ohashi, Okada, and Tsuruga for **Sagami**; (d) Hirota, Igarashi, Kawazoe, Shikano, Suzuki,

16   Takashima, Teramachi, Tsuboi, and Yawata of **Sumida**; (e) Endo, Hattori, Ishinari, Kaneda,

17   Kanzaki, Murakani, Murata, Oi, and Umezawa of **Taiyo Yuden**; (f) Abe, Hoshikawa, Ikeda,

18   Ishigaki, Ishiguro, Ishizu, Kikuchi, Koseki, Mochizuki, Morikawa, Nakaya, Ogasawara, Saito,

19   Suda, Sudo, Takano, Ueno, and Yamao of **TDK**; (g) Date, Hatakeyama, Hori, Hosokawa,

20   Ichikawa, Kobayashi, Muramatsu, Nishiwaki, Okabe, Saito, Sato, and Watanabe for **Tokin**;

21   (h) Asao, Fujii, Itou, Kitano, Norose, Ogino, Ohnishi, Ohsawa, Ohtaki, Shinoda, Tanaka,

22   Takeda, and Yamaguchi for **TOKO**.

23

24   ─────────────────────

     [57]JEITA also held meetings at a branch office in the Kansai region known as "JEITA Kansai."

25   JEITA Kansai held similar activities to its sister branch in Tokyo during the Class Period,
     conducting meetings among electronic components manufacturers through the Electronic

26   Components Steering Committee ("ECSC"). The ECSC consisted of three subcommittees,
     including the CR Advisory Subcommittee ("CRAS") focused on passive components. The

27   CRAS was established at least as early as February 10, 2002 and purged sometime before
     October 2017.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

270.    Information exchanges in furtherance of the alleged conspiracy also occurred at meetings of the PCC during the Conspiracy Period. Some examples follow.

271.    ████████████████████████████████████

272.   ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████

273.   A meeting of the PCC occurred on May 25, 2007. Attendees included: Inoue, Kudo and Nobumoto of Murata; Date and Muramatsu of NEC-Tokin; Chikada, Ebine, Kita, and Kamioka of Panasonic; Ogiso of Sagami; Hattori of Taiyo Yuden; Abe, Ishizu and Saito of TDK; and Kitano, Ogino, Ohnishi, and Takeda of TOKO. The topics discussed at this meeting included: ████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████
███ ███████████████████████████████████████
███████████████████████████████████
███ ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████

276.   Another PCC meeting was held on November 14, 2008. Representatives from Murata (Aoki and Inoue), NEC-Tokin (Kobayashi), Panasonic (Hourai), Sumida (Suzuki), Taiyo Yuden (Hattori), TDK (Ishiguro and Saito) and TOKO (Ohnishi and Shinoda) were in attendance. ███████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14    278.    In addition to detailed information exchanges at meetings such as those of the

15  IC, JEITA members also provided supply and demand data for passive components at the

16  ECB's "Informal Gathering on Business Conditions" and cooperated with European and

17  American passive components industry associations in continuing to collect data in response to

18  the World Statistics Conference, including the World Inductors Trade Statistics ("WITS"). As

19  part of the data collection, JEITA pulled information from various Foreign Component

20  Committees throughout Asia. JEITA also conducted meetings at a separate location, known as

21  JEITA Kansai where participants exchanged information much like in PCC meetings.

22    279.    Preparation for the informal ECB roundtable meeting was one of the major

23  discussion topics at the PCC and IC meetings. Inductors members gathered and discussed

24  individual company data specifically for the informal gathering. IC members put together

25  presentations, discussing the Global Demand Forecast, Global Trends, and Global Shipments

26  Outlook surveys at meetings. At the November 2007 IC meeting, for example, participants

27  reviewed production figures in order to formulate forecasts to be presented at December 2007

28

1 informal gathering. Members discussed the global demand and production surveys, the results
2 of individual companies, and the inductors global demand forecast patterns in preparation.

3      280.   At the May 2015 PCC meeting, participants further discussed collection of
4 shipments outlook data for each category of passive components including inductors, and
5 corresponding comments from individual companies. IC members also gathered individual
6 production data to discuss at the informal gathering. This included implementing the Global
7 Production Outlook Survey which collected data through questionnaires to each member
8 company.

9      281.   PCC and IC participants also gathered data in connection with WITS, formed in
10 2008 for the purpose of collecting and disseminating statistics on world shipments of electronic
11 inductors. Similar organizations collected such data for resistors and capacitors. All of these
12 were part of the World Trade Statistics ("WTS") group. JEITA was one of the trade associations
13 that conducted the data for capacitors, resistors and inductors.

14      282.   An integral part of WITS-related meetings both at IC and international WTS
15 meetings was the formulation of the Consumption Factor ("CF"). CF data was used to calculate
16 forward-looking shipments and sales information using estimated consumption and reported
17 total sales. Because CF data included forward-looking non-public information, the exchange of
18 such data was another way that Defendants were able to fix or inflate prices of Inductors.

19      283.   JEITA participants exchanged material non-public information related to CF
20 from at least January of 2009 through the beginning of 2016. JEITA gathered data used to
21 formulate Japanese CF figures from individual companies. JEITA opposed the idea of using an
22 independent third party to directly collect data from individual companies. Instead, the Japanese
23 WITS participants designated JEITA to directly collect individual company data from member
24 companies.

25      284.   **Sharing of Information With Defendants' Respective Corporate Sales**
26 **Teams At Social Gatherings Scheduled Around JEITA Meetings.** Not only was confidential
27 company-specific information shared at CWG, PCC, and IC meetings, but it was also shared at
28 social gatherings held contemporaneously with such meetings. ██████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ███████████████████████

9  ███    █████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████

14 ███    █████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ███████████████████████. This PCC meeting was

19 attended by Hatta and Yamakawa of Murata; Kobayashi and Sato of NEC-Tokin; Hourai of

20 Panasonic; Igarashi of Sagami, Suzuki and Takeshima of Sumida; Hattori and Kanzaki of Taiyo

21 Yuden; Ishizu, Saito, Kikuchi and Takano of TDK; and Aso and Fujii of TOKO.

22 ███    █████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 █████████████████████

27

28

### c.      JEITA's Recognition Of Its Unlawful Practices.

288.     The foregoing activities, viewed as a whole, violated United States antitrust laws. The exchanges of company-specific data are unlawful *per se* in and of themselves, as described above. These actions also facilitated agreements to fix prices by the Defendants who participated in IC meetings. As the FTC has said:

> [F]orming a trade association does not shield joint activities from antitrust scrutiny: Dealings among competitors that violate the law would still violate the law even if they were done through a trade association. For instance, it is illegal to use a trade association to control or suggest prices of members. It is illegal to use information-sharing programs, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, as a disguised means of fixing prices. One area for concern is exchanging price or other sensitive business data among competitors, whether within a trade or professional association or other industry group. Any data exchange or statistical reporting that includes current prices, or information that identifies data from individual competitors, can raise antitrust concerns if it encourages more uniform prices than otherwise would exist.[58]

289.     JEITA and its members have acknowledged that these activities violated antitrust laws. As explained in the unsealed Consolidated Amended Class Action Complaint for Direct Purchaser Plaintiffs filed on June 24, 2016 in *Resistors*, JEITA's PCC was a "focal point" for collusion and that it was utilized for "facilitating coordination of industry behavior…with the aim of reducing output and stabilizing prices."[59] The defendants in *Resistors* were also accused of providing each other with detailed company-specific competitive information. KOA Corporation ("KOA"), one of those defendants in that case (although not named here), noted generally, "There are many events that are considered normal in Japan but strange from the viewpoints of foreigners. Participating in some of these events can put the company at risk of being deemed taking part in antitrust activities."[60] As also noted in paragraph 101 of the *Resistors* complaint:

> By July 2014, JEITA's leadership also had become aware that its activities

[58]https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade

[59] ECF No. 140, *Resistors* (June 24, 2016), ¶ 3.

[60] *Id*. ¶ 10. Koichi Mukaiyama, President of KOA, served as a Chair of the PCC during the Class Period.

violated the antitrust laws. During that month, JEITA distributed a handout to its members (including Panasonic) announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

292.    JEITA as an entity also came to recognize that its antitrust compliance measures were insufficient.

293.    In March of 2014, competition authorities throughout the world began investigating a capacitors cartel and conducted dawn raids of various companies believed to be cartel members. JEITA in 2014 informed members through a memorandum that there had been cases where JEITA was required to submit its committee meeting minutes and handouts to the competition law enforcement authorities pursuant to requests.

294.    As a result of the capacitor investigation, JEITA destroyed certain documents, including those relevant to the allegations in the 2CAC. An inference can fairly be drawn that the destroyed documents relating to Inductors were further proof of collusion.

295.     In September of 2014, the PCC presented an explanation of a newly-devised competition law compliance system that would go into effect the following day.[61] Among the rules that were enacted was the requirement that all information exchanges through JEITA use an independent third party to ensure confidentiality. The guidance explained how to conduct association meetings and exchange competitor information in a way that complied with antitrust and competition laws. Reflecting the involvement of legal counsel in addressing the now publicly-reported collusion, concerns about unlawful information exchanges at social gatherings held in conjunction with JEITA meetings were expressed. Of course, despite these warnings, no Defendant announced that it would no longer participate in such information exchanges or cease participating in JEITA.

296.     On February 5, 2015, the PCC announced for the first time that it would conduct a Competition Law Compliance Seminar on February 9, 2015, at which the law firm Gibson Dunn would make a presentation. PCC members were warned about exchanging confidential corporate information at social gatherings.

297.     In September of 2016, consideration was given to creating audio recordings of JEITA meetings. The proposal was not passed because it was perceived as chilling free communication among JEITA members and because it might create antitrust exposure.

298.     Antitrust concerns about JEITA's CF data collection practices also surfaced prior to the 2016 WTS conference in Rome. At a January 2016 IC meeting, members were notified the international gathering would be governed under the "Statement of Antitrust Policy" sent by the aforementioned EPCIA.

299.     At the Rome meeting, a German attorney for EPCIA, Gerhard Pschel ("Pschel"), expressed concern over how JEITA members were formulating CF. Pschel cautioned JEITA against communications with its member companies other than questionnaires and general information regarding the estimation of the total market size. He was concerned with the method of collecting CF-related data up to that point, specifically: (1) communications from

---

[61] It had been publicly announced that the DOJ commenced its criminal antitrust investigation of capacitor manufacturers in April of 2014.

JEITA to its individual member companies; and (2) communications among individual companies within the trade associations. Thereafter, PCC and IC members ceased discussing CF-related topics at PCC and IC meetings.

**D.   Circumstantial Evidence Of Defendants' Unlawful Conduct**

300.   The foregoing allegations constitute direct evidence of the existence of a conspiracy.  Plaintiffs also plead additional circumstantial evidence that supports their claims. These allegations concern: (1) industry structure; (2) parallel pricing by individual Defendants; (3) Defendants' participation in trade associations other than JEITA; (4) certain other interactions among Defendants; and (5) Defendants' participation in other conspiracies.

301.   On the second of these points, the Court previously said that Plaintiffs could not rely on industrywide average pricing. Of course, individualized transactional pricing is not publicly available, and it is for this very reason that the Defendants' exchange of such information is unlawful. Indeed, it is often in opaque pricing markets that conspiracies like this can flourish because pricing is *not* transparent.

302.   However, Plaintiffs have obtained already some pricing data of Inductors. This data is limited to United States pricing and does not include pricing data for Inductors impacting United States commerce that involved transactions outside the United States. Based on a preliminary analysis of this data, Plaintiffs can allege that at least for certain time periods where the production was robust, pricing of Inductors on an individualized basis supports the conspiracy allegations set forth herein. Plaintiffs reserve the right to amend should additional information become available later.

**1.   Structural Characteristics of the Industry.**

303.   The DOJ has explicitly recognized that certain structural aspects of a market are conducive to collusion.[62] One such factor is "when the number of firms is fairly large, but there is a small group of major sellers and the rest are 'fringe' sellers who control only a small fraction of the market." Another is where "other products cannot easily be substituted for the product in

---

[62] *See* https://www.justice.gov/sites/default/files/atr/legacy/2013/01/31/disaster_primer.pdf

question". A third is "[t]he more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure." A fourth is that "[c]ollusion is more likely if the competitors know each other well, through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another." And a fifth is that "[b]idders who congregate in the same building or town to submit their bids, have an easy opportunity for last-minute communications."

304.    The inductors market exhibits all of these characteristics, as explained in the section on market structure above. There are no close substitutes for inductors. The products are standardized. The Defendants dominate the market and non-Defendant firms are "fringe" sellers within the market. And, as explained above in the section on direct evidence, personnel from the Defendants know each other well through JEITA, have headquarters based in Japan, and congregated in the San Jose area to submit bids to major United States customers.

## 2.    Defendants' Pricing With Respect To Inductors.

305.    The Court previously indicated it was interested in receiving allegations comparing the prices at which individual Defendants sold Inductors. It suggested that the named Plaintiffs could look at their own purchasing records in pleading such prices. As a practical matter, that simply is not feasible. No Plaintiff bought Inductors from all Defendants or even from a majority of Defendants. Some bought Inductors (or products containing Inductors) from one Defendant.

306.    Given the ample direct evidence of conspiracy identified in this 2CAC, "plus factors" such as inferences to be drawn from pricing information are not necessary to sustain the complaint.

307.    Since the filing of the CAC, Defendants have produced certain transactional data with respect to Inductors sold in the United States. Defendants have designated these productions as "highly confidential" pursuant to the Protective Order entered in this case, emphasizing that this information is not otherwise publicly available. These databases have many limitations that make comparisons difficult at present.  Plaintiffs' attempts to clarify the

1   meaning of certain data, as well as to explain gaps in the data, have been met with a refusal to

2   produce any additional data or information following the order on the last motion to dismiss.

3   ████  ████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████

7   ████████████████████████

8   309.   The cutoff date for all of these productions ended in December of 2016 (the end

9   of the Class Period identified in the CAC), while the end of the Class Period pled in this 2CAC

10  is one year later. Given that fact, no productions have been made with respect to that additional

11  year.

12  ████  ████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ██████████████████████████████████████

16  ████  ████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████

25  312.   Plaintiffs have raised with Defendants a host of follow-up questions about these

26  datasets, many of which remain unanswered.

27  313.   Despite these infirmities in the data, Plaintiffs can offer the following allegations

28  of pricing similarity.



### 3. Use of Trade Associations Other Than JEITA to Facilitate and Organize the Conspiracy

317.    Trade associations other than JEITA also provided opportunities for the Defendants to meet frequently and exchange information to facilitate collusion. The Defendants are members of a number of trade associations in the United States, Asia and Europe. Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor and police one another's activities in the inductors market and punish non-compliance. The Defendants' participation in trade associations, as described above, helped facilitate their collusion.

318.    One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia. Several of the Defendants are members of

this organization, including MENA, Sumida America, TDK America, and PCNA (through its division Panasonic Industrial Sales Company of America). They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

> ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth and profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.
>
> Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves as a vital nexus for refinement and progress.[63]

319.     For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision-making (Executive summaries, confidence surveys, end market reports, etc.)," the opportunity to "[s]hape opinion and direction by participating on Councils and Committees that design, develop, and publish processes the industry will follow" and "[n]etworking among the industry leaders (…can't have enough professional relationships!)."[64]

320.     The data and statistics mentioned by ECIA are significant. For the inductors market, ECIA prepares quarterly sale reports of inductors sold in North America, as well as indices of monthly and weekly sales of electronic components.[65] The ECIA also has a Statistics and Industry Data Council, the role of which is defined as follows:

> The Statistics and Industry Data Council oversees several programs that collect and provide unique industry data. These include commodity and market segment level sales trends as well as discrete passive electronic components market

---

[63] https://www.ecianow.org/what-we-do/

[64] https://www.ecianow.org/join-ecia/manufacturer/. The quotation above, which was included in the CAC, was at one time publicly available. The ECIA has now required a password to access this information.

[65] https://www.ecianow.org/north-america-sales-booking-reports/. The quotation above, which was included in the CAC, was at one time publicly available. The ECIA has apparently deleted this webpage since the CAC was filed.

1  reports. The primary outputs are the Electronic Component Sales Trends survey
2  (ECST) and the MS Series, a collection of 13 individual reports on capacitors, resistors, and inductors that include world statistics.[66]

3  The same webpage goes on to list among "2014 accomplishments" that the Statistics and
4  Industry Data Council "[c]ompiled and published more than 100 statistics reports (MS series)
5  on *North American Sales and Booking* for capacitors, resistors and inductors plus monthly
6  reports on world statistics for capacitors and quarterly reports for world statistics for resistors
7  and inductors." Within the council is the "Passive Components Market Services Working
8  Group," of which TDK America, Panasonic Corporation, and MENA are members.

9       321.    The ECIA, like the European inductors trade association described below, hosts
10 periodically World Capacitor/Resistor/Inductor Trade Statistics meetings, which are held
11 biannually. Many Defendants named here, as well as defendants sued in the Capacitors and
12 Resistors class actions, attend these meetings. As stated on ECIA's website with respect to the
13 April 2012 meeting held in Washington DC, "'[t]hese World Meetings demonstrate a unique
14 cooperation among major companies in the international electronic components community,'
15 says Jim Bruorton, KEMET Electronics and WCTS Chairman, The Americas. 'The meetings
16 offer a one of a kind opportunity for the three regions to discuss common goals and issues in
17 the industry. This special session provides a baseline for many of these discussions.'"[67]

18      322.    By virtue of their membership in such organizations, the Defendants have the
19 opportunity to meet, have improper discussions under the guise of legitimate business contacts,
20 and perform acts necessary for the operation and furtherance of the conspiracy. ECIA, for
21 example, hosts an annual "Executive Conference." The 2014 conference was held in Chicago,
22 Illinois, and the 2015 conference was held in Chicago on October 25-27, 2015. ECIA also hosts
23 an "EDS Summit" that includes electronic component manufacturers "where valuable idea

24

25

26  [66]     https://www.ecianow.org/about-ecia/councils/statistics-industry-data-council/.     The
    quotation above, which was included in the CAC, was at one time publicly available. The ECIA
27  has apparently deleted this webpage since the CAC was filed.

28  [67] https://www.ebnonline.com/ecia-to-host-trade-statistics-meeting/

exchange can happen through high-level strategic meetings, event functions and informal gatherings."[68] Last year's EDS Summit took place on May 15-18, 2018 in Las Vegas, Nevada.

323.     Another trade association to which some of the Defendants belong is the European Passive Components Industry Association ("EPCIA"), which is headquartered in Brussels, Belgium. Its members include Murata and Panasonic entities. The Vice-President of EPCIA is Reinhard Sperlich of Murata Europe GmBH, which is headquartered in Nürnberg, Germany. EPCIA's goal is "[t]o represent and promote the common interests of the Passive Components Manufacturers active in Europe to ensure an open and transparent market for Passive Components in Europe as part of the global market place"; among its activities are providing members with "general market data," "[f]acilitat[ing] worldwide networking between Passive Component Manufacturers at expert/Management level" and "[r]elat[ing] with similar Industry Associations in other Regions around the world."[69]

### 4.     Other Interactions

324.     Beyond trade associations, Murata, TDK, and Taiyo Yuden have a history of working closely together. As noted above, the DOJ regards this as an appropriate factor in assessing the likelihood of collusion.

325.     For example, in 2005, they jointly prepared and proposed new recommended dimensions for Ultra-Compact Multilayer Chip Ceramic Capacitors.

326.     In Taiyo Yuden's 2013 annual report, Eiji Watanuki, its President, stated that "we are transforming our business model to accommodate the formation of alliances with other companies. Looking ahead, we intend to proactively enter these markets characterized as being comparatively less susceptible to price competition."

---

[68] https://www.ecianow.org/connection-points/eds/. The quotation above, which was included in the CAC, was at one time publicly available. The ECIA has apparently deleted this webpage since the CAC was filed.

[69]
https://www.eusemiconductors.eu/index.php?option=com_content&view=article&id=76&Itemid=165

327.   As discussed above, beginning in September of 2005, Taiyo Yuden and Kemet entered into a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire product lines."[70]

328.   Likewise, the Defendants had opportunities to meet and conspire at industry events such as Semicon Japan, which has an annual trade show and bills itself as the premier exposition for the electronics manufacturing supply chain.

329.   Taken together, all of these characteristics of the industry including economic characteristics inconsistent with the qualities of a competitive market; collusive activities at JEITA meetings and related meetings, significant opportunities to conspire at other venues, the history of past collusion in related markets for passive electronics or in other electronic component markets by certain of these defendants, and the grand jury investigation, strongly support an inference of collusion.

**5.     Some Defendants' Involvement in Other Conspiracies in Electronic Product Markets Further Support an Inference of Conspiratorial Conduct Based on Similar Facts Pled Here**

330.   Collusion is also the most plausible explanation of what occurred in the inductors market. Defendants Panasonic, Tokin (the successor to NEC Tokin), Taiyo Yuden, and TDK are well-known recidivist antitrust violators. Panasonic, one of the world's leading manufacturers of inductors generally, has pled guilty in numerous price-fixing cases, including electronic products.

331.   On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

332.   On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors

---

[70] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf. This arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.

1  and automotive high intensity discharge ballasts installed in cars sold in the United States and

2  elsewhere from at least as early as September of 2003 until at least February of 2010.

3      333.    That same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to

4  plead guilty and to pay a large criminal fine for its participation in a conspiracy to fix the prices

5  of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery

6  packs from about April of 2007 until about September of 2008.

7      334.    In 2008, Panasonic created "Rules Concerning Activity and Relationship with

8  Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that

9  meets annually was set up to monitor these efforts. The rules did not solve the problem. In its

10  2012 corporate "Sustainability Report," Panasonic stated:

11      In fiscal 2012, the company reviewed the efforts related to the company's
       compliance activities in the corporate "Compliance Committee" and discussed
12      additional personnel measures. The top management strongly restated that it is
       the company's policy not to engage in cartel activities and requests employees
13      mainly in sales and marketing departments to confirm whether they encounter
       suspicious activities or not.[71]
14

15      335.    The same report noted that Panasonic had created a Global & Group Risk

16  Management Committee chaired by the President of the company and including directors and

17  executive officers in charge of corporate operational functions at the company's headquarters.

18  That group identified the "corporate major risks" for the then just-ended fiscal year 2012 and

19  the then upcoming fiscal year 2013. On both lists was "Cartels." Subsequent corporate

20  sustainability reports for 2013, 2014 and 2015 identified this same "corporate major risk' for

21  the 2013, 2014 and 2015 fiscal years, as well as the 2016 fiscal year.[72]

22      336.    The foregoing pattern of anticompetitive practices in various technology-related

23  markets is illustrative of Panasonic's corporate conduct, which has included illegal activity

24  aimed at generating profits at the expense of its customers. It is highly plausible that the same

25  type of conduct occurred in the Inductors market.

26  _____

27  [71] https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf

28  [72]      Panasonic's      Sustainability      Reports      are      found      at
    https://www.panasonic.com/global/corporate/sustainability/downloads/back_number.html

337.    Faced with an overall decline in demand for their Inductors, and steep price declines after the introduction of the ITA, Panasonic and its colleagues had a keen desire to avoid price competition.

338.    As noted above, NEC Tokin, the predecessor of Defendant Tokin, was fined by the JFTC and by a federal district court judge for fixing the prices of certain capacitors and one of its executives (Date, who participated in meetings of both the IC and the PCC meetings) has been indicted for his involvement in that conspiracy. NEC Tokin was also sued in *Capacitors* and settled that case.

339.    Likewise, Taiyo Yuden has also been accused of, or investigated for, anticompetitive practices by foreign competition authorities. On June 26, 2018, *MLex* reported that the Korean Fair Trade Commission ("KFTC") had completed its investigation into cartel activity in the capacitors market in South Korea. According to *MLex*, Taiyo Yuden was implicated in the KFTC's report, along with Panasonic, NEC-Tokin, and other capacitors manufacturers.

340.    In 2009, Taiyo Yuden was fined two million New Taiwan Dollars (NT$) and ordered to cease its illegal licensing practices by the Taiwanese Fair Trade Commission for violating the Taiwanese Fair Trade Act in conspiring with Royal Dutch Philips Electronics, Ltd. and Sony Corporation to abuse their joint monopoly power in the Market for CD-Recordable discs.[73]

341.    Similarly, in July of 2016, the JFTC raided the offices of TDK Corporation and NHK Spring Co. ("NHK") on suspicion that they created an unlawful cartel concerning suspensions for hard disk drives ("HDD"). In February of 2018, the JFTC fined suspension makers 1076.16 million yen for agreeing to fix prices. In April of 2018, CADE—Brazil's Administrative Council for Economic Defense—announced that it was investigating a cartel among HDD suspension manufacturers that included TDK and NHK. On July 29, 2019, it was announced by the DOJ that NHK had agreed to pay $29.5 million to resolve a criminal

---

[73] https://www.ftc.gov.tw/internet/english/doc/docDetail.aspx?uid=786&docid=1720

1  conspiracy case brought against it with respect to HDD suspensions.[74] Presumably, TDK

2  provided the evidence to the DOJ that supported this case. TDK was also sued in *Capacitors*.

3      342.    The highly concentrated nature and structure of the inductors market made it

4  likely that collusion would be both possible and profitable. As shown above, Defendants

5  comprised over 75% of the market during much of the Class Period.

6

7  **VI.    TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE**

       **INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT**

8      **CONCEALMENT**

9      343.    Plaintiffs and members of the Class could not have discovered, with reasonable

10 diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it,

11 until the DOJ's investigation was made public in January of 2018.

12     344.    Defendants actively concealed the existence of the conspiracy from Plaintiffs

13 and members of the Class, and there is nothing in the public domain that would put Plaintiffs

14 or anyone else on notice that the Defendants were conspiring at meetings regarding prices for

15 Inductors sold in the United States. These acts of concealment included collusive conduct

16 carried out under the auspices of what were presented to the public as legitimate trade

17 associations, such as JEITA.

18     345.    There was no way Plaintiffs could have learned that conspiratorial conduct

19 concerning Inductors was occurring through trade associations such as JEITA, the meetings of

20 which were non-public. Nor were Plaintiffs privy to the conspiratorial acts that occurred at

21 social gatherings of Defendants' executives that occurred in proximity to JEITA meetings,

22 where conspiratorial discussions occurred orally or through other surreptitious means. ████

23 ████████████████████████████████████████████████████████

24 ██████████████████████████████

25     346.    Defendants' own public statements concealed the existence of the alleged

26 conspiracy. For example, Murata in its Fiscal Year 2004, 2007 and 2008 Annual Reports

27 ────────────────────

[74]  https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-

28 suspension-assemblies-used-hard-disk

repeatedly referred to "competition" as being "fierce." Many of TDK's Annual Reports during the Class Period also refer to the challenges of "competition." Similarly, in its Annual Reports during the Class Period (such as those from 2009-11), Taiyo Yuden touted its "social responsibility" charter and how it engaged in "fair, open and free competition" and how it was facing "increased" competition. And Panasonic, despite all its public pronouncements that it was educating its executives and departing from its cartel past, has in fact, not done so.

347.    Several of the Defendants have adopted and promulgated a "code of conduct" that is at odds with their participation in the alleged conspiracy.

348.    Thus, Murata said in its 2007 Code of Conduct that "[w]e will conduct fair business by complying with all applicable laws and regulations regarding antitrust and fair competition and trade."[75]

349.    Similarly, TDK's 2005 Code of Conduct states that:

> In general, the purpose of antitrust laws or similar competition laws in many countries is to encourage free competitions or trade and to protect consumer interests. TDK Members must exercise special care to ensure that any business activity with representatives of other companies is not contrary to such antitrust laws or similar anti-competition laws of other countries, where applicable. Each member organization of TDK Group should have its compliance company policy with regard to its respective applicable antitrust laws or similar anti-competition laws, and such policy must be respected or observed by TDK Members of the member organization.[76]

350.    Likewise, Taiyo Yuden's Code of Conduct states that "[a]ny unfair business practice or suspected act of cartel behavior, abuse of dominant bargaining position, tie-in sales or other acts for improper restriction of trade or unfair transaction shall be never committed."[77]

351.    Sumida's "business principles" include the precept that "[w]e respect the manners, customs and laws of local regions in all our business activities."[78]

---

[75]            https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/p02.ashx?la=en

[76]            https://www.sec.gov/Archives/edgar/data/203383/000114554907001603/k01416exv11w1.htm

[77] https://www.yuden.co.jp/cs/company/csr/charter/rule.html

[78] https://www.sumida.com/info-centre/index.php?categoryId=17#BusinessPrinciples

352.   And Panasonic's 2008 Code of Conduct states that "[w]e will respect free and fair competition, and abide by all applicable antitrust (competition law) and other laws and regulations."[79]

353.   Kemet, which owns Tokin, has a code of conduct that includes the following:

> Antitrust laws, sometimes also called competition laws, govern the way that companies interact with their competitors, customers, and suppliers in the market place. They are designed to encourage competition by prohibiting unreasonable restraints on trade. KEMET and its directors, officers, and employees are required to comply with the antitrust and unfair competition laws of the many countries in which the company does business. These laws are complex and vary considerably from country to country. They generally concern:
>
> •   Agreements with competitors that harm customers, including price fixing and allocations of customers or contractors,
>
> •   Agreements that unduly limit a customer's ability to sell a product, including establishing the resale price of a product or service or conditioning the sale of products on an agreement to buy other company products and services, and/or
>
> •   Attempts to monopolize, including pricing a product below cost in order to eliminate competition.
>
> KEMET is committed to competing vigorously but fairly for suppliers and customers in all regions and countries where we do business. Violating antitrust laws is a serious matter, and could place both the company and the individual at risk for substantial criminal penalties.

354.   By promulgating these codes of conduct and then not living up to them, the Defendants engaged in fraudulent concealment.

355.   As reported in the *Resistors* complaint described above, Defendants also began sanitizing the minutes memorializing their meetings at JEITA in order to cover their tracks, changing the entries on its meeting minutes from "information exchange conducive to corporate management" to "information exchange concerning general market conditions," regardless of the actual information exchanged in them.

---

[79]   https://www.panasonic.com/global/corporate/management/code-of-conduct/pdf/code-of-conduct/02_coc2008English.pdf

1

2

3

4

5

6

7 **VII.    CLASS ACTION ALLEGATIONS**

8       357.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant

9 to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a

10 Class, which is defined as follows:

11       358.    All persons or entities in the United States, its territories, and the District of

12 Columbia who purchased Inductors (including through controlled subsidiaries, agents,

13 affiliates, or joint ventures) from any of the Defendants identified therein, their subsidiaries,

14 agents, affiliates or joint ventures from January 1, 2003 through December 31, 2017 (the "Class

15 Period"). This Class includes two Subclasses: (a) those who bought Inductors from one of the

16 Defendants and (b) those who bought manufactured products containing Inductors made by one

17 of the Defendants from one or more of the Defendants. Excluded from the Class are the

18 Defendants and their co-conspirators, subsidiaries, agents, and/or affiliates; Defendants'

19 officers, directors, management, employees, subsidiaries, and/or agents; all governmental

20 entities; and the Judges and chambers staff presiding over this case, as well as any members of

21 their immediate families.

22       359.    The Class definition thus encompasses those who purchased Inductors and/or

23 product(s) containing one or more Inductors from any of the Defendants, even if the Inductors

24 purchased were manufactured, sold, or distributed by a given Defendant's predecessors,

25 parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

26       360.    While Plaintiffs do not know the exact number of the members of the Class, they

27 believe there are at least thousands of members.

28

361.   Plaintiffs also do not know the exact duration of the alleged conspiracy and reserve the right to amend its complaint.

362.   Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

      a.   Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold to customers in the United States, its territories and the District of Columbia;

      b.   The identity of the participants of the alleged conspiracy;

      c.   The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

      d.   Whether the alleged conspiracy violated the Sherman Act;

      e.   Whether the conduct of Defendants, as alleged in this 2CAC, caused injury to the business or property of Plaintiffs and members of the Class;

      f.   The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period;

      g.   The appropriate injunctive and related equitable relief; and

      h.   The appropriate class-wide measure of damages.

363.   The claims of Dependable, Powerweb, and Lifetime are typical of the claims of the members of the Subclass who bought Inductors from any of the Defendants, and the claims of Arch and Cambridge are typical of the claims of members of the Subclass who bought manufactured products containing Inductors made by one of the Defendants from one or more of the Defendants. The Plaintiffs will fairly and adequately protect the interests of the entire Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Inductors purchased from the Defendants or manufactured products containing Inductors made by one of the Defendants.

364.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

365.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

366.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

367.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**VIII.    CLAIM FOR RELIEF**
**VIOLATIONS OF THE SHERMAN ACT**
**15 U.S.C. §§ 1 and 3**
**(Alleged against all Defendants)**

368.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

369.    Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to artificially restrict competition in the market for inductors. During the Conspiracy Period, the Defendants met repeatedly to exchange competitively sensitive information, including price and price-related information. These meetings include meetings that were orchestrated by or

through JEITA. The effect of these meetings was to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

370.    Defendants formed a cartel, organized in part around JEITA meetings, designed to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

371.    As described above, Defendants implemented this conspiracy in the United States as well.

372.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for Inductors and manufactured products containing Inductors sold to purchasers in the United States, its territories, and the District of Columbia during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated cartel levels.

373.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

374.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including setting prices of Inductors at supra-competitive prices, and selling these Inductors to Plaintiffs and the members of the Class.

375.    Defendants' anticompetitive and unlawful conduct is illegal *per se*.

376.    As a result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and the members of the Class have been injured in their businesses and property in that they have paid more for the Inductors that they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

### IX.    DEMAND FOR JUDGMENT

377.    Plaintiffs request that the Court enter judgment on its behalf and on behalf of the Class that:

A.  This action may proceed as a class action, with Plaintiffs serving as Class Representative under Fed. R. Civ. P. 23(c);

B.  Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

C.  Plaintiffs and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15);

D.  Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E.  Plaintiffs and the Class are entitled to equitable relief under 15 U.S.C. § 26 appropriate to remedy Defendants' restraint of trade, including issuing a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from repeating (or continuing and maintaining) the conspiracy or agreements alleged herein;

F.  Defendants are to be jointly and severally responsible financially for all costs, including the expenses of a Court-approved notice program;

G.  Plaintiffs and the Class recover their reasonable attorneys' fees as provided by law; and

H.  Plaintiffs and the Class receive such other or further relief as may be just and proper.

//

1

## X.   JURY DEMAND

2        378.    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by

3   jury on all matters so triable.

4

5    Dated: November 15, 2019                     Respectfully submitted,

6                                                 /s/ *Lesley E. Weaver*

7                                                 Lesley E. Weaver (SBN 191305)
                                                  Anne K. Davis (SBN 267909)
8                                                 BLEICHMAR FONTI & AULD LLP
                                                  555 12th Street, Suite 1600
9                                                 Oakland, CA 94607
                                                  Tel.: (415) 445-4003
10                                                Fax: (415) 445-4020
                                                  lweaver@bfalaw.com
11                                                adavis@bfalaw.com

12

13                                                /s/ *Michael P. Lehmann*

14                                                Michael P. Lehmann (SBN 77152)
15                                                Bonny E. Sweeney (SBN 176174)
                                                  Christopher Lebsock (SBN 184546)
16                                                Samantha Stein (SBN 302034)
                                                  HAUSFELD LLP
17                                                600 Montgomery Street, Suite 3200
                                                  San Francisco, CA 94111
18                                                Tel.: (415) 633-1908
19                                                Fax: (415) 358-4980
                                                  mlehmann@hausfeld.com
20                                                bsweeney@hausfeld.com
                                                  clebsock@hausfeld.com
21                                                sstein@hausfeld.com

22                                                *Interim Co-Lead Counsel for the Proposed*
23                                                *Direct Purchaser Class*

24

25                                                Marc H. Edelson (admitted *pro hac vice*)
                                                  EDELSON & ASSOCIATES, LLC
26                                                3 Terry Drive, Suite 205
                                                  Newtown, PA 18940
27                                                Tel.: (215) 867-2399
                                                  medelson@edelson-law.com
28

Joshua H. Grabar (admitted *pro hac vice*)
GRABAR LAW OFFICE
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel.: (267) 507-6085
jgrabar@grabarlaw.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
guido@saveri.com
rick@saveri.com
zirpoli@saveri.com

Christopher M. Burke (SBN 214799)
Walter W. Noss (SBN 277580)
Hal Cunningham (SBN 243048)
John Jasnoch (SBN 281605)
SCOTT + SCOTT ATTORNEYS AT LAW
LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-4565

Todd A. Seaver (SBN 271067)
Joseph J. Tabacco, Jr. (SBN 75484)
Matthew D. Pearson (SBN 235339)
Sarah Khorasanee McGrath (SBN 263935)
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
mpearson@bermantabacco.com
smcgrath@bermantabacco.com

Marc Greenspon
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194

1

mgreenspon@bermantabacco.com

2

Vincent Briganti
Barbara Hart

3

LOWEY DANNENBERG P.C.
White Plains Plaza

4

44 South Broadway, Suite 1100
White Plains, NY 10601

5

Tel.: (914) 997-0500
Fax: (914) 997-0035

6

vbriganti@lowey.com

7

bhart@lowey.com

8

Brian Murray
Lee Albert

9

GLANCY PRONGAY & MURRAY

10

230 Park Avenue, Suite 530
New York, NY 10169

11

Tel.: (212) 682-5340
Fax: (212) 884-0988

12

bmurray@glancylaw.com
lalbert@glancylaw.com

13

14

Allan Steyer (SBN 100318)
D. Scott Macrae (SBN 104663)

15

STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH LLP

16

One California Street, Suite 300
San Francisco, CA 94111

17

Tel.: (415) 421-3400
Fax: (415) 421-2234

18

asteyer@steyerlaw.com

19

smacrae@bamlawca.com

20

21

22

23

24

25

26

27

28

---

DPPS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 5:18-cv-00198-EJD-NC
107

1

2

3

4

5

6

7

Arthur N. Bailey
R. Anthony Rupp, III
Marco Cercone
RUPP BASE PFALZGRAF
CUNNINGHAM, LLC
424 Main Street, 1600 Liberty Building
Buffalo, NY 14202
Tel: (716) 854-3400
bailey@ruppbaase.com
rupp@ruppbaase.com
cercone@ruppbaase.com

8

9

10

11

Joseph W. Cotchett
Adam J. Zapala
Elizabeth T. Castillo
COTCHETT, PITRE, McCARTHY, LLP
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

12

13

*Additional Counsel for the Proposed Direct Purchaser Class*

14

15

16

        Pursuant to Civil L. R. 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories above.

17

Date: November 15, 2019

18

19

                                                */s/ Michael P. Lehmann*
                                                Michael P. Lehmann

20

21

22

23

24

25

26

27

28