Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com

Michael P. Lehmann (SBN 77152)
Bonny E. Sweeney (SBN 176174)
Samantha J. Stein (SBN 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeld.com
bsweeney@hausfeld.com
sstein@hausfeld.com

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*
[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INDUCTORS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>THE DIRECT PURCHASER PLAINTIFF'S ACTION | Case No. 5:18-cv-00198-EJD-NC<br><br>**DIRECT PURCHASER PLAINTIFF'S THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br>JURY TRIAL DEMANDED<br><br><u>REDACTED VERSION<br>OF DOCUMENT SOUGHT TO BE<br>SUBMITTED UNDER SEAL</u> |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE ................................................................... 4

III.  PARTIES ................................................................................................... 4

      A.    Plaintiff ........................................................................................... 4

      B.    The Murata Defendants ................................................................... 4

      C.    The Taiyo Yuden Defendants .......................................................... 6

      D.    The TDK Defendants ....................................................................... 7

      E.    Agents and Co-Conspirators .......................................................... 11

IV.   AFFECTED COMMERCE ......................................................................... 11

      A.    The Defendants' Conduct Involved Import Trade or Import Commerce and
            Had Direct, Substantial and Reasonably Foreseeable Effects on United States
            Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's and
            Class Members' Antitrust Claims ................................................... 12

      B.    The Defendants Targeted the United States .................................... 14

V.    FACTUAL ALLEGATIONS ....................................................................... 19

      A.    The Structure of the Inductor Market ............................................. 19

            1.    Market Concentration ........................................................... 20

            2.    Product Commoditization and Lack of Substitutability ....... 20

            3.    Entry Barriers ....................................................................... 22

            4.    Demand Inelasticity .............................................................. 26

            5.    Variations In Demand And Supply ....................................... 27

      B.    Evidence of Defendants' Unlawful Conduct ................................... 28

            1.    TDK Admitted to Criminal Violations of the Antitrust Laws ........... 29

            2.    Examples of Conspiratorial Acts Impacting Customers in the United
                  States ...................................................................................... 29

                  a.    Unlawfulness of Such Conspiratorial Acts ................. 29

        b.     Background of TDK's Sales to Major United States Customers and Key Participants ............................................................. 30

        c.     ███████ ...................................................................... 33

            (1)    Umeda's Communications with Murata ..................... 33

            (2)    Umeda's Communications with Taiyo Yuden ........... 37

            (3)    Kamagata's Dealings with Murata and Taiyo Yuden . 38

            (4)    *Nakakabu* Meetings in Japan ....................................... 39

            (5)    Concurrent Meetings in the United States .................. 40

            (6)    Acts of Other TDK Employees ................................... 41

            (7)    Unlawful Agreements Among TDK, Murata, and TOKO ......................................................................... 44

            (8)    Summary ..................................................................... 44

    3.    Contacts and Unlawful Agreements Among TDK, Murata, And Taiyo Yuden Targeting U.S. Customers Other Than ████ .......................... 45

        a.     ██████ ................................................................. 45

        b.     ████████ ............................................................. 45

        c.     ██████ ................................................................. 46

        d.     ███ ....................................................................... 46

        e.     ████ ..................................................................... 47

        f.     ████ ..................................................................... 47

        g.     ████ ..................................................................... 48

    4.    TDK, Taiyo Yuden and Murata Collusively Agreed to Maintain their Incumbent Status by Assisting Each Other During the OEM Qualification Process ........................................................................... 48

    5.    Defendants' Bid-Rigging Activities Resulted In Collusive Parallel Pricing Of Inductors, Including Inductors Other Than Those That Were The Subject of The Bid-Rigging ................................................. 50

VI.  TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT ...................................................................................55

VII.  CLASS ACTION ALLEGATIONS ...........................................................57

    a.  Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold to customers in the United States, its territories and the District of Columbia;57

    b.  The identity of the participants of the alleged conspiracy;............................57

    c.  The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy; ...................................................................57

    d.  Whether the alleged conspiracy violated the Sherman Act;...........................57

    e.  Whether the conduct of Defendants, as alleged in this 3CAC, caused injury to the business or property of Plaintiff and members of the Class;....................58

    f.  The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period; ...........................................................58

    g.  The appropriate injunctive and related equitable relief; and ..........................58

    h.  The appropriate class-wide measure of damages. ...........................................58

VIII.  CLAIM FOR RELIEF ...............................................................................59

IX.  DEMAND FOR JUDGMENT ...................................................................60

X.  JURY DEMAND........................................................................................61

1.      Plaintiff Dependable Component Supply Corporation ("Plaintiff" or "Dependable") brings this action on behalf of itself and on behalf of a class of all similarly situated persons and entities in the United States, its territories, and the District of Columbia (the "Class") for damages and injunctive relief pursuant to Sections 15 and 26 of the Clayton Act (15 U.S.C. §§ 15 and 26) for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against Defendants Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Murata Power Solutions, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of North America; TDK U.S.A. Corporation; and TOKO Inc. (now known as Saitama Murata Manufacturing Co., Ltd.) (collectively "Defendants").[1] The allegations in this Third Consolidated Amended Complaint ("3CAC") supersede all others in earlier complaints filed in connection with this litigation. Plaintiff alleges as follows, based on information and belief, except as to itself.

## I.      NATURE OF THE ACTION

2.      Plaintiff challenges Defendants' conspiracy to fix prices, allocate markets and rig bids for Inductors that they sold to Plaintiff and class members in the United States, its territories, or the District of Columbia (including through controlled subsidiaries, agents, affiliates, or joint ventures) during the period from January 1, 2003 through December 31, 2017 (the "Class Period").

3.      As used in this 3CAC, the non-capitalized term "inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; common mode filters ("CMFs"); "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching. Inductors are one of the most common passive linear elements in electronic circuits and thus are ubiquitous in thousands of products that rely on electronic circuits for power.

---

[1] Plaintiff reserves the right to amend its complaint once the identities of any other alleged conspirators are established.

Inductors are found in a wide variety of electronic equipment, including: (a) smartphones, laptop and desktop computers, video game consoles, wireless LAN (Local Area Network) boxes, and other types of consumer electronic equipment; (b) televisions; (c) advanced driver assistance systems ("ADAS") used in vehicles; and (d) induction motors that are used in industry to convert electrical energy into mechanical energy.

4.      The capitalized term "Inductors" refers to all inductors manufactured by each of the Defendants and sold to members of the proposed Class, unless the context indicates otherwise. When the term "inductors" with no initial capitalization is used herein, it refers to inductors generally, including inductors made by Defendants and by others, unless the context indicates otherwise.

5.      Defendant TDK Corporation has admitted that it is the United States Department of Justice ("DOJ") leniency applicant and has confessed to participating in a conspiracy to fix prices, rig bids, and allocate markets for Inductors.

6.      Beginning in January of 2019, TDK Corporation has provided information relating to the price-fixing and market allocation of Inductors sold by it, Murata and/or Taiyo Yuden to certain large customers (mostly OEMs) who purchased Inductors from one or more of those Defendants during the Class Period. Plaintiff is currently able to identify the following entities who are in that group:

These customers will be referred to collectively in this 3CAC as the "Major Customers." The foregoing list is not intended to be exclusive; there may well be others in this category. These acts in furtherance of conspiracy are described in detail below. These activities extended from at least 2003 through at least 2017. They involved information sharing and price-fixing agreements among at least the TDK, Taiyo Yuden, Murata, and TOKO (now part of Murata) entities. The illegal activities occurred in both Japan and California and involved at least 24

individuals from the TDK entities, 28 from the Murata entities, and seven from the Taiyo Yuden entities, all of whom are identified below. The participants ranged from sales representatives in the United States, to the key individuals in the Magnetics Departments (responsible for Inductors) of each company in Japan, to company executives in Japan. These participants are identified by name in the 3CAC.

7.    The conspiracy was carried out through multiple instances of bid-rigging and other price-fixing activity; many of the participants had price-setting authority. The Defendants continually exchanged highly sensitive competitive information, including pricing information, pricing strategy, product development updates, information about customer status, negotiation tactics they used with customers, and contents of communications with customers, among other matters. Defendants coordinated their responses to customers' Request for Quotations ("RFQs") and allocated customers and markets of Inductors among themselves to set the floor for pricing of all inductors. These exchanges were antitrust violations in and of themselves and also served to facilitate the price-fixing conspiracy.

8.    Defendants carried out their illegal activity in secret by a variety of means. These included face-to-face meetings in locales such as the Hatcho Restaurant in Sunnyvale, California, as well as at various golf outings. During part of this period, there were group meetings among representatives of TDK, Taiyo Yuden, and Murata personnel at various restaurants in Japan. These meetings, which the conspirators named *Nakakabu* meetings based upon a combination of the conspirators' names, were often accompanied by follow up meetings in California.

9.    Through this conspiracy, Defendants' coordinated price agreements and information sharing set the floor for the pricing of inductors. The conspiracy also enabled Defendants to maintain their incumbent and pre-qualified status with major purchasers like ███████████████████, and Defendants' Major Customer-specific agreements targeted them and other major manufacturers, such as ███████████████████ ███████████████, among others.

## II.   JURISDICTION AND VENUE

10.     Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable relief for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 12 and 22) and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly transact business in this District. Additionally, a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Specifically, some Defendants maintain offices in this District, and all Defendants sell or seek to sell Inductors to electronics companies located in this District.

12.     This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at purchasers of Inductors and/or products containing Inductors in the United States and in this District.

## III.   PARTIES

### A. Plaintiff

13.     Plaintiff Dependable, an approved supplier of many of the largest original equipment manufacturer ("OEM") parts in the world, was incorporated under the laws of Florida. During the Class Period, Dependable purchased Inductors directly sold by one or more of the Defendants and was thus directly harmed by the conspiracy alleged herein. Because of Defendants' conspiracy to fix prices of Inductors that Dependable purchased, Dependable paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein and has standing to pursue claims on its own behalf and on behalf of the Class.

### B. The Murata Defendants

14.     Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or

through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that Murata Manufacturing had $15 million in sales of one type of Inductors (ceramic chip Inductors) in North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers of passive electronic components. Murata Manufacturing annually has revenues in excess of $5 billion from sales of passive electronic components, including Inductors.

15. In March of 2014, Murata Manufacturing acquired a controlling interest in Defendant TOKO, Inc. ("TOKO"), a Japanese company that was a leading Inductor manufacturer that sold hundreds of millions of dollars of Inductors in the United States, its territories and the District of Columbia during the Class Period. According to estimates from one industry expert, TOKO had $47 million of sales of one type of Inductors (ceramic chip Inductors), in North America in 2007 alone. By April of 2015, Murata Manufacturing had assumed all aspects of TOKO's business, including its assets, sales, service, and technical support for the portfolio of TOKO products, including Inductors. To the extent Murata Manufacturing assumed, in whole or in part, the assets and liabilities of TOKO, Plaintiff intends to hold Murata Manufacturing liable for any violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by TOKO that occurred during the Class Period. Plaintiff also separately names TOKO as a Defendant.

16. Defendant Murata Electronics North America, Inc. ("MENA") is a wholly owned subsidiary of Murata Manufacturing. MENA is a Texas corporation with its principal place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors that were purchased throughout the United States, its territories and the District of Columbia during the Class Period.

17. Murata Power Solutions, Inc. ("Murata Power") is a wholly owned subsidiary of Murata Manufacturing that was created in 2007 when Murata Manufacturing acquired a division of C&D Technologies, a United States company with its headquarters in Pennsylvania.

Murata Power has its headquarters at 129 Flanders Road, Westborough, Massachusetts01581. Murata Power sells Inductors to customers located in the United States. Murata Power had $5 million of sales of Inductors in the United States in 2007.

18.    Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth, Georgia.

19.    Defendant TOKO (now known as Saitama Murata Manufacturing Co., Ltd. ("Saitama Murata")) was once an independent company that had substantial market share in sales of Inductors. TOKO's headquarters are at 18, Gomigaya, Tsurugashima-shi, Saitama, 350-2281, Japan. As is alleged in greater detail below, TOKO—both before and after its acquisition by Murata Manufacturing—attended meetings of competitors and participated in anticompetitive activity with Defendants. The current TOKO entity is a subsidiary of Murata Manufacturing. TOKO continues to manufacture and perform research and development for Inductors under the direction of Murata Manufacturing. In 2019, TOKO was renamed Saitama Murata.

20.    Defendants Murata Manufacturing, MENA, Murata Power, and TOKO (now known as Saitama Murata) will be referred to collectively herein as "Murata" or the "Murata Defendants", unless otherwise noted.

## C.    The Taiyo Yuden Defendants

21.    Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. Taiyo Yuden Co.—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. In its 2017 Annual Report, Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

22.    Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Class Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries,

agents, or affiliates, which it wholly owned and/or controlled—sold and distributed to purchasers in the in the United States, its territories and the District of Columbia Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo Yuden Co.

23.    Defendant Taiyo Yuden Co. exerts control over Taiyo Yuden USA. Corporate policies are set by the parent company and govern the activities of the United States subsidiary, as depicted in the following chart taken from Taiyo Yuden Co.'s website:



24.    Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants" unless otherwise noted.

**D.  The TDK Defendants**

25.    Defendant TDK Corporation is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chome, Chuo-ku, Tokyo 103-8272, Japan. TDK Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

26.    Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of

the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK-EPC—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. More specifically, TDK-EPC itself develops and manufactures Inductors, which are sold by the TDK Defendants under the TDK and EPCOS brands.[2] TDK-EPC is a wholly owned subsidiary of the TDK Corporation.

27.     Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at 525 RXR Plaza, Uniondale, New York 11556. TDK USA describes itself as a "group company of TDK Corporation." During the Class Period, TDK USA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation and TDK-EPC to purchasers in the United States purchasers the United States, its territories and the District of Columbia.

28.     Defendant TDK Corporation of America ("TDK America") is a wholly owned subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite 300, Lincolnshire, Illinois 60069. Like TDK USA, TDK America describes itself as a "group company of TDK Corporation." TDK America sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the United States, its territories and the District of Columbia. TDK America has a marketing and sales office located in San Jose, California, that serves North American and Latin American customers.

29.     The TDK Defendants were the largest manufacturers of Inductors during the Class Period. For example, in 2007 TDK sold $57 million of one type of Inductor (ceramic chip

---

[2] https://www.global.tdk.com/corp/en/news_center/press/aah34500.htm

1    Inductors) in North America, more than any other manufacturer according to one industry

2    expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded

3    Inductors and does so to this day.

4         30.     TDK Corporation owns and controls both TDK USA and TDK America, as

5    reflected in the following graphic of the "TDK Organization" taken from TDK Corporation's

6    website:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26      31.     TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively

27  referred to as "TDK" or the "TDK Defendants" unless otherwise noted.

28

1

      **E.  Agents and Co-Conspirators**

2

      32.  Each Defendant or co-conspirator acted as the principal of or agent for the others

3

with respect to the acts, violations, and common course of conduct alleged herein.

4

      33.  When Plaintiff refers to a corporate family or companies by a single name in

5

their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging

6

that one or more employee or agent of entities within the corporate family engaged in

7

conspiratorial acts or meetings on behalf of all of the Defendant companies within that family.

8

In fact, the individual participants in the conspiratorial meetings and discussions did not always

9

know the corporate affiliation of their counterparts, nor did they distinguish among the entities

10

within a corporate family. The individual participants entered into agreements on behalf of, and

11

reported these meetings and discussions to, their respective corporate families. As a result, the

12

entire corporate family was represented in meetings and discussions by their agents and were

13

parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within

14

corporate families distributed products containing Inductors, these subsidiaries played a

15

significant role in the alleged conspiracy because Defendants wished to ensure that the prices

16

paid for such products would not undercut the pricing agreements reached at these various

17

meetings. Thus, all Defendant entities within the corporate families were active, knowing

18

participants in the alleged conspiracy.

19

                     **IV.  AFFECTED COMMERCE**

20

      34.  During the Class Period, the Defendants and co-conspirators collectively

21

controlled the market for inductors, both globally and in the United States, as further described

22

below.

23

      35.  The Defendants sold Inductors (or products containing Inductors) directly to

24

customers located in the United States. Substantial quantities of Inductors are shipped from

25

outside the United States into the United States in a continuous and uninterrupted flow of

26

interstate and foreign trade and commerce.

27

      36.  In addition, substantial quantities of equipment and supplies necessary to the

28

production and distribution of Inductors, as well as payments for Inductors and related products

sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

**A.  The Defendants' Conduct Involved Import Trade or Import Commerce and Had Direct, Substantial and Reasonably Foreseeable Effects on United States Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's and Class Members' Antitrust Claims**

37.     The Defendants' illegal conduct involved United States import trade or import commerce. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed Inductors to enter the United States market and inflating the prices of Inductors destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

38.     According to one leading analyst, the inductors market in the United States "was an estimated $280 MM in FY 2018 or 10% of global consumption value."

39.     The Defendants recognize the importance of sales of Inductors in the United States in their annual reports and other financial reports. That is why they created and invested in entities like MENA, Murata Power, Murata RF, Taiyo Yuden USA, TDK America, and TDK USA. The websites of those entities boast about their respective sales networks in the United States.

40.     To give one example, MENA's website states that "[w]e serve as the regional and functional headquarters supporting our customers' engineering and procurement activities throughout the Americas. Along with experienced teams of Technical Sales Managers located in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized

Distributors to service our customers' requirements for sales and technical support, design expertise, logistics and supply chain initiatives."[3]

41.    Taiyo Yuden's website similarly lists a headquarters for Taiyo Yuden USA in Chicago and "sales offices" in San Diego, San Jose, Chicago and Boston.[4] Taiyo Yuden USA assisted its corporate parent in marketing and selling Inductors, issuing press releases and disseminating product guides.

42.    As a third example, TDK America's website states that "TDK Corporation of America (TCA), a group company of TDK Corporation, was established in 1974 in California as the sales and marketing force for electronic components in North America and Latin America."[5] "TCA has grown into a sales force of nine offices in the U.S. with headquarters located in Lincolnshire, Illinois. The combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry."[6]

43.    The Defendants shipped millions of Inductors (and/or products containing Inductors) into the United States during the Class Period. In addition, Inductors that were shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States companies. As a result, a substantial portion of the Defendants' revenues were derived from the United States market. Defendants spent millions of dollars on advertising their products in the United States.

44.    Because of the importance of the United States market to the Defendants and their co-conspirators, Inductors intended for importation into and ultimate consumption in the United States were a focus of the Defendants' illegal conduct. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that led directly into the

---

[3] https://www.murata.com/en-us/about/company/muratalocations/americas/mea

[4] https://www.yuden.co.jp/ut/company/overseas/

[5] https://www.tdk-electronics.tdk.com/en/1767762/company/press-center/press-releases/press-release-usa/distribution-award--tdk-honors-avnet-for-highest-sales-growth/1767750

[6] https://www.linkedin.com/jobs/view/technical-account-representative-at-tdk-corporation-of-america-1308754304/

United States. Defendants' conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for Inductors.

45.     Thus, when high-level executives within the Defendants' companies agreed on prices for Inductors, they knew that their price-fixed Inductors would be sold in the United States. This included negotiating prices for Inductors for the Major Customers identified previously would set the floor for market pricing for similar Inductors sold through other channels in the United States.

46.     For the reasons set forth above, the Defendants' illegal conduct involved import trade or import commerce into the United States.

47.     The Defendants' illegal conduct had direct, substantial, and reasonably foreseeable effects on United States domestic and import trade or commerce in the form of higher prices for Inductors that Plaintiff and Members of the Class paid. These prices, tainted by collusion, directly and immediately impacted Plaintiff and Members of the Class in the United States. In this respect, the United States effects of the Defendants' illegal conduct gives rise to Plaintiff's and Class Members' antitrust claims and are the proximate cause of the injury that Plaintiff and Members of the Class suffered.

48.     As described in further detail herein, Defendants' price-fixing conspiracy involved unlawful conduct within the United States that had a direct, substantial and reasonably foreseeable effect on domestic commerce.

**B.  The Defendants Targeted the United States**

49.     Because of the small size of Inductors, transportation costs are relatively minor and there is substantial international trade in these electronic components.

50.     During the Class Period, the Defendants manufactured and sold substantial quantities of Inductors shipped from outside the United States, its territories, and the District of Columbia in a continuous and uninterrupted flow of interstate and foreign trade and commerce. In addition, substantial quantities of equipment and supplies necessary for the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. Defendants' business

activities in connection with the production and sale of Inductors were within the flow of, and affected substantially, interstate and foreign trade and commerce.

51.     During the Class Period, the Defendants also manufactured and sold manufactured products in the United States, its territories, and the District of Columbia that incorporated Inductors made by the Defendants. The Defendants also sold substantial quantities of these products overseas to direct purchasers for importation to the United States, its territories, and the District of Columbia. The business activities of the Defendants in connection with the production and sale of products containing their Inductors were within the flow of, and affected substantially, interstate and foreign trade and commerce. The paragraphs below detail some specific examples of this.

52.     Murata's connections to the United States, its territories, and the District of Columbia are deep and sustained. "In 1971, General Motors (GM) introduced Murata's ceramic filters to its car radios. This was the result of efforts by Akira Murata, the founder of Murata Manufacturing who traveled to the United States and aggressively pioneered the market. Getting fully involved with the automobile industry was Murata's big dream then. Over 40 years ago, we built a plant in the United States and started production locally. Ceramic resonators were introduced to the automobile industry about 25 years ago, and their market continues to enjoy steady sales to this day."[7]

53.     On September 3, 2007, Murata announced that it had completed the acquisition of the Power Electronics Division of C&D Technologies ("C&D"), a United States company located in Pennsylvania, for $85 million in cash. After the acquisition, Murata operated C&D's business as "Murata Power Solutions" in the United States and sold Inductors in the United States, its territories, and the District of Columbia that were once offered by C&D.

54.     In 2014, Murata received a Preferred Quality Supplier ("PQS") award from Intel Corporation ("Intel") based in part on its sales of Inductors. In a press release, Tsuneo Murata, President of Murata Manufacturing, said "[w]e would like to express our sincere appreciation

---

[7] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline

to Intel for its tremendous support and assistance to achieve this award. We are committed to make every effort to meet and exceed Intel's expectation in 2014."[8] Murata received Intel's PQS award for 2010, 2011, and 2012. In 2014, Intel recognized Murata with a Supplier Continuous Quality Improvement award based in part on its sales of Inductors, "Intel's highest honor for its suppliers."[9]

55.     As explained below, Murata had also qualified as a supplier of Inductors to ███████████████████

56.     As also explained below, Murata engaged in numerous conspiratorial acts relating to Inductors within the United States.

57.     Murata has sales representatives across the United States, including in Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo (Indiana), and Boston.

58.     Taiyo Yuden has focused on markets in the United States, its territories, and the District of Columbia, on its own and through its relationships with other United States passive electronic components manufacturers, and has customers in the United States, its territories, and the District of Columbia. In 2005, Taiyo Yuden announced that it would sell Inductors in connection with Kemet, through a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire product lines."[10] According to Taiyo Yuden, "Taiyo Yuden and Kemet have built up a cooperative relationship since 1997, when the two companies began regular information exchanges on the product technology side. Now the relationship is to be strengthened even more through a comprehensive sales alliance."[11]

59.     In April of 2011, Intel gave Taiyo Yuden a PQS award, reflecting Taiyo Yuden's substantial efforts to sell their products, including Inductors, to U.S. companies. Taiyo Yuden President Yoshiro Kanzaki stated, "we shall continue to do our utmost to provide quality

---

[8] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411
[9] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411
[10] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf.
[11] Id.

advanced products and shall approach our work with the aim of becoming Intel's best partner."[12]

60.     As explained below, Taiyo Yuden had also qualified as a supplier of Inductors to ▮▮▮▮

61.     As also explained below, Taiyo Yuden engaged in numerous conspiratorial acts relating to Inductors within the United States.

62.     The United States has also long been central to TDK's global marketing strategy. TDK has a billboard on Times Square in New York City:



63.     This billboard has been part of TDK's "global advertising strategy" since 2001.[13]

64.     In July of 2013, TDK revamped its English language website to allow customers to search for Inductors and contact sales agents directly for purchases online: "In recent years,

_____

[12] https://www.yuden.co.jp/ut/news/release/pdf_150.pdf

[13] https://www.tdk.com/corp/en/news_center/press/aah33300.htm. In December of 2011, TDK announced that it had lit up a Christmas tree on Times Square to promote its brand. https://www.global.tdk.com/corp/en/news_center/press/aah37600.htm. TDK lit the Christmas Tree in Times Square again in 2014 and 2015 and promoted its brand in the summer of 2012 by sponsoring a Fourth of July display on Times Square. *See* https://www.global.tdk.com/corp/en/news_center/press/aah40100.htm;   https://www.global.tdk.com/corp/en/news_center/press/201412191618.htm (in 2014 TDK advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise").

the ratio of information acquisition via the Internet has become extremely high for the departments of customers' development, design, purchasing, etc. Also, due to the trend of globalization, there is a need to respond quickly whenever you request from any customer. The inductor site to be announced here inherits the same concept as the monolithic ceramic capacitor site which has been popularly released in January 2013. Please use the new website for searching TDK's inductor which is the No. 1 supplier of inductor by all means."[14] TDK's website currently has an active feature that allows purchase of Inductors through a search feature that links directly to inventory for certain distributors.

65.     Following this development, TDK announced that TDK and EPCOS brand Inductors were available through United States distributors and the EPCOS website it maintained: "TDK Corporation announces that its broad spectrum of sample kits for EPCOS components is now also available directly from Mouser Electronics, a high-service electronic component distributor focused on providing new products to design engineers. Currently, nearly 40 sample kits containing the latest EPCOS protection devices, sensors, chokes, SAW filters, SMT inductors and power inductors are offered on the EPCOS website."[15]

66.     For much of the Class Period, TDK's American Depositary Receipts Shares ("ADRs") were listed on the New York Stock Exchange. In delisting its ADRs in 2009, TDK explained that "[i]n June 1982, TDK listed its [ADRs] on the NYSE primarily to raise funds, bolster corporate creditworthiness and the TDK brand, and broaden its investor base, as it globalized its business operations and rapidly expanded overseas sales. Ever since, the Company has worked to expand its operations in the U.S. and elsewhere around the world."[16] Foreign corporations that issue ADRs must register with the Securities and Exchange Commission and are subject to various federal regulations and reporting rules. These securities allow foreign corporations to profitably enter the United States capital markets.

[14] https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm

[15] https://www.marketscreener.com/EPCOS-AG-ADR-424434/news/EPCOS-AG-ADR-Online-Service-Easy-ordering-of-sample-kits-from-Mouser-Electronics-16581394/

[16] https://www.global.tdk.com/corp/en/news_center/press/aah29200.htm

67.     As explained below, TDK had also qualified as a supplier of Inductors to ▮▮▮▮

68.     As also explained below, TDK engaged in numerous conspiratorial acts relating to Inductors within the United States.

69.     The Defendants thus engaged in conduct both inside and outside the United States, its territories, and the District of Columbia that caused direct, substantial, and reasonably foreseeable and/or intended anticompetitive effects upon interstate commerce within the United States.

70.     The Defendants, directly and through their wholly owned and/or controlled subsidiaries and agents, engaged in a conspiracy to fix or inflate prices of Inductors that restrained trade unreasonably and affected adversely the market for Inductors and manufactured products that incorporated Inductors. The Defendants affected commerce, including import commerce, substantially throughout the United States, thereby proximately causing injury to Plaintiff and members of the Class.

## V.     FACTUAL ALLEGATIONS

71.     Plaintiff incorporates by reference the factual allegations made in previous sections.

### A.     The Structure of the Inductor Market

72.     Inductors work by creating magnetic fields when current passes through the coils or other inductive material. Inductors are classified primarily by inductance, the ability of an inductor to store energy in the form of a magnetic field. Inductance is measured in the unit of the Henry ($\mu$H). Inductors are sold by specifications that relate to inductance, voltage, and size. Inductors can be as simple as wrapping a metal wire around a metallic or ceramic core. Inductors can also be multilayered; these types of inductors are typically encased in plastic and may involve the use of ferrite beads, or bead arrays, or may involve the stacking or layering of film and various types of coils and electrode materials. The global market for inductors is estimated to be worth billions of dollars; the United States has approximately 71% of the North American market for these products.

73. The inductors market exhibits four salient characteristics: (1) the Defendants collectively dominate that market; (2) there are high barriers to entry that prevent significant new entrants from appearing and competing effectively with Defendants; (3) inductors are standardized, commoditized products; (4) inductors are price inelastic; and (5) variations in demand and capacity should have accounted for price declines during the Class Period, but did not . Each of these factors is discussed separately below.

### 1. Market Concentration

74. The inductors market is highly concentrated. As of 2004, Defendants TDK, Murata and Taiyo Yuden collectively held over 70% of the global market for inductors.

75. In 2016, Defendants TDK, Murata, and Taiyo Yuden still held 49% of the global inductors market. This statistic does not tell the whole story, however, because, while there was entry by Chinese manufacturers of inductors during 2004-16, those companies produced inductors of acknowledged low quality that did not really compete with Defendants' Inductors for sales to United States-based customers, as explained in detail below. Flextronics Inc. ("Flextronics"), a member of the putative Class that has filed its own lawsuit, reported that it bought from the Defendants collectively 63.4% of the inductors that it purchased during the Class Period.

76. As also discussed below, Defendants had agreed to create an oligopoly with respect to the sale of Inductors to their Major Customers by conspiring to maintain their incumbent positions as qualified vendors.

77. Acquisitions within the inductors market, such as Murata Manufacturing's acquisition of TOKO in April of 2015, Murata Manufacturing's acquisition of C&D Technologies' inductors business, and TDK's successful tender offer for EPCOS AG in October of 2008, have contributed to this market concentration.

### 2. Product Commoditization and Lack of Substitutability

78. Inductors have no close substitutes. As noted above, they perform different functions from other passive electronic components.

79.     Inductors are also treated as a commoditized product and are found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiation is "minimal."[17]

80.     Inductors are identified by a series of letters and numbers using standardized values. The first two digits marking an Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = $10*10^1 \mu H = 100 \mu H$. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means $4.7 \mu H$. Precision of an Inductor is also expressed using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

81.     The International Electrotechnical Commission ("IEC"), an organization that promotes standardization in the electrical fields, has published standards for testing relating to this component. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable within the various types described above.

82.     Defendants understand their products are interchangeable. For example, TDK maintains a webpage that allows users to enter a non-TDK inductor product code so that "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar specifications can be searched."[18]

83.     Inductors may be initially manufactured for use by one customer and then adapted by others over time, and the same inductors may be used by repeat customers. That is, inductors designed for one OEM may be designed into other products for other OEMs.

---

[17] To be clear, the 3CAC defines "Inductors" to include all such components manufactured by Defendants, regardless of whether some of them are commoditized or not.

[18] https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/

### 3. Entry Barriers

84. Entry barriers into the inductor market are high. The costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

85. Barriers to entry also exist because of the resources of the incumbents. The inductors market is a mature one dominated by established corporations, most of which have global operations. TDK reported revenues of over $10 billion in 2017. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of which is attributable to sales of electronic components. All are large and diverse multinational corporations that, like all of the Defendants, can benefit from economies of scale.

86. The Defendants have established reputations with purchasers of inductors and sellers of the raw materials needed to manufacture inductors; have access to significant amounts of capital to fund current operations; have global operations that allow them to specialize function and meet the needs of customers with global businesses; can weather downturns in the economy due to their size and substantial resources; and have integrated supply chains due to their diverse products.

87. The qualification processes with Major Customers, such as ████ also operate as a barrier to effective entry. Such Customers are unlikely to invest in the resources necessary to qualify a supplier who does not have a proven track record for producing high-quality inductors.

88. During the Class Period, there were few significant new entrants into the market for inductors and much consolidation of that market. The inductors market is a mature market with diminishing demand, circumstances that make the market ripe for collusion.

89.     As a result of the China's adoption of the International Technology Agreement in 2003, there was new entry in the form of a number of small Chinese manufacturers of inductors, but that new entry did not play a significant role with respect to inductors sold in, or shipped to, the United States. Chinese manufacturers of inductors primarily served Asian markets, particularly China. The following chart depicts that point.



Mainland China: Inductor Exports by Region

Middle East 0.10%
South/Central America 0.95%
Other 7.10%
North America 2.12%
Asia 79.44%
Western Europe 10.29%

Source: China Customs Jan 03-Apr 04

90.     Chinese manufacturers did not make significant inroads into the United States market because their inductor products were perceived as being of lesser quality than those of the Japanese Defendants and they could not pre-qualify for sales to major United States components manufacturers. Based on statements from Flextronics, ███████████████ ████████████████████████████████████████████████

91.     In a 2018 article discussing Chinese and Japanese manufacturers of passive electronic components, it was pointed out that the Japanese manufacturers are known for the consistency and quality control of their mass-produced passive component products; Wu Yeqing, the General Manager and electronic engineer of Beijing Technology, Ltd., conceded in the article that domestic Chinese enterprises are "relatively weak in terms of technology, materials and quality control."[19]

---

[19]https://www.jqknews.com/news/17693-China_consumes_trillions_of_capacitors_and_resistors_every_year_and_high-end_products_come_from_Japan.html

92.     Commentators recognize the inferior nature of inductors made by Chinese manufacturers. One industry commentator stated in 2004 that there was a "preference for Japanese passive components in the Asian market. Apparently, quality is still a sensitive issue among OEMs and CEMs [Contract Electronics Manufacturers]."[20]

93.     A contributor to one online electronics forum has explained, "Some chinese inductors are junk. They bla[]tantly lie about specs, particularly about saturation current. But then again, this is the kind of thing you should be on the lookout for with cheap Chinese parts."

> There is an even more insidious problem with many low spec / no spec / fake spec power inductors. Power inductors are often based on powdered iron cores held together by a binder. All binders are not created equ[]al and the losses in a given core depend not only on circuit parameters but on dark implementation magic learned by competent inductor makers over aeons.

> The binder degrades with temperature and time and the degradation affects the losses, leading to a feedback process which in many cases will run away very rapidly or exponentially past some critical level. In fact, it always does this, but the time scales of a properly design ed and specified part are so much larger than the design lifetime that you don't see it. Low cost john[n]y come lately cores of any origin, Chinese or otherwise, are liable to have higher losses or less capable binders or both. This means that an inductor designed to use a core well but not to over stress it will often have early catastr[o]phic failure if an inferior core material is used.[21]

94.     Another commentator put it more succinctly: "stock Chinese inductors are rather crummy (low quality)."[22]

95.     Defendants themselves were aware that Chinese inductors often were not considered to be substitutes for Japanese inductors due to the lower quality of the Chinese electronics, and thus were not serious price competitors. ███████████████

---

[20] Dennis Zogbi, "Letter from the Publisher," *Passive Components Industry Magazine* at 4 (July-August 2004).

[21] http://ecomorder.com/techref/postbot.asp?by=thread&id=%5BEE%5D+New+ideas+for+power+factor+corrected+supplies&w=body&tgt=post&at=20080826152343a

[22] http://www.dadaelectronics.eu/ForumRetrieve.aspx?ForumID=317&TopicID=487554. *See also* https://forums.anandtech.com/threads/best-gaming-mouse-20-60.2532960/page-2 (in a blog concerning the best computer mouse to use, one participant noted an audible whine emanating from his model and stated "those cheap Chinese inductors/designs will probably do that.").

1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████

4 ██████████████████████████████████████████

5      96.     It is no surprise that new entry was limited, and the number of significant

6  participants contracted. New entrants would need to invest hundreds of millions of dollars in

7  building manufacturing facilities, obtaining patents or licenses for technology, and creating a

8  production line; assembling a workforce, including professionals and executives with industry

9  experience; obtaining a supply network; and investing in R&D, marketing, and transportation

10  capabilities necessary to bring a product to market. And even then, it takes years to demonstrate

11  quality control and establish a customer base to see any return on this investment. In short, a

12  prospective competitor in the inductors market would face a daunting task in establishing and

13  growing a business. It speaks volumes that the United States hardly has a competitive player in

14  this field.

15      97.     Further barriers to entry exist because manufacture of inductors requires an

16  expensive supply chain, including the purchase and in-house processing of raw materials such

17  as metals. Inductors can incorporate iron, nickel, zinc, and sometimes barium, cobalt, and

18  strontium.

19      98.     After raw materials are purchased, they must be processed and chemically

20  treated. Leading inductor manufacturers have facilities for processing and treating the raw

21  materials. The processing and treating of raw materials requires large expenditures of capital

22  for nanotechnology. Nanotechnology, which concerns analysis of materials at the molecular (or

23  very small particle) level, is necessary because of the precision involved in manufacturing small

24  components. Nanotechnology equipment is very expensive.

25      99.     A core principle of the physics and economics of manufacturing inductors is that

26  the performance of the component is directly proportional to the size, or surface area, of the

27  Inductor. Accordingly, precision manufacturing and quality control measures are critical.

28

100.    Manufacture of inductors involves stacking, winding, and pressing metals and other raw materials, and the technology to imprint and manipulate thin metals and wire. This process requires sophisticated engineering as well as expertise in nanotechnology and process yields.

101.    And as discussed below, the Defendants colluded to deter such entry by other manufacturers, thus effectively creating an oligopoly that no inductor manufacturer could effectively breach until recently.

### 4.    Demand Inelasticity

102.    A 2017 report on the inductor market noted that "demand is considerably inelastic", meaning that as the price of inductors increases, demand does not decrease. As the report explains:

> In the inductors market, the consumer base is rather fragmented and product differentiation is minimal, thus lowering the overall bargaining power of customers. But fixed costs for suppliers are high thus giving them some power. For a consumer, the switching cost is high and the possibility of backward integration is low since production of inductors involves exclusive expertise and most OEMs find it cheaper to buy it from such suppliers than foray into its manufacturing. The bargaining power of customers is *low*.

(Emphasis in original).

103.    Several characteristics of inductors cause demand inelasticity. *First*, there are no substitutes for inductors. No other passive electronic component can perform all the functions of an inductor. Its electromagnetic properties distinguish it from a capacitor, as does its operation in relation to DC current. Capacitors can only store current; they cannot increase voltage like an Inductor can by use of magnetic fields. Resistors perform some of the "blocking" functions of inductors, but cannot store or generate voltage. If a circuit in a product calls for an Inductor, no other component will do.

104.    *Second*, generally the price of inductors is relatively low. Products such as computers and cars may have up to sixty or seventy inductors, but other products have only a couple dozen. Thus, if prices for inductors rise, such an increase is usually still not significant enough for there to be any drop in demand.

105.   *Third*, the fact that Defendants' customers, including OEMs and other manufacturers that use inductors in their products, face periodic deadlines for production reduces the chance that Defendants' customers will invest the time and resources to find another supplier.

### 5.   Variations In Demand And Supply

106.   Inductors faced declining demand following the 2001 recession at the beginning of the Class Period. One industry expert has noted that price erosion was severe in 2001 and 2002 as inductor manufacturers suffered from excess capacity, and leading inductor manufacturers contemplated selling their production facilities. Indeed, flagging demand for electronics products characterized much of the early 2000s, including the beginning of the Class Period.

107.   In addition to the effects of the 2001 recession, new technology, such as semiconductor chips and digital circuits, has threatened inductors. Inductors are not incorporated in digital circuits, which are increasingly used in high-technology products. Inductors are too large to be integrated into semiconductor chips, which are micro-electric circuits that fit onto a silicon wafer. Many consumer electronics have moved to chip technology. In 2007, a leading analyst predicted that the North American sales volume of inductors would fall by over a billion units from 2007 to 2014, mostly due to a poor outlook for consumer digital electronics. Compact portable devices that rely on digital chip circuits, such as smartphones, have replaced several different personal electronic devices.

108.   As demand waned, Defendants faced excess capacity at their Inductor manufacturing facilities. They addressed this problem by reaching agreements that limited the risk of overcapitalization by permitting them to shift production to a Defendant with available capacity, thereby avoiding price concessions due to overcapacity. Defendants without sufficient capacity to manufacture a particular inductor for a particular Major Customer assisted other Defendants to obtain qualification to sell for that Major Customer. In return, the newly-qualified Defendant covered supply shortfalls without significantly reducing prices below the referring Defendant's original prices. Defendants further reduced the risk of price competition be

agreeing not to submit bids to sell inductors that another Defendant was qualified to sell and had sufficient capacity to supply. The remarkably resilient inductor prices following the 2008 Great Recession are consistent with collusion.

109.    Inductor prices have tended to move steadily since 2008, despite large volatility in the total inductors market. For example, in 2008, the global inductor market increased in value by 16.1%, then dropped by 18.3% the next year, followed by an additional 5.5% drop in 2010 before rebounding by 12% in 2011. In 2012, the market experienced a further decline of 9.8%. In 2013, the global inductor market declined about 4%, with a 3.5% decline in shipments and a 1.8% decline in price.

110.    In a competitive market, a significant decrease in demand likely would be coupled with a commensurate decrease in price, while competitors would increase prices when demand is high. Prices in a competitive market would therefore be expected to roughly track the direction and magnitude in demand shifts, in the absence of other factors. And over time, advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period. In the global inductors market, however, average prices maintained a steady rate of change from 2008 to 2013. High prices that do not change with swings in demand or decline with long-term declining demand and advances in production efficiency are consistent with collusion. In a competitive market, a drop in demand would be expected to lead to a decrease, not an increase, in prices, as sellers move to utilize excess capacity and liquidate inventories to cover fixed costs. The consistency of Defendants' Inductor pricing trends--in a market faced with production advances, generally declining demand and large swings in year-to-year demand--suggests that non-market factors, such as collusion, were impacting prices.

**B.  Evidence of Defendants' Unlawful Conduct**

111.    The evidence of Defendants' unlawful conduct falls into two categories; (1) TDK's application for leniency from the DOJ and its admission of guilty conduct to Plaintiff in this action; and (2) the acts of information sharing and/or price-fixing by TDK, Taiyo Yuden, and Murata TOKO in the United States and Japan with respect to certain large United States

customers.[23] The facts relating to each of these categories are pled separately below, but these allegations must be viewed holistically.

### 1.    TDK Admitted to Criminal Violations of the Antitrust Laws

112.    TDK has confirmed that it applied for leniency in connection with the Department of Justice's criminal investigation into price-fixing, bid-rigging, market allocation and other anticompetitive conduct in the inductors market.

113.    As the leniency applicant, TDK was required to admit to participating in a "criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes."[24]

114.    The leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[25]

115.    TDK provided Plaintiff's counsel with documents and lawyer proffers detailing is conspiratorial acts in an attempt to limit its civil liability under ACPERA, a statute that allows antitrust leniency applicants to avoid treble damages and joint and several liability if they provide "satisfactory" cooperation to claimants.

### 2.    Examples of Conspiratorial Acts Impacting Customers in the United States

#### a.    Unlawfulness of Such Conspiratorial Acts

116.    TDK has admitted that it participated in numerous criminal acts in both the United States and Japan that violate the Sherman Act's proscription against price-fixing, bid-rigging and market allocation. The acts described below that occurred in the United States

---

[23] In previous complaints, Plaintiff has alleged that Defendants engaged in conspiratorial conduct in connection with meetings of the Japan Electronics & Information Technology Association ("JEITA"). In deference to the Court's prior rulings, Plaintiff is not including these allegations here, but is also not waiving them, in the event that further discovery allowed in this litigation demonstrates that Defendants did conspire to fix prices for their Inductors through JEITA.

[24] https://www.justice.gov/atr/page/file/926521/download.

[25] https://www.justice.gov/atr/corporate-leniency-policy.

involved, *inter alia*, explicit agreements to fix the prices of Inductors sold to United States companies. The acts in Japan involved some of the same conduct.

117.    Some of the acts described below also involve sharing of confidential information among horizontal competitors for the purpose of implementing a price-fixing agreement.

                **b.**      **Background of TDK's Sales to Major United States Customers and Key Participants**

118.    TDK has provided the following information to Plaintiff's counsel in support of its application to limit its liability under ACPERA. These facts constitute admissions by TDK that its conduct violates U.S. antitrust law.

119.    TDK's business group responsible for Inductors is known as L2 (Magnetics Group). Within L2, the Product Marketing Department ("PMD") is responsible for pricing of Inductors. Individuals with pricing responsibility are known as PMDs. PMDs based at TDK offices in Japan work with locally-based PMDs around the world to set prices for various customers. At the factory level, some managers may have input into prices quoted to customers.

120.    Defendants' Major Customers in the United States typically issue RFQs several times a year. RFQs are generally received by the TDK America sales organization, which would then provide a copy to a local PMD, who would focus on the products within the RFQ for which he or she had pricing responsibility. A PMD would first determine what he or she thought the price should be and would communicate back and forth with colleagues in Japan for a final price. Once the price was settled, then the price would be communicated to the customer, generally with the sales organization's involvement, and perhaps management as well, depending on the customer. Managers responsible for manufacturing also sometimes would receive proposed pricing information and be given an opportunity to weigh in.

121.    The Inductors TDK and the other Defendants sold to their Major Customers were fungible; they marketed the same products to different customers. For example, in 2008, TDK considered selling its ████████████████████████████, which TDK had previously sold to ████████████. Similarly, TDK sold the ████████████████ and

many other customers. TDK's ███████████████ was comparable to Murata's ███████████.

Additionally, Murata supplied its ██████████████, such as the ██████████, to several

different customers, including ██████████████████████████████

███████, among others. ████████████████████████████████████ and

sold it to so many different customers that it was forced to allocate supply in 2011. Likewise,

██████████████████████████, as well as to distributors and other customers.

These are merely a few of *many* representative examples.

122.    Flextronics has corroborated this point. It has produced a chart ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████

123.     The prices set by Defendants for these and other similar Inductors in negotiations with Major Customers operated as floors for the prices charged to other customers for the same or similar products. Indeed, many of Defendants' Major Customers usually imposed most favored customer ("MFC") requirements. An MFC is an agreement that obligates a supplier to provide favored customers with pricing that is no higher than the best prices offered by the supplier to other clients. This is generally referred to as "on no less favorable terms."

124.     Defendants knew that use of MFCs that locked in collusively high prices that would cause prices to increase for all of the other Inductors they were selling to customers other than their Major Customers. This conclusion is further supported by the facts discussed below.

125.     Two key TDK employees who helped orchestrate conspiratorial price-fixing were **Umeda** (mentioned previously) and **Toshimichi Kamagata** ("Kamagata"). Umeda began working at TDK America's San Jose-based PMD in 1999. In conjunction with others at TDK, Umeda had pricing responsibility for pricing in the United states. He reported to PMDs in Japan. Umeda returned to Japan in 2016.

126.     Umeda exchanged information with his United States-based counterparts at Murata and Taiyo Yuden regarding pricing, pricing strategy, coordinating responses to RFQs, negotiation tactics with customers, product development, customer status, and contents of communications with customers, among other matters. Umeda also negotiated pricing agreements among the three competitors for ■■■■, thereby setting the floor for the prices of Inductors. Umeda reported to several Japan-based PMDs of TDK. He most often communicated with Kamagata regarding information exchanges with Murata and Taiyo Yuden in connection with pricing negotiations. Umeda also communicated with various TDK employees regarding competitor information exchanges and pricing for customers. Umeda returned to Japan in 2016.

127.     Kamagata was a PMD of TDK in Japan from 2012-16 and was Umeda's superior. He was also a superior to **Mitsuharu Mizutani** ("Mizutani"), (head of passive applications) and **Yohei Yamasaki** ("Yamasaki") (a strategic account officer at TDK America). Kamagata succeeded **Takuji Suda** of TDK. Kamagata reported to his boss, **Toshihiro**

**Kuroshima** ("Kuroshima") of TDK, regarding his communications with Murata and Taiyo Yuden.

128.   What follows are descriptions of Defendants' collusive conduct with respect to certain Major Customers based in the United States.

■   ■■■

**(1)    Umeda's Communications with Murata**

■■  ■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

■■  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

131.   ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. Soon after the introduction, Umeda and ■■■■ had a dinner meeting at which they focused on selling to ■■■■

1    Umeda shared that TDK was focused at that time on ████████,[26] CMFs, and ████████

2    ████████████ told Umeda that Murata also sold those products to █████.

3    

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    135.

24

25

26    ────────────────
[26] "An LC filter combines inductors (L) and capacitors (C) to form low-pass, high-pass,
multiplexer, band-pass, or band-reject filtering in radio frequency (RF) and many other
applications. Passive electronic LC filters block, or reduce, noise (EMI) from circuits and

27    systems, and separate, or condition, desired signals." https://www.coilcraft.com/edu/
LC_Filter.cfm.

28

1

2

3         ████ This had the effect of setting the floor for prices of similar types of inductors.

4         136.   ██████████████████████████████████████████

5

6

7         ████████████████████████████████ Such coordination inhibited competition in

8  the market overall, inflating the prices of Inductors.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





**(2)     Umeda's Communications with Taiyo Yuden**

---

[27] Hiraoka was not Umeda's first contact at Taiyo Yuden. In 1999, Umeda initially met ████████████████, who was the PMD for Taiyo Yuden's Magnetics Group, which included Inductors. After the initial meeting, ███████████████ ██████████████████ They likely had discussions about which specific customers they were approaching and may have discussed their overlapping products. █████████



**(3)** **Kamagata's Dealings with Murata and Taiyo Yuden**

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████ .

**(4)** *Nakakabu* **Meetings in Japan**

155. █████████████████████ , there were a series of meetings involving TDK,

Murata, and Taiyo Yuden called *Nakakabu*. meetings. ████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ███████████████████████

9 ███ ███████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ██████████████████████████████████

16 ███ ███████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ██████████████████████████████████████

23 ███ ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ██████████████████████████

26 ███ ███████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14          **(5)      Concurrent Meetings in the United States**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

**(6)    Acts of Other TDK Employees**

165.    Several TDK employees other than Umeda and Kamagata engaged in communications with competitors. They also assisted Kamagata and Umeda to obtain sensitive commercial information from competitors used to coordinate intercompetitor pricing.

166.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    178.  **Yohei "Ringo" Yamasaki**: Yamasaki was the Strategic Account Officer at

24  TDK America. ███████████████████████████████. His superiors included

25  Kamagata and Umeda █████████████████████

26  ████████████████████

27  ████████████████████████████████████████

28

1

2

3

4

5

6

7

8

9           **(7)**      **Unlawful Agreements Among TDK, Murata, and**

10                              **TOKO**

11       181.    Murata began conspiring with TOKO well before Murata acquired a controlling

12 interest in TOKO.

13

14

15

16

17

18               **(8)**      **Summary**

19       182.    The purpose of these meetings at all times was to keep prices of Inductors higher

20 than they would otherwise have been, as well as to limit competitive participation in RFQs. The

21 net effect of these actions, taken over nearly a decade, was to inflate the price of inductors

22 overall.

23       183.    Plaintiff is aware of no specific act taken by any Defendant to withdraw from

24 this conspiracy, other than TDK's cooperation with the government. TDK itself has not

25 indicated that it is no longer participating in collusive activity or that it took steps to make a

26 "noisy withdrawal" from these collusive acts. TDK has been largely unresponsive to Plaintiff's

27 requests for information following its initial proffer, including failing to provide information

28

1    that it offered to produce in the proffer itself, and failing to respond substantively to multiple

2    requests for additional information.

3           **3.      Contacts and Unlawful Agreements Among TDK, Murata, And**
              **Taiyo Yuden Targeting U.S. Customers Other Than** ▉

4

5           184.    TDK reached anticompetitive agreements with Murata and Taiyo Yuden

6    regarding customers in addition to ▉. Major Customer-specific agreements among TDK,

7    Taiyo Yuden, and Murata targeted many different Major Customers other than ▉ some of

8    whom are discussed in this section of the 3CAC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1

2

3

4

5

6

7

8

9

10

11

12       201.    On one occasion, TDK and Murata colluded to impose a liability term upon the

13   inventory of Flextronics,

14

15

16

17

18

19

20

21

22

23           **4.      TDK, Taiyo Yuden and Murata Collusively Agreed to Maintain**
                       **their Incumbent Status by Assisting Each Other During the OEM**
24                     **Qualification Process**

25       203.    Documents TDK produced and the proffer it provided reflect several building

26   blocks of a successful bid to supply inductors to large OEM and EMS customers. These include,

27   but are not limited to:

28

204. *First*, the supplier must be able to demonstrate that the product it proposes to sell the OEM has the technical capabilities to perform as required. Thus, the inductor being proposed must meet relevant inductance requirements, saturation thresholds, size requirements, composition requirements, etc.

205. *Second*, the bidder must propose an acceptable price term.

206. *Third*, the bidder must satisfy the OEM that the bidder can reliably supply the requested inductors and that the supplied inductors will reliably meet quality requirements.

207. *Fourth*, the bidder must address any OEM or EMS idiosyncratic preferences regarding bid format, timing, presentation, etc.

208. The incumbent bidder has already successfully navigated these requirements. Assistance from the incumbent in the bidding process is thus of enormous benefit to a new bidder, even an established manufacturer with a solid reputation for quality like Defendants.

209. By assisting each other with qualifying products to large OEMs and EMS customers and coordinating their bids, Murata, TDK, and Taiyo Yuden effectively protected their incumbent status as the inductor suppliers to large EMS and OEM customers. Large OEMs and EMS customers were unlikely to invest substantial resources qualifying new market entrants in the first place, and new market entrants were unlikely to submit successful bids that would even permit an attempt at qualification, as long as the Defendant that was an incumbent supplier to the OEM was assisting only co-conspirators in submitting bids. Defendants TDK, Taiyo Yuden, and Murata colluded to maintain their collective incumbent status with the OEM purchasers that had qualified any one of the three to sell inductors. This collusion both inflated the price of all inductors sold for the OEMs for which TDK, Taiyo Yuden or Murata had qualified, and created a major barrier to entry for other suppliers attempting to enter the inductors market.

210. By maintaining their collective hegemony over sales to large OEMs that TDK, Taiyo Yuden and Murata supplied, they increased prices by limiting competition to only entities TDK, Taiyo Yuden and Murata trusted not to engage in price competition (other Defendants),

1   and substantially impaired other suppliers from imposing price discipline on TDK, Murata, or

2   Taiyo Yuden.

3      211.   The conspirators' efforts to assist each other in qualifying for large OEM

4   accounts is also strong circumstantial evidence of a broader understanding not to compete on

5   price. Simply put, a firm acting in its own self-interest would not help its competitors qualify

6   to sell a competing product to that firm's existing customers. Even speeding up the qualification

7   process for a competitor sure to be qualified at some point would, in the absence of broader

8   collusion, accomplish nothing other than advance the date a newly qualified competitor would

9   drive down prices. Providing technical assistance to a competitor developing a product to

10   compete with one's own is the quintessential definition of an action against self-interest unless

11   one has solid assurances that the competitor will not compete on price and one trusts those

12   assurances.

13        **5.**    **Defendants' Bid-Rigging Activities Resulted In Collusive Parallel**
                **Pricing Of Inductors, Including Inductors Other Than Those That**
14              **Were The Subject of The Bid-Rigging.**

15      212.   The prices set by Defendants for these and other similar Inductors in negotiations

16   with Major Customers operated as floors for the prices charged to other customers for the same

17   or similar products. Indeed, customers like ███████████ and other Major Customers

18   usually imposed requirements on vendors such as the Defendants. As indicated above, an MFC

19   is an agreement that outlines an obligation for a supplier to provide favored customers with

20   pricing that is no higher than the best prices offered by the supplier to other clients. This is

21   generally referred to as "on no less favorable terms." Many other major customers with whom

22   Defendants dealt imposed similar requirements with respect to purchasers of Inductors because

23   MFC clauses are commonly used.

24      213.   As Defendants themselves recognized, inflating the price of Inductors sold to

25   Defendants' Major Customers drove up the prices of Inductors that Defendants sold to other

26   customers. For example, on March 18, 2010, TDK and Taiyo Yuden discussed market pricing.

27   TDK confirmed that TDK's Matsuura passed on the information, including that Taiyo Yuden

28

1   "said that they had not provided a price below ████████████████████." Similarly,

2   Sato of TDK referred to effects on the overall market for Inductors sold by Defendants when

3   he said ████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████ He was referring to a meeting with Murata,

6   which supports the conclusion that the two had reached an agreement to suppress competition

7   for Inductors not only on items sold to OEMs, EMSs, and CEMs, but also all Inductors

8   competing with or corresponding to them. Thus, Defendants' bid-rigging activities with respect

9   to major customers had the foreseeable and intended effect of causing the collusive pricing to

10  which they agreed to establish the price floor for Inductors that they sold to United States-based

11  customers generally.

12       214.   Flextronics has confirmed this fact, saying "[b]ecause the agreements between

13  Defendants and the OEMs essentially set the pricing floor for Flex, Flex was forced to pay the

14  same or even greater inflated prices as the OEMs even for 'Flex Priced' inductors that Flex

15  purchased for other customers." It concluded that "it is much more difficult or impossible for

16  Flex to obtain price concessions for products purchased to build finished goods for its other

17  customers when the benchmark price for market-dominant customers like ████████████

18  has been artificially inflated."

19       215.   Defendants did not produce transactional data for most of their sales to the Major

20  Customers described above. As determined by Dr. Russell Lamb, an economist hired by

21  Flextronics, it is likely impractical for many smaller purchasers (such as Plaintiff Dependable)

22  to allege parallel pricing using statistical analysis of only their own purchasing data. Calculating

23  and alleging statistically accurate pricing allegations requires a substantial quantity of purchases

24  of comparable products from multiple Defendants over the course of the alleged Class Period.

25       216.   Dr. Lamb did an analysis of the quarterly average price, by Defendant, for

26  specific categories of inductor (ferrite chip bead inductors, chip inductors, and common mode

27  choke inductors) and types of inductor (ferrite bead, multilayer type with a non-ferrite core,

28  multilayer type with a ferrite core, and wirewound) of a specific size (0603, 1005, 1608, 2012)

1  and in some cases for a given application (*e.g.*, for power lines) that Defendants' catalogs

2  identified as comparable. He thus analyzed the price of inductors of the same category, type,

3  size, and application. Products were identified as comparable using online catalogs and

4  references. The products in question and Defendants' respective shares of volume with respect

5  to sales to Flextronics were as follows:



13      217.    Dr. Lamb's analysis supports the allegation that Defendants' prices for

14  comparable Inductors sold to Flextronics moved in a parallel fashion during the Class Period.

15  Although Flextronics has filed a separate lawsuit, it is a member of the proposed Class and

16  therefore its experience is relevant here.

17      218.    For example, Dr. Lamb looked at quarterly transaction prices for common mode

18  choke Inductors sold by Murata and TDK to Flextronics during the Class Period. The following

19  chart depicts what he found.

219.    This chart depicts parallel price movements. Except for a period in late 2011 when Murata's prices increased, prices moved in parallel fashion throughout the Class Period. At no point did prices diverge by more than three cents, and then only for a short time. Notably, the prices of these Inductors remained stubbornly stable throughout the Class Period, and increased during certain years, even though demand changes should have caused price swings and advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period.

220.    Dr. Lamb reached a similar result with respect to ferrite bead Inductors sold by Murata, TDK, and Taiyo Yuden to Flextronics during the Class Period, as depicted in the chart below.

Quarterly Transaction Prices

221.   All three Defendants' prices moved in parallel fashion except for very brief spikes by Taiyo Yuden in 2004, TDK in 2005, and Murata in 2013. Some price variation is unsurprising; conspirators that are rigging bids often do not reach consistent agreements to price at the same level. Idiosyncratic conditions at certain times also may have led to short term price variation. But at no point did prices move in different directions for any significant period. It is also notable that the prices of these Inductors remained stubbornly stable throughout the Class Period, and even rose during certain years, even though changes in demand should have caused price swings and advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period.

222.   The prices of the other Inductors that Dr. Lamb analyzed followed similar patterns. Prices for multilayer ferrite chip inductors that Flextronics purchased from Defendants TDK, Taiyo Yuden, and Murata moved in parallel fashion during the Class Period, as did prices for multilayer ceramic chip inductors purchased from the same Defendants. The prices of these

1    Inductors also remained stubbornly stable beginning in 2006 and even began to rise to some

2    extent in 2011, even though advances in production efficiency and technology would typically

3    be expected to drive down prices over the course of the Class Period.

4         223.    The pricing by Defendants of Inductors sold to Flextronics is likely to be similar

5    to what other members of the proposed Class experienced. Inductors can be and have been

6    initially manufactured for one customer and then adapted by others over time. The same

7    inductors may be used by many customers for some time and then later by only a few customers

8    or one customer. Inductors made by one Defendant may be designed into other OEM products

9    and manufactured by other Defendants for other OEMs.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

12        224.    Plaintiff and members of the Class could not have discovered, with reasonable

13   diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it,

14   until the DOJ's investigation was made public in January of 2018.

15        225.    Defendants actively concealed the existence of the conspiracy from Plaintiff and

16   members of the Class, and there is nothing in the public domain that would put Plaintiff or

17   anyone else on notice that the Defendants were conspiring at meetings regarding prices for

18   Inductors sold in the United States.

19        226.    Defendants' own public statements concealed the existence of the alleged

20   conspiracy. For example, Murata in its Fiscal Year 2004, 2007 and 2008 Annual Reports

21   repeatedly referred to "competition" as being "fierce." Many of TDK's Annual Reports during

22   the Class Period also refer to the challenges of "competition." Similarly, in its Annual Reports

23   during the Class Period (such as those from 2009-11), Taiyo Yuden touted its "social

24   responsibility" charter and how it engaged in "fair, open and free competition" and how it was

25   facing "increased" competition.

26        227.    Several of the Defendants have adopted and promulgated a "code of conduct"

27   that is at odds with their participation in the alleged conspiracy.

28

228.    Thus, Murata said in its 2007 Code of Conduct that "[w]e will conduct fair business by complying with all applicable laws and regulations regarding antitrust and fair competition and trade."[28]

229.    Similarly, TDK's 2005 Code of Conduct states that:

> In general, the purpose of antitrust laws or similar competition laws in many countries is to encourage free competitions or trade and to protect consumer interests. TDK Members must exercise special care to ensure that any business activity with representatives of other companies is not contrary to such antitrust laws or similar anti-competition laws of other countries, where applicable. Each member organization of TDK Group should have its compliance company policy with regard to its respective applicable antitrust laws or similar anti-competition laws, and such policy must be respected or observed by TDK Members of the member organization.[29]

230.    Likewise, Taiyo Yuden's Code of Conduct states that "[a]ny unfair business practice or suspected act of cartel behavior, abuse of dominant bargaining position, tie-in sales or other acts for improper restriction of trade or unfair transaction shall be never committed."[30]

231.    By promulgating these codes of conduct and then not living up to them, the Defendants engaged in fraudulent concealment.

232.    Likewise, TDK actively sought to conceal conspiratorial activity with respect to the MT Cup, as described above. Similarly, as also noted above, ███████████████████ ████████████████████████████████████████████ ████████████████████████████████

233.    And, as noted above, ███████████████████████ ████████████████████████████████████████████

---

[28] https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/p02.ashx?la=en.

[29] https://www.sec.gov/Archives/edgar/data/203383/000114554907001603/k01416exv11w1.htm.

[30] https://www.yuden.co.jp/cs/company/csr/charter/rule.html.

1

## VII.    CLASS ACTION ALLEGATIONS

2      234.    Plaintiff brings this action on behalf of itself and as a class action pursuant to

3   Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a Class,

4   which is defined as follows:

5      235.    All persons or entities in the United States, its territories, and the District of

6   Columbia who purchased Inductors (including through controlled subsidiaries, agents,

7   affiliates, or joint ventures) from any of the Defendants identified therein, their subsidiaries,

8   agents, affiliates or joint ventures from January 1, 2003 through December 31, 2017 (the "Class

9   Period"). Excluded from the Class are the Defendants and their co-conspirators, subsidiaries,

10   agents, and/or affiliates; Defendants' officers, directors, management, employees, subsidiaries,

11   and/or agents; all governmental entities; and the Judges and chambers staff presiding over this

12   case, as well as any members of their immediate families.

13      236.    While Plaintiff does not know the exact number of the members of the Class, it

14   believes there are at least thousands of members.

15      237.    Plaintiff also does not know the exact duration of the alleged conspiracy and

16   reserves the right to amend its complaint.

17      238.    Common questions of law and fact exist as to all members of the Class. This is

18   particularly true given the nature of Defendants' conspiracy, which was applicable to all of the

19   members of the Class, thereby making appropriate relief with respect to the Class as a whole.

20   Such questions of law and fact common to the Class include, but are not limited to:

21          a.   Whether Defendants engaged in a combination and conspiracy among

22             themselves to fix, raise, maintain, and/or stabilize the prices of Inductors

23             sold to customers in the United States, its territories and the District of

24             Columbia;

25          b.   The identity of the participants of the alleged conspiracy;

26          c.   The duration of the alleged conspiracy and the acts carried out by

27             Defendants in furtherance of the conspiracy;

28          d.   Whether the alleged conspiracy violated the Sherman Act;

e. Whether the conduct of Defendants, as alleged in this 3CAC, caused injury to the business or property of Plaintiff and members of the Class;

f. The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period;

g. The appropriate injunctive and related equitable relief; and

h. The appropriate class-wide measure of damages.

239. The claims of Plaintiff are typical of the claims of the members of the Class who bought Inductors from any of the Defendants. The Plaintiff will fairly and adequately protect the interests of the entire Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Inductors purchased from the Defendants or manufactured products containing Inductors made by one of the Defendants.

240. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

241. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

242. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

1    243.    The prosecution of separate actions by individual members of the Class would

2  create a risk of inconsistent or varying adjudications, establishing incompatible standards of

3  conduct for Defendants.

4                         **VIII.    CLAIM FOR RELIEF**
                   **VIOLATIONS OF THE SHERMAN ACT**
5                        **15 U.S.C. §§ 1 and 3**
                      **(Alleged against all Defendants)**
6

7    244.    Plaintiff hereby repeats and incorporates by reference each preceding and

8  succeeding paragraph as though fully set forth herein.

9    245.    Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to

10 artificially restrict competition in the market for inductors. Defendants formed a cartel designed

11 to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond

12 the natural interplay of supply and demand.

13   246.    As described above, Defendants implemented this conspiracy in the United

14 States as well.

15   247.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts

16 taken in furtherance of their conspiracy, prices for Inductors and manufactured products

17 containing Inductors sold to purchasers in the United States, its territories, and the District of

18 Columbia during the Class Period were raised, fixed, maintained, or stabilized at artificially

19 inflated cartel levels.

20   248.    The combination or conspiracy among Defendants consisted of a continuing

21 agreement, understanding and concerted action among Defendants and their co-conspirators.

22   249.    For purposes of formulating and effectuating their combination or conspiracy,

23 Defendants and their co-conspirators did those things they combined or conspired to do,

24 including setting prices of Inductors at supra-competitive prices, and selling these Inductors to

25 Plaintiff and the members of the Class.

26   250.    Defendants' anticompetitive and unlawful conduct is illegal *per se.*

27   251.    As a result of Defendants' anticompetitive and unlawful conduct, Plaintiff and

28 the members of the Class have been injured in their businesses and property in that they have

1   paid more for the Inductors that they purchased during the Class Period than they otherwise

2   would have paid but for Defendants' conduct.

3                           **IX.    DEMAND FOR JUDGMENT**

4        252.    Plaintiff requests that the Court enter judgment on its behalf and on behalf of the

5   Class that:

6              A.  This action may proceed as a class action, with Plaintiff serving as Class

7                   Representative under Fed. R. Civ. P. 23(c);

8              B.  Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§

9                   1 and 3) and that Plaintiff and the Class have been injured in their business

10                  and property as a result of Defendants' violations;

11             C.  Plaintiff and the Class are entitled to recover damages sustained by them, as

12                  provided by the federal antitrust laws under which relief is sought herein, and

13                  that a joint and several judgment in favor of Plaintiff and the Class be entered

14                  against Defendants in an amount subject to proof at trial, which is to be trebled

15                  in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15);

16             D.  Plaintiff and the Class are entitled to pre-judgment and post-judgment interest

17                  on the damages awarded them, and that such interest be awarded at the highest

18                  legal rate from and after the date this class action complaint is first served on

19                  Defendants;

20             E.  Plaintiff and the Class are entitled to equitable relief under 15 U.S.C. § 26

21                  appropriate to remedy Defendants' restraint of trade, including issuing a

22                  permanent injunction against Defendants and their parents, subsidiaries,

23                  affiliates, successors, transferees, assignees and the respective officers,

24                  directors, partners, agents, and employees thereof and all other persons acting

25                  or claiming to act on their behalf from repeating (or continuing and

26                  maintaining) the conspiracy or agreements alleged herein;

27             F.  Defendants are to be jointly and severally responsible financially for all costs,

28                  including the expenses of a Court-approved notice program;

1    G.  Plaintiff and the Class recover their reasonable attorneys' fees as provided by

2        law; and

3    H.  Plaintiff and the Class receive such other or further relief as may be just and

4        proper.

5                              **X.    JURY DEMAND**

6        253.    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiff demands a trial by

7    jury on all matters so triable.

8

9    Dated: February 5, 2021                    Respectfully submitted,

10                                              /s/ *Lesley E. Weaver*
                                                Lesley E. Weaver (SBN 191305)
11                                              Anne K. Davis (SBN 267909)
                                                BLEICHMAR FONTI & AULD LLP
12                                              555 12th Street, Suite 1600
                                                Oakland, CA 94607
13                                              Tel.: (415) 445-4003
                                                Fax: (415) 445-4020
14                                              lweaver@bfalaw.com
                                                adavis@bfalaw.com
15

16

17                                              /s/ *Michael P. Lehmann*
                                                Michael P. Lehmann (SBN 77152)
18                                              Bonny E. Sweeney (SBN 176174)
                                                Samantha Stein (SBN 302034)
19                                              HAUSFELD LLP
                                                600 Montgomery Street, Suite 3200
20                                              San Francisco, CA 94111
                                                Tel.: (415) 633-1908
21                                              Fax: (415) 358-4980
                                                mlehmann@hausfeld.com
22                                              bsweeney@hausfeld.com
                                                sstein@hausfeld.com
23

24                                              *Interim Co-Lead Counsel for the Proposed*
                                                *Direct Purchaser Class*
25

26                                              Marc H. Edelson (admitted *pro hac vice*)
27                                              EDELSON & ASSOCIATES, LLC
                                                3 Terry Drive, Suite 205
28

Newtown, PA 18940
Tel.: (215) 867-2399
medelson@edelson-law.com

Joshua H. Grabar (admitted *pro hac vice*)
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (267) 507-6085
jgrabar@grabarlaw.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
guido@saveri.com
rick@saveri.com
zirpoli@saveri.com

Christopher M. Burke (SBN 214799)
Walter W. Noss (SBN 277580)
Hal Cunningham (SBN 243048)
John Jasnoch (SBN 281605)
SCOTT + SCOTT ATTORNEYS AT LAW
LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-4565

Todd A. Seaver (SBN 271067)
Joseph J. Tabacco, Jr. (SBN 75484)
Matthew D. Pearson (SBN 235339)
Sarah Khorasanee McGrath (SBN 263935)
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
mpearson@bermantabacco.com
smcgrath@bermantabacco.com

Marc Greenspon

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194
mgreenspon@bermantabacco.com

Vincent Briganti
LOWEY DANNENBERG P.C.
White Plains Plaza
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com

Brian Murray
Lee Albert
GLANCY PRONGAY & MURRAY
230 Park Avenue, Suite 530
New York, NY 10169
Tel.: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

Allan Steyer (SBN 100318)
D. Scott Macrae (SBN 104663)
STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
Tel.: (415) 421-3400
Fax: (415) 421-2234
asteyer@steyerlaw.com
smacrae@bamlawca.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Arthur N. Bailey
R. Anthony Rupp, III
Marco Cercone
RUPP BASE PFALZGRAF
CUNNINGHAM, LLC
424 Main Street, 1600 Liberty Building
Buffalo, NY 14202
Tel: (716) 854-3400
bailey@ruppbaase.com
rupp@ruppbaase.com
cercone@ruppbaase.com

Joseph W. Cotchett
Adam J. Zapala
Elizabeth T. Castillo
COTCHETT, PITRE, McCARTHY, LLP
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Additional Counsel for the Proposed Direct Purchaser Class*

Pursuant to Civil L. R. 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories above.

Date: February 5, 2021

*/s/ Michael P. Lehmann*
Michael P. Lehmann