Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com

Michael P. Lehmann (SBN 77152)
Bonny E. Sweeney (SBN 176174)
Samantha J. Stein (SBN 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeld.com
bsweeney@hausfeld.com
sstein@hausfeld.com

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*
[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INDUCTORS ANTITRUST LITIGATION | Case No. 5:18-cv-00198-EJD-NC |
| THIS DOCUMENT RELATES TO: THE DIRECT PURCHASER PLAINTIFF'S ACTION | **DIRECT PURCHASER PLAINTIFF'S THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | **CLASS ACTION** |
| | JURY TRIAL DEMANDED |
| | REDACTED VERSION OF DOCUMENT SUBMITTED UNDER SEAL PER COURT ORDER, ECF NO. 458 |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ......................................................................................1

II.     JURISDICTION AND VENUE................................................................................4

III.    PARTIES ..................................................................................................................4

        A.      Plaintiff ........................................................................................................4

        B.      The Murata Defendants ................................................................................4

        C.      The Taiyo Yuden Defendants........................................................................6

        D.      The TDK Defendants ...................................................................................7

        E.      Agents and Co-Conspirators.......................................................................11

IV.     AFFECTED COMMERCE .....................................................................................11

        A.      The Defendants' Conduct Involved Import Trade or Import Commerce and

                Had Direct, Substantial and Reasonably Foreseeable Effects on United States

                Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's and

                Class Members' Antitrust Claims ................................................................12

        B.      The Defendants Targeted the United States .................................................14

V.      FACTUAL ALLEGATIONS .................................................................................19

        A.      The Structure of the Inductor Market ..........................................................19

                1.      Market Concentration.......................................................................20

                2.      Product Commoditization and Lack of Substitutability ......................20

                3.      Entry Barriers ..................................................................................22

                4.      Demand Inelasticity..........................................................................26

                5.      Variations In Demand And Supply ...................................................27

        B.      Evidence of Defendants' Unlawful Conduct...................................................28

                1.      TDK Admitted to Criminal Violations of the Antitrust Laws............29

                2.      Examples of Conspiratorial Acts Impacting Customers in the United

                        States...............................................................................................29

                        a.      Unlawfulness of Such Conspiratorial Acts..............................29

          b.      Background of TDK's Sales to Major United States Customers and Key Participants ............................................................ 30

          c.      ███ ..................................................................... 33

                (1)    Umeda's Communications with Murata ..................... 33

                (2)    Umeda's Communications with Taiyo Yuden ........... 37

                (3)    Kamagata's Dealings with Murata and Taiyo Yuden . 38

                (4)    *Nakakabu* Meetings in Japan ................................. 39

                (5)    Concurrent Meetings in the United States ................. 40

                (6)    Acts of Other TDK Employees .................................. 41

                (7)    Unlawful Agreements Among TDK, Murata, and TOKO ...................................................................... 44

                (8)    Summary ................................................................... 44

     3.    Contacts and Unlawful Agreements Among TDK, Murata, And Taiyo Yuden Targeting U.S. Customers Other Than ███ ......................... 45

          a.      ███ .............................................................. 45

          b.      ███ .............................................................. 45

          c.      ███ .............................................................. 46

          d.      ███ .............................................................. 46

          e.      ███ .............................................................. 47

          f.      ███ .............................................................. 47

          g.      ███ .............................................................. 48

     4.    TDK, Taiyo Yuden and Murata Collusively Agreed to Maintain their Incumbent Status by Assisting Each Other During the OEM Qualification Process ........................................................... 48

     5.    Defendants' Bid-Rigging Activities Resulted In Collusive Parallel Pricing Of Inductors, Including Inductors Other Than Those That Were The Subject of The Bid-Rigging ................................. 50

VI.   TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-
      DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT
      CONCEALMENT ........................................................................................55

VII.  CLASS ACTION ALLEGATIONS ...........................................................57

      a.    Whether Defendants engaged in a combination and conspiracy among
            themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold
            to customers in the United States, its territories and the District of Columbia;57

      b.    The identity of the participants of the alleged conspiracy;............................57

      c.    The duration of the alleged conspiracy and the acts carried out by Defendants
            in furtherance of the conspiracy; ...................................................................57

      d.    Whether the alleged conspiracy violated the Sherman Act;...........................57

      e.    Whether the conduct of Defendants, as alleged in this 3CAC, caused injury to
            the business or property of Plaintiff and members of the Class; ....................58

      f.    The effect of the alleged conspiracy on the prices of Inductors sold in the
            United States during the Class Period; ...........................................................58

      g.    The appropriate injunctive and related equitable relief; and ...........................58

      h.    The appropriate class-wide measure of damages. ...........................................58

VIII. CLAIM FOR RELIEF ...................................................................................59

IX.   DEMAND FOR JUDGMENT ......................................................................60

X.    JURY DEMAND...........................................................................................61

1.     Plaintiff Dependable Component Supply Corporation ("Plaintiff" or "Dependable") brings this action on behalf of itself and on behalf of a class of all similarly situated persons and entities in the United States, its territories, and the District of Columbia (the "Class") for damages and injunctive relief pursuant to Sections 15 and 26 of the Clayton Act (15 U.S.C. §§ 15 and 26) for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against Defendants Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Murata Power Solutions, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of North America; TDK U.S.A. Corporation; and TOKO Inc. (now known as Saitama Murata Manufacturing Co., Ltd.) (collectively "Defendants").[1] The allegations in this Third Consolidated Amended Complaint ("3CAC") supersede all others in earlier complaints filed in connection with this litigation. Plaintiff alleges as follows, based on information and belief, except as to itself.

## I.     NATURE OF THE ACTION

2.     Plaintiff challenges Defendants' conspiracy to fix prices, allocate markets and rig bids for Inductors that they sold to Plaintiff and class members in the United States, its territories, or the District of Columbia (including through controlled subsidiaries, agents, affiliates, or joint ventures) during the period from January 1, 2003 through December 31, 2017 (the "Class Period").

3.     As used in this 3CAC, the non-capitalized term "inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; common mode filters ("CMFs"); "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching. Inductors are one of the most common passive linear elements in electronic circuits and thus are ubiquitous in thousands of products that rely on electronic circuits for power.

---

[1] Plaintiff reserves the right to amend its complaint once the identities of any other alleged conspirators are established.

Inductors are found in a wide variety of electronic equipment, including: (a) smartphones, laptop and desktop computers, video game consoles, wireless LAN (Local Area Network) boxes, and other types of consumer electronic equipment; (b) televisions; (c) advanced driver assistance systems ("ADAS") used in vehicles; and (d) induction motors that are used in industry to convert electrical energy into mechanical energy.

4.     The capitalized term "Inductors" refers to all inductors manufactured by each of the Defendants and sold to members of the proposed Class, unless the context indicates otherwise. When the term "inductors" with no initial capitalization is used herein, it refers to inductors generally, including inductors made by Defendants and by others, unless the context indicates otherwise.

5.     Defendant TDK Corporation has admitted that it is the United States Department of Justice ("DOJ") leniency applicant and has confessed to participating in a conspiracy to fix prices, rig bids, and allocate markets for Inductors.

6.     Beginning in January of 2019, TDK Corporation has provided information relating to the price-fixing and market allocation of Inductors sold by it, Murata and/or Taiyo Yuden to certain large customers (mostly OEMs) who purchased Inductors from one or more of those Defendants during the Class Period. Plaintiff is currently able to identify the following entities who are in that group: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

These customers will be referred to collectively in this 3CAC as the "Major Customers." The foregoing list is not intended to be exclusive; there may well be others in this category. These acts in furtherance of conspiracy are described in detail below. These activities extended from at least 2003 through at least 2017. They involved information sharing and price-fixing agreements among at least the TDK, Taiyo Yuden, Murata, and TOKO (now part of Murata) entities. The illegal activities occurred in both Japan and California and involved at least 24

individuals from the TDK entities, 28 from the Murata entities, and seven from the Taiyo Yuden entities, all of whom are identified below. The participants ranged from sales representatives in the United States, to the key individuals in the Magnetics Departments (responsible for Inductors) of each company in Japan, to company executives in Japan. These participants are identified by name in the 3CAC.

7.      The conspiracy was carried out through multiple instances of bid-rigging and other price-fixing activity; many of the participants had price-setting authority. The Defendants continually exchanged highly sensitive competitive information, including pricing information, pricing strategy, product development updates, information about customer status, negotiation tactics they used with customers, and contents of communications with customers, among other matters. Defendants coordinated their responses to customers' Request for Quotations ("RFQs") and allocated customers and markets of Inductors among themselves to set the floor for pricing of all inductors. These exchanges were antitrust violations in and of themselves and also served to facilitate the price-fixing conspiracy.

8.      Defendants carried out their illegal activity in secret by a variety of means. These included face-to-face meetings in locales such as the Hatcho Restaurant in Sunnyvale, California, as well as at various golf outings. During part of this period, there were group meetings among representatives of TDK, Taiyo Yuden, and Murata personnel at various restaurants in Japan. These meetings, which the conspirators named *Nakakabu* meetings based upon a combination of the conspirators' names, were often accompanied by follow up meetings in California.

9.      Through this conspiracy, Defendants' coordinated price agreements and information sharing set the floor for the pricing of inductors. The conspiracy also enabled Defendants to maintain their incumbent and pre-qualified status with major purchasers like ████████████████ and Defendants' Major Customer-specific agreements targeted them and other major manufacturers, such as ████████████████████ ████████████████, among others.

## II.    JURISDICTION AND VENUE

10.    Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable relief for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

11.    Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 12 and 22) and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly transact business in this District. Additionally, a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Specifically, some Defendants maintain offices in this District, and all Defendants sell or seek to sell Inductors to electronics companies located in this District.

12.    This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at purchasers of Inductors and/or products containing Inductors in the United States and in this District.

## III.    PARTIES

### A. Plaintiff

13.    Plaintiff Dependable, an approved supplier of many of the largest original equipment manufacturer ("OEM") parts in the world, was incorporated under the laws of Florida. During the Class Period, Dependable purchased Inductors directly sold by one or more of the Defendants and was thus directly harmed by the conspiracy alleged herein. Because of Defendants' conspiracy to fix prices of Inductors that Dependable purchased, Dependable paid more for Inductors than it would have in the absence of the anticompetitive and unlawful conspiracy alleged herein and has standing to pursue claims on its own behalf and on behalf of the Class.

### B. The Murata Defendants

14.    Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or

through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. For example, industry data shows that Murata Manufacturing had $15 million in sales of one type of Inductors (ceramic chip Inductors) in North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers of passive electronic components. Murata Manufacturing annually has revenues in excess of $5 billion from sales of passive electronic components, including Inductors.

15. In March of 2014, Murata Manufacturing acquired a controlling interest in Defendant TOKO, Inc. ("TOKO"), a Japanese company that was a leading Inductor manufacturer that sold hundreds of millions of dollars of Inductors in the United States, its territories and the District of Columbia during the Class Period. According to estimates from one industry expert, TOKO had $47 million of sales of one type of Inductors (ceramic chip Inductors), in North America in 2007 alone. By April of 2015, Murata Manufacturing had assumed all aspects of TOKO's business, including its assets, sales, service, and technical support for the portfolio of TOKO products, including Inductors. To the extent Murata Manufacturing assumed, in whole or in part, the assets and liabilities of TOKO, Plaintiff intends to hold Murata Manufacturing liable for any violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by TOKO that occurred during the Class Period. Plaintiff also separately names TOKO as a Defendant.

16. Defendant Murata Electronics North America, Inc. ("MENA") is a wholly owned subsidiary of Murata Manufacturing. MENA is a Texas corporation with its principal place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors that were purchased throughout the United States, its territories and the District of Columbia during the Class Period.

17. Murata Power Solutions, Inc. ("Murata Power") is a wholly owned subsidiary of Murata Manufacturing that was created in 2007 when Murata Manufacturing acquired a division of C&D Technologies, a United States company with its headquarters in Pennsylvania.

Murata Power has its headquarters at 129 Flanders Road, Westborough, Massachusetts01581. Murata Power sells Inductors to customers located in the United States. Murata Power had $5 million of sales of Inductors in the United States in 2007.

18.     Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth, Georgia.

19.     Defendant TOKO (now known as Saitama Murata Manufacturing Co., Ltd. ("Saitama Murata")) was once an independent company that had substantial market share in sales of Inductors. TOKO's headquarters are at 18, Gomigaya, Tsurugashima-shi, Saitama, 350-2281, Japan. As is alleged in greater detail below, TOKO—both before and after its acquisition by Murata Manufacturing—attended meetings of competitors and participated in anticompetitive activity with Defendants. The current TOKO entity is a subsidiary of Murata Manufacturing. TOKO continues to manufacture and perform research and development for Inductors under the direction of Murata Manufacturing. In 2019, TOKO was renamed Saitama Murata.

20.     Defendants Murata Manufacturing, MENA, Murata Power, and TOKO (now known as Saitama Murata) will be referred to collectively herein as "Murata" or the "Murata Defendants", unless otherwise noted.

C.  **The Taiyo Yuden Defendants**

21.     Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. Taiyo Yuden Co.—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. In its 2017 Annual Report, Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

22.     Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Class Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries,

agents, or affiliates, which it wholly owned and/or controlled—sold and distributed to purchasers in the in the United States, its territories and the District of Columbia Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo Yuden Co.

23.     Defendant Taiyo Yuden Co. exerts control over Taiyo Yuden USA. Corporate policies are set by the parent company and govern the activities of the United States subsidiary, as depicted in the following chart taken from Taiyo Yuden Co.'s website:



24.     Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants" unless otherwise noted.

**D. The TDK Defendants**

25.     Defendant TDK Corporation is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chome, Chuo-ku, Tokyo 103-8272, Japan. TDK Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period.

26.     Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of

the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK-EPC—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Class Period. More specifically, TDK-EPC itself develops and manufactures Inductors, which are sold by the TDK Defendants under the TDK and EPCOS brands.[2] TDK-EPC is a wholly owned subsidiary of the TDK Corporation.

27. Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at 525 RXR Plaza, Uniondale, New York 11556. TDK USA describes itself as a "group company of TDK Corporation." During the Class Period, TDK USA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation and TDK-EPC to purchasers in the United States purchasers the United States, its territories and the District of Columbia.

28. Defendant TDK Corporation of America ("TDK America") is a wholly owned subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite 300, Lincolnshire, Illinois 60069. Like TDK USA, TDK America describes itself as a "group company of TDK Corporation." TDK America sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, to purchasers in the United States, its territories and the District of Columbia. TDK America has a marketing and sales office located in San Jose, California, that serves North American and Latin American customers.

29. The TDK Defendants were the largest manufacturers of Inductors during the Class Period. For example, in 2007 TDK sold $57 million of one type of Inductor (ceramic chip

[2] https://www.global.tdk.com/corp/en/news_center/press/aah34500.htm

1  Inductors) in North America, more than any other manufacturer according to one industry

2  expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded

3  Inductors and does so to this day.

4          30.     TDK Corporation owns and controls both TDK USA and TDK America, as

5  reflected in the following graphic of the "TDK Organization" taken from TDK Corporation's

6  website:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Organizational chart:

- Board of Directors
- President
- Executive Committee Meeting
- Business Ethics & CSR Committee
- Disclosure Advisory Committee
- Compensation Advisory Committee
- Nomination Advisory Committee
- Enterprise Risk Management Committee
- Crisis Management Committee
- Information Security Committee
- Audit & Supervisory Board

- Electronic Components Sales & Marketing Group
  - Application Center
- Electronic Components BC
  - Ceramic Capacitors BG
  - Magnetics BG
  - Communication Devices BG
  - Piezo & Protection Devices BG
  - Aluminum & Film Capacitors BG
  - Package & Foundry BD
- Sensor Systems BC
  - Temperature & Pressure Sensors BG
  - Magnetic Sensors BG
  - MEMS Sensors BG
- Magnetic Heads BC
  - HDD Heads BG
  - HDD Components BG
- Energy Solutions BC
  - Energy Devices BG
  - Energy Systems BG
  - Power Systems BG
- Magnet Products BG
- Micro-actuator Solutions BG
  - Flash Memory Applied Device BD
  - EMC & RF Engineering BD
  - Thin Film Wafer Foundry BD
  - New Business Promotion Center

- Corporate Strategy HQ
- Human Resources HQ
- Administration HQ
- SCM & Management System HQ
- Technology and Intellectual Property HQ
- Quality Assurance HQ
- Production Engineering HQ
- Finance & Accounting HQ
- Legal & Compliance HQ
  - Management Review & Support Group
- Humidifier Countermeasures HQ
- China HQ
- Europe HQ
- Americas HQ
- Audit & Supervisory Board Members Office

31. TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively referred to as "TDK" or the "TDK Defendants" unless otherwise noted.

E. **Agents and Co-Conspirators**

32. Each Defendant or co-conspirator acted as the principal of or agent for the others with respect to the acts, violations, and common course of conduct alleged herein.

33. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed products containing Inductors, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

IV. **AFFECTED COMMERCE**

34. During the Class Period, the Defendants and co-conspirators collectively controlled the market for inductors, both globally and in the United States, as further described below.

35. The Defendants sold Inductors (or products containing Inductors) directly to customers located in the United States. Substantial quantities of Inductors are shipped from outside the United States into the United States in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

36. In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products

sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

**A. The Defendants' Conduct Involved Import Trade or Import Commerce and Had Direct, Substantial and Reasonably Foreseeable Effects on United States Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's and Class Members' Antitrust Claims**

37. The Defendants' illegal conduct involved United States import trade or import commerce. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed Inductors to enter the United States market and inflating the prices of Inductors destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

38. According to one leading analyst, the inductors market in the United States "was an estimated $280 MM in FY 2018 or 10% of global consumption value."

39. The Defendants recognize the importance of sales of Inductors in the United States in their annual reports and other financial reports. That is why they created and invested in entities like MENA, Murata Power, Murata RF, Taiyo Yuden USA, TDK America, and TDK USA. The websites of those entities boast about their respective sales networks in the United States.

40. To give one example, MENA's website states that "[w]e serve as the regional and functional headquarters supporting our customers' engineering and procurement activities throughout the Americas. Along with experienced teams of Technical Sales Managers located in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized

Distributors to service our customers' requirements for sales and technical support, design expertise, logistics and supply chain initiatives."[3]

41.     Taiyo Yuden's website similarly lists a headquarters for Taiyo Yuden USA in Chicago and "sales offices" in San Diego, San Jose, Chicago and Boston.[4] Taiyo Yuden USA assisted its corporate parent in marketing and selling Inductors, issuing press releases and disseminating product guides.

42.     As a third example, TDK America's website states that "TDK Corporation of America (TCA), a group company of TDK Corporation, was established in 1974 in California as the sales and marketing force for electronic components in North America and Latin America."[5] "TCA has grown into a sales force of nine offices in the U.S. with headquarters located in Lincolnshire, Illinois. The combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry."[6]

43.     The Defendants shipped millions of Inductors (and/or products containing Inductors) into the United States during the Class Period. In addition, Inductors that were shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States companies. As a result, a substantial portion of the Defendants' revenues were derived from the United States market. Defendants spent millions of dollars on advertising their products in the United States.

44.     Because of the importance of the United States market to the Defendants and their co-conspirators, Inductors intended for importation into and ultimate consumption in the United States were a focus of the Defendants' illegal conduct. The Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that led directly into the

---

[3] https://www.murata.com/en-us/about/company/muratalocations/americas/mea

[4] https://www.yuden.co.jp/ut/company/overseas/

[5] https://www.tdk-electronics.tdk.com/en/1767762/company/press-center/press-releases/press-release-usa/distribution-award--tdk-honors-avnet-for-highest-sales-growth/1767750

[6] https://www.linkedin.com/jobs/view/technical-account-representative-at-tdk-corporation-of-america-1308754304/

United States. Defendants' conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for Inductors.

45.     Thus, when high-level executives within the Defendants' companies agreed on prices for Inductors, they knew that their price-fixed Inductors would be sold in the United States. This included negotiating prices for Inductors for the Major Customers identified previously would set the floor for market pricing for similar Inductors sold through other channels in the United States.

46.     For the reasons set forth above, the Defendants' illegal conduct involved import trade or import commerce into the United States.

47.     The Defendants' illegal conduct had direct, substantial, and reasonably foreseeable effects on United States domestic and import trade or commerce in the form of higher prices for Inductors that Plaintiff and Members of the Class paid. These prices, tainted by collusion, directly and immediately impacted Plaintiff and Members of the Class in the United States. In this respect, the United States effects of the Defendants' illegal conduct gives rise to Plaintiff's and Class Members' antitrust claims and are the proximate cause of the injury that Plaintiff and Members of the Class suffered.

48.     As described in further detail herein, Defendants' price-fixing conspiracy involved unlawful conduct within the United States that had a direct, substantial and reasonably foreseeable effect on domestic commerce.

**B.  The Defendants Targeted the United States**

49.     Because of the small size of Inductors, transportation costs are relatively minor and there is substantial international trade in these electronic components.

50.     During the Class Period, the Defendants manufactured and sold substantial quantities of Inductors shipped from outside the United States, its territories, and the District of Columbia in a continuous and uninterrupted flow of interstate and foreign trade and commerce. In addition, substantial quantities of equipment and supplies necessary for the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. Defendants' business

1  activities in connection with the production and sale of Inductors were within the flow of, and
2  affected substantially, interstate and foreign trade and commerce.

3         51.    During the Class Period, the Defendants also manufactured and sold
4  manufactured products in the United States, its territories, and the District of Columbia that
5  incorporated Inductors made by the Defendants. The Defendants also sold substantial quantities
6  of these products overseas to direct purchasers for importation to the United States, its
7  territories, and the District of Columbia. The business activities of the Defendants in connection
8  with the production and sale of products containing their Inductors were within the flow of, and
9  affected substantially, interstate and foreign trade and commerce. The paragraphs below detail
10 some specific examples of this.

11        52.    Murata's connections to the United States, its territories, and the District of
12 Columbia are deep and sustained. "In 1971, General Motors (GM) introduced Murata's ceramic
13 filters to its car radios. This was the result of efforts by Akira Murata, the founder of Murata
14 Manufacturing who traveled to the United States and aggressively pioneered the market.
15 Getting fully involved with the automobile industry was Murata's big dream then. Over 40
16 years ago, we built a plant in the United States and started production locally. Ceramic
17 resonators were introduced to the automobile industry about 25 years ago, and their market
18 continues to enjoy steady sales to this day."[7]

19        53.    On September 3, 2007, Murata announced that it had completed the acquisition
20 of the Power Electronics Division of C&D Technologies ("C&D"), a United States company
21 located in Pennsylvania, for $85 million in cash. After the acquisition, Murata operated C&D's
22 business as "Murata Power Solutions" in the United States and sold Inductors in the United
23 States, its territories, and the District of Columbia that were once offered by C&D.

24        54.    In 2014, Murata received a Preferred Quality Supplier ("PQS") award from Intel
25 Corporation ("Intel") based in part on its sales of Inductors. In a press release, Tsuneo Murata,
26 President of Murata Manufacturing, said "[w]e would like to express our sincere appreciation

27

28 _____
   [7] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline

to Intel for its tremendous support and assistance to achieve this award. We are committed to make every effort to meet and exceed Intel's expectation in 2014."[8] Murata received Intel's PQS award for 2010, 2011, and 2012. In 2014, Intel recognized Murata with a Supplier Continuous Quality Improvement award based in part on its sales of Inductors, "Intel's highest honor for its suppliers."[9]

55.     As explained below, Murata had also qualified as a supplier of Inductors to ████████████████.

56.     As also explained below, Murata engaged in numerous conspiratorial acts relating to Inductors within the United States.

57.     Murata has sales representatives across the United States, including in Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo (Indiana), and Boston.

58.     Taiyo Yuden has focused on markets in the United States, its territories, and the District of Columbia, on its own and through its relationships with other United States passive electronic components manufacturers, and has customers in the United States, its territories, and the District of Columbia. In 2005, Taiyo Yuden announced that it would sell Inductors in connection with Kemet, through a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire product lines."[10] According to Taiyo Yuden, "Taiyo Yuden and Kemet have built up a cooperative relationship since 1997, when the two companies began regular information exchanges on the product technology side. Now the relationship is to be strengthened even more through a comprehensive sales alliance."[11]

59.     In April of 2011, Intel gave Taiyo Yuden a PQS award, reflecting Taiyo Yuden's substantial efforts to sell their products, including Inductors, to U.S. companies. Taiyo Yuden President Yoshiro Kanzaki stated, "we shall continue to do our utmost to provide quality

---

[8] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411
[9] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411
[10] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf.
[11] *Id.*

advanced products and shall approach our work with the aim of becoming Intel's best partner."[12]

60.    As explained below, Taiyo Yuden had also qualified as a supplier of Inductors to ███.

61.    As also explained below, Taiyo Yuden engaged in numerous conspiratorial acts relating to Inductors within the United States.

62.    The United States has also long been central to TDK's global marketing strategy. TDK has a billboard on Times Square in New York City:



63.    This billboard has been part of TDK's "global advertising strategy" since 2001.[13]

64.    In July of 2013, TDK revamped its English language website to allow customers to search for Inductors and contact sales agents directly for purchases online: "In recent years,

---

[12] https://www.yuden.co.jp/ut/news/release/pdf_150.pdf

[13] https://www.tdk.com/corp/en/news_center/press/aah33300.htm. In December of 2011, TDK announced that it had lit up a Christmas tree on Times Square to promote its brand. https://www.global.tdk.com/corp/en/news_center/press/aah37600.htm. TDK lit the Christmas Tree in Times Square again in 2014 and 2015 and promoted its brand in the summer of 2012 by sponsoring a Fourth of July display on Times Square. *See* https://www.global.tdk.com/corp/en/news_center/press/aah40100.htm; https://www.global.tdk.com/corp/en/news_center/press/201412191618.htm (in 2014 TDK advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise").

the ratio of information acquisition via the Internet has become extremely high for the departments of customers' development, design, purchasing, etc. Also, due to the trend of globalization, there is a need to respond quickly whenever you request from any customer. The inductor site to be announced here inherits the same concept as the monolithic ceramic capacitor site which has been popularly released in January 2013. Please use the new website for searching TDK's inductor which is the No. 1 supplier of inductor by all means."[14] TDK's website currently has an active feature that allows purchase of Inductors through a search feature that links directly to inventory for certain distributors.

65.     Following this development, TDK announced that TDK and EPCOS brand Inductors were available through United States distributors and the EPCOS website it maintained: "TDK Corporation announces that its broad spectrum of sample kits for EPCOS components is now also available directly from Mouser Electronics, a high-service electronic component distributor focused on providing new products to design engineers. Currently, nearly 40 sample kits containing the latest EPCOS protection devices, sensors, chokes, SAW filters, SMT inductors and power inductors are offered on the EPCOS website."[15]

66.     For much of the Class Period, TDK's American Depositary Receipts Shares ("ADRs") were listed on the New York Stock Exchange. In delisting its ADRs in 2009, TDK explained that "[i]n June 1982, TDK listed its [ADRs] on the NYSE primarily to raise funds, bolster corporate creditworthiness and the TDK brand, and broaden its investor base, as it globalized its business operations and rapidly expanded overseas sales. Ever since, the Company has worked to expand its operations in the U.S. and elsewhere around the world."[16] Foreign corporations that issue ADRs must register with the Securities and Exchange Commission and are subject to various federal regulations and reporting rules. These securities allow foreign corporations to profitably enter the United States capital markets.

---

[14] https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm

[15] https://www.marketscreener.com/EPCOS-AG-ADR-424434/news/EPCOS-AG-ADR-Online-Service-Easy-ordering-of-sample-kits-from-Mouser-Electronics-16581394/

[16] https://www.global.tdk.com/corp/en/news_center/press/aah29200.htm

67. As explained below, TDK had also qualified as a supplier of Inductors to ███ .

68. As also explained below, TDK engaged in numerous conspiratorial acts relating to Inductors within the United States.

69. The Defendants thus engaged in conduct both inside and outside the United States, its territories, and the District of Columbia that caused direct, substantial, and reasonably foreseeable and/or intended anticompetitive effects upon interstate commerce within the United States.

70. The Defendants, directly and through their wholly owned and/or controlled subsidiaries and agents, engaged in a conspiracy to fix or inflate prices of Inductors that restrained trade unreasonably and affected adversely the market for Inductors and manufactured products that incorporated Inductors. The Defendants affected commerce, including import commerce, substantially throughout the United States, thereby proximately causing injury to Plaintiff and members of the Class.

## V. FACTUAL ALLEGATIONS

71. Plaintiff incorporates by reference the factual allegations made in previous sections.

### A. The Structure of the Inductor Market

72. Inductors work by creating magnetic fields when current passes through the coils or other inductive material. Inductors are classified primarily by inductance, the ability of an inductor to store energy in the form of a magnetic field. Inductance is measured in the unit of the Henry ($\mu$H). Inductors are sold by specifications that relate to inductance, voltage, and size. Inductors can be as simple as wrapping a metal wire around a metallic or ceramic core. Inductors can also be multilayered; these types of inductors are typically encased in plastic and may involve the use of ferrite beads, or bead arrays, or may involve the stacking or layering of film and various types of coils and electrode materials. The global market for inductors is estimated to be worth billions of dollars; the United States has approximately 71% of the North American market for these products.

73.     The inductors market exhibits four salient characteristics: (1) the Defendants collectively dominate that market; (2) there are high barriers to entry that prevent significant new entrants from appearing and competing effectively with Defendants; (3) inductors are standardized, commoditized products; (4) inductors are price inelastic; and (5) variations in demand and capacity should have accounted for price declines during the Class Period, but did not . Each of these factors is discussed separately below.

### 1.     Market Concentration

74.     The inductors market is highly concentrated. As of 2004, Defendants TDK, Murata and Taiyo Yuden collectively held over 70% of the global market for inductors.

75.     In 2016, Defendants TDK, Murata, and Taiyo Yuden still held 49% of the global inductors market. This statistic does not tell the whole story, however, because, while there was entry by Chinese manufacturers of inductors during 2004-16, those companies produced inductors of acknowledged low quality that did not really compete with Defendants' Inductors for sales to United States-based customers, as explained in detail below. Flextronics Inc. ("Flextronics"), a member of the putative Class that has filed its own lawsuit, reported that it bought from the Defendants collectively 63.4% of the inductors that it purchased during the Class Period.

76.     As also discussed below, Defendants had agreed to create an oligopoly with respect to the sale of Inductors to their Major Customers by conspiring to maintain their incumbent positions as qualified vendors.

77.     Acquisitions within the inductors market, such as Murata Manufacturing's acquisition of TOKO in April of 2015, Murata Manufacturing's acquisition of C&D Technologies' inductors business, and TDK's successful tender offer for EPCOS AG in October of 2008, have contributed to this market concentration.

### 2.     Product Commoditization and Lack of Substitutability

78.     Inductors have no close substitutes. As noted above, they perform different functions from other passive electronic components.

79.     Inductors are also treated as a commoditized product and are found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiation is "minimal."[17]

80.     Inductors are identified by a series of letters and numbers using standardized values. The first two digits marking an Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = 10*101μH = 100μH. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means 4.7μH. Precision of an Inductor is also expressed using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

81.     The International Electrotechnical Commission ("IEC"), an organization that promotes standardization in the electrical fields, has published standards for testing relating to this component. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable within the various types described above.

82.     Defendants understand their products are interchangeable. For example, TDK maintains a webpage that allows users to enter a non-TDK inductor product code so that "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar specifications can be searched."[18]

83.     Inductors may be initially manufactured for use by one customer and then adapted by others over time, and the same inductors may be used by repeat customers. That is, inductors designed for one OEM may be designed into other products for other OEMs.

---

[17] To be clear, the 3CAC defines "Inductors" to include all such components manufactured by Defendants, regardless of whether some of them are commoditized or not.

[18] https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/

**3. Entry Barriers**

84.     Entry barriers into the inductor market are high. The costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

85.     Barriers to entry also exist because of the resources of the incumbents. The inductors market is a mature one dominated by established corporations, most of which have global operations. TDK reported revenues of over $10 billion in 2017. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of which is attributable to sales of electronic components. All are large and diverse multinational corporations that, like all of the Defendants, can benefit from economies of scale.

86.     The Defendants have established reputations with purchasers of inductors and sellers of the raw materials needed to manufacture inductors; have access to significant amounts of capital to fund current operations; have global operations that allow them to specialize function and meet the needs of customers with global businesses; can weather downturns in the economy due to their size and substantial resources; and have integrated supply chains due to their diverse products.

87.     The qualification processes with Major Customers, such as ████, also operate as a barrier to effective entry. Such Customers are unlikely to invest in the resources necessary to qualify a supplier who does not have a proven track record for producing high-quality inductors.

88.     During the Class Period, there were few significant new entrants into the market for inductors and much consolidation of that market. The inductors market is a mature market with diminishing demand, circumstances that make the market ripe for collusion.

89.     As a result of the China's adoption of the International Technology Agreement in 2003, there was new entry in the form of a number of small Chinese manufacturers of inductors, but that new entry did not play a significant role with respect to inductors sold in, or shipped to, the United States. Chinese manufacturers of inductors primarily served Asian markets, particularly China. The following chart depicts that point.



90.     Chinese manufacturers did not make significant inroads into the United States market because their inductor products were perceived as being of lesser quality than those of the Japanese Defendants and they could not pre-qualify for sales to major United States components manufacturers. Based on statements from Flextronics, no Chinese manufacturer of inductors became qualified to sell to ███████████████████.

91.     In a 2018 article discussing Chinese and Japanese manufacturers of passive electronic components, it was pointed out that the Japanese manufacturers are known for the consistency and quality control of their mass-produced passive component products; Wu Yeqing, the General Manager and electronic engineer of Beijing Technology, Ltd., conceded in the article that domestic Chinese enterprises are "relatively weak in terms of technology, materials and quality control."[19]

---

[19]https://www.jqknews.com/news/17693-China_consumes_trillions_of_capacitors_and_
resistors_every_year_and_high-end_products_come_from_Japan.html

92.     Commentators recognize the inferior nature of inductors made by Chinese manufacturers. One industry commentator stated in 2004 that there was a "preference for Japanese passive components in the Asian market. Apparently, quality is still a sensitive issue among OEMs and CEMs [Contract Electronics Manufacturers]."[20]

93.     A contributor to one online electronics forum has explained, "Some chinese inductors are junk. They bla[]tantly lie about specs, particularly about saturation current. But then again, this is the kind of thing you should be on the lookout for with cheap Chinese parts."

> There is an even more insidious problem with many low spec / no spec / fake spec power inductors. Power inductors are often based on powdered iron cores held together by a binder. All binders are not created equ[]al and the losses in a given core depend not only on circuit parameters but on dark implementation magic learned by competent inductor makers over aeons.
>
> The binder degrades with temperature and time and the degradation affects the losses, leading to a feedback process which in many cases will run away very rapidly or exponentially past some critical level. In fact, it always does this, but the time scales of a properly design ed and specified part are so much larger than the design lifetime that you don't see it. Low cost john[n]y come lately cores of any origin, Chinese or otherwise, are liable to have higher losses or less capable binders or both. This means that an inductor designed to use a core well but not to over stress it will often have early catastr[o]phic failure if an inferior core material is used.[21]

94.     Another commentator put it more succinctly: "stock Chinese inductors are rather crummy (low quality)."[22]

95.     Defendants themselves were aware that Chinese inductors often were not considered to be substitutes for Japanese inductors due to the lower quality of the Chinese electronics, and thus were not serious price competitors. For example, in a 2011 report written

---

[20] Dennis Zogbi, "Letter from the Publisher," *Passive Components Industry Magazine* at 4 (July-August 2004).

[21] http://ecomorder.com/techref/postbot.asp?by=thread&id=%5BEE%5D+New+ideas+for+power+factor+corrected+supplies&w=body&tgt=post&at=20080826152343a

[22] http://www.dadaelectronics.eu/ForumRetrieve.aspx?ForumID=317&TopicID=487554. *See also* https://forums.anandtech.com/threads/best-gaming-mouse-20-60.2532960/page-2 (in a blog concerning the best computer mouse to use, one participant noted an audible whine emanating from his model and stated "those cheap Chinese inductors/designs will probably do that.").

by TDK's employee **Kazuhiro ("Kevin") Umeda** ("Umeda") following a meeting with Murata personnel regarding a bid to be submitted to ████████████████████, Umeda wrote that ██████████████████████████████████████████████████████████ ████████████████████████████████.

96.     It is no surprise that new entry was limited, and the number of significant participants contracted. New entrants would need to invest hundreds of millions of dollars in building manufacturing facilities, obtaining patents or licenses for technology, and creating a production line; assembling a workforce, including professionals and executives with industry experience; obtaining a supply network; and investing in R&D, marketing, and transportation capabilities necessary to bring a product to market. And even then, it takes years to demonstrate quality control and establish a customer base to see any return on this investment. In short, a prospective competitor in the inductors market would face a daunting task in establishing and growing a business. It speaks volumes that the United States hardly has a competitive player in this field.

97.     Further barriers to entry exist because manufacture of inductors requires an expensive supply chain, including the purchase and in-house processing of raw materials such as metals. Inductors can incorporate iron, nickel, zinc, and sometimes barium, cobalt, and strontium.

98.     After raw materials are purchased, they must be processed and chemically treated. Leading inductor manufacturers have facilities for processing and treating the raw materials. The processing and treating of raw materials requires large expenditures of capital for nanotechnology. Nanotechnology, which concerns analysis of materials at the molecular (or very small particle) level, is necessary because of the precision involved in manufacturing small components. Nanotechnology equipment is very expensive.

99.     A core principle of the physics and economics of manufacturing inductors is that the performance of the component is directly proportional to the size, or surface area, of the Inductor. Accordingly, precision manufacturing and quality control measures are critical.

100.    Manufacture of inductors involves stacking, winding, and pressing metals and other raw materials, and the technology to imprint and manipulate thin metals and wire. This process requires sophisticated engineering as well as expertise in nanotechnology and process yields.

101.    And as discussed below, the Defendants colluded to deter such entry by other manufacturers, thus effectively creating an oligopoly that no inductor manufacturer could effectively breach until recently.

### 4.    Demand Inelasticity

102.    A 2017 report on the inductor market noted that "demand is considerably inelastic", meaning that as the price of inductors increases, demand does not decrease. As the report explains:

> In the inductors market, the consumer base is rather fragmented and product differentiation is minimal, thus lowering the overall bargaining power of customers. But fixed costs for suppliers are high thus giving them some power. For a consumer, the switching cost is high and the possibility of backward integration is low since production of inductors involves exclusive expertise and most OEMs find it cheaper to buy it from such suppliers than foray into its manufacturing. The bargaining power of customers is *low*.

(Emphasis in original).

103.    Several characteristics of inductors cause demand inelasticity. *First*, there are no substitutes for inductors. No other passive electronic component can perform all the functions of an inductor. Its electromagnetic properties distinguish it from a capacitor, as does its operation in relation to DC current. Capacitors can only store current; they cannot increase voltage like an Inductor can by use of magnetic fields. Resistors perform some of the "blocking" functions of inductors, but cannot store or generate voltage. If a circuit in a product calls for an Inductor, no other component will do.

104.    *Second*, generally the price of inductors is relatively low. Products such as computers and cars may have up to sixty or seventy inductors, but other products have only a couple dozen. Thus, if prices for inductors rise, such an increase is usually still not significant enough for there to be any drop in demand.

105.    *Third*, the fact that Defendants' customers, including OEMs and other manufacturers that use inductors in their products, face periodic deadlines for production reduces the chance that Defendants' customers will invest the time and resources to find another supplier.

## 5.    Variations In Demand And Supply

106.    Inductors faced declining demand following the 2001 recession at the beginning of the Class Period. One industry expert has noted that price erosion was severe in 2001 and 2002 as inductor manufacturers suffered from excess capacity, and leading inductor manufacturers contemplated selling their production facilities. Indeed, flagging demand for electronics products characterized much of the early 2000s, including the beginning of the Class Period.

107.    In addition to the effects of the 2001 recession, new technology, such as semiconductor chips and digital circuits, has threatened inductors. Inductors are not incorporated in digital circuits, which are increasingly used in high-technology products. Inductors are too large to be integrated into semiconductor chips, which are micro-electric circuits that fit onto a silicon wafer. Many consumer electronics have moved to chip technology. In 2007, a leading analyst predicted that the North American sales volume of inductors would fall by over a billion units from 2007 to 2014, mostly due to a poor outlook for consumer digital electronics. Compact portable devices that rely on digital chip circuits, such as smartphones, have replaced several different personal electronic devices.

108.    As demand waned, Defendants faced excess capacity at their Inductor manufacturing facilities. They addressed this problem by reaching agreements that limited the risk of overcapitalization by permitting them to shift production to a Defendant with available capacity, thereby avoiding price concessions due to overcapacity. Defendants without sufficient capacity to manufacture a particular inductor for a particular Major Customer assisted other Defendants to obtain qualification to sell for that Major Customer. In return, the newly-qualified Defendant covered supply shortfalls without significantly reducing prices below the referring Defendant's original prices. Defendants further reduced the risk of price competition be

agreeing not to submit bids to sell inductors that another Defendant was qualified to sell and had sufficient capacity to supply. The remarkably resilient inductor prices following the 2008 Great Recession are consistent with collusion.

109. Inductor prices have tended to move steadily since 2008, despite large volatility in the total inductors market. For example, in 2008, the global inductor market increased in value by 16.1%, then dropped by 18.3% the next year, followed by an additional 5.5% drop in 2010 before rebounding by 12% in 2011. In 2012, the market experienced a further decline of 9.8%. In 2013, the global inductor market declined about 4%, with a 3.5% decline in shipments and a 1.8% decline in price.

110. In a competitive market, a significant decrease in demand likely would be coupled with a commensurate decrease in price, while competitors would increase prices when demand is high. Prices in a competitive market would therefore be expected to roughly track the direction and magnitude in demand shifts, in the absence of other factors. And over time, advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period. In the global inductors market, however, average prices maintained a steady rate of change from 2008 to 2013. High prices that do not change with swings in demand or decline with long-term declining demand and advances in production efficiency are consistent with collusion. In a competitive market, a drop in demand would be expected to lead to a decrease, not an increase, in prices, as sellers move to utilize excess capacity and liquidate inventories to cover fixed costs. The consistency of Defendants' Inductor pricing trends--in a market faced with production advances, generally declining demand and large swings in year-to-year demand--suggests that non-market factors, such as collusion, were impacting prices.

## B. <u>Evidence of Defendants' Unlawful Conduct</u>

111. The evidence of Defendants' unlawful conduct falls into two categories; (1) TDK's application for leniency from the DOJ and its admission of guilty conduct to Plaintiff in this action; and (2) the acts of information sharing and/or price-fixing by TDK, Taiyo Yuden, and Murata TOKO in the United States and Japan with respect to certain large United States

customers.[23] The facts relating to each of these categories are pled separately below, but these allegations must be viewed holistically.

### 1. TDK Admitted to Criminal Violations of the Antitrust Laws

112. TDK has confirmed that it applied for leniency in connection with the Department of Justice's criminal investigation into price-fixing, bid-rigging, market allocation and other anticompetitive conduct in the inductors market.

113. As the leniency applicant, TDK was required to admit to participating in a "criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes."[24]

114. The leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[25]

115. TDK provided Plaintiff's counsel with documents and lawyer proffers detailing is conspiratorial acts in an attempt to limit its civil liability under ACPERA, a statute that allows antitrust leniency applicants to avoid treble damages and joint and several liability if they provide "satisfactory" cooperation to claimants.

### 2. Examples of Conspiratorial Acts Impacting Customers in the United States

#### a. Unlawfulness of Such Conspiratorial Acts

116. TDK has admitted that it participated in numerous criminal acts in both the United States and Japan that violate the Sherman Act's proscription against price-fixing, bid-rigging and market allocation. The acts described below that occurred in the United States

---

[23] In previous complaints, Plaintiff has alleged that Defendants engaged in conspiratorial conduct in connection with meetings of the Japan Electronics & Information Technology Association ("JEITA"). In deference to the Court's prior rulings, Plaintiff is not including these allegations here, but is also not waiving them, in the event that further discovery allowed in this litigation demonstrates that Defendants did conspire to fix prices for their Inductors through JEITA.

[24] https://www.justice.gov/atr/page/file/926521/download.

[25] https://www.justice.gov/atr/corporate-leniency-policy.

involved, *inter alia*, explicit agreements to fix the prices of Inductors sold to United States companies. The acts in Japan involved some of the same conduct.

117. Some of the acts described below also involve sharing of confidential information among horizontal competitors for the purpose of implementing a price-fixing agreement.

**b.     Background of TDK's Sales to Major United States Customers and Key Participants**

118. TDK has provided the following information to Plaintiff's counsel in support of its application to limit its liability under ACPERA. These facts constitute admissions by TDK that its conduct violates U.S. antitrust law.

119. TDK's business group responsible for Inductors is known as L2 (Magnetics Group). Within L2, the Product Marketing Department ("PMD") is responsible for pricing of Inductors. Individuals with pricing responsibility are known as PMDs. PMDs based at TDK offices in Japan work with locally-based PMDs around the world to set prices for various customers. At the factory level, some managers may have input into prices quoted to customers.

120. Defendants' Major Customers in the United States typically issue RFQs several times a year. RFQs are generally received by the TDK America sales organization, which would then provide a copy to a local PMD, who would focus on the products within the RFQ for which he or she had pricing responsibility. A PMD would first determine what he or she thought the price should be and would communicate back and forth with colleagues in Japan for a final price. Once the price was settled, then the price would be communicated to the customer, generally with the sales organization's involvement, and perhaps management as well, depending on the customer. Managers responsible for manufacturing also sometimes would receive proposed pricing information and be given an opportunity to weigh in.

121. The Inductors TDK and the other Defendants sold to their Major Customers were fungible; they marketed the same products to different customers. For example, in 2008, TDK considered selling its ████████████████████, which TDK had previously sold to ████████████. Similarly, TDK sold ████████████████ and

many other customers. TDK's █████████████ was comparable to Murata's █████████████.

Additionally, Murata supplied its ███████████████, such as the █████████, to several

different customers, including █████████████████████████████████████████████

█████, among others. Murata also manufactured the ████████████████████████████ and

sold it to so many different customers that it was forced to allocate supply in 2011. Likewise,

Taiyo Yuden sold its ██████████████████████, as well as to distributors and other customers.

These are merely a few of *many* representative examples.

122.    Flextronics has corroborated this point. It has produced a chart listing various

Inductors it purchased from Defendants and breaking them out by both sales volume and gross

sales amount the quantity or dollar value of such purchases it made on behalf of ███████████

██████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████.

123.     The prices set by Defendants for these and other similar Inductors in negotiations with Major Customers operated as floors for the prices charged to other customers for the same or similar products. Indeed, many of Defendants' Major Customers usually imposed most favored customer ("MFC") requirements. An MFC is an agreement that obligates a supplier to provide favored customers with pricing that is no higher than the best prices offered by the supplier to other clients. This is generally referred to as "on no less favorable terms."

124.     Defendants knew that use of MFCs that locked in collusively high prices that would cause prices to increase for all of the other Inductors they were selling to customers other than their Major Customers. This conclusion is further supported by the facts discussed below.

125.     Two key TDK employees who helped orchestrate conspiratorial price-fixing were **Umeda** (mentioned previously) and **Toshimichi Kamagata** ("Kamagata"). Umeda began working at TDK America's San Jose-based PMD in 1999. In conjunction with others at TDK, Umeda had pricing responsibility for pricing in the United states. He reported to PMDs in Japan. Umeda returned to Japan in 2016.

126.     Umeda exchanged information with his United States-based counterparts at Murata and Taiyo Yuden regarding pricing, pricing strategy, coordinating responses to RFQs, negotiation tactics with customers, product development, customer status, and contents of communications with customers, among other matters. Umeda also negotiated pricing agreements among the three competitors for ███, thereby setting the floor for the prices of Inductors. Umeda reported to several Japan-based PMDs of TDK. He most often communicated with Kamagata regarding information exchanges with Murata and Taiyo Yuden in connection with pricing negotiations. Umeda also communicated with various TDK employees regarding competitor information exchanges and pricing for customers. Umeda returned to Japan in 2016.

127.     Kamagata was a PMD of TDK in Japan from 2012-16 and was Umeda's superior. He was also a superior to **Mitsuharu Mizutani** ("Mizutani"), (head of passive applications) and **Yohei Yamasaki** ("Yamasaki") (a strategic account officer at TDK America). Kamagata succeeded **Takuji Suda** of TDK. Kamagata reported to his boss, **Toshihiro**

**Kuroshima** ("Kuroshima") of TDK, regarding his communications with Murata and Taiyo Yuden.

128.    What follows are descriptions of Defendants' collusive conduct with respect to certain Major Customers based in the United States.

███ █████ ████

### (1)    Umeda's Communications with Murata

129.    **Mr. Nagasaka of Murata (2004-07)**. At a trade show around 2004, Umeda met Mr. Nagasaka of Murata. Nagasaka was a PMD for Murata's Magnetic Products department, which included Inductors. After the initial meeting, the two began regularly communicating by telephone with respect to common customers for which Nagasaka had responsibility, including ████████████████ ██████████████████ Umeda and Nagasaka exchanged pricing information by telephone, and thereafter spoke frequently, sometimes weekly when there was an announcement about a new product or an RFQ. They discussed new product inquiries, product design and development, the timing of products, vendor qualification, and responses to RFQs, including prices to be quoted.

130.    As one example, in 2007, while engaging in pricing negotiations for ████████, Umeda obtained sensitive pricing and strategy information for Murata from Nagasaka. The two Defendants further coordinated pricing for the customer. Umeda communicated to Nagasaka that he did not want Murata to come in aggressively at too low a price; both shared their respective companies' price ranges in order to effectuate this strategy.

131.    **Mr. Tsuda of Murata (2007-09)**. Nagasaka put Umeda in touch with a Mr. Tsuda of Murata, who was Umeda's primary contact at Murata between 2007 and June of 2009. During his tenure in San Jose, Tsuda was Umeda's primary contact at Murata after Nagasaka returned to Japan. Tsuda had responsibility for Murata's sales to ██████ Soon after the introduction, Umeda and Tsuda had a dinner meeting at which they focused on selling to ████.

Umeda shared that TDK was focused at that time ███████████ ██████████████ ███████. Tsuda told Umeda that Murata also sold those products to ██████.

132.    During the years Tsuda was stationed in San Jose, he and Umeda met face to face three to four times. They communicated more regularly by telephone. Generally, Umeda would call Tsuda in order to initiate a discussion. When ██████ issued an RFQ or was considering new products, they would speak more frequently in order to share information and discuss a concerted approach. On one occasion, Umeda along with another TDK employee, **Taketomo Ishibashi** ("Ishibashi"), met Tsuda and another Murata PMD for a drinking party in June of 2009. The participants shared information for customers such as ████████.

133.    Umeda met Tsuda again in January of 2010 about how to deal with █████. On this occasion, **Yoshi Imanishi** ("Imanishi"), Nagasaka, and a **Mr. Ueda** from Murata also attended. Umeda and Tsuda discussed pricing and development of ██████████████████ sold to █████. At that time, TDK was not qualified to serve as a supplier for the then-new ████████, but Umeda told Murata that TDK was going to develop a similar product to Murata's product and would try to get qualified.

134.    **Yoshi Imanishi (2009-14).** Imanishi of Murata was Tsuda's successor in San Jose. Umeda and Imanishi had discussions from the time of Imanishi's arrival there until January of 2014, when Imanishi returned to Japan. The two would have quarterly business lunch meetings at the Hatcho Restaurant ("Hatcho") in Sunnyvale, California, often including one person in addition from both TDK and Murata. Umeda and Imanishi spoke weekly by cellular telephone about ██████ design events, new products, and ██████ RFQs. Sometimes, Umeda and Imanishi would text each other to set up telephone calls.

135.    During this period, ████████ began asking for more discounts from vendors. Umeda and Imanishi agreed not to give ████████ what it wanted, but instead to go in with a price

---

[26] "An LC filter combines inductors (L) and capacitors (C) to form low-pass, high-pass, multiplexer, band-pass, or band-reject filtering in radio frequency (RF) and many other applications. Passive electronic LC filters block, or reduce, noise (EMI) from circuits and systems, and separate, or condition, desired signals." https://www.coilcraft.com/edu/LC_Filter.cfm.

higher than what ▮ was asking for. Umeda and Imanishi agreed that neither would bid too low. The goal was to stabilize prices at which their respective companies sold Inductors to ▮. This had the effect of setting the floor for prices of similar types of inductors.

136.    For example, in April of 2010, Umeda explained that because its ▮ was a new product for TDK and since Murata made a similar product that it sold to ▮, the companies should coordinate so that they each submitted a higher price to ▮, with the goal of each obtaining a 50% share. Such coordination inhibited competition in the market overall, inflating the prices of Inductors.

137.    In 2011, a similar situation occurred when Umeda and Imanishi had a call regarding the ▮ used in ▮ headsets. At the time, Murata was the sole supplier, but TDK also was about to become qualified and wanted to sell to ▮. Umeda did not want to ruin the relationship with Imanishi, so he let Imanishi know in advance that TDK was about to be qualified and would bid. Umeda spoke with Imanishi in advance about TDK's plans in order to avoid a price war and instead keep the price of ▮ high for both suppliers. Umeda got assurances from Murata that TDK would not need to price low, and, as a result, the latter did not. TDK bid accordingly and got a portion of the ▮ business.

138.    Umeda also communicated with Imanishi to secure an agreed-upon share for its ▮ of Inductors sold to ▮. In October of 2011, Umeda spoke with Imanishi and learned about Murata's submitted prices. ▮ deemed the prices to be too high and asked Murata to reconsider its submission. Umeda used this information to formulate a TDK pricing proposal that served both competitors' interests.

139.    **Mr. Imaizumi of Murata**. In addition to talking with Imanishi in 2011, Umeda spoke to a Mr. Imaizumi of Murata occasionally by telephone. Imaizumi was Murata's sales representative for ▮ and Umeda understood that he had some responsibility for pricing at Murata. Imaizumi was located in the United States. Imaizumi shared specific pricing information and strategy decisions with Umeda with regard to customers such as ▮.

140.    In January of 2011, ▮ wanted to buy ▮ from multiple vendors. When Umeda learned of this, he contacted Imaizumi to find out about Murata's prices. Imaizumi told

Umeda Murata's intended price, which Murata knew was at the bottom of what Murata intended to offer; Umeda shared Murata's intended price range with Kuroshima of TDK. The purpose was for TDK to discount to the minimum possible in order to maintain share. In this case, TDK and Murata had an agreement about pricing for ███. Umeda reported on his call with Imaizumi regarding ███ to Kuroshima of TDK after receiving an RFQ from ███.

141. **Kazuhido Kudo and a Mr. Goto of Murata (2014-16)**. Imanishi was replaced in 2014 by Kazuhide Kudo ("Kudo") and a Mr. Goto of Murata. Both were PMDs. Kudo handled ███ and Goto handled ███ and ███. After being introduced to both of them in February of 2014, Umeda had subsequent discussions with Kudo. Umeda had subsequent discussions with Kudo following the introductory dinner. Umeda was interested in what products Kudo handled and how well he knew ███. Umeda and Kudo spoke by phone and exchanged messages to discuss whether they were available to talk. The two met at Hatcho in January 2014 with two other Murata employees, **Ken Hadano** ("Hadano") and a **Mr. Yoshida**. **Junshi Saito ("Saito")** of TDK arranged the meeting and also attended. Umeda and Kudo spoke by telephone and exchanged messages to discuss whether they were available to talk.

142. Around the time of Umeda's February 2014 meeting with Kudo, TDK had an existing price. ███ target price to Murata was lower. TDK's Kamagata wanted to convey to Murata that there was no need to lower the price so much.

143. **Golf Meetings**. In addition to the multiple meetings identified above, several social events involving TDK and Murata took place in the United States. Umeda was a regular attendee at golf events involving foursomes between the two competitors that were known as the "MT cup" or the "TM cup", depending on who won the last round. These outings occurred from 2013-14 at locations throughout the Bay Area, such as the Santa Teresa Golf Club and the Callippe Preserve Golf Course. The outings were primarily organized by Saito of TDK and **Kenshi Yamazaki** ("Yamazaki") or **Shiro Ono** of Murata.

144. In addition to Umeda, golf participants from TDK included: **Kiyoshi Kanashiro**; **Shinya Okuyama**; Saito; **Kohei Wada**, and Yamasaki. Participants from Murata

included: **Masa Hashimoto**; **Mike Hikita**; a **Mr. Iemura**; Imanishi; a **Mr. Kurose**; **a Mr. Koyama**; **Seishi Miyamura**; **Shiro Ono**; a **Mr. Usami**; and Yamazaki.

145.    On one occasion, while scheduling an October 2013 outing, Yamazaki of Murata informed Saito of TDK that there had been an internal Murata warning about inter-competitor meetings due to recent price-fixing claims brought against automotive parts makers. Yamazaki requested to Saito that TDK refrain as much as possible from disclosing the existence of the golf meetings.

### (2)    Umeda's Communications with Taiyo Yuden

146.    **Hiraoka and a Mr. Nakamoto of Taiyo Yuden (2002-08)**. Umeda met Hiraoka around 2002-03.[27] He was Taiyo Yuden's PMD for power Inductors and ferrite bead Inductors. They met for a few meals and spoke typically by cellular phone. From 2002 until approximately 2007, Umeda and Hiraoka discussed power Inductors for ███████████ ██████ Discussions involved technical design, development, timing, power, and qualification requests. In 2007-08, they had discussions about Inductors for ████.

147.    In 2006, Umeda had lunch with Hiraoka and Nakamoto, who was Taiyo's PMD for power Inductors. At the time of the lunch meeting, TDK was bidding to sell Inductors to █████ for the █████████. Nakamoto was interested in obtaining intelligence regarding ██████ and the engineering group for the ████. Umeda gave him information about the engineering group for the ████.

148.    A dinner also took place at Hatcho with Hiraoka and Umeda. At the time, TDK had a power Inductor, but it had failed. Umeda wanted to know about Taiyo Yuden's design because the latter had a successful product. Hiraoka supplied this information, saying that if TDK changed a portion of the design it would improve efficiency. TDK implemented that

---

[27] Hiraoka was not Umeda's first contact at Taiyo Yuden. In 1999, Umeda initially met **Kenchiro Tanahashi** ("Tanahashi"), who was the PMD for Taiyo Yuden's Magnetics Group, which included Inductors. After the initial meeting, Umeda spoke with Tanahashi regularly, typically by cellular phone. They likely had discussions about which specific customers they were approaching and may have discussed their overlapping products. Their discussions may have included customers, power Inductors and noise filters and ferrite beads.

change, and later qualified as a vendor to ████ for this product. The product was for the ████

████████. Hiraoka and Umeda shared their respective price ranges with each other;

TDK encouraged Taiyo Yuden not to price as low as ████ was pushing both companies go.

Hiraoka agreed not to do so.

149. **Naoto ("Nate") Yokoyama (2008-12)**. Around 2008, Hiraoka was replaced by

Naoto Yokoyama ("Yokoyama"). Umeda met with Yokoyama once a year when they would

run into each other at ████. However, they communicated regularly by telephone. Typically,

Umeda would call Yokoyama's cellular telephone. Umeda and Yokoyama discussed power

Inductors sold to ████.

150. In 2012, Umeda met with Yokoyama to discuss its pricing for ████

████ for ████ and qualification for ████████. Yokoyama told Umeda that

Taiyo Yuden could not meet ████ targets, so Umeda knew that TDK could keep its prices

higher. Umeda reported on this conversation to Kamagata.

151. With respect to ████████, Yokoyama told Umeda that ████ was

demanding a cost breakdown from Taiyo Yuden and that TDK would likely be asked to do the

same. Umeda passed on to Kamagata Taiyo Yuden's pricing to ████.

### (3) Kamagata's Dealings with Murata and Taiyo Yuden

152. Kamagata used the information obtained from competitors to formulate TDK's

pricing strategies during the negotiation process during the first quarter of 2013. In October of

2012, Kamagata received an RFQ proposal from Koichi Shirai of TDK listing TDK's prices

for Inductor products to be offered to ████ for the negotiation. Kamagata changed the first

offers and bottom prices based on price information he received for Taiyo Yuden. Kamagata

was pleased to find Taiyo Yuden's prices were similar to TDK's.

153. Kamagata then directed Umeda to contact Murata and Taiyo Yuden in order to

coordinate on the bidding process for the ████ RFQ.

154. Umeda asked TDK's Yamasaki to talk to his sales contacts at Murata and Taiyo

Yuden. Yamasaki then called Murata again, with Umeda present. Yamasaki gave the price TDK

intended to quote and price reduction range and encouraged Murata not to quote too low. The Murata employee (a **Mr. Umetani**) responded, saying he understood.

### (4) *Nakakabu* **Meetings in Japan**

155. Starting in March of 2012, there were a series of meetings involving TDK, Murata, and Taiyo Yuden called *Nakakabu* meetings. The idea for the meetings originated with Taiyo Yuden's **Kazuo Inaba** ("Inaba"). Inaba and Kamagata set up the meetings. Kamagata was introduced to Inaba by Tsuda of TDK (Kamagata's predecessor) who wanted to arrange the introduction before he retired.

156. The purpose of *Nakakabu* meetings was to maintain a friendly network and to discuss design, qualification progress, demand, production and capacity. Attendees shared information about capacity utilization rates, and how much time it would take to recoup investment. In Japanese, the attendees used expressions like being "hungry" or "having stomachs full" to convey information about capacity utilization rates. Participants also discussed customers. Participants also had discussions about a certain type of Inductor used in the automobile business, including for customers such as ██████.

157. One goal of the meetings was to avoid waste because the build of materials for ██████ changed frequently, and there was no guarantee ██████ would use the same components or suppliers for the next model. If there were multiple vendors, there would be pricing pressure, which the participants wanted to avoid. Another goal was to avoid ██████ requests for discounting. ██████ had begun seeking second and third suppliers, which reduced its risk and also resulted in pricing competition. TDK, Murata, and Taiyo Yuden wanted to participate, but also wanted to maintain high prices and discussed how to achieve that goal.

158. *Nakakabu* meetings included the following regular attendees: (a) for TDK, Kamagata and Mizutani; (b) for Taiyo Yuden, Inaba and **Hidetaka Ikari**; and (c) for Murata, **Tatsuyuki Yamada** ("Yamada") and **Masahiro Adachi**.

159. The initial *Nakakabu* meeting took place in March of 2012 at a Tokyo restaurant called Torafugu. Attendees included Kamagata, Inaba, and Yamada. Participants discussed capacity and approval status for ██████. Kamagata reported on the meeting to Umeda and asked

him to confirm the details on Taiyo Yuden's capacity for ████████████ and its impending second source approval from ████ for ████████. Umeda then met with Taiyo Yuden in San Jose to follow up.

160.    These meetings were intended to occur regularly, and the participants developed the name for the *Nakakabu*, based on a joke about who would pick up the check. The word *Nakakabu* is a play on the Japanese words for "middle" and "limited." In Japan, when one has dinner and the server needs to fill out the receipt in the name of company, the server will ask whether "LTD" comes before or after. For TDK, the "LTD" designation comes after; for Murata, it comes before. Thus, at the end of dinner, they joked that the LTD designation should go in the middle (*Naka*).

161.    During a 2013 *Nakakabu* meeting, Kamagata told Inaba that it did not need to price too low on an upcoming Inductor bid for ████, because the competitors were not going to bid low because nobody would follow Taiyo Yuden's price.

**(5)    Concurrent Meetings in the United States**

162.    As Kamagata met with *Nakakabu* participants in Japan, TDK America employees would sometimes meet concurrently or close in time with Murata and Taiyo Yuden in the United States. On one occasion at a January 2013 meeting, Kamagata and Mizutani learned Murata was pushing for an answer as to qualification status of its ████████ as production would require considerable investment. Murata shared its investment and capacity status for ████ inductors and plans for reselling TOKO products rebranded as Murata. Saito and Umeda concurrently met with Murata in the United States, confirming the information obtained by Kamagata. Umeda also met with Imanishi and Hadano of Murata.

163.    Kamagata and Mizutani again participated in a *Nakakabu* meeting on April 11, 2013 in Tokyo. The next day, Saito met with a United States-based Murata sales employee. The main topics concerned were ████████████.

164.    During an October 2013 *Nakakabu* meeting, the participants discussed, in part, Murata's ████████ Inductors, expansion of their product line, and investment in TOKO

to increase production capacity. The next day, Saito met with **Yoshinori Soutome**, **Kenshi Yamazaki** and **Shiro Ono** of Murata in the United States. Yamasaki and **Shinya Okuyama** of TDK were also invited and likely joined the meeting.

**(6)    Acts of Other TDK Employees**

165.    Several TDK employees other than Umeda and Kamagata engaged in communications with competitors. They also assisted Kamagata and Umeda to obtain sensitive commercial information from competitors used to coordinate intercompetitor pricing.

166.    **Masao Asakawa.** Masao Asakawa ("Asakawa") succeeded Umeda in 2016. After taking over the post, he continued to communicate and participate in private meetings with Murata employees in the same manner as his predecessor. Asakawa was often invited by **Shinya Okuyama** to join in drinking parties with Murata's **Shiro Ono** and **Seishi Miyamura**. Asakawa also communicated with **Jun Karino** and **Katsu (Caster) Tawa** of Murata via a mobile messaging app and met for informal dinners and drinking parties. Asakawa also assisted in making arrangements on behalf of Umeda for information exchanges with Murata, reserving private rooms and participating in meetings.

167.    Asakawa obtained prices from Murata which he used to negotiate with customers. For example, during a September 2016 negotiation on Inductors with Asakawa proposed bottom prices to **Shigenori Komatsu** of TDK for approval, which were based on his knowledge of Murata's specific pricing. TDK used Murata's pricing information to keep prices higher.

168.    **Hiroki Honma**. Hiroki Honma ("Honma") of TDK was active in RFQ negotiations with and often attended price negotiations with other TDK personnel.

169.    Honma obtained pricing, capacity and product development information from Murata and used it to craft TDK's negotiating strategies for . For example, in February of 2014, he reported on Murata's investment status with respect to its equivalent to TDK's product, including its price range. Honma later learned Murata would be able to provide only around half of demanded supply. Based on the information, Honma crafted a two-step negotiation strategy of bundling price and capacity.

170.     Honma also met with competitors such as Taiyo Yuden. On one occasion in or around February of 2009, Honma had an informal dinner with **Hisashi Oi** of Taiyo Yuden USA to exchange information on customers.

171.     **Nobumitsu "Tommy" Kanemori.** Nobumitsu Kanemori ("Kanemori") engaged in information exchanges with Murata and Taiyo Yuden. In June of 2011 when ▓▓▓ selected TDK as its supplier for certain Inductor products but not others, ▓▓▓ told Kanemori that TDK could regain share for the other products if it was willing to agree to price reductions. Kanemori then met with Murata and Taiyo Yuden to see whether the competitors had been given a similar price reduction request; when he was told that they had not, he got assurances that they would not lower prices on their single source products. Kanemori also aggregated and reported competitor information collected by other TDK employees.

172.     **Chris Keller.** Chris Keller ("Keller") of TDK America coordinated with the competition regarding customer negotiations. In March of 2008, he met with **John Fullem** of Murata regarding negotiations with ▓▓▓. He advised **Jon Nelson** ("Nelson"), President of TDK America, noting that Murata and TDK intended to compare notes as the companies moved through the process. Keller further disclosed Murata's negotiation strategies to Nelson.

173.     **Toshihiro Kuroshima.** Kuroshima was Kamagata's superior in Japan. During 2013 RFQ negotiations with ▓▓▓, Kuroshima directed Kamagata to negotiate a pricing agreement with Murata and Taiyo Yuden and provided suggestions on prices. Kuroshima had pricing authority for various Inductor products.

174.     **Yutaka Matsuura**. Yutaka Matsuura ("Matsuura") of TDK investigated pricing and capacity information, which led to formulation of TDK's pricing and negotiation strategies. In March of 2010, he spoke with Taiyo Yuden regarding its ▓▓▓ Inductor for ▓▓▓ in connection with TDK's potentially becoming a second source approval for its equivalent product. Matsuura was advised of Murata's delivery prices and that Murata had not supplied the product at a lower price to other customers. He reported this information to Sasaki of TDK. Umeda, concurrently gathering similar information, corroborated the prices obtained by

Matsuura. Based on this information, Umeda and Sasaki formulated a plan whereby TDK would not compete on pricing with Taiyo Yuden, instead offering a higher price because TDK did not want to engage in what it deemed unreasonable price competition.

175. Matsuura and Umeda often worked together to obtain and confirm pricing and capacity information of competitors. In May of 2010, in connection with concerns over TDK's supply issues to ████████ for certain Inductors, Umeda reported to Matsuura a meeting with Murata where Umeda was told about Murata's second source approval and its issues in not having enough capacity to supply the product. Umeda asked Matsuura to confirm this with Murata; Matsuura complied.

176. **Junshi Saito.** Saito often met with Murata employees to exchange information regarding customers in the United States. In January of 2013, he met with Murata and learned it had not received second source approval for its ████████████ because it had not hit price target. Saito met with Murata again in April of 2013 obtaining information regarding ████████████████. He was told Murata's budget, as well as details of its ████████████████.

177. In October of 2013, Saito met informally with Murata's **Yoshinori Soutome**, **Kenshi Yamazaki**, and Shiro Ono at a pizza shop near Saito's home in San Jose. **Shinya Okuyama** of TDK also joined in the gathering. In January 2014, Saito contacted **Ken Hadano**, Murata's Business Development Manager for chip inductors and other products in the United States. The two arranged a meeting at Hatcho among Saito and Umeda from TDK and Hadano, Kudo, and Yoshida from Murata. Umeda specifically requested Murata's Kudo attend the meeting.

178. **Yohei "Ringo" Yamasaki**: Yamasaki was the Strategic Account Officer at TDK America. He was involved in ████ RFQ negotiation meetings. His superiors included Kamagata and Umeda with whom he worked to coordinate with Murata and Taiyo Yuden on the ████ RFQ bidding process.

179. During the 2013 ████ negotiations for ████████████, Yamasaki contacted Murata and Taiyo Yuden concerning ████████████████████

. Yamasaki spoke with **Yukihiro Umetani** of Murata who told him Murata would not go too aggressive on price; **Jun Nakajima** of Taiyo Yuden told him it would bid aggressively if necessary. Based on this information Kuroshima requested Kamagata negotiate with the competitors for a common pricing approach.

180.    In connection with the same RFQ negotiation, Yamasaki communicated with Taiyo Yuden concerning its ▮▮▮ products. In December of 2012, he told Taiyo Yuden what price levels to charge for its "▮▮▮" equivalent product which Taiyo Yuden, which Taiyo Yuden intended to discontinue.

### (7)    Unlawful Agreements Among TDK, Murata, and TOKO

181.    Murata began conspiring with TOKO well before Murata acquired a controlling interest in TOKO. In August of 2012, TDK had received TOKO's information concerning TOKO's products that were equivalent to TDK's Inductors. In January of 2013, Murata told TDK that it controlled TOKO's pricing and coordinated with TOKO in submitting bids to certain customers. Prior to the acquisition, Murata passed on information to TDK about TOKO's bidding and prices for a project with ▮▮▮. and Murata reported to TDK that it was submitting bids with TOKO regarding ▮▮▮ Inductors parts.

### (8)    Summary

182.    The purpose of these meetings at all times was to keep prices of Inductors higher than they would otherwise have been, as well as to limit competitive participation in RFQs. The net effect of these actions, taken over nearly a decade, was to inflate the price of inductors overall.

183.    Plaintiff is aware of no specific act taken by any Defendant to withdraw from this conspiracy, other than TDK's cooperation with the government. TDK itself has not indicated that it is no longer participating in collusive activity or that it took steps to make a "noisy withdrawal" from these collusive acts. TDK has been largely unresponsive to Plaintiff's requests for information following its initial proffer, including failing to provide information

that it offered to produce in the proffer itself, and failing to respond substantively to multiple requests for additional information.

       **3.**       **Contacts and Unlawful Agreements Among TDK, Murata, And Taiyo Yuden Targeting U.S. Customers Other Than** ▆▆▆

184.     TDK reached anticompetitive agreements with Murata and Taiyo Yuden regarding customers in addition to ▆▆▆. Major Customer-specific agreements among TDK, Taiyo Yuden, and Murata targeted many different Major Customers other than ▆▆▆, some of whom are discussed in this section of the 3CAC.

       ▆▆▆  ▆▆▆▆

185.     In November of 2007, Umeda of TDK and Nagasaka of Murata shared their companies' pricing and strategy information for the sale of ▆▆▆▆▆▆▆▆ to customer ▆▆▆▆. Umeda called Nagasaka to ask how much Murata would quote ▆▆▆▆. Nagasaka told Umeda that he was under a lot of pressure from Murata Japan to increase Murata's share and thus Murata did not want TDK to undercut Murata's prices. Umeda and Nagasaka then shared their respective companies' price ranges and coordinated their pricing strategy so that TDK would not undercut Murata's prices.

       **b.**    ▆▆▆▆

186.     In March of 2008, Keller of TDK America spoke with **John Fullem** ("Fullem") of Murata about negotiations with ▆▆▆ and ▆▆▆. Keller and Fullem discussed their companies' negotiation strategies, including the expected timing of contracts, whether Murata and TDK should be "jointly pushing back on" the customers' requests, and cost estimates.

187.     Keller and Fullem agreed to "continue to compare notes as we move through this process" of negotiating prices with ▆▆▆ and ▆▆▆. Keller reported this information to Nelson (President of TDK America), **Eric Percival** (sales manager at TDK America), and **Richard Howarth** (senior account executive at TDK America). Both TDK and Murata lived up to their agreement to coordinate their bargaining positions.

188.    Fullem disclosed Murata's negotiation strategy to TDK pursuant to their agreement. Murata would not have disclosed its negotiating strategy to a competitor in the absence of an anticompetitive agreement because of the substantial risk that the information would be used by TDK to disadvantage Murata in the negotiations. TDK did not undercut Murata's price, which also strongly suggests collusion.

189.    In April of 2010, TDK found itself unable to supply all the inductors needed to manufacture its ███. █████ announced that it would qualify a second inductor supplier to address the shortfall. TDK feared that a new qualified supplier would drive down prices and began a frantic effort to determine who would be the new supplier. In May of 2010, Matsuura of TDK met with ███████████████████████, to explain TDK's supply situation.

190.    After his meeting with ████████, Matsuura reported to Umeda and Hayakawa of TDK: "I heard from ████. To my surprise, the 2nd supplier turned out to be Murata … Even in the worst-case scenario, as I think I can exchange information with them, I will make necessary arrangement[s] and manage the situation."

191.    The next day, Umeda spoke with Murata USA and confirmed that Murata had been approved as the second inductor supplier. TDK Japan did the same. TDK and Murata then coordinated their price submissions to ██████. TDK and Murata's collusion artificially inflated the amount ████████ paid for the Inductors purchased to manufacture ███████.

192.    Saito of TDK met with Murata in April 2013. Murata shared confidential price and contract terms regarding ████ with Saito. Murata told Saito that Murata's ████ budget and details of ██████████████████████████████████ It is very unlikely that Murata would have shared details of Murata's budget and pricing agreements for these customers if TDK and Murata did not share the understanding that TDK would not use the information to compete with Murata.

193.     In September of 2013, TDK learned that Murata had developed product equivalent to TDK's fixed Inductor ████████ and that Murata was likely to be approved as a second source manufacturer for customer █████.

194.     When discussing this information internally, Sato of TDK noted, "we should keep an eye on the products that will compete with/correspond to [TDK's] █████ products," and that "we will need to inspect them, one by one, *without waiting for the next collaboration meeting*." (Emphasis added).

195.     This email's reference to regular, generalized "collaboration meetings" between TDK and Murata supports the conclusion that Murata and TDK had a broad agreement to collaborate and dampen competition between them in the inductor market.

196.     Pursuant to instructions from Saito, Umeda spoke with Murata USA about Murata's potential qualification. Murata gave Umeda its datasheets and other confidential information regarding Murata's equivalent product. Murata also told Umeda it had started providing samples of its equivalent product to customers.

197.     Umeda shared this information with Sato, Kamagata, Kuroshima, Mizutani, and others at TDK. Umeda asked the recipients to "Please treat this information as strictly confidential." TDK used this information from Murata to bid for and negotiate the terms under which TDK sold its fixed inductors to █████. Murata would not have provided the information unless it understood TDK would not use the information to compete, and TDK did not do so.

198.     ████████████████████████████████████████████. In August of 2014, █████ attempted to use the additional pricing information it had acquired by virtue of the acquisition to negotiate price concessions with TDK. The parts on which █████ attempted to renegotiate prices included inductors supplied by TDK.

199.     During the negotiation process, TDK America employees, including **Mike White** and Nelson, contacted other electronic component suppliers, which included Taiyo

1  Yuden, to coordinate the suppliers' strategies for responding to ████ price decrease

2  requests.

3       200.   TDK America communicated the results of their discussions with competitors

4  to TDK Japan employees including **Moritaka Kamiya** and **Yukihiko Sawairi**. TDK America

5  reported to TDK Japan that it had "independently verified that our major competitors have

6  complied with this request for price harmonization." By contacting its competitors, TDK was

7  able to learn the price to which they had agreed with ████. TDK thereby avoided giving

8  ████ greater discounts than necessary to match TDK's co-conspirators. Taiyo Yuden would

9  not have shared its price information unless it expected TDK to abide by an agreement between

10 them not to use the information to compete with Taiyo Yuden.

11

12      201.   On one occasion, TDK and Murata colluded to impose a liability term upon the

13 inventory of ████, which was negotiating a purchase for ████. In the midst of the

14 negotiations, TDK employee **Christian Hoffman** ("Hoffman") reached out to his "colleagues

15 at M [a code reference to Murata]" and had a 45-minute phone call about the proposed contract

16 term. In an email titled, "TDK/████████████████ Agreement for

17 ████ – 4/21 Update," Hoffman reported the call and that he had coordinated with Murata

18 regarding their joint response to the proposed contract term.

19      202.   Nelson of TDK America reprimanded Hoffman for creating a written record of

20 the collusion. Nelson, also using a code name for Murata, wrote: "I agree with your assessment.

21 M[urata] is doing the right thing. In the future, do not put in writing the competitor provided

22 information, especially on an email with so many cc's and different levels of personnel."

23          **4.    TDK, Taiyo Yuden and Murata Collusively Agreed to Maintain
24                 their Incumbent Status by Assisting Each Other During the OEM
                   Qualification Process**

25      203.   Documents TDK produced and the proffer it provided reflect several building

26 blocks of a successful bid to supply inductors to large OEM and EMS customers. These include,

27 but are not limited to:

28

204. *First*, the supplier must be able to demonstrate that the product it proposes to sell the OEM has the technical capabilities to perform as required. Thus, the inductor being proposed must meet relevant inductance requirements, saturation thresholds, size requirements, composition requirements, etc.

205. *Second*, the bidder must propose an acceptable price term.

206. *Third*, the bidder must satisfy the OEM that the bidder can reliably supply the requested inductors and that the supplied inductors will reliably meet quality requirements.

207. *Fourth*, the bidder must address any OEM or EMS idiosyncratic preferences regarding bid format, timing, presentation, etc.

208. The incumbent bidder has already successfully navigated these requirements. Assistance from the incumbent in the bidding process is thus of enormous benefit to a new bidder, even an established manufacturer with a solid reputation for quality like Defendants.

209. By assisting each other with qualifying products to large OEMs and EMS customers and coordinating their bids, Murata, TDK, and Taiyo Yuden effectively protected their incumbent status as the inductor suppliers to large EMS and OEM customers. Large OEMs and EMS customers were unlikely to invest substantial resources qualifying new market entrants in the first place, and new market entrants were unlikely to submit successful bids that would even permit an attempt at qualification, as long as the Defendant that was an incumbent supplier to the OEM was assisting only co-conspirators in submitting bids. Defendants TDK, Taiyo Yuden, and Murata colluded to maintain their collective incumbent status with the OEM purchasers that had qualified any one of the three to sell inductors. This collusion both inflated the price of all inductors sold for the OEMs for which TDK, Taiyo Yuden or Murata had qualified, and created a major barrier to entry for other suppliers attempting to enter the inductors market.

210. By maintaining their collective hegemony over sales to large OEMs that TDK, Taiyo Yuden and Murata supplied, they increased prices by limiting competition to only entities TDK, Taiyo Yuden and Murata trusted not to engage in price competition (other Defendants),

and substantially impaired other suppliers from imposing price discipline on TDK, Murata, or Taiyo Yuden.

211. The conspirators' efforts to assist each other in qualifying for large OEM accounts is also strong circumstantial evidence of a broader understanding not to compete on price. Simply put, a firm acting in its own self-interest would not help its competitors qualify to sell a competing product to that firm's existing customers. Even speeding up the qualification process for a competitor sure to be qualified at some point would, in the absence of broader collusion, accomplish nothing other than advance the date a newly qualified competitor would drive down prices. Providing technical assistance to a competitor developing a product to compete with one's own is the quintessential definition of an action against self-interest unless one has solid assurances that the competitor will not compete on price and one trusts those assurances.

### 5. Defendants' Bid-Rigging Activities Resulted In Collusive Parallel Pricing Of Inductors, Including Inductors Other Than Those That Were The Subject of The Bid-Rigging.

212. The prices set by Defendants for these and other similar Inductors in negotiations with Major Customers operated as floors for the prices charged to other customers for the same or similar products. Indeed, customers like ▆▆▆▆▆▆▆ and other Major Customers usually imposed requirements on vendors such as the Defendants. As indicated above, an MFC is an agreement that outlines an obligation for a supplier to provide favored customers with pricing that is no higher than the best prices offered by the supplier to other clients. This is generally referred to as "on no less favorable terms." Many other major customers with whom Defendants dealt imposed similar requirements with respect to purchasers of Inductors because MFC clauses are commonly used.

213. As Defendants themselves recognized, inflating the price of Inductors sold to Defendants' Major Customers drove up the prices of Inductors that Defendants sold to other customers. For example, on March 18, 2010, TDK and Taiyo Yuden discussed market pricing. TDK confirmed that TDK's Matsuura passed on the information, including that Taiyo Yuden

"said that they had not provided a price below ████████, except the price for ████." Similarly, Sato of TDK referred to effects on the overall market for Inductors sold by Defendants when he said "we should keep an eye on the products that will compete with/correspond ty [TDK's] ████████████████ Inductor] products" and that "we will need to inspect them, one by one, without waiting for the next collaboration meeting." He was referring to a meeting with Murata, which supports the conclusion that the two had reached an agreement to suppress competition for Inductors not only on items sold to OEMs, EMSs, and CEMs, but also all Inductors competing with or corresponding to them. Thus, Defendants' bid-rigging activities with respect to major customers had the foreseeable and intended effect of causing the collusive pricing to which they agreed to establish the price floor for Inductors that they sold to United States-based customers generally.

214.    Flextronics has confirmed this fact, saying "[b]ecause the agreements between Defendants and the OEMs essentially set the pricing floor for Flex, Flex was forced to pay the same or even greater inflated prices as the OEMs even for 'Flex Priced' inductors that Flex purchased for other customers." It concluded that "it is much more difficult or impossible for Flex to obtain price concessions for products purchased to build finished goods for its other customers when the benchmark price for market-dominant customers like ████████████ has been artificially inflated."

215.    Defendants did not produce transactional data for most of their sales to the Major Customers described above. As determined by Dr. Russell Lamb, an economist hired by Flextronics, it is likely impractical for many smaller purchasers (such as Plaintiff Dependable) to allege parallel pricing using statistical analysis of only their own purchasing data. Calculating and alleging statistically accurate pricing allegations requires a substantial quantity of purchases of comparable products from multiple Defendants over the course of the alleged Class Period.

216.    Dr. Lamb did an analysis of the quarterly average price, by Defendant, for specific categories of inductor (ferrite chip bead inductors, chip inductors, and common mode choke inductors) and types of inductor (ferrite bead, multilayer type with a non-ferrite core, multilayer type with a ferrite core, and wirewound) of a specific size (0603, 1005, 1608, 2012)

and in some cases for a given application (*e.g*., for power lines) that Defendants' catalogs identified as comparable. He thus analyzed the price of inductors of the same category, type, size, and application. Products were identified as comparable using online catalogs and references. The products in question and Defendants' respective shares of volume with respect to sales to Flextronics were as follows:



217.    Dr. Lamb's analysis supports the allegation that Defendants' prices for comparable Inductors sold to Flextronics moved in a parallel fashion during the Class Period. Although Flextronics has filed a separate lawsuit, it is a member of the proposed Class and therefore its experience is relevant here.

218.    For example, Dr. Lamb looked at quarterly transaction prices for common mode choke Inductors sold by Murata and TDK to Flextronics during the Class Period. The following chart depicts what he found.

219.     This chart depicts parallel price movements. Except for a period in late 2011 when Murata's prices increased, prices moved in parallel fashion throughout the Class Period. At no point did prices diverge by more than three cents, and then only for a short time. Notably, the prices of these Inductors remained stubbornly stable throughout the Class Period, and increased during certain years, even though demand changes should have caused price swings and advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period.

220.     Dr. Lamb reached a similar result with respect to ferrite bead Inductors sold by Murata, TDK, and Taiyo Yuden to Flextronics during the Class Period, as depicted in the chart below.

221.     All three Defendants' prices moved in parallel fashion except for very brief spikes by Taiyo Yuden in 2004, TDK in 2005, and Murata in 2013. Some price variation is unsurprising; conspirators that are rigging bids often do not reach consistent agreements to price at the same level. Idiosyncratic conditions at certain times also may have led to short term price variation. But at no point did prices move in different directions for any significant period. It is also notable that the prices of these Inductors remained stubbornly stable throughout the Class Period, and even rose during certain years, even though changes in demand should have caused price swings and advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period.

222.     The prices of the other Inductors that Dr. Lamb analyzed followed similar patterns. Prices for multilayer ferrite chip inductors that Flextronics purchased from Defendants TDK, Taiyo Yuden, and Murata moved in parallel fashion during the Class Period, as did prices for multilayer ceramic chip inductors purchased from the same Defendants. The prices of these

Inductors also remained stubbornly stable beginning in 2006 and even began to rise to some extent in 2011, even though advances in production efficiency and technology would typically be expected to drive down prices over the course of the Class Period.

223. The pricing by Defendants of Inductors sold to Flextronics is likely to be similar to what other members of the proposed Class experienced. Inductors can be and have been initially manufactured for one customer and then adapted by others over time. The same inductors may be used by many customers for some time and then later by only a few customers or one customer. Inductors made by one Defendant may be designed into other OEM products and manufactured by other Defendants for other OEMs.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

224. Plaintiff and members of the Class could not have discovered, with reasonable diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it, until the DOJ's investigation was made public in January of 2018.

225. Defendants actively concealed the existence of the conspiracy from Plaintiff and members of the Class, and there is nothing in the public domain that would put Plaintiff or anyone else on notice that the Defendants were conspiring at meetings regarding prices for Inductors sold in the United States.

226. Defendants' own public statements concealed the existence of the alleged conspiracy. For example, Murata in its Fiscal Year 2004, 2007 and 2008 Annual Reports repeatedly referred to "competition" as being "fierce." Many of TDK's Annual Reports during the Class Period also refer to the challenges of "competition." Similarly, in its Annual Reports during the Class Period (such as those from 2009-11), Taiyo Yuden touted its "social responsibility" charter and how it engaged in "fair, open and free competition" and how it was facing "increased" competition.

227. Several of the Defendants have adopted and promulgated a "code of conduct" that is at odds with their participation in the alleged conspiracy.

228. Thus, Murata said in its 2007 Code of Conduct that "[w]e will conduct fair business by complying with all applicable laws and regulations regarding antitrust and fair competition and trade."[28]

229. Similarly, TDK's 2005 Code of Conduct states that:

> In general, the purpose of antitrust laws or similar competition laws in many countries is to encourage free competitions or trade and to protect consumer interests. TDK Members must exercise special care to ensure that any business activity with representatives of other companies is not contrary to such antitrust laws or similar anti-competition laws of other countries, where applicable. Each member organization of TDK Group should have its compliance company policy with regard to its respective applicable antitrust laws or similar anti-competition laws, and such policy must be respected or observed by TDK Members of the member organization.[29]

230. Likewise, Taiyo Yuden's Code of Conduct states that "[a]ny unfair business practice or suspected act of cartel behavior, abuse of dominant bargaining position, tie-in sales or other acts for improper restriction of trade or unfair transaction shall be never committed."[30]

231. By promulgating these codes of conduct and then not living up to them, the Defendants engaged in fraudulent concealment.

232. Likewise, TDK actively sought to conceal conspiratorial activity with respect to the MT Cup, as described above. Similarly, as also noted above, Nelson of TDK at one point instructed Christian, who had had discussions with Murata about a common customer that he was "not [to] put in writing the competitor provided information"

233. And, as noted above, when Umeda of TDK received confidential information from Murata he told his colleagues to "Please treat this information as strictly confidential."

---

[28] https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/p02.ashx?la=en.

[29] https://www.sec.gov/Archives/edgar/data/203383/000114554907001603/k01416exv11w1.htm.

[30] https://www.yuden.co.jp/cs/company/csr/charter/rule.html.

## VII.   CLASS ACTION ALLEGATIONS

234.   Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a Class, which is defined as follows:

235.   All persons or entities in the United States, its territories, and the District of Columbia who purchased Inductors (including through controlled subsidiaries, agents, affiliates, or joint ventures) from any of the Defendants identified therein, their subsidiaries, agents, affiliates or joint ventures from January 1, 2003 through December 31, 2017 (the "Class Period"). Excluded from the Class are the Defendants and their co-conspirators, subsidiaries, agents, and/or affiliates; Defendants' officers, directors, management, employees, subsidiaries, and/or agents; all governmental entities; and the Judges and chambers staff presiding over this case, as well as any members of their immediate families.

236.   While Plaintiff does not know the exact number of the members of the Class, it believes there are at least thousands of members.

237.   Plaintiff also does not know the exact duration of the alleged conspiracy and reserves the right to amend its complaint.

238.   Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

   a.  Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold to customers in the United States, its territories and the District of Columbia;

   b.  The identity of the participants of the alleged conspiracy;

   c.  The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

   d.  Whether the alleged conspiracy violated the Sherman Act;

e.  Whether the conduct of Defendants, as alleged in this 3CAC, caused injury to the business or property of Plaintiff and members of the Class;

f.  The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period;

g.  The appropriate injunctive and related equitable relief; and

h.  The appropriate class-wide measure of damages.

239.  The claims of Plaintiff are typical of the claims of the members of the Class who bought Inductors from any of the Defendants. The Plaintiff will fairly and adequately protect the interests of the entire Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Inductors purchased from the Defendants or manufactured products containing Inductors made by one of the Defendants.

240.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

241.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

242.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

243. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII. CLAIM FOR RELIEF
## VIOLATIONS OF THE SHERMAN ACT
## 15 U.S.C. §§ 1 and 3
### (Alleged against all Defendants)

244. Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

245. Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to artificially restrict competition in the market for inductors. Defendants formed a cartel designed to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

246. As described above, Defendants implemented this conspiracy in the United States as well.

247. As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for Inductors and manufactured products containing Inductors sold to purchasers in the United States, its territories, and the District of Columbia during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated cartel levels.

248. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

249. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including setting prices of Inductors at supra-competitive prices, and selling these Inductors to Plaintiff and the members of the Class.

250. Defendants' anticompetitive and unlawful conduct is illegal *per se*.

251. As a result of Defendants' anticompetitive and unlawful conduct, Plaintiff and the members of the Class have been injured in their businesses and property in that they have

paid more for the Inductors that they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

## IX. DEMAND FOR JUDGMENT

252. Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class that:

A. This action may proceed as a class action, with Plaintiff serving as Class Representative under Fed. R. Civ. P. 23(c);

B. Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

C. Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15);

D. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E. Plaintiff and the Class are entitled to equitable relief under 15 U.S.C. § 26 appropriate to remedy Defendants' restraint of trade, including issuing a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from repeating (or continuing and maintaining) the conspiracy or agreements alleged herein;

F. Defendants are to be jointly and severally responsible financially for all costs, including the expenses of a Court-approved notice program;

1  G. Plaintiff and the Class recover their reasonable attorneys' fees as provided by

2     law; and

3  H. Plaintiff and the Class receive such other or further relief as may be just and

4     proper.

5                          **X.    JURY DEMAND**

6     253.    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiff demands a trial by

7  jury on all matters so triable.

8

9  Dated: February 5, 2021                    Respectfully submitted,

10                                             /s/ *Lesley E. Weaver*
                                               Lesley E. Weaver (SBN 191305)
11                                             Anne K. Davis (SBN 267909)
                                               BLEICHMAR FONTI & AULD LLP
12                                             555 12th Street, Suite 1600
                                               Oakland, CA 94607
13                                             Tel.: (415) 445-4003
                                               Fax: (415) 445-4020
14                                             lweaver@bfalaw.com
                                               adavis@bfalaw.com
15

16
                                               /s/ *Michael P. Lehmann*
17                                             Michael P. Lehmann (SBN 77152)
                                               Bonny E. Sweeney (SBN 176174)
18                                             Samantha Stein (SBN 302034)
                                               HAUSFELD LLP
19                                             600 Montgomery Street, Suite 3200
                                               San Francisco, CA 94111
20                                             Tel.: (415) 633-1908
                                               Fax: (415) 358-4980
21                                             mlehmann@hausfeld.com
                                               bsweeney@hausfeld.com
22                                             sstein@hausfeld.com

23

24                                             *Interim Co-Lead Counsel for the Proposed*
                                               *Direct Purchaser Class*
25

26                                             Marc H. Edelson (admitted *pro hac vice*)
27                                             EDELSON & ASSOCIATES, LLC
                                               3 Terry Drive, Suite 205
28

Newtown, PA 18940
Tel.: (215) 867-2399
medelson@edelson-law.com

Joshua H. Grabar (admitted *pro hac vice*)
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (267) 507-6085
jgrabar@grabarlaw.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
guido@saveri.com
rick@saveri.com
zirpoli@saveri.com

Christopher M. Burke (SBN 214799)
Walter W. Noss (SBN 277580)
Hal Cunningham (SBN 243048)
John Jasnoch (SBN 281605)
SCOTT + SCOTT ATTORNEYS AT LAW
LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-4565

Todd A. Seaver (SBN 271067)
Joseph J. Tabacco, Jr. (SBN 75484)
Matthew D. Pearson (SBN 235339)
Sarah Khorasanee McGrath (SBN 263935)
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
mpearson@bermantabacco.com
smcgrath@bermantabacco.com

Marc Greenspon

BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194
mgreenspon@bermantabacco.com

Vincent Briganti
LOWEY DANNENBERG P.C.
White Plains Plaza
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com

Brian Murray
Lee Albert
GLANCY PRONGAY & MURRAY
230 Park Avenue, Suite 530
New York, NY 10169
Tel.: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

Allan Steyer (SBN 100318)
D. Scott Macrae (SBN 104663)
STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
Tel.: (415) 421-3400
Fax: (415) 421-2234
asteyer@steyerlaw.com
smacrae@bamlawca.com

Arthur N. Bailey
R. Anthony Rupp, III
Marco Cercone
RUPP BASE PFALZGRAF
CUNNINGHAM, LLC
424 Main Street, 1600 Liberty Building
Buffalo, NY 14202
Tel: (716) 854-3400
bailey@ruppbaase.com
rupp@ruppbaase.com
cercone@ruppbaase.com

Joseph W. Cotchett
Adam J. Zapala
Elizabeth T. Castillo
COTCHETT, PITRE, McCARTHY, LLP
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Additional Counsel for the Proposed Direct Purchaser Class*

Pursuant to Civil L. R. 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories above.

Date: February 5, 2021

*/s/ Michael P. Lehmann*
Michael P. Lehmann